UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHARLENE McEVOY | : | CIVIL ACTION NO.:  3:17-CV-01861 (MPS) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FAIRFIELD UNIVERSITY | : | NOVEMBER 21, 2018 |
| Defendant | : | |

DEFENDANT FAIRFIELD UNIVERSITY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I.   Introduction

Dr. Sharlene McEvoy, a tenured Professor at Fairfield University in the Dolan School of Business, claims she was discriminated against because of her age when she was not reappointed as the Director of the Pre-Law Advising Program.  The annual stipend for this position was $10,000.  Fairfield University denies that it discriminated against Dr. McEvoy because of her age.  Rather, it had legitimate concerns about the way in which the Pre-Law Advising Program was being run.  The University wanted, among other changes, a new vision, a greater focus on becoming a student-centric program, the introduction of best practices, and the measurement and analysis of programming and improvement in student outcomes.  In addition, director positions are regularly rotated among faculty at the discretion of the administration.  Age was not a factor in assessing the Program and in selecting another faculty member, Dr. Gwendoline Alphonso, to be the Director.  Fairfield University had legitimate, nondiscriminatory reasons for naming Dr. Alphonso as the Director.

**ORAL ARGUMENT REQUESTED**

7037122v1

Dr. McEvoy has no evidence of any ageist comments.  She only has her personal opinion that her qualifications were better those of Dr. Alphonso and her own opinion that she was doing a good job.  There is no evidence that the reasons for the change in leadership of the Pre-Law Advising Program were a pretext for age discrimination.  There is no basis for Dr. McEvoy's claim that she was discriminated against because of her age.  Fairfield University is entitled to summary judgment.

## II.    Factual Background

In May 2012, Senior Vice President for Academic Affairs Dr. Paul J. Fitzgerald, SJ, sought to make changes to the Pre-Law Advising Program and sought applications from the faculty following the decision by Dr. Don Greenberg to step down as the Director of the Program.  McEvoy Tr. 16-18, Exhibit 3; Exhibit 4.  Dr. McEvoy applied for the position and submitted a plan to Dr. Fitzgerald.  Exhibit 5.  After reviewing her proposal and meeting with Dr. McEvoy, Dr. Fitzgerald appointed her to a three-year term as Director of the Program, beginning July 1, 2012 and concluding June 30, 2015.  The position paid a stipend of $10,000 per year and had an annual budget of $10,000.  Exhibit 6.

In the appointment letter, Dr. Fitzgerald outlined some of his expectations for the Program.  These included the formation of a Pre-Law Club with meetings twice annually with University alumni as speakers; the collection and analysis of student successes in gaining admission to law schools in order to assess outcomes; and the giving of the best advice and guidance to students seeking to go to law school.  Dr. McEvoy was directed

to work with the Institutional Research Department to collect and organize data and analyze that data. She was told that she should increase the number of internships, reconnect with alumni to foster support for pre-law students, and work with the Advancement Office. Exhibit 6.

In 2013, David Sapp became the University's Associate Vice President for Academic Affairs. Among his responsibilities was overseeing the Pre-Law Advising Program. Affidavit of Mark Guglielmoni. ("Guglielmoni Affidavit"), Exhibit 1. Dr. Sapp had concerns about the Program and expressed those concerns to Dr. McEvoy.[1] Williams Tr. 39-40, Exhibit 13; McEvoy Tr. 47-48, Exhibit 3.

Dr. Fitzgerald left Fairfield University in June 2014. Dr. Lynn Babington, who had been Dean of the School of Nursing, was then named Senior Vice President of Academic Affairs in July 2014.[2] At about that same time, Dr. Sapp accepted a position at another university. Guglielmoni Affidavit, Exhibit 1.

Before Dr. Sapp left Fairfield University, Dr. Babington named Dr. Yohuru Williams to be Associate Vice President of Academic Affairs, succeeding Dr. Sapp. Dr. Sapp met with Dr. Williams to discuss the transition of responsibilities, including

---

[1] After receiving her annual report for 2012-2013 or on about May 15, 2013, Exhibit 7, Dr. Sapp requested additional information about the Program. Dr. McEvoy responded with information about student LSAT scores, the impact of the LSAT prep boot camp, the students participating in internships or the job shadow programs, the goals she had for the next two academic years, and the names of the students she had counseled. She provided that information on July 23, 2013. Exhibit 11. This information was never included in subsequent annual reports. Exhibits 8, 9, and 10.

[2] Dr. Babington became the Provost in July 2015 which was a change in title, but not a change in responsibilities. Babington Tr. 11-12, Exhibit 12; Guglielmoni Affidavit, Exhibit 1.

3

7037122v1

oversight of the Pre-Law Advising Program. Williams Tr. 35-40, Exhibit 13. Dr. Sapp told Dr. Williams that he was concerned about the direction of the Program, as he thought it was not responding to changes for the preparation for law school and was frozen around corporate and criminal law and not on other career opportunities for law school graduates. Williams Tr. 29, Exhibit 13. Dr. Sapp determined that Dr. McEvoy was not effectively engaging alumni or reaching out to law schools in order to establish Fairfield University as a pipeline for those law schools. He also was concerned about student outcomes (where students were being admitted). Williams Tr. 32, Exhibit 13. Dr. Sapp thought that the Program should be reimagined with more focus on student outcomes (admission to higher tier law schools); donor relations; and metrics as it was difficult to assess the effectiveness of the Program as Dr. McEvoy's annual reports were not terribly helpful in identifying new directions and what had been accomplished.[3] Dr. Sapp also shared with Dr. Williams that Dr. McEvoy could be difficult to work with, difficult to get in touch with, and was generally defensive about the Program.[4] Williams Tr. 39-40, Exhibit 13. See also Ogletree Tr. 18-19, 22, Exhibit 18; Pates Tr. 23-24, Exhibit 14.

---

[3] Several of the annual reports either estimated the number of students who attended programs or made no mention of how many students attended events. In her 2012-2013 Report there was no report on the number of students who attended the first student-alumni event of the Major-Minor Information Fair. Exhibit 7 The Report for 2013-2014 did not indicate how many students participated in the St. Robert Bellarmine Pre-Law School Distinguished Alumni Awards dinner held on April 3, 2014. Exhibit 8. The Report for 2014-2015 did not indicate how many students participated in the Personal Statement Seminar. Exhibit 9.

[4] Susanne Quinlivan, Associate Director, Career Services, who was assigned to assist Dr. McEvoy in running the Program, met with Dr. Fitzgerald and Dr. Sapp during which time she was asked about the Program under Dr. McEvoy's direction. She understood from Dr. Sapp's questions that he had concerns about the way the Program was operating. Quinlivan Tr. 53-54, Exhibit 16.

7037122v1

Dr. Sapp and Dr. Williams met with Dr. McEvoy to discuss the Program. During the meeting, Dr. McEvoy was asked whom she thought should succeed her as director in June 2015 when her term was up. Dr. McEvoy did not make any suggestions nor did she ask whether she would be able to continue in the position. McEvoy Tr. 82-84, Exhibit 3.

During the 2014-2015 academic year, Dr. Williams did his own assessment of the Program and met with Dr. McEvoy regularly throughout the year. Williams Tr. 46-48, 79-80, Exhibit 13. He also had concerns about the Program from discussions he had with members of the University community and from reviewing her annual reports. He found that Dr. McEvoy had not gathered and analyzed data on student GPAs (grade point averages), LSAT scores, or their successes in gaining admission to law schools. There was no assessment of outcomes in order to give the best advice and guidance to students. Her annual reports provided no analysis to determine what improvements were occurring in gaining admission to law schools. Williams Tr. 83-86, 98-99, Exhibit 13; Exhibits 9-10; McEvoy Tr. 26-31, 39, Exhibit 3. She had not increased the number of internship opportunities for students and did not work with the Advancement Office to connect and engage alumni and to assist in fundraising. McEvoy Tr. 39.

Further, Dr. Williams learned that students found it hard to reach Dr. McEvoy, who was not on campus on Thursdays or Fridays, and her office hours were generally late in the afternoons on the days she was on campus. McEvoy Tr. 13-14, Exhibit 3. As Dr. McEvoy did not have a computer at home or a smart cell phone, she did not

7037122v1

respond to student emails in a timely manner.[5] McEvoy Tr. 14-15, Exhibit 3. Dr. McEvoy also did no research on what other colleges and universities were doing for their pre-law students and was defensive when suggestions were made about improving the Program.[6] McEvoy Tr. 58-59, Exhibit 3; Pates Tr. 22-24, Exhibit 14.

In the spring of 2015 as Dr. McEvoy's three year term was about to be up, Dr. Babington and Dr. Williams discussed the Program, what would make the Program better, and who would be the best person to lead the Program. That spring the University was completing a strategic plan, Fairfield2020, with an emphasis on making the University more student-centric and improving student outcomes. Guglielmoni Affidavit, Exhibit 1. Dr. Babington and Dr. Williams were concerned with improving student outcomes, wanted the Program to reflect the strategic plan, wanted to create more efficiency by having the Program run by someone in the College of Arts and Sciences,[7] which was where more faculty taught law related courses and where many of the Pre-Law undergraduate students were centered, wanted to provide a broader range of

---

[5] Susanne Quinlivan was able to reach Dr. McEvoy as she had her home phone number and her cell phone number. Quinlivan Tr. 47, Exhibit 16. Dr. McEvoy did not give students her cell phone number or home number and did not list either number on her office door or publish them in De Jure, the Pre-Law Advising Program newsletter. Quinlivan Tr. 47, Exhibit 16.

[6] Dr. McEvoy complained to the head of the Advancement Office about Christopher Pates, the Director of Development, who was assigned to assist in raising funds to support the Program and to engage alumni. She complained that he was asking questions about the Program and was allegedly critical of her when he advised her on September 5, 2014, that "The issue of DeJure currently on the Pre-Law Program webpage appears to be from 2012. Are there plans to produce a new issue and place it on the site?" He also asked "what are some specific ways in the upcoming school year that alumni who are practicing lawyers can become involved in the program?" Exhibit 19. As a result of her response to his email and her uncooperativeness with the development of a case statement that was to be used to raise funds for the Program, Mr. Pates was instructed to work on other areas for fund-raising. Pates Tr. 31, Exhibit 14.

[7] Dr. McEvoy taught in and had her office in the Dolan School of Business and not in the College of Arts and Sciences.

6

opportunities for students to distinguish themselves from students from other colleges and universities, and wanted the Director to work more effectively with the Advancement Office to raise funds to support the Program[8] and wanted the Program to implement best practices. Williams Tr. 67, 109-110, Exhibit 13. Dr. Babington explained that "[the Program] wasn't bad the way it was. It just wasn't good." Babington Tr. 58, Exhibit 12.

They concluded that Dr. McEvoy's term was up and that the Pre-Law Advisory Program needed new leadership. They believed that Dr. McEvoy had not provided any strategic vision nor shown any attempt to engage with the priorities established by the Fairfield2020 strategic plan.[9] Williams Tr. 98-99, Exhibit 13.

Dr. Babington and Dr. Williams discussed several candidates to lead the Program. Babington Tr. 39, Exhibit 12. They were familiar with Dr. Alphonso, who had a reputation for being an innovative teacher, whose courses students really enjoyed, and whose courses were frequently oversubscribed. Dr. Alphonso also had a law degree and taught Political Science and Public Policy in the College of Arts and Sciences. Among the courses she has taught have been the United States Congress, the Battle over Family Values and American Politics, Political Parties Interest Groups and Public Opinion, the American Presidency and the Supreme Court. Guglielmoni Affidavit,

---

[8] The Advancement Office and Development Office are interchangeable references to the office responsible for raising operating and endowment funds for the University.

[9] In her deposition, Dr. McEvoy stated that she thought Fairfield2020 was a fund raising effort and that she did not participate in any discussions or meetings about the plan. She also did not ask any questions about it. McEvoy Tr. 109, Exhibit 3.

7

Exhibit 1.  This background gave her a perspective beyond lawyers just practicing law. Dr. Babington and Dr. Williams decided to offer the position to Dr. Alphonso.  Dr. Williams explored with Dr. Alphonso her becoming the director; however, Dr. Alphonso declined the opportunity as she was applying for tenure during the 2015-2016 school year.  She indicated, however, that she would consider becoming the Director in the future.  Williams Tr. 114, Exhibit 13; Exhibit 20.

Dr. Babington and Dr. Williams next discussed extending Dr. McEvoy's time as the director for one more year.  They felt that although the position could be done much better, having her remain for an additional year would not be harmful, while the Fairfield2020 strategic plan was being implemented.   With Dr. Babington's authorization, Dr. Williams offered Dr. McEvoy a one-year extension, until June 30, 2016, which she accepted.  Exhibit 17; Williams Tr. 117, Exhibit 13.

During the 2015-2016 academic year, Dr. McEvoy initiated some changes to the Program, particularly scheduling various trips to museums, plays and movies.  Dr. McEvoy did nothing to determine whether students found these trips helpful to their plans for law school and did no analysis of the way in which the programs aided students in gaining admission to law school.  Quinlivan Tr. 61-62, Exhibit 16; McEvoy Tr. 116-117, Exhibit 3.

Despite the addition of these trips, Dr. Babington and Dr. Williams still were focused and concerned with improving student outcomes, wanted the Program to reflect the new University strategic plan, wanted it to be more student focused, and wanted to

8

have the Program reflect best practices. They thought the Program should be headed by someone in the College of Arts and Sciences where more faculty taught law related courses. They also wanted to provide students with a broader range of opportunities so that they could distinguish themselves from students from other colleges and universities. Additionally, they wanted the Director to work more effectively with the Advancement Office to raise funds to support the Program. In short, their goal was to improve the Program, implement best practices, and be student-centered. Williams Tr. 160-164, Exhibit 13.

Dr. Babington and Dr. Williams thought that Dr. Alphonso would be able to make the Program more student-centric, would introduce best practices, would work at improving student outcomes, would develop and provide mentorship opportunities,[10] and would improve the working relationship with the Advancement Office. Williams Tr. 176-182, 186, Exhibit 13. As a result, following discussions with Dr. Alphonso about her interest in becoming the Director and what the University wanted to accomplish with

---

[10] The idea of a mentorship program that Dr. Babington and Dr. Williams had in mind was quite different from what Dr. McEvoy referred to as a mentorship program. Under Dr. McEvoy, the mentorship program was an informal system by which current students would contact Ms. Quinlivan to see if there were a Fairfield graduate at a law school that he/she might be interested in applying to. Ms. Quinlivan would then contact a Fairfield graduate at the law school to see if he/she would be willing to speak with the current student about the law school experience or if they were visiting the campus to meet with the current student. There were no formal guidelines and no monitoring or reporting on what happened after the contact information was provided. Quinlivan Tr. 50-53, Exhibit16; McEvoy Tr. 67-71,118, Exhibit 3. The mentorship program that the University was seeking was a formal program in which lawyers would meet with students, share their experiences and provide guidance to the current students. It might also provide an opportunity to work with the lawyer to see what could be done with a law degree. This is consistent with what Dr. Fitzgerald had detailed in the appointment letter. Exhibit 6.

the Program, Dr. Alphonso was offered and accepted an appointment to a three-year term beginning in 2016.[11]  Williams Tr. 138-139, 158, Exhibit 13.

### III.    Dr. McEvoy has no evidence of age related comments.

Dr. McEvoy does not contend that her age was discussed by Dr. Babington or Dr. Williams or that either of them or anyone else made any age related comments to her or about her.  She not only has failed to offer any evidence that she was subjected to any age-related comments or criticisms on the job, but admitted that she was aware of no age comments.  McEvoy Tr. 88-89, Exhibit 3.  As a result, she must provide evidence that the reasons articulated for not being reappointed were a pretext for age discrimination.  See Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000).  There is no direct evidence of age discrimination.

### IV.    Fairfield University had legitimate non-discriminatory reasons for not reappointing Dr. McEvoy to the Directorship of the Pre-Law Advising Program.

In the absence of direct evidence of age discrimination, disparate treatment claims are analyzed using the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework, as modified by Gross v. FBL Financial Services, 557 U.S.

---

[11] Since becoming the Director, Dr. Alphonso has surveyed students about the programs they attended to determine whether they felt each program was valuable and to seek input on what programs they might like to see.  She has heavily marketed the presentations being offered and has made presentations about the Pre-Law Advising Program to the Advisory Board of the College of Arts and Sciences and the Department Chairs in that College.  She has directed that mailings go to area alumni about the Program and invited their support and participation.  She has worked on introducing a Legal Studies Minor. She hosted an alumni networking event.  She has initiated tracking of students who have expressed an interest in a legal career from their first year to help craft their resumes, internships experiences and to meet with students early in their college careers to encourage better academic performance so that they can be admitted to higher tier, more prestigious law schools.  Quinlivan Tr.  43-45, Exhibit 16.

7037122v1

167 (2009).  In order to establish a prima facie case of age discrimination, a plaintiff must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced an adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105–06 (2d Cir. 2010).

Once the prima facie case is made, the defendant must articulate legitimate, non-discriminatory reason(s) for the action.  After that occurs, the burden is on the plaintiff to establish that the reason(s) for the action are pretextual and "but for" the plaintiff's age the adverse action would not have occurred.  It is not sufficient to suggest that age was a contributing or motivating factor, it must be the "but-for cause." Gross, 557 U.S. at 180; Mann v. Donohoe, 2012 WL 32956, at *4 (D. Conn. Jan. 5, 2012) (Hall, J.). The plaintiff's age had to actually have played a role in the employer's decision and had a determinative influence on the outcome.  Gross, 557 U.S. at 176.

As the degree of proof necessary to establish a prima facie case "is minimal," the University reserves its right to challenge the elements of the prima facie case at this time. Instead, it will focus on its legitimate, nondiscriminatory reasons for its action and Dr. McEvoy's inability to prove pretext.

A.    The University had legitimate concerns about Dr. McEvoy's role as Director of the Pre-Law Advising Program.

When Dr. McEvoy was originally appointed as the Director of the Pre-Law Program in 2012, Dr. Fitzgerald set out specific goals for her in addition to the plan she presented.  These included gathering and analyzing data to assess student outcomes and

11

to give the best advice and guidance to students. She was told to increase the number of internships and reconnect with Fairfield alumni as well as work with the Advancement Office. Exhibit 6.

In submitting her annual reports on the Program, she did not provide the type of data that Dr. Fitzgerald had indicated that he wanted. The reports often did not provide a vision for the future of the Program nor did the reports provide data on the success of students in seeking admission to law school.[12] Exhibits 7-10.

Dr. David Sapp had concerns about Dr. McEvoy's leadership of the Program and shared his concerns with Dr. Williams before he left the University. During the 2014-2015 academic year, Dr. Williams met with Dr. McEvoy on a regular basis, and did his own assessment of the Program. Williams Tr. 46-48, 69-72, Exhibit 13. He found that there were several concerns about the Pre-Law Advising Program, which were consistent with what Dr. Sapp had told him and which Dr. Sapp had indicated he had shared with Dr. McEvoy. Williams Tr. 40, 48, 100, 109-110, Exhibit 13. There were accounts that students were unable to reach Dr. McEvoy or that she did not respond in a timely manner to them. Because her office was in the Dolan School of Business and her office hours were on Mondays, Tuesdays and Wednesdays in the late afternoon, undergraduates in the College of Arts and Sciences found it difficult to drop in on her. As she did not have a computer at home or access to email at home, she was not easy to reach,

---

[12] While some reports indicate the law schools to which students had been admitted, there was no indication of what their GPAs were or what their LSATs were and there was no analysis of such data.

12

particularly as she was not on campus on Thursdays or Fridays. McEvoy Tr. 12-15, Exhibit 3. Further, there were issues concerning her relationship with the Advancement Office. She was defensive about any suggestions to improve the Program and provided virtually no assistance in developing a case statement that was to be used for fund raising. Williams Tr. 69-75, Exhibit 13; Pates Tr. 27-29, Exhibit 14; Admissions #28, Exhibit 15; McEvoy Tr. 63, Exhibit 3. She made no effort to research what other colleges and universities were doing. Rather, she thought the Program was fine the way it was. Pates Tr. 23, Exhibit 14; Ogletree Tr. 18-19, 22, Exhibit 18; McEvoy Tr. 59-60, Exhibit 3.

Dr. Williams did not think that the Program was as effective as it could be. The Program was not sufficiently student focused, there was no data included in the annual reports to determine what was being accomplished, and there was no articulation of a vision for improving the Program. Williams Tr. 160, Exhibit 13. Dr. McEvoy was aware of the concerns about the Program as she asked Ms. Quinlivan what she could do better. Quinlivan Tr. 55, Exhibit 16.

In the spring of 2015 as the three year term was about to be up, Dr. Babington and Dr. Williams discussed the Program, what would make the Program better, and who would be the best person to lead the Program. They concluded that Dr. McEvoy's term was up and the Pre-Law Advisory Program needed new leadership. However, when Dr. Alphonso indicated that she could not take on the responsibility that year, Dr. Babington and Dr. Williams discussed extending Dr. McEvoy's time as the director for one more

13

year. Williams Tr. 67, 94, Exhibit 13. With Dr. Babington's authorization, Dr. Williams offered Dr. McEvoy a one-year extension until June 30, 2016, which she accepted. Williams Tr. 117, 119-120, Exhibit 13; Babington Tr. 58, Exhibit 12.

Dr. Williams did not see any significant changes in the Program during the 2015-2016 year. In the spring of 2016, Dr. Williams met with Dr. Babington to review the future of the Program. They discussed the continuing issues with Dr. McEvoy's performance and the need to reinvigorate the Program and give the Program a new direction. They wanted to institute best practices and revise and revamp the Program to be more student-centered, student-focused and to improve outcomes for students. Babington Tr. 75, Exhibit 12. They believed that the Program basically had been doing the same thing for several years with the same outcomes and was not student focused or student centric.[13] The Program was also not significantly improving connections with alumni or finding internships for students. Babington Tr. 77, Exhibit 12. They concluded that a change was needed and believed that Dr. Alphonso could improve the Program. Babington Tr. 75, Exhibit 16.

They decided to again offer the position to Dr. Alphonso. They hoped that the Program would be more responsive to students and alumni and that Dr. Alphonso would improve the working relationship with the Advancement Office. Babington Tr. 75-78,

---

[13] During Dr. McEvoy's directorship she did not survey students seeking their opinions about the programs that were offered and she did not seek input from students on what they would like to see that would assist in the law school application process. She did not analyze data from students' grades, LSAT scores and where they were applying to law school and getting admitted. McEvoy Tr. 26-31, 39, Exhibit 3; Quinlivan Tr. 58, Exhibit 16. She did not make the St. Robert Bellarmine Society into a student led group or even provide them with leadership opportunities. Quinlivan Tr. 62, Exhibit 16.

14

Exhibit 12; Williams Tr. 138-139, Exhibit 13.  They wanted a student-centered program that would provide the development and mentorship to help students achieve their goals.[14]  Babington Tr. 30, Exhibit12.  Dr. Alphonso accepted the Directorship in June 2016.[15]

The University made the change in the Directorship as Dr. McEvoy's term was up and Dr. Babington and Dr. Williams wanted to see best practices implemented, wanted to see better student outcomes, and wanted the Program to be more-student-centric.  Quite clearly the University has articulated legitimate, non-discriminatory reasons for why the change was made.

B.    The Same Actor Inference Defeats Dr. McEvoy's Claim of Discrimination.

In 2015, Dr. Babington and Dr. Williams decided to continue to have Dr. McEvoy serve as the Director of the Program.  While both had concerns about the Program and had considered appointing Dr. Alphonso at that time, when Dr. Alphonso indicated that she could not take on the responsibility then, they chose to offer an additional year as the Director to Dr. McEvoy.[16]  One year later, after again assessing the Program, they decided to appoint Dr. Alphonso to be the Director.  Thus, the same

---

[14] During the time that Dr. McEvoy was the Director of the Program, she never established any summer or semester internships.  Admissions #46 and 47, Exhibit 15.

[15] During the 2015-2016 school year, Dr. McEvoy did not contact Dr. Williams or Dr. Babington about extending her appointment as Director beyond June 30, 2016.  Admissions, #42, 51-56, Exhibit 15.

[16] There were certainly other faculty members who could have been appointed Director.  For example, Dr. Babington and Dr. Williams had considered Dr. Strauss as a possible candidate for the position.  Williams Tr. 107, Exhibit 13; Babington Tr. 35, Exhibit 12.

15

persons who appointed Dr. McEvoy to a one-year term in June 2015 were the same persons who chose not to reappoint her in June 2016 and to appoint Dr. Alphonso.

The Second Circuit has recognized the same actor inference as a basis for defeating an age discrimination case, particularly when the time between the appointment and the decision to not reappoint is short. A one year period between hiring and firing by the same decision-makers is considered a particularly strong inference against age discrimination. The premise supporting this inference is that if the person who fires an employee is the same person who hired that employee, there cannot be a finding of age discrimination. This is because one cannot logically impute to those decision-makers an invidious intent to discriminate against the employee whom they recently hired. Such an inference is especially strong where the time elapsed between the events of hiring and firing is brief. In fact, it "applies with greatest force where the act of hiring and firing are not significantly separated in time." Choate v. Transp. Logistics Corp., 234 F. Supp. 2d 125, 130–31 (D. Conn. 2002).

In Saliga v. Chemtura Corporation, 2015 WL 5822589 (D. Conn. 2015), the inference was found to be especially strong as the manager who hired the plaintiff in October 2010, was the same person who fired her one year later. Under these circumstances "it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997), *cert. denied.* 525 U.S. 936 (1998)), *cert. denied.* 530 U.S. 1261 (2000).

16

The same actor inference applies here. There is no logical basis for imputing a discriminatory intent to Dr. Babington or Dr. Williams.  Consequently, Dr. McEvoy's claim of age discrimination must be rejected.

## V.    <u>Dr. McEvoy Cannot Prove Pretext.</u>

### A.    <u>Dr. McEvoy</u> <u>cannot establish that her age was the "but for" cause of her not being re-appointed</u>

Because the University has articulated legitimate, nondiscriminatory reasons for having not reappointed Dr. McEvoy to the directorship, the burden shifts back to her to "present[ ] sufficient evidence for a reasonable jury to conclude that [defendants] discriminated against [her] because of ... age." <u>Hollander v. American Cyanamid Co.</u>, 172 F.3d 192, 200 (2d Cir.1999) (abrogated on other grounds).  During her deposition, Dr. McEvoy explained that the reason she believes she was discriminated against because of her age is that Dr. Alphonso is several decades younger than she is, that Dr. Alphonso is not as qualified as she is as Dr. Alphonso has not been tenured or been teaching as long as Dr. McEvoy has been, and that the reasons provided by the University are false. McEvoy Tr. 143-144, Exhibit 3.  While there is no dispute that Dr. Alphonso is younger than Dr. McEvoy, there is no basis for her opinion that Dr. Alphonso is not as qualified, or that Fairfield University's reasons for appointing Dr. Alphonso to the directorship are false.

While the age difference is necessary to satisfy the fourth element of the prima facie case, it is not sufficient to prove that the age difference is the but-for cause.

B.    Dr. McEvoy's personal opinion of her job performance does not underline the reasons articulated by the University.

Dr. McEvoy's disagreement with University's decision to appoint Dr. Alphonso does not raise a genuine issue of disputed fact as to discriminatory intent. Her own opinion of the Program simply is not relevant. See Ricks v. Conde Nast Publ'ns., Inc., 6 Fed. Appx. 74, 78 (2d Cir. 2001) (summary order) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent."). As the court in Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F. Supp. 977, 988 (W.D.N.Y. 1996) explained, it is well settled law that an employee's subjective belief that an adverse employment action was the result of discrimination is not enough to survive a summary judgment motion. A plaintiff's disagreement with an employer's evaluation of performance does not raise an issue of material dispute. See also Taylor v. Polygram Records, 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999); Shaw v. McHugh, 2015 WL 1400069 (S.D.N.Y. March 26, 2015).

While Dr. McEvoy believes that her performance warranted reappointment and that the Program was meeting the needs of the students, her opinion does not matter. It is insufficient to create a disputed material fact and is insufficient to prove pretext or discriminatory intent.

It is important to recognize that it is not the role of the Court to review the correctness of an employer's employment decisions or the processes by which those decisions are made. Sassaman v. Gamche, 566 F.3d 307, 314 (2d Cir. 2009). It is well-

18

settled that courts in discrimination cases should not serve as "super-personnel department[s]" reviewing employer decisions.  Ghent v. Moore, 324 Fed. Appx. 55, 57 (2d Cir. 2009) (summary order); see also Byrnie v. Cromwell Board of Education., 243 F.3d 93, 103 (2d Cir. 2001) (superseded on other grounds).

Consequently, the court cannot second guess the University's decision nor can Dr. McEvoy.  Dr. McEvoy's disagreement with the University's decision to appoint Dr. Alphonso simply cannot raise a genuine issue of disputed fact as to discriminatory intent.[17]  There is no basis for finding the decision to appoint Dr. Alphonso to be because of Dr. McEvoy's age.

C.    Dr. Alphonso's academic and teaching record demonstrate her strengths and qualifications to be the Director of the Pre-Law Advising Program.

Dr. McEvoy attempts to create evidence of pretext by claiming that Dr. Alphonso was not as qualified as she was to be Director.  She poses the wrong question.  There can be no dispute that Dr. Alphonso was qualified to be the Director.  The evidence is overwhelming that she was.

Dr. Alphonso was granted tenure at Fairfield University in March 2016 after joining the faculty in 2011.  She has dual doctoral degrees, in Political Science from Cornell University and in Law, Doctor of Juridical Science, from Cornell Law School. She has a Bachelor's of Civil Law from Oxford University and a LLB from the National Law School of India University.  She was the recipient of several prizes for her

---

[17] When Dr. Williams raised concerns about the Program with Dr. McEvoy, she became defensive. Williams Tr. 48, Exhibit 13.

dissertation and for one of the articles she has authored. She has published numerous articles and essays, has published a book, and has been working on another book. Guglielmoni Affidavit, Exhibit 1. Dr. Alphonso has established and maintained a reputation for being an innovative teacher, whose courses students really enjoy. Her classes have frequently been oversubscribed. Dr. Alphonso has taught Political Science and Public Policy in the College of Arts and Sciences. Her experiences and academic interests have given her a perspective beyond lawyers just practicing law. Dr. Alphonso has a very strong academic record and has been recognized for her teaching and communication skills. Babington Tr. 48-49, Exhibit 12. Among the courses she taught between 2012-2013 and 2016-2017 which were are related to legal studies are: a course of the United States Congress, the Battle over Family Values and American Politics, Political Parties, Interest Groups and Public Opinion, the American Presidency, and the Supreme Court. Guglielmoni Affidavit, Exhibit 1.

Certainly, Dr. Alphonso is and was qualified to be the Director of the Program. Dr. McEvoy's personal opinion of her own qualifications in comparison to Dr. Alphonso's is simply not evidence that supports her claim of age discrimination. Dr. McEvoy's opinion does not create a material issue of fact or establish unlawful motivation. Crawford-Mulley v. Corning, Inc., 194 F. Supp. 2d 212, 220 (W.D.N.Y. 2002); Ameti, ex rel. United States v. Sikorsky Aircraft Corp., 289 F. Supp. 3d 350 (D. Conn. 2018).

20

It is also important to recognize that director positions are filled at the discretion of the Provost or the Dean. They are generally time limited so that each program can be changed to reflect new thinking and to better align with the University's strategic plan, and, in particular, the needs of the students. It is the general practice of the University to rotate these administrative assignments among the faculty. Babington Tr. 100-103, Exhibit 12; Guglielmoni Affidavit, Exhibit 1.

University-wide programs such as Pre-Law Advising Program until 2017 and the Honors Program have their directors appointed by the Provost. Dr. John Thiel (date of birth 28-JUL-1951) was the Director on the Honors Program in 2012 and was succeeded by Dr. Laura Nash (date of birth 10-OCT-1961) and Dr. Giovanni Ruffini (date of birth 12-JUL-1974) in 2018. There are also in the College of Arts and Sciences directorships for the Black Studies Program, the Latin American & Caribbean Studies Program, and the Women, Gender & Sexuality Studies Program. Faculty committees recommend individuals to the Dean who has the final authority on these appointments. Dr. Johanna Garvey (date of birth 20-JUL-1951) was appointed the Director of the Black Studies Program for 2014-2015. She served three years and then was succeeded by Dr. Elizabeth Hohl (date of birth 12-MAR-1953) in 2017. Dr. Dina Franceschi (date of birth 29-DEC-1969) and Dr. Anibal Torres (date of birth 17-JUL-1973) were the co-directors of the Latin American & Caribbean Studies Program in 2012; in 2013 Dr. Dina Franceschi and Dr. William Vasquez (date of birth 10-DEC-1977) were named the co-directors. In 2014, Dr. Gisela Gil-Egui (date of birth 21-APR-1967) and Dr. William

21

Vasquez were selected as the co-directors; in 2015 Dr. Gisela Gil-Egui and Dr. Edrik Lopez (date of birth 17-NOV-1978) were chosen as the co-directors; in 2016 Dr. Dina Franceschi and Dr. William Vasquez were appointed the co-directors; and in 2017, Michelle Farrell (date of birth 3-NOV-1979 ) and Dr. William Vasquez were the co-directors.  Dr. David Gudelunas (date of birth 26-JAN-1977) was the director from 2012 through 2014 of the Women, Gender & Sexuality Studies Program; in 2015, Dr. Anna Lawrence (date of birth 27-JAN-1971) and Dr. Emily Orlando (date of birth 10-AUG-1969) were appointed the co-directors for two years; then in 2017, Dr. Emily Orlando was appointed as the director.  Quite clearly these positions are rotated and the persons filling the positions are both over and under 50 years old.  Guglielmoni Affidavit, Exhibit 1.

D.       Dr. McEvoy's assertion that the University has given false reasons for not reappointing her is without any evidentiary support.

In order to establish pretext, a plaintiff may identify "implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013).  It is not enough that the reasons advanced by different persons or in different forums be merely different, they must be inconsistent with one another.  Richardson v. Bronx Lebanon Hosp., 2014 WL 4386731, at *16 (S.D.N.Y. 2014) (collecting cases); see also Irons v. Bedford-Stuyvesant Cmty. Legal Servs., 2015 WL 5692860, at *30 (E.D.N.Y. 2015) ("As these varied explanations for Plaintiffs' selection for termination are not *contradictory*, this . . . fails to raise a question of fact as to whether Defendants

22

would not have terminated Plaintiffs but for their retaliatory motives." (emphasis added)); Lin v. New York State Department of Labor, 2017 WL 435811 (N.D.N.Y. 2017).

In Ehrbar v. Forest Hills Hosp., 131 F.Supp.3d 5 (E.D.N.Y. 2015), the court explained that merely having multiple reasons for firing an employee does not constitute pretext where the differences among them are not materially inconsistent. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. 2001) (employer's justifications were "variations . . . on the same theme rather than separate inconsistent justifications"); Mathews v. Huntington, 499 F. Supp. 2d 258, 267 n. 6 (E.D.N.Y. 2007) (The varying "explanations must be *materially* inconsistent with one another." (emphasis in original) (citing cases)).

An examination of the reasons for the change in directors reveals that there are no implausibilities, inconsistencies, or contradictions. Dr. McEvoy did not seek an explanation for the change when it happened. In fact, she never spoke with Dr. Babington or Dr. Williams about her continuing in the position between April 2016 and August 2016 or why the change was made. McEvoy Tr. 118-119, Exhibit 3.

In its CHRO and Interrogatory responses, the University pointed out concerns with the Program, including reports of difficulties students had reaching Dr. McEvoy, her lack of cooperation with the Advancement Office, and her failure to address new areas of the law. The University explained that Dr. Babington and Dr. Williams hoped to find a way for the Program to be more responsive to students and alumni, to improve

7037122v1

the working relationship with the Advancement Office, and to reinvigorate the Program. Exhibits 24 and 25.

Dr. Babington elaborated on these reasons in her deposition. She explained that she wanted the Program to be more student-centered, wanted to improve student outcomes, wanted the Program to provide mentorship opportunities and wanted more data in order to provide guidance to students, and wanted to be using best practices. Babington Tr.74-79, Exhibit 12. There is nothing in her testimony that is materially inconsistent with the CHRO and Interrogatory responses and, in fact, they are an elaboration of the University's CHRO and Interrogatory responses which noted the need to reinvigorate the Pre-Law Program, be more responsive to students and alumni, and improve the working relationship with the Development Office. Exhibit 24 (see Position Statement which notes the need to improve the program, reinvigorate it, and give it a new direction) and Exhibit 25 (see response to Interrogatory 3 regarding testimony of Dr. Williams and reason for the change).

That is also true of Dr. Williams' deposition testimony. He explained that he wanted the Program to better align with the strategic plan, Fairfield2020; that it emphasize student-centric programming; that it improve student outcomes; and that it provide students with opportunities to have experiences that would make them more distinctive from others applying to law school from other colleges and universities. He

also wanted to position the Program so that it would attract additional donor funds.[18]  He saw that having served four years, Dr. McEvoy's time was up and that new ideas and perspectives were important to bring to the Program.  Williams Tr. 176-182, 186, Exhibit 13.  Dr. Williams' explanation, like Dr. Babington's, is consistent with the CHRO and Interrogatory responses.

Thus there is no support for Dr. McEvoy's claim of pretext based on implausibilities, inconsistencies, or contradictions in the explanations provided by the University, Dr. Babington and Dr. Williams.  The fact that the reasons for appointing Dr. Alphonso are expressed in slightly different ways and vary in degree of specificity is not evidence that they are inconsistent or shifting.  The testimony and the University's CHRO and Interrogatory responses do not create a genuine issue of material fact or establish a basis for a claim of pretext for discrimination. Each noted the need to reinvigorate the Pre-Law Program, be more responsive to students and alumni, and improve the working relationship with the Development Office.  See, e.g., Coleman v. Quaker Oats Co., 232 F.3d 1271, 1286-87 (9th Cir. 2000) (finding that later, more specific reasons for termination "not properly described as 'shifting reasons'") (citation omitted)).[19]

---

[18] Mr. Pates received and shared feedback on the Program from alumni-donors who thought topics for meetings could be different, that they could be engaged more effectively, and that there could be ways for them to be involved and to be recognized for donations.  Dr. McEvoy was focused on recent graduates of law school rather than those with capacity to support and sustain the Program.  Pates Tr. 32, 46-51, Exhibit 14.

[19] See also Vulcan Basement Waterproofing of Ill., Inc. v. Nat'l Labor Relations Bd., 219 F.3d 677, 689 (7th Cir. 2000) (noting that "[a]n understandably 'different emphasis' in reasons should be discarded as 'shifting reasons'"); O'Connor v. DePaul Univ., 123 F.3d 665, 671 (7th Cir. 1997) (use of different

25

7037122v1

E.   Even if there was inconsistent explanations for the change in directors, that does not establish that age was the "but for" cause.

Even if Dr. McEvoy could identify some inconsistency or other indicia of pretext, that does not provide a basis for denying summary judgment.  In Hodges v. Rensselaer Hartford Graduate Ctr., Inc., 2008 WL 793594, at *10 (D. Conn. 2008), Judge Dorsey explained that even if there were inconsistencies or other indicia of pretext, they do not support, either alone or in conjunction with the other evidence raised by the plaintiff, an inference that age was the real reason for the adverse action.  See also Timothy v. Our Lady of Mercy Med. Ctr., 233 Fed. Appx. 17, 20 (2d Cir. 2007).

In her CHRO reply letter dated June 12, 2017, Dr. McEvoy identified the following as support for her claim of pretext.  Exhibit 21.  First, she said that Dr. Williams did not meet with her in May 2016 and inform her that she would not be continuing as Director.  She testified, however, that they met in the spring of 2016, but there was no indication whether she would be continuing or not.  Not meeting with her does not amount to pretext.

---

terminology to describe elements of overall conduct does not create an inference of pretext); Smith v. Cingular Wireless, 579 F. Supp. 2d 231, 244 (D. Conn. 2008); Loeb v. Best Buy Co., Inc., 2007 WL 2264729, at *11-14 (D. Minn. Aug. 6, 2007) (holding that six reasons for termination, of various degrees of specificity, "do not create a fact issue about pretext"), aff'd 537 F.3d 867, 873-875 (8th Cir 2008); Sullivan v. Paulson, 2007 WL 1790892 (N.D. Tex. Jun. 20, 2007) (granting motion for summary judgment where potential employer offered several variations of reason for non-selection because they were all consistent with the defendant's proffered reason).  It is well-established that an employer may elaborate on its explanation for an employment decision.  See Mervine v. Plant Eng'g Servs., LLC, 859 F.3d 519, 528 (8th Cir. 2017); Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1004 (8th Cir. 2012); Smith v. Allen Health Sys., Inc., 302 F.3d 827, 835 (8th Cir. 2002); Rooney v. Rock-Tenn Converting Co., 878 F.3d 1111 (8th Cir. 2018).

7037122v1

Second, she says she was not informed of her deficiencies. While there are multiple examples of Dr. Sapp and Dr. Williams communicating with her and the Assistant Director of the Program, Susanne Quinlivan, being aware that Dr. Sapp was not happy with the program, Quinlivan Tr. 53-54, Exhibit 16, Dr. McEvoy's opinion does not establish pretext.

Her third example had to do with her not being accessible by email and not being viewed as working cooperatively with the Advancement Office. There is no dispute that she complained when Mr. Pates asked questions to understand the Program as he was trying to develop a case statement to raise funds to help the Program. Pates Tr. 30-31, Exhibit 14. Her perception of her accessibility does not provide proof that she was easily accessible. She did not have email at home or on her phone and she was not on campus from Wednesday until Monday afternoon. For example, it took her 4 days to respond to an email from Dr. Fitzgerald, Exhibit 22; and a week to respond to a student asking her for advice about her law school application essays, which she wanted to submit the week after the original email. Exhibit 23.

She argues that she did a good job and listed the programs that were offered. Dr. McEvoy's personal opinion does not create a basis for pretext, and she fails to point out how any of these programs helped students gain admission to law school or whether these programs were perceived by students as helpful. She conducted no surveys or assessments of the programs. Quinlivan Tr. 61-62, Exhibit 16; McEvoy Tr. 26-31, 39, Exhibit 3.

7037122v1

Dr. McEvoy next claimed that the Program was not reinvigorated under Dr. Alphonso. However, Ms. Quinlivan detailed the extensive changes that had been brought about under Dr. Alphonso. Quinlivan Tr. 43-45, Exhibit 16. Finally, she argues that her not being reappointed was not part of a normal rotation of directors. As is evident from the discussion of the other programs, directorships did rotate. Guglielmoni Affidavit, Exhibit 1. Furthermore, there is no tenure in the position and no guarantee of continued employment. Her 2015 appointment was for one year at the discretion of the Provost. Exhibit 17.

It is quite clear that there must be evidence that age was the "but for" reason for the decision. The record provides no basis for creating a genuine issue of material fact as to the falsity of the University's reasons or to infer that her age was the real reason for appointing Dr. Alphonso instead of reappointing Dr. McEvoy.

## VI    Conclusion

Fairfield University has articulated the reasons for not reappointing Dr. McEvoy and for appointing Dr. Alphonso as the Director of the Pre-Law Advising Program. The decision-makers wanted a new vision and direction. They wanted to see measureable results on student admissions to law school. They wanted the director to be more responsive to students and alumni. They wanted to see the Program aligned with the University's strategic plan and for the Director to work with the Advancement Office to help sustain the program. The University has articulated and proven these reasons. As such, the University has met its burden under the McDonnell Douglas standard.

28

Faced with the University's evidence, Dr. McEvoy has offered no evidence to support a claim that age was the "but for" reason for the University's decision. She has offered no evidence that the decision-makers had a discriminatory animus, particularly since the same people who decided not to reappoint her were the individuals who had extended her appointment the year before. She has also not shown that the University's explanation for appointing Dr. Alphonso is unworthy of credence or that the change was not based on the legitimate desire to improve the Program. Dr. McEvoy has provided no evidence that there were inconsistent reasons given for the change in the directorship. She has not established that there is a dispute over the material facts. She has not identified any evidence that her age made a difference in the decision-making. Summary judgment must enter for Fairfield University.

DEFENDANT
FAIRFIELD UNIVERSITY

By: _____
Gary S. Starr
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Facsimile: (860) 251-5216
Juris No. ct06038
Its Attorneys

29

7037122v1

## CERTIFICATION OF SERVICE

This is to certify that on November 21, 2018, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  The following Parties may access this filing through the Court's system:

Todd D. Steigman
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT  06103
Phone:  860-246-2466
Fax:  860-246-1794
Email:  tsteigman@mppjustice.com
*Counsel for Plaintiff*

_____
Gary S. Starr

7037122v1