# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

———————————————————    *
                                          *    CIVIL ACTION NO.
SHARLENE McEVOY                           *    3:17-CV-01861 (MPS)
          Plaintiff                       *
                                          *
     vs.                                  *
                                          *
FAIRFIELD UNIVERSITY                      *    AUGUST 14, 2018
          Defendant                       *
                                          *
———————————————————    *

DEPOSITION
OF
SHARLENE MCEVOY

          Taken before Sandy K. Visentin, Registered
Professional Reporter and Notary Public in and for the
State of Connecticut, pursuant to the Federal Rules of
Civil Procedure, at the law offices of Shipman & Goodwin,
LLP, One Constitution Plaza, Hartford, Connecticut, on
Tuesday, August 14, 2018, commencing at 9:47 a.m.

Sandy K. Visentin, LSR, RPR
CSR No. 234

2

A P P E A R A N C E S

REPRESENTING THE PLAINTIFF:

MADSEN, PRESTLEY & PARENTEAU, LLC
402 Asylum Street
Hartford, CT   06103
(860) 246-2466
      By:   Todd Steigman, Esq.
            tsteigman@mppjustice.com

REPRESENTING THE DEFENDANT:

SHIPMAN & GOODWIN, LLP
One Constitution Plaza
Hartford, CT   06103-1919
(860) 251-5000
      By:   Gary S. Starr, Esq.
            gstarr@goodwin.com

Transcript Legend

[sic]                          - Exactly as said.

[phonetic]                     - Exact spelling not provided.

[--]                           - Break in speech continuity and/or
                                 interrupted sentence.

[. . .]                        - Indicates omission of word[s] when
                                 reading  OR  trailing off and not
                                 finishing a sentence.

---

Direct Examination by Mr. Starr ..................    7

Cross-Examination by Mr. Steigman ................  167

12

were three of my regular load and then the two additional in the fall.

Q. Do you know if the chair needs to get approval from anybody else to get you to be able to teach those overload courses?

A. I think the dean is in the picture that signs off, but I don't think it's a matter of getting the dean's permission.

Q. Do you have an office on campus?

A. Yes.

Q. And where is that located?

A. It's in the Dolan School of Business.

Q. And do you have posted office hours?

A. Yes.

Q. And what, generally, are your office hours?

A. Well, they, generally, are scheduled around the courses that I teach.

Q. Can you give me some idea as to --

A. Well, it could be afternoons, evenings, because we do have an evening contingent.

Q. So, let's talk about this past spring, what kind of office hours did you have then?

A. In the spring of 2018?

Q. Yes.

A. Okay. I had late afternoon, evening hours on

Monday, also on Tuesday, I had midday on Wednesday, and then late afternoon on Wednesday, and then early evening on Wednesday.

Q.     You gave me midday on Wednesday and then late afternoon on Wednesday as well?

A.     Yes.  Well, the class began at 2:00.

Q.     Ah, okay.

A.     So I would be there at, say, 12:15, and then the class would conclude around 4:30, so I would be there from 4:30 to 6:30, and then that would be the next class starting at 6:30 to 9:00.

Q.     When you say late afternoon on Monday evening, what actual hours would that be?

A.     It would be 4:30 to 6:00.

Q.     And on Wednesday?

A.     Well, Wednesday was the one where I had the longer day.

Q.     Right.

A.     I would have 4:30 to 6:00 -- 6:30, rather, and then earlier in the day prior to the first class.

Q.     And about what time would that be?

A.     12:15 to 2:00, because the class starts at 2:00, and then the class runs from 2:00 to 4:30.

Q.     Okay.  And then --

A.     And other times by appointment.  In other

14

words, if a student couldn't make those times I can make time to come in at a different time.

Q. Are you on campus on Thursdays and Fridays?

A. No, those are research days. But I can be if someone needs to talk to me.

Q. And you have University email?

A. Yes.

Q. Do you have access to email at home?

A. Yes.

Q. And how do you have access to email at home?

A. My phone.

Q. I'm sorry?

A. Smartphone.

Q. And how long have you had that?

A. A year or so.

Q. And prior to that did you have access to email at home?

A. No.

Q. Do you have a computer at home?

A. No.

Q. Does your office have voicemail?

A. Yes.

Q. Do you use voicemail?

A. Yes.

Q. Prior to having the smartphone, you didn't have

a voicemail?

A.    Well, I have voicemail on my other phone. I have two phones.  The one I have with me today has voicemail.  But the smartphone also has voicemail but I use it primarily for the email.

Q.    So one smartphone and one other --

A.    One flip phone.  Old-fashioned flip phone, yes, but it has voicemail.

Q.    And how long have you had that one?

A.    I've had the flip phone for years.

Q.    Are either your smartphone telephone number or your flip phone telephone number published some place?

A.    My assistant at the University, at the School of Business, we have one assistant per faculty, she has my cell phone, my home phone.  And anyone else who has to deal with me on a regular basis also has my cell phone.  The Dean's assistant, let's say.

Q.    Are either of your phones posted on the posting about your hours, office hours?

A.    No.  My extension at the University is posted on the office hours.

Q.    Did there come a time where you sought to become the Director of the Pre-Law Advisory Program?

A.    When did I --

16

Q.    Yes, was there a time when you sought the position as the Director of --

A.    Yes.  In the spring of 2012, Father Paul Fitzgerald sought people from the faculty to apply for the position, which was open due to the departure of Don Greenberg, who was the Pre-Law advisor.

Q.    How did Father Fitzgerald publicize or how did you come to know that --

A.    He sent an email.

Q.    And was there something that you did to apply?

A.    Yes, I put forward a plan of what I would do were I to be named Director.

Q.    Do you know if anybody else applied?

A.    I think one other person did.

Q.    And do you know who that was?

A.    I think it may have been, but I'm not sure, Debra Strauss.

Q.    And you submitted a plan, did you have discussions with Father Fitzgerald --

A.    Yes.

Q.    -- before submitting the plan?

A.    No, I submitted the plan and then he called me in for a discussion.

Q.    Okay.

A.   Now, I had met with him in 2012 as part of a larger group of people who taught law-related courses on campus, and he was interested at that point in creating a pre-law program.

Q.   Do you recall when that was?

A.   Yes, it was in the spring of 2010.  I think it was around late April or May of 2010.

Q.   And in the spring of 2010 did Father Fitzgerald give you a sense of what he was looking for?

A.   Well, he pretty much asked us what our assessment of the advising situation for pre-law students was, and I don't think he was satisfied with the way things had been handled.

Q.   Did you share with him your impressions of your assessment of the program?

MR. STEIGMAN:   Objection.

MR. STARR:   Let me rephrase the question.

BY MR. STARR:

Q.   In the meeting in the spring of 2010 with Father Fitzgerald, did you express your opinion with respect to the pre-law advising program?

A.   No.

Q.   During the course of this meeting in the spring of 2010, did anyone express an opinion as to the

18

program?

A.   Well, it wasn't really a program at that point, I should say.  There was a Pre-Law Advisor, who was Don Greenberg, and he told Father Fitzgerald that he was doing, and I'm quoting him now, "a piss poor job of advising."

Q.   Did Don Greenberg say that in a meeting?

A.   Yes.

Q.   Did anyone else comment on the Pre-Law Advising?

A.   No one said anything in response that I can recall to that.

Q.   And then it was two years later that Father Fitzgerald sought --

A.   Yes.  Yes, it was quite a time lapse.

[Defendant's Exhibit 1:  Marked for identification.]

BY MR. STARR:

Q.   Dr. McEvoy, I'm showing you what's been marked as Defendant's Exhibit 1 and ask you if you can identify that?

A.   Yes, this is my work.

Q.   And can you be more specific about this --

26

to, because some schools were more generous with financial aid than others were.

Q.   And how many students did you have records on?

A.   I had about 30 students visit me.  Although that varied sometimes, sometimes it was 25, sometimes it was 30.

Q.   And would these be one-time events or --

A.   Well, sometimes people would come back for another visit, depending on what their plans were. Some people abandoned the idea of going to law school. Some people decided they wanted to finish with Fairfield and then work for a while before making any decisions.

Q.   Did you keep any records with respect to how many people came back more than once?

A.   No, just informally.  Because if I saw them more than once, I knew they were probably on the verge of applying and we were going to be working on personal statements and applications and things of that nature.

Q.   Of the 25 to 30 students that visited you a year, how many of them came back more than once?

A.   Maybe four or five.

Q.   The next point that you indicated in your proposal to Father Fitzgerald is that you keep records

of students from which majors have an interest in law school.

Did you record and report to anyone what majors were more likely to be sending people to law school or not?

A.   No, Sue Quinlivan then kept that information.

Q.   Did you discuss it with Sue Quinlivan or --

A.   No, not really, because we were going to serve every major at the University; no matter who came to me I was going to talk to them and advise them.

Q.   Did you keep records of who was successful in getting admitted to law school?

A.   Again, post-graduation survey was done by Career Planning.

Q.   Did you get information about where students were --

A.   Informally.

Q.   And did you record it anyplace?

A.   No.

Q.   Did you record anyplace where students actually went to law school?

A.   No, we just learned anecdotally where students were accepted to.  And sometimes they would not go to law school right away; they would be accepted but might defer.

28

Q.    Did you record information on students who got admitted but then deferred?

A.    We knew a few of those people, informally again.

Q.    Did you keep track of schools that Fairfield students were not admitted to?

A.    Yes.  I knew the schools that they would have a difficult time getting admitted to.

Q.    Well, that's not exactly my question.

A.    All right.

Q.    Did you track the schools that students applied to but were not accepted to?

A.    Yes.

Q.    And where did you keep those records?

A.    They were, again, informal records.

Q.    Did you report that information to anybody?

A.    Well, at one point we had been contacted by the Yale School of Law about getting our students to apply, and I had a question of whether or not they had a realistic chance of getting in there in the first place.  Because none of our students recently, to my knowledge, had applied there and been successful.  And I did invite the representative to come to one of our law school fairs and they declined.

Q.    What, if anything, did you do with the

information about schools that Fairfield University students applied to and were not accepted?

A.    Nothing, really, because that depended on where the students applied to.

Q.    The next sentence talks about "I would build on data previously gathered, if any has been kept in the past ten years."  What does that refer to?

A.    Well, I thought there was data being kept by my predecessor, but it turns out that was not the case.

Q.    And did you keep any data that was given to the University for analysis?

A.    Well, again, that was Career Planning that kept all of that information.

Q.    My question is, did you provide --

A.    Not me.

Q.    Did you provide Career Planning with any information about the students; where they were applying to, what their LSAT scores were?

A.    Well, I would discuss this with Sue Quinlivan as to where students were applying for that particular year.  But, you know, again, it was depending on whether they pursued those applications or just had plans to do so.

Q.    All right, I'm not exactly clear on your answer

30

so let me try to ask it a different way.

A. All right.

Q. What information from the students did you share with Sue Quinlivan?

A. If I found out that a student was admitted to a law school, I would notify her. So-and-so got into X. Whether that person decided to attend or not, that would be their decision, and they might not make that immediately.

Q. For those people who had identified themselves as members of the Society, did you share with Sue Quinlivan their LSAT scores?

A. No.

Q. Did you share with Sue Quinlivan their grade point averages?

A. No.

Q. Did you share with Sue Quinlivan where they were applying to law school?

A. Not necessarily, unless we had a conversation about it.

Q. So it wasn't an organized manner of --

A. No.

Q. -- of collecting and sharing --

A. No.

Q. -- data?

A.    No.

Q.    Is that correct?

A.    Right.  Yes.

Q.    Did you share that type of information about students with anyone at the University?

A.    Just informally.

Q.    What do you mean by that?

A.    Well, if we had a conversation with someone, I would say, oh, students are applying to this, that or the other school, but it wasn't something that we reported on.

Q.    And when you say you would have a conversation informally with someone, who would you be having these conversations with?

A.    It might be another faculty member who might be interested in what the students were doing.

Q.    Did you share that information with Paul Fitzgerald?

A.    No, he never asked me that information.

Q.    Did you share it with David Sapp?

A.    I don't believe he asked for it either.

Q.    Did you share it with Lynn Babington?

A.    No.

Q.    Did you share it with Yohuru Williams?

A.    No.

or not their GPA's and LSAT scores were going to be workable or not.

Q.   Did you work with the Office of Institutional Research to gather that?

A.   No.

Q.   Was there any kind of analysis that you did that you submitted to either Dr. Sapp or Dr. Fitzgerald about the students' successes?

A.   No.

Q.   You already mentioned that you didn't establish any internships?

A.   Right.

Q.   What steps did you take to reconnect with Fairfield alumni?

A.   Well, we invited alumni to our various events, they would either be speakers to be our students or be invited to these dinners or luncheons that we held.

Q.   And how did you identify the alumni to invite?

A.   We worked with the Alumni Office and -- do you mean our honorees or the attendees?

Q.   Either or both?

A.   Well, the first honoree was Raymond Dearie of the U.S. District Court.  I found him because our Alumni office did not have him on our list of alumni.

And, generally, we had two events at the same time. I think the first one was talking about the importance of the LSAT. So that person talked for the first few minutes and then we had the speaker come and then refreshments thereafter.

Q. In terms of the speakers, did you contact them to invite them, or did somebody else do that?

A. The Alumni office took care of that.

Q. You talked about the fact that Dr. Sapp became the person to whom you reported?

A. Yes.

Q. And you indicated that you had several meetings with him?

A. Not several, a few along the way.

Q. A few?

A. Yes.

Q. And how long was he the person to whom you reported?

A. I think he came on board in January or February of 2013 and he left in May of 2014. So three semesters.

Q. And, approximately, how many times did you meet with him?

A. I don't think there were more than four times.

Q. And do you recall what was discussed in any of

48

those meetings?

A.    We discussed what I was planning to do, what was coming up in terms of the events.  The first time I think I met him I discussed that we were planning this dinner for Judge Dearie, explained how the alumni were involved, et cetera, et cetera.  So, just really just informational.

Q.    Did he provide you any feedback on what he thought of the program?

A.    He didn't think there should be a program.  I don't recall when he told me that, but at one point he said he didn't think it was worthwhile.

Q.    Did he provide you any other feedback?

A.    No.

Q.    Did he tell you why he didn't think it was worthwhile?

A.    He said we weren't getting students into Yale or Harvard Law School and, therefore, we shouldn't be spending so much effort, I guess, trying to get them into other places.

Q.    How would you describe your relationship with him?

A.    I think it was just informational.  He really didn't have any suggestions to offer.  I remember one thing he suggested, which I agreed with, was that he

58

I was quite surprised that we were having a meeting in the summer. And Chris Pates told me that he didn't like the way the Pre-Law Club was being run. He thought we should be copying other institutions and that we should have officers.

Q.   And who is Chris Pates?

A.   He was someone I had never met until that day but, apparently, was in Advancement. But there had been a new person who had been appointed to head Advancement.

Q.   And do you recall who that was?

A.   Yes, Wally Halas. I think he was appointed in the spring or summer of 2014.

Q.   You said that Mr. Pates said that we should copy other institutions?

A.   Yeah.

Q.   I'm not sure I understand, what was he asking you?

A.   Apparently, other institutions had pre-law programs and he wondered why ours wasn't similar to theirs. I don't know how much he knew about them.

Q.   Oh, when you say copy them, you meant copy the type of program they had, not send them stuff you had on your program?

A.   No, no, no. He wanted our program to be like

other institutions' programs.

Q. Did he suggest any particular institutions' programs to you?

A. No.

Q. Had you ever looked at other institutions to see what they did?

A. No, I wanted us to be unique because we were a Jesuit school. I know that other institutions have different things; they have the students join Phi Alpha Delta, for example. And I thought we could have our own society and do many of the things that they were doing.

Q. And when he suggested that you look to other institutions for ideas or to copy what they do, what did you tell him?

A. I said I didn't think we should be aping other institutions and I thought the program was running pretty satisfactorily as it was.

Q. You also said that Mr. Pates said that you should have officers; did you respond to him about that?

A. Yes, in the same thing I told you earlier. In other words, people didn't join this club, if you will, I call it a society, as a freshman and then worked their way through the ranks. Some people joined

60

when they were juniors and decided they were interested in Pre-Law.  So we didn't necessarily have a continuum of people who came to us as freshmen, sophomores, et cetera.

Q.    And what did you tell Mr. Pates about his suggestion that you have officers?

A.    Well, I said, you know, we were working fine as it was and I didn't think we needed officers.

Q.    Did Mr. Pates offer any other suggestions?

A.    I don't recall anything.

Q.    Did you have any further interactions with Hope Ogletree?

A.    She was fired about two weeks later.

Q.    Have you talked with Hope Ogletree since then?

A.    No.

Q.    Have you spoken with Geri Derbyshire?

A.    No.  I just saw her at a luncheon, I think, but I didn't speak to her.

Q.    With respect to Mr. Pates, did you have any other interactions with him about the Pre-Law Program?

A.    I never saw him again at a meeting.  He sent emails complaining about the fact that our website hadn't been updated.  But this was at the beginning of the school year so we had to get organized for that year.  And he had suggested things to do, and we didn't

THE WITNESS:  Not with me.

[Defendant's Exhibit 4:  Marked for identification.]

BY MR. STARR:

Q.    Dr. McEvoy, I'm showing you what's been marked as Exhibit 4, can you identify that?

A.    Yes.  It's a Case Statement prepared by, I believe, Advancement in hopes of raising funds for the program.

Q.    And had you seen that before?

A.    I got a copy of it.

Q.    Did you participate in its preparation?

A.    No.

Q.    Did anyone seek your input?

A.    No.

Q.    Did you send any comments to anyone about it?

A.    No.

Q.    Do you recall about when you saw it?

A.    It might have been in September of 2014.

Q.    And do you know what, if anything, the Case Statement was used for?

A.    No.

Q.    Did you inquire about what the Case Statement

talks about curriculum?

A.    Yes.

Q.    Did you review that paragraph, those three paragraphs, at the time and agree with what they had to say?

A.    Well, this just discusses the core curriculum which every student has to take, and then there were courses they listed there. I had no objection to these courses. I'm not sure how often some of these are offered, however.

Q.    And these are courses that are available to undergraduate students?

A.    Undergraduate, yes. But I'm not sure how frequently they are offered.

Q.    And on page 4, which is Fairfield 1164, it talks about mentoring?

A.    Yes.

Q.    Was there a mentorship program?

A.    No. I started one, though.

Q.    No, was --

A.    There was not.

Q.    Under your direction, was there a mentorship program?

A.    Yes.

Q.    Can you describe the mentorship program?

68

A.    We knew of students who were attending law schools that our current students were interested in, so we established a law school mentoring program whereby if an undergraduate student wanted to visit a law school, we could identify someone who is currently a student there who might act as a guide during an undergraduate student visit and mentor that student in making a choice as to whether that law school would be appropriate for them.

Q.    When you say mentor the student, were there some guidelines that you provided to the law school students as to what your expectations were for them when someone from Fairfield visited their law school?

A.    There were no set guidelines.

Q.    Did you give the Fairfield alumni any kind of guidance on what they would be expected to do when a student visited?

A.    It was an informal arrangement.

Q.    Well, was there anything that you talked to them about, the people who were willing to be mentors?

A.    No.

Q.    Besides being able to take a current Fairfield University student around the law school, was there anything else that was expected of the

mentors?

A.    Nothing was expected, but they could keep in contact with this person if they desired.

Q.    Was there anything that you did to urge the person in law school to keep in contact with somebody who had visited?

A.    No.

Q.    How did someone become a participant as a mentor in the mentorship program?

A.    Well, you would have to agree to be available to a student should an undergraduate student want to seek out your advice or visit the campus.  But the way it worked was the undergraduate student could not directly contact the law student.  The undergraduate student would contact Sue Quinlivan, who had the contact information for the law student, ask the law student if he or she could guide the student or make him or herself available to the student, and then Sue Quinlivan would notify the undergraduate student that yes, the person was available.

Q.    Did you give Sue Quinlivan some guidance on what the expectation was for the law student to do with the undergraduate?

A.    No.

Q.    Did you send out any kind of communication

70

to law students seeking their interest or support as mentors?

A.    No.

Q.    How were potential mentors identified?

A.    Well, they would be contacted informally. Because we knew, since I had come on board, we knew students who were in law school.  And if we had an undergraduate who was interested in that particular law school we could then make contact with that law student.

Q.    And when did you start this mentor program?

A.    It wasn't at the beginning, I think it was more toward the middle of my tenure.

Q.    And that would be what year?

A.    I think it was more toward the beginning of the third year when we got to doing that.

Q.    So that's 2014-2015?

A.    I think so.

Q.    And how many mentors did you have in that year?

A.    I would say there were four or five.

Q.    And how about in the 2015-2016 year?

A.    I think about the same.  There were very few.

Q.    Did the mentors receive anything from the University for being mentors?

A.    No.   It was just informal.

[Defendant's Exhibit 5:   Marked for identification.]

BY MR. STARR:

Q.    Dr. McEvoy, I'm showing you what's been marked as Exhibit 5, and can you tell me what that is?

A.    Yes.   This is my original 2013 report on the Pre-Law Program.

Q.    So this is for the 2012-2013 year?

A.    Yes.

Q.    And is this something that you typed up?

A.    Yes.

Q.    Using a typewriter?

A.    Yes.

Q.    And to whom did you submit it?

A.    To David Sapp's office, Helen Kerpitus.

Q.    And prior to submitting it, did you have any discussion with anyone about what information should be provided in the report?

A.    No.

Q.    In preparing the report, how did you decide what should be included in the report?

A.    I just listed the events that we had held

72

during the year.

Q.    And what did you understand the purpose of the report to be?

A.    To give the Director a chance to see what had been accomplished during that time frame.

Q.    Did you share with your supervisor areas that you thought needed additional help with?

A.    No, it was just really a list of what had happened.

Q.    Did you provide him with any analysis of what the students were doing towards applying for law school?

A.    No.

Q.    We had talked earlier about the Law School Fair, that was something that was already in the works prior to your becoming the Director; is that correct?

A.    Yes.

Q.    And that's something that Sue Quinlivan or Career Planning had been doing for quite a while; is that right?

A.    Yes.  As I understand it, yes.

Q.    Did you attend the Law School Fair?

A.    Yes.

Q.    And how long were you at it?

students chances of admission to law school were.  Was that data organized in any formal way?

A.    It was just from the sheets that I filled out when the students came in, and I could see where they were eventually accepted, where their GPA's were, where their LSAT's were so I could get a feel for what to tell the next group of students.

Q.    Was there any kind of analysis that said that for a particular law school when someone got admitted we found that their LSAT scores were in this range or their GPA was in this range, so that someone could take a summary sheet and be able to quickly gather this information, or was this something that you had a feel for?

MR. STEIGMAN:  Objection.

THE WITNESS:  I had a feel for once --

MR. STEIGMAN:  Go ahead.

BY MR. STARR:

Q.    You can answer.

A.    I urged the students to go to the law schools' websites because they contained parameters for GPA's and LSAT scores.

Q.    Did you have a discussion with either Dr. Sapp or Dr. Williams about what successes Fairfield was

78

having in having students admitted to particular law schools?

A.    No.

Q.    Was that something you had a follow-up with Father Fitzgerald?

A.    No.

Q.    Or with Lynn Babington?

A.    No.


          [Defendant's Exhibit 6:  Marked for
          identification.]


BY MR. STARR:

Q.    I'm showing you what's been marked as Exhibit 6, are you familiar with that document?

A.    Yes.

Q.    And what is this?

A.    It's the Pre-Law report for 2013-2014.

Q.    And did you prepare this?

A.    Yes, the information.

Q.    This doesn't look like it's from a typewriter?

A.    No.

Q.    So how was it ultimately --

A.    I think I passed it along maybe to Sue Quinlivan and then she prepared it.

80

Q. What analysis did you do as to why there was a drop off in people showing up?

A. I didn't do an analysis.

Q. The report indicates that there are 172 students who show an interest in law and only 40 or 50 are active members in the Pre-Law Society. What efforts, if any, did you make to engage the 130, 120 other students who had showed an interest in law?

A. That was gathered by Career Planning and it was a general question whether they might be interested. So they might initially show interest but as time went off that would drop off.

Q. And what, if any, efforts did you make to reach out to those 120, 130 students who had shown an interest in law?

A. I didn't know who they were.

Q. Did you make any effort to try to discover who they were?

A. I think the questions posed by Career Planning were rather general, and I think there was always a large number of people who said yes, I have some interest, but as time went on I think fewer people, when they realized what it entailed, fewer people were going to pursue it.

Q. And did you take any steps to reach out to

those who had expressed some interest in the law but had not become engaged in the Pre-Law Society?

A.    Not in that group, no.

Q.    As I look at the number of students who attended the alumni lawyer panel and the financing of law schools, the numbers are in the twenties?

A.    Yes.

Q.    Did you do an analysis of why those numbers were so low?

A.    No.

Q.    Apparently the law school prep course was cancelled --

A.    For lack of attendance.

Q.    Lack of people signing up?

A.    Right.

Q.    Did you do anything to determine why that had happened?

A.    No.

Q.    Besides swapping out the law school reps panel for the Law School Fair, was there anything else that was new in 2013-2014?

A.    Yes.  Instead of having one lawyer alumni speaker, we did a panel.  There were three lawyer alumni at the panel.

Q.    And whose idea was that?

82

A.    Julie Tuozzoli thought that we should have more than one alumni lawyer instead of doing them one at a time.   I agreed, let's try it.

Q.    And who then found the alumni to participate?

A.    I found Courtney Darts.   And Dan Fitzgerald and Peter Murphy were known to Alumni.

Q.    After you submitted the 2013-2014 report that's been marked as Exhibit 6, did you have any discussion with Dr. Sapp about the report?

A.    No.

Q.    Did you have any discussion with Dr. Sapp about the program?

A.    No.

Q.    Dr. Sapp was still there in 2013-2014?

A.    I think he was on the verge of leaving at that point.

Q.    And did you know at that point who was going to succeed him?

A.    I found out because there was a meeting held with me and Dr. Williams and Dr. Sapp before Dr. Sapp departed.

Q.    And when did that meeting occur?

A.    I thought it was in the spring, late spring of 2014.

Q.    And where did it take place?

A.   It took place in Canisius.  I think it was Canisius 300, the office there.

Q.   Is that Dr. Sapp's office complex?

A.   Yes.

Q.   And what do you recall occurring at the meeting?

A.   Well, Dr. Sapp went on at some length about his interest in baseball.

Q.   If he's going to move to Los Angeles, that's not a bad thing.

A.   No, he's an Atlanta Braves fan.

Q.   Okay.

A.   And that went on for some time, and Dr. Williams seemed very disengaged and there was very little substantive discussion about what this report said or about the program.  And then toward the end of that meeting, Dr. Sapp said, Who do you want your successor to be?

Q.   He asked you that question?

A.   Yes.

Q.   And what was your response?

A.   I was taken aback, and I pointed out that I was only at the end of my second year as Pre-Law Director, I can't speak to my replacement.

Q.   I understand that.  What did you say to

84

Dr. Sapp?

A.   I don't know if I said anything.  I just was surprised, I guess.  I don't know.  Because he suggested a couple of names.

Q.   What names did he suggest?

A.   Gwen Alphonso and Debra Strauss.

Q.   And did you respond about either of them?

A.   No.

Q.   Was there any other discussion in this meeting with Dr. Sapp and Dr. Williams about the Pre-Law Program?

A.   Not really.

Q.   Did you ask about your continuing position?

A.   Well, I was going to continue for at least another year because my appointment was for three years.

Q.   No, I understand that.  Did you ask or raise the question of whether at the end of the three years you would be considered for continuing?

A.   No.

Q.   Did you ask any questions at all about your future as the Director of the Pre-Law Program in your meeting with Dr. Williams and Dr. Sapp?

A.   Did I ask them about my future?

Q.   Yes.

A.   No.

88

Q. This was in December of 2013?

A. Yes.

Q. Anyone else present at that meeting?

A. No.

Q. Did you explore it further?

A. No.

Q. Did Father Fitzgerald make any derogatory comments to you?

A. No. Complimentary.

Q. And did he make any discriminatory comments to you?

A. No.

Q. Did Yohuru Williams make any derogatory comments to you?

A. No.

Q. Did Yohuru Williams make any discriminatory comments to you?

A. No.

Q. Did Lynn Babington make any derogatory comments to you?

A. I never met with Lynn Babington.

Q. Did Lynn Babington make any discriminatory comments to you?

A. No.

Q. Did you hear of Dr. Sapp making discriminatory

comments about you?

A.   Just that he didn't like me.

Q.   Did you hear of Dr. Williams making any discriminatory comments about you?

A.   No.

Q.   Did you hear of Dr. Babington making any derogatory comments about you?

A.   No.

Q.   Did you hear about Dr. Babington making any discriminatory comments about you?

A.   No.

Q.   Did you ever hear the idea of a virtual mentoring program?

A.   No.

Q.   With respect to the students who had become members of the Pre-Law Society, you indicated there were between 40 and 50 that were members a year; correct?

A.   Yes.  Roughly that number, right.  It varied.

Q.   And you said you met with somewhere between 25 and 30 students a year --

A.   Yes.

Q.   -- about their law school planning; is that correct?

A.   Right.

Father Fitzgerald after you submitted your Annual Report?

A.    No.

Q.    Are you familiar with Fairfield 2020?

A.    I've heard of it.

Q.    What have you heard?

A.    I gather it's a fund-raising effort.

Q.    Anything else?

A.    No.

Q.    Have you participated in any discussions among the faculty about Fairfield 2020?

A.    No.

Q.    Are you aware of any meetings of the faculty where Fairfield 2020 was being discussed?

A.    There have been meetings among faculty who were involved in it.

Q.    And have you attended any of those meetings?

A.    No.

Q.    Have you been invited to any of those meetings?

A.    No.

Q.    Have you asked any questions about what is going on with that?

A.    No.

Q.    Did you meet with any of the faculty in the College of Arts and Sciences to discuss the Pre-Law program?

116

A.    I don't recall how many were there.  We were in the School of Business dining room and it didn't seem very full, so maybe 20'ish.

Q.    And in the "Financing Your Law School Education," there were, approximately, 12 students that attended?

A.    Yes, there was a low turnout for that.  Yes.

Q.    And a low turnout for the Powerscore prep course?

A.    Yes, that was a smaller number.

Q.    Did you do any analysis of why you were having low attendance at these programs?

A.    No.

Q.    Did you survey the students who had expressed an interest in the Pre-Law Program as to what they might be interested in?

A.    No.

Q.    Did you ask for feedback from the students on the programs that you offered?

A.    No.

Q.    Did you do any analysis of what was working and what wasn't working to reach the law school students?

A.    No.

Q.    Did you consider changing the way that you

communicated the programs to the students who had expressed an interest in pre-law?

A.    No.

Q.    This report doesn't look like it's on your typewriter; is that correct?

A.    No, I had my assistant work on it.

Q.    So the Law Day luncheon attendance in 2015 had been -- I guess you had 30 for lunch and then approximately 75 listened to Ms. Gibbs?

A.    Yes, but one of my classes was involved in that presentation, they were not at the luncheon.

Q.    So there were 30 students there and then the following there were about 30 students as well in April of 2016; is that correct?

A.    Right.

Q.    In this report you talk again about diversity of majors amongst students interested in pursuing a career of law, but you make no mention of what majors they had or even how many people of cultural or ethnic backgrounds?

A.    No, I didn't single that out.  No.

Q.    Did you record that anywhere so you could monitor that?

A.    No.

Q.    On the last page of this report, which is

118

McEvoy 387.

A.    Yes.

Q.    It says the Law School Mentor Program began in 2014 and will continue?

A.    Yes.

Q.    What are you referring to there?

A.    Where we have the undergraduate students get in contact with the law students.

Q.    Okay.  And there's no mention of how many students participated in that program?

A.    No.

Q.    Had that program grown in any way?

A.    Not that I'm aware of.

Q.    And who was responsible for overseeing that program?

A.    Well, as I mentioned, Sue Quinlivan would contact law students if an undergraduate student expressed an interest in that particular law school.

Q.    In April of 2016, did you contact Dr. Williams about your continuing as the Director?

A.    No.

Q.    In May of 2016, did you contact Dr. Williams about your continuing as the Director?

A.    No.

Q.    In June of 2016, did you contact

Dr. Williams --

A.   No.

Q.   Let me finish my question.

A.   Okay.

Q.   In June of 2016, did you contact Dr. Williams about continuing as the Director?

A.   No.

Q.   In July of 2016, did you contact Dr. Williams about your continuing as the Director?

A.   No.

Q.   From April through July of 2016, did you contact Dr. Babington about your continuing in the position?

A.   No.

Q.   In 2015 or 2016, did you have any conflicts with Dr. Williams over anything?

A.   No.

Q.   How would you describe your relationship with Dr. Williams in 2015-2016?

A.   I think he was very hands-off, he wasn't involved at all.

Q.   Did you complain to anyone about Dr. Williams?

A.   No.

Q.   Did you ask anyone in the University's administration why you were not reappointed?

140

students' LSAT scores?

A.   I'm not sure they did.

Q.   In what way did people who going on the trips improve their acceptances to law schools?

A.   I'm not sure that was going to help.

Q.   With respect to the films, did the films help students raise their LSAT scores?

A.   No.

Q.   Did the films help improve students' law school acceptances?

A.   No.   As far as I know.

Q.   Did you do anything to analyze what benefit the students received from the trips?

A.   No.   Except that they conveyed their enthusiasm and appreciation.

Q.   Did you do any analysis of what benefit the students got from viewing the films that were shown?

A.   No.   Some they liked and some they didn't like.

Q.   So you were alleging that Fairfield's reasons that they articulated were pretextual or false?

A.   Yes.

Q.   Can you identify those for us?

A.   In this document here?

Q.   Well, anywhere.

A.   No.

Q.   What evidence do you have that age was a factor that made a difference in your not being reappointed?

MR. STEIGMAN:  Objection.

THE WITNESS:  Because the person who succeeded me was way, way younger, more than a quarter century younger, I believe.  And also the reasons they gave were not true.

BY MR. STARR:

Q.   Is the fact that Dr. Alphonso was younger than you evidence of age discrimination?

MR. STEIGMAN:  Objection.

THE WITNESS:  Well, the fact that she was younger and less qualified than I was. I was certainly qualified to handle this position.  In fact, I created the entire program.

BY MR. STARR:

Q.   And what made Dr. Alphonso less qualified than you?

A.   The fact that she doesn't teach law courses, she's in the Politics Department.  The fact that she

144

doesn't have a record of publications in law journals as I have. The fact that she does not present scholarly papers at law conferences that I present, and have presented over a period of time, I believe makes me more qualified than she is.

Q. Is any of that required to fill the position of Director of the Pre-Law Advising Program?

MR. STEIGMAN: Objection.

THE WITNESS: Well, prior to my taking the job, the people who were Pre-Law advisors were not lawyers.

But it wasn't a program then.

BY MR. STARR:

Q. How would you describe the essential functions of the job of the Director of the Pre-Law Program?

MR. STEIGMAN: Objection.

THE WITNESS: I think trying to promote at all times the interests of the students. Trying to interest them in the law, to determine if they are suitable to pursue a law career, to be candid with them about their shortcomings in terms of their grade point averages and where they fell short on the LSAT exams, to be candid

152

Pre-Law Advising Program, did you work with the Office of Institutional Research?

A.    No.

Q.    In Paul Fitzgerald's letter to you in July of 2012 appointing you, he references using the Office of Institutional Research.  Why did you decide not to use that office?

A.    I guess I was busy with other activities connected with the program and I didn't think much about it.

Q.    And did you take any steps to establish internships, other than to talk with the woman at the Dolan School of Business?

A.    I spoke with Rick Newman, who --

Q.    Rick who?

A.    Newman, N-e-w-m-a-n, who is the Director of the American Museum of Tort Law in Winsted.

Q.    And when was that?

A.    The museum I think opened in --

Q.    No, when did you talk to Mr. Newman?

A.    I was trying to recall the date here.  I think it was in late 2015.

Q.    And what did you discuss with him?

A.    I discussed any possible opportunities for positions as docents or guides at the museum for my

students.

Q.    And what was his response?

A.    The museum was just getting underway.  He said that one of the board members was the Dean at the University of Connecticut School of Law who might be interested in having his students involved, so he never followed up and said we have any opportunities.

Q.    Did you ever follow up with him?

A.    I have seen him a couple times since but not during the time I was Pre-Law Director.  He's an adjunct at Fairfield occasionally.

Q.    Any other steps you took to try to establish internships?

A.    No.

Q.    During the time that you were the Director of the Pre-Law Program, did you see any change in the tier of the law school that students were getting into?

MR. STEIGMAN:    Objection.

BY MR. STARR:

Q.    Do you understand what tiers of law schools are?

A.    Yes, I do.

Q.    Okay.

A.    We had a few prospects get into Fordham, which was considered higher tiers than some of the others that

STATE OF CONNECTICUT   :
                       :   ss
COUNTY OF NEW HAVEN    :


         I, SANDY K. VISENTIN, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to notice there came before me on August 14, 2018, the following-named person to wit: SHARLENE MCEVOY, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this transcript is a true record of the testimony given by the witness.

         I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

_Sandy K. Visentin_

_____          DATED:   August 20, 2018
Sandy K. Visentin
LSR, RPR and Notary Public
CSR No. 234

My Commission Expires:
August 31, 2021