# EXHIBIT 12

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SHARLENE MCEVOY,                 )  CIVIL ACTION NO.:
                                 )  3:17CV01861 (MPS)
                                 )
                 Plaintiff,      )
                                 )
        vs.                      )
                                 )
FAIRFIELD UNIVERSITY,            )
                                 )
                                 )
                 Defendant.      )
_____)

TELEPHONIC DEPOSITION OF LYNN BABINGTON, Ph.D.

        Taken on behalf of Plaintiff, Sharlene McEvoy, at Chaminade University, 3140 Waialae Avenue, Honolulu, Hawaii, commencing at 8:09 a.m., on Friday, August 31, 2018, pursuant to Notice.

BEFORE:        ADRIANNE IGE KURASAKI, CSR 388
               Registered Professional Reporter
               Hawaii CSR #388; California CSR #11470

2

APPEARANCES *(via Teleconference)*:

For Plaintiff, Sharlene McEvoy:

      TODD D. STEIGMAN, ESQ.
      Madsen, Prestley & Parenteau, LLC
      402 Asylum Street
      Hartford, Connecticut   06103
      (860)246-2466
      tsteigman@mppjustice.com

For Defendant, Fairfield University:

      GARY STARR, ESQ.
      Shipman & Goodwin, LLP
      One Constitution Plaza
      Hartford, Connecticut   06103-1919
      gstarr@goodwin.com

3

INDEX OF EXAMINATIONS

PAGE

LYNN BABINGTON Ph.D.

Examination by Mr. Steigman                    4

Examination by Mr. Starr                      99

EXHIBITS MARKED FOR IDENTIFICATION

NONE

Q    Okay.  And prior to that, were you employed at Fairfield University?

A    I was.

Q    And during what period of time were you employed at Fairfield University?

A    I'll have to think of the exact date.  I started on June 1st.  I'll back it up for a minute.

I was the dean for the school of nursing for two years.  I'll get the date in a moment.  Then I became the provost for two and a half years, then I was the interim president.  And I left there June 30th, 2017.  So let's see.  I was there five years.  So that must have been '12 -- June 1st, 2012.

Q    Okay.  So June 1st, 2012 is when you started your employment at Fairfield University; is that correct?

A    Correct.  And I finished June 30th, 2017.

Q    Okay.  And for the first two years of your employment at Fairfield University, you were the dean of the school of nursing; is that right?

A    Correct.

Q    Okay.  And then you became provost of Fairfield University and you were the provost for two and a half years, did you say?

A    Correct.

Q     Okay.  So does that mean that you became provost in 2014?

A     Yes.  July 1st, 2014 actually it might have been June 1st, 2014.  June or July.  I don't remember.

Q     Okay.  And then do you remember the approximate date that you became interim president?

A     January 1st, 2017.

Q     Okay.  And, Dr. Babington, did you leave your employment at Fairfield University voluntarily or involuntarily?

A     Voluntarily.

Q     And at the time that you left Fairfield University, did you enter into any contracts or agreements with the university?

A     Not with Fairfield University, no.

Q     Okay.  After you left your employment at Fairfield University, did you enter into contracts with anybody else?

A     My current employer, Chaminade University of Honolulu.

Q     Okay.  So there's currently no contractual provision, that you're aware of, that requires you to cooperate with Fairfield University in connection with the defense of this case; is that correct?

pre-law advisory program was student-centered, can you explain what you meant by that term "student-centered"?

A    That's a term I used.  I doubt that Dr. Williams used that term.  In my view, "student-centered" means that a program is designed to help students learn with experiences embedded in a program that helps students to achieve their goals.

So in my view, a student-centered program would be one where an advisor would be readily available, would have mentoring relationships with individual students and groups of students, and would help them in their development.

Q    Okay.  And based on what Dr. Williams reported to you, his assessment was that the pre-law advisory program under Dr. McEvoy's directorship in the 2014-2015 academic year did not satisfy those criteria for how you just defined student-centered; is that right?

A    Correct.

Q    During the 2014-2015 academic year, did you ever personally communicate with Dr. McEvoy regarding her directorship of the pre-law advisory program?

A    No, not to my recollection.

Q    During the 2014-2015 academic year, do you have any knowledge of Dr. Williams meeting with Dr. McEvoy

Q       -- during that academic year?

A       I do recall being available to students, responding to e-mails, and evaluating the program for its effectiveness.

Q       Okay.  What did you mean by the last recommendation to evaluate the program for effectiveness?

A       To look at how the program was structured, look at best practices, and consider making some changes.

Q       Do you have any knowledge of any specific recommendations that Dr. Williams thought were appropriate in order to structure the program differently to make it more effective?

A       I don't have recollection of any of those details.

Q       Okay.  During any of your meetings with Dr. Williams during the 2014-2015 academic year, do you remember that either yourself or Dr. Williams identified any specific changes that should be made to the pre-law advisory program so that it could be structured differently and become more effective?

A       I don't have the program details in front of me right now, but I do recall looking at how it was structured and talking about changes that could have occurred.  I don't have any recollection of those

program, you came up with potential people that may be good candidates to lead the program instead of Dr. McEvoy; is that correct?

A    Correct.

Q    And approximately when in the 2014-2015 academic year do you believe that you and Dr. Williams identified those potential candidates?

A    Second semester.  Sometime in the second semester.

Q    Okay.  So that would be spring semester 2015; right?

A    Correct.

Q    And so that would have run from January -- mid January to mid May?

A    Correct.

Q    Is that how the Fairfield calendar worked?

A    Correct.

Q    Are you able to estimate with any more precision when those conversations took place between you and Dr. Williams in which you identified potential candidates to succeed Dr. McEvoy?  Was it closer to January or closer to May?

A    Closer to May.

Q    Okay.  And in those discussions in the spring semester of 2015, do you remember who you and

Dr. Williams identified as potential successors to Dr. McEvoy?

A    I do.

Q    Okay.  And can you identify those individuals for me, please?

A    Dr. Gwen Alphonso.  And we also talked about Deb Strauss, Dr. Debra Strauss.

Q    Any other potential candidates that you talked about in that period of time?

A    I do believe we talked about other candidates. I can't recall anyone's name right now.

Q    Okay.  The list of candidates, was it something that Dr. Williams generated on his own and presented to you or did you generate names and he also generated names?  Can you describe for me the process that was used to generate the list of potential successors?

A    I believe we were discussing who we thought together.  We were sitting together discussing who we thought would be able to create a very student-centric, best-practice, pre-law program and we determined that Dr. Gwen Alphonso would be a great match for a lot of reasons.

Q    Okay.  And what were those reasons?

A    First of all, she was an excellent teach- -- she was a lawyer herself, a well-respected scholar, an

excellent teacher, very dynamic, well-liked by students, and very creative in her teaching.

Q    Any other reasons that you remember that caused you and Dr. Williams to identify Dr. Alphonso as a candidate in the spring of 2015?

A    Not to my recollection.

Q    Did you also understand at that time that Dr. Alphonso was younger than Dr. McEvoy?

A    I'm confused by that question.

Q    Okay.  Well, did you understand at that time --

A    It's obvious.

Q    -- Dr. Alphonso --

A    The question makes no sense.  I knew both of them.  Of course I knew she was younger.

Q    Okay.  That's all I wanted to know.

Did you also understand that Dr. McEvoy was a lawyer?

A    Yes.

Q    Okay.  Do you believe that Dr. McEvoy was a well-respected scholar?

A    I do not believe she was a well-respected scholar.

Q    Why do you say that?

A    Because all of her publications are in a journal that is part of a professional organization to

practice at Fairfield to evaluate who best met these directorships at the end of every contract. And we were doing that as due diligence that we would have done for any directorship for a program. In this case, it was in three years. You look at the program, make a determination who would be the best leader for the program, to either keep the current one or move to someone else.

In the regular course of those discussions is when we began to identify other people who would be good to direct this program.

BY MR. STEIGMAN:

Q    Okay. So, Dr. Babington, based on the clarification that you did not have access to Dr. Alphonso's promotion and tenure application materials in the spring of 2015 when you and Dr. Williams initially identified her as a potential candidate to succeed Dr. McEvoy, what information did you rely upon to assess that she was creative in her teaching?

A    Student feedback. Her classes were always over enrolled. Her students loved her classes. And it was general knowledge around campus.

Q    And how did you know that students loved her classes?

A    Talking to them.

Q    So specific students came up to you personally and said that they loved Dr. Alphonso's classes?

A    In my role as provost, I had lunch with students all the time and I would sit down and talk with them about what they're studying, who their favorite professors were, why they liked the classes. So in the context of that, that's where I gained the information.

Q    Okay. So did specific students tell you personally that they loved Dr. Alphonso's classes?

A    They did.

Q    Did you ever personally ask students who were taking classes with Dr. McEvoy whether they enjoyed her classes?

A    No. But I had a student personally tell me that he thought that she was very vindictive if she did not like you in class, during one of those lunch conversations.

Q    Okay. And what student was that?

A    I would have no idea of the student's name. It was a male.

Q    Okay. Did you ever do anything to follow up on that student's concern to try and address it?

A    I did address in general with Dr. Don Gibson

serving as the director of the pre-law advisory program at any point in the 2014-2015 academic year?

A    Not to my recollection.

Q    Is it the case that after Dr. Alphonso declined the offer to serve as the director of the pre-law advisory program in the spring of 2015, that the decision was made to offer Dr. McEvoy additional time as the director of the program; right?

A    A one-year extension.

Q    And who made that decision to offer Dr. McEvoy a one-year extension?

A    Dr. Williams.

Q    Okay.  Did he make that decision with your approval?

A    Yes.

Q    And why did you feel that it was appropriate to approve a one-year extension for Dr. McEvoy to serve as the director of the pre-law program at that time?

A    Our goal was to improve the program and make it state of the art, best practice, student-centered.  It wasn't bad the way it was.  It just wasn't good.  And Dr. McEvoy had proven that she could adequately run the program.

        But we definitely wanted a change and Dr. Alphonso had indicated that when she received -- if

A       To my recollection, we discussed that he had talked to her about that.

Q       And when do you recall you and Dr. Williams discussing that he had talked to Dr. McEvoy about the fact that she was not going to be reappointed?

A       As we were sitting down looking at the other reappointments.  So it would have been the end of the spring semester.

Q       Would that have been in June or in May?  Do you remember the month?

A       No, I don't remember the month.

Q       But ultimately, the decision was made to not reappoint Dr. McEvoy for continued service as the director of the pre-law advisory program after the conclusion of the 2015-2016 academic year; is that right?

A       Correct.

Q       And who made that decision?

A       Dr. Williams would have made the decision or would have recommended that and I would have approved his recommendation.

Q       Okay.  And do you recall when Dr. Williams made the recommendation to not continue Dr. McEvoy as the director of the pre-law program?

A       Not the exact time.  As I said, the end of the

spring semester.

Q     That recommendation that Dr. Williams made and that you approved, do you remember any documents memorializing that decision or was it a verbal conversation?

A     I don't remember any documents memorializing the decision.

Q     Okay.  And can you explain to me all the reasons why you approved the decision to not continue Dr. McEvoy as the director of the pre-law advisory program at the conclusion of the 2015-2016 academic year?

A     I would like to reframe that.  We were looking to appoint the best director for a program in evaluating all programs at the university, and Dr. Gwen Alphonso, we felt, would be able to institute best practices and revise and revamp the pre-law program to make it more student-centered, student-focused, and improve outcomes for our students.  That's how the decision was made to appoint Dr. Alphonso.  It wasn't the decision not to appoint Dr. McEvoy.

Q     Well, you did make a decision not to continue Dr. McEvoy's appointment; right?

A     Dr. McEvoy had a one-year appointment.  We did not reappoint Dr. McEvoy.

Q        Okay.  And so why did you not reappoint her?

A        We -- I just explained the entire reason.

MR. STARR:  Asked and answered.

THE WITNESS:  I think what you have to understand is this wasn't the only case.  There was another program that I worked with the dean and we did exactly the same thing.  We're looking for best practices to revise the program to make it student-centric and student-friendly.  And if it resulted in somebody not being reappointed but somebody being appointed that we felt would better match those outcomes that we were hoping to attain, we did so.

BY MR. STEIGMAN:

Q        Okay.  So Dr. Babington, why did you decide to not reappoint Dr. McEvoy at the conclusion of the 2015-2016 academic year?

A        In looking at -- I already answered that, but I'll answer it again.

In reviewing the pre-law program as it currently stood, we were looking for the program to be revised to reflect best practices, to be student-centric, student-focused, so that our students -- the outcomes for our students could be improved.  We did not feel Dr. McEvoy was able to, in a directorship, lead the program in that way.

(Cell phone interruption.)

THE WITNESS:  That's not my phone.

BY MR. STEIGMAN:

Q    Okay.  Dr. Babington, were there any particular best practices that you felt that Dr. McEvoy was not instituting when she was the director of the pre-law advisory program?

A    I'm not a pre-law advisor, so I would leave it to somebody to investigate best practices, make recommendations for changes to a program to meet what best practices are.  I would never have made specific recommendations to the program.  It's not my field.

Q    But did you make a determination that Dr. McEvoy was not instituting best practices when she led the pre-law program?

A    Correct.

Q    Okay.  So how did you determine that Dr. McEvoy was not instituting best practices when she was the director of the pre-law program?

A    The program had been doing the same thing for years with the same outcomes.  It wasn't student-focused, student-centric.  We were not improving our connection with our alumni and finding internships for our students.  No changes had been made over the years.

Q       Okay.  And what years are we talking about, just so I'm clear.

A       The years that Dr. McEvoy was the director of the program.

Q       And how many years do you believe she was the director?

A       Beginning in 2012.  Fall of 2012.

Q       Do you believe that Dr. McEvoy improved the program over what was in its place before 2012?

A       I don't know.

Q       Did you ever endeavor to find out --

A       No.

Q       -- what the pre-law program looked like before 2012?

A       No.

Q       When you testified that you determined that the pre-law program was not student-centered, what did you mean by that?

A       In my view, a student-centered program is one that provides the development, mentorship, to help students achieve their goals.  And Dr. McEvoy's inaccessibility, slowness in responding or not responding at all to e-mails and not being available on campus to our undergraduate students at the time that they are on campus was evidence to me that that's not

student-friendly or student-centered.

Q     And the fact that you had just identified Dr. McEvoy being inaccessible, slowness in responding, not responding, and not being available to students when they needed her to be available, is that -- are those determinations that you made personally or were you relying on Dr. Williams' determinations as to those deficiencies --

MR. STARR:  Object to the form of the question.

MR. STEIGMAN:  -- in arriving at --

THE WITNESS:  I --

MR. STARR:  Dr. Babington, you can answer that.

THE WITNESS:  Dr. -- I was relying on Dr. Williams.

BY MR. STEIGMAN:

Q     Okay.  So you never personally made a determination that Dr. McEvoy was inaccessible to students; right?

A     I'm not sure what you mean by "personally."

Q     Well, did you reach your own personal conclusion that Dr. McEvoy was inaccessible to students?

A     Based on the information I had, that is the conclusion I came to.

Q     Okay.  And what's the information that you had

You were talking about the leadership position versus academic positions and how those appointments are made. Could you describe for us how leadership positions are -- how those appointments are made generally?

A      Okay. Leadership positions -- it depends on the leadership position, but leadership positions are appointed and they're appointed by administrators or those serving in an administrative role. In contrast, academic faculty positions are approved ultimately by faculty.

Does that answer your question?

Q      Okay. And is there a process that is used to fill those kinds of leadership -- director -- how about director positions?

A      Repeat the question, please.

MR. STEIGMAN:  Object to form.

You can go ahead.  Sorry.

BY MR. STARR:

Q      Yeah.  In terms of director positions, which are leadership positions; is that correct?

A      Correct.  I think the leader --

Q      Is there a process -- I'm sorry?

A      I understand what you're asking now.  There's no direct process.  The point of leadership positions

for programs are twofold. One, to provide opportunities for faculty to assume leadership positions and have that experience, which actually is part of how they're able to get promoted to a full professor. And then part of it is to leverage the expertise of faculty in particular areas to enhance programs that are typically interdisciplinary, cross-disciplinary programs, as this pre-law program was or is.

Q     You indicated that there were other directorships in the college of arts and sciences?

A     Yes.

Q     Is that correct?

A     Yes.

Q     Okay. And you recall what directorships there were?

A     These are for interdisciplinary programs. I'm going to get some of the names wrong, probably. But there's the center for the humanities, I think. But I don't think that's exactly what it's called now. And that has a directorship that rotates, you know, over time. For example, I think Ron -- I can't think of his last name. He was the director of it with a couple of associate directors and then they changed.

There was the Irish studies program, Black

studies program.  There's quite a few programmatic pieces like the pre-law program that a director -- a faculty is appointed as the director for a period of time, and then typically that directorship rotates.

That's different than, say, an administrative position, like a dean whereby somebody is hired as a full-time permanent position in a deanship.  The director positions are not meant to be permanent positions held by one person.

Q    Okay.  And in terms of the interdisciplinary program that you just identified, who is the -- who decides on the appointment of the director?

A    The dean.  So the dean for the college of arts and sciences typically makes that recommendation.  The pre-law program, when I entered the provost office, was held within the larger provost office instead of in the college of arts and sciences.  So therefore, the decision about the directorship was within the provost office by an assistant or associate vice president for academic affairs.

Q    And when Dr. Williams went back to obtain the interim dean of the college of arts and sciences and continued to supervise the pre-law program, did that become similar to the other disciplinary programs with the appointment being by the dean as opposed to the

provost office?

A    Correct.

Q    If you -- okay.

Were there any other directorships that were directly in the provost office when you were provost?

A    Catholic studies.  But that was a permanently appointed endowed professorship.  The center for Catholic studies at Fairfield is a totally endowed center and the faculty member that holds that appointment is by virtue of an academic appointment, not an administrative appointment, if you will.  It's more a deep dive into the scholarship.

Oh, also the center for Judaic studies.  Again, that was a permanently appointed administrative position.

So, no, besides the pre-law program, there were no programmatic areas that were held directly in the provost office.  They typically sat in the schools, as now the -- I assume right now, the prehealth law program -- or pre-law program sits within arts and sciences.

Q    Okay.  Do you know whether or not, when Dr. Alphonso was appointed the directorship of the pre-law advisory program, she was given any directives as to what she should do to change the program?

CERTIFICATE

I, ADRIANNE IGE KURASAKI, C.S.R., in and for the State of Hawaii, do hereby certify:

That on Friday, August 31, 2018, at 8:09 a.m., appeared before me LYNN BABINGTON, Ph.D., the witness whose testimony is contained herein; that, prior to being examined, the witness was by me duly sworn or affirmed; that the proceedings were taken down by me in computerized machine shorthand and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

This 104-page Deposition of LYNN BABINGTON, Ph.D., dated August 31, 2018, was subscribed and sworn to before me this 18th day of September, 2018, in the First Circuit of the State of Hawaii, by Adrianne Ige Kurasaki.

_____
Adrianne Ige Kurasaki, CSR 388
State of Hawaii