# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No. 3:17-CV-01861 (MPS)

- - - - - - - - - - - - - - - - - - - - - - - -

Sharlene McEvoy, an individual,

Plaintiff,

vs.

Fairfield University,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

YOHURU WILLIAMS

- - - - - - - - - - - - - - - - - - - - - - - -

Taken September 6, 2018          By Deanna Oaks

Page 2

APPEARANCES:

MADSEN, PRESTLEY & PARENTEAU, LLC
402 Asylum Street
Hartford, Connecticut  06103
Phone:  860.246.2466
Fax:  860.246.1794
Email:  tsteigman@mppjustice.com
By:  Mr. Todd Steigman
       For the Plaintiff

SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut  06103
Phone:  860.251.5000
Fax:  860.251.5316
Email:  gstarr@goodwin.com
By:  Mr. Gary S. Starr
       For the Defendant

Page 3

I N D E X

Examination by MR. STEIGMAN  Page 4

INDEX OF EXHIBITS

2       Report of the Pre-Law Program 2015
        Page 95
3       Email Chain From Dr. Williams to
        Ms. McEvoy Page 117
6       Report of the Pre-LAw Program 2016
        Page 126
7       Email Chain From Dr. Alphonso to
        Dr. Williams Page 134
9       Email Chain From Ms. Baer to Dr.
        Williams Page 141
11       Email Chain From Ms. Babington to
        Dr. Williams Page 148
13       Letter to Dr. Gwen Alphonso Page
        147
15       Email Chain From Ms. Sally to Dr.
        Williams Page 156
18       Defendant's Responses to
        Interrogatories Page 182

Page 12

end in June of 2017?

A. Yes, it did.

Q. And what was the last position you held at Fairfield?

A. Interim Dean of the College of Arts and Sciences.

Q. Did you say interim dean?

A. Interim dean, yes.

Q. Okay. And during what period of time did you hold the position of interim Dean of the College of Arts and Sciences at Fairfield?

A. For -- let's see -- 2015. September of 2015 to June of 2017.

Q. Did you consider that a long period of time to be interim dean?

A. It's not unusual by academic standards.

Q. Okay. And before September of 2015, what was the position that you held at Fairfield?

A. And actually, I think I have to clarify that. I don't think it was September. It must have been -- there was a dean in place who was replaced; so it must have been June of 2015 to June of '17 that I was interim dean. Before serving as interim dean, I was an associate vice president for academic

Page 29

told him that they had difficulty reaching Dr. McEvoy or that Dr. McEvoy did not make herself available to people in the development office?

A. No, he did not.

Q. So other than the challenges that we just went over, as it related to the availability of Dr. McEvoy, her being accessible via email and phone and issues with the development office as it related to accessibility and availability for Dr. McEvoy, did you have knowledge of any other complaints that David Sapp communicated to you as it related to Dr. McEvoy's directorship of the Pre-Law Advisory Program at that time?

A. As I shared, I believe there were also -- he shared some concerns about the curricular -- the direction of the program where the program did not seem to be responding to changing avenues for the preparation of young people into law school particularly around health care and technology. It seemed kind of frozen around corporate and criminal law, and so that was part of the conversation we had as a challenge as we thought about -- as

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 30

I was assuming that position, helping pre-law move forward and think about some of those opportunities. Opportunities to engage recent alum, opportunities to think about how we could reach out to other law schools perhaps or -- sorry -- law school perhaps, to create a pipeline for Fairfield University students into those programs.  But they were not very high level conversations.  David at that point was on his way out the door.  He just shared that this was one of the challenges that he'd had was that moving that -- moving Dr. McEvoy in the direction of taking some of that on and steering the program in a way that would address some of those concerns.

Q.  Okay.  At that time in June of 2014, was your understanding that the Pre-Law Advisory Program had a set curriculum to it?

A.  Can you repeat your question.

Q.  Sure.  As I understood your testimony, I believe you used the phrase that there were concerns about the curriculum direction of the Pre-Law Advisory Program, and so I was trying to follow-up on that and ask you if you understood at that time in June of 2014

Page 31

that the Pre-Law Advisory Program did have a set curriculum as part of the program?

A. No. I would not have been aware of that at that time, but there was a curriculum that appeared obviously in the student handbook. But, you know, like most universities of Fairfield's size, that curriculum was very flexible in terms of what students could take to satisfy the requirements for pre-law, and that included courses both in the business school and the College of Arts and Sciences and various departments. At that point I was not very familiar with it. I probably had advised some pre-law students in the past about what they could take specifically in my department or in the college, but that would have been my first kind of deep dive into it; so, so no.

Q. Okay. And so at that time when you met with David Sapp and he expressed concerns to you regarding the curriculum direction of the program and highlighted issues such as health care and technology that might be deserving of some more emphasis in the curriculum program, was it your understanding that David

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 32

Sapp thought that the Pre-Law Program should facilitate actual courses taught by professors in those subject areas of health care and technology?

A.  Again, they were not high-level conversations.  It was just him sharing what he believed to be specific challenges to the program and the fact that in that program in particular, we didn't appear to be responsive to kind of emerging fields in the law, things that I later came to understand in conversations with people after David Sapp left.  Specifically, the development office after David Sapp left about potential for giving donations associated with us moving more aggressively in that area, and then later on in conversations, not just with development, but in terms of thinking about Fairfield 2020 about student outcome specifically and whether we were doing our students a disservice by not focusing on a full range of opportunities for them in terms of careers in the law.  So not just a corporate or criminal pathway, but a pathway to careers that would include applications of

Page 33

the law in human resources, the application of the law in intellectual property, technology, and in health care.

Q. Okay. So right now I just want to stay focused on the conversation you had with David Sapp in 2014. So other than what you've already testified to, you know, the high-level discussions that you described in which it was communicated to you that David Sapp had concerns about the curriculum direction of the program, and, you know, not a sufficient emphasis on curriculum development and emerging issues like health care and technology, did David Sapp communicate anything else to you in that -- in June of 2014 that you haven't already testified to?

A. No. I apologize. I'm sort of cutting you off. Do you mind repeating your question. I just want to make sure I heard it in it's completeness.

Q. Sure. So for the moment I just want to stay focused on the June of 2014 time period, and you provided testimony about conversations that you and David had during that month as

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 34

it related to the Pre-Law Program and your recollection that David Sapp communicated some concerns about challenges that he saw with Professor McEvoy's directorship at the program, and one of the things that I understood you say is that you had high-level discussions with David Sapp at that time about concerns that David Sapp had about the curricular direction of the Pre-Law Program and that there wasn't a sufficient emphasis on highlighting emerging issues in the law such as technology and health care as part of the curriculum of the Pre-Law Advisory Program. So other than what you've already testified to, is there anything else David Sapp communicated to you about Professor McEvoy's directorship of the Pre-Law Advising Program in June of 2014?

BY MR. STARR:

Object to the form of the question because he's identified availability.

BY MR. STEIGMAN:

Right.

BY MR. STARR:

And development office issues.

Page 35

BY MR. STEIGMAN:

Right.

BY MR. STARR:

Okay.  So in addition to those.

BY MR. STEIGMAN:

Q.  Yeah.  So right now we just talked about curriculum direction.  I think we already covered availability and accessibility.

BY DR. WILLIAMS:

A.  Yes.  The final thing -- or another thing, excuse me -- that Dr. Sapp mentioned was that Dr. McEvoy's directorship would be coming to a close in the '14, '15.  That was her third year.  And he shared that that would be an opportunity to think about someone we could bring on that would help the program respond to those issues that he had highlighted.

Q.  Okay.  And when you just referred to the issues that he highlighted at the end of your last answer, can you just tell me what you're referring to just to make sure that there wasn't anything we haven't already covered.

A.  I want to be very clear in the way that I'm sharing this.  So these are not -- were not necessarily -- there were the issues with the

Page 36

availability that I shared and the curricular direction of the program, but there was also the opportunity to think about new directions for pre-law, what we would do, and maybe thinking about bringing someone in or reimagining a program in a way that would be more responsive to the higher level issues of how we focused more concretely on student outcomes. So the conversation at that point was really about here's a chance within the next year to think about how we might reimagine this program and the direction it's going in, and that would or could include a new director, and that was what he shared with me.

Q. Did -- in June of 2014, did David Sapp identify anything for you that he thought that Professor McEvoy should have been doing as the director of the Pre-Law Program, but was not doing?

A. Dr. Sapp talked about a number of things. I'm not gonna have the clearest recollection I'm not sure I'm gonna be able to give you an full shopping list, but I can highlight two that remain pretty fresh in my memory. One

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 37

was the fact that in addition to not being accessible, Dr. McEvoy wasn't the most tech savvy in terms of her annual reports. There were some issues in terms of the reporting and how she was sharing what she accomplished and some real concerns about whether they were demonstrable things we could point to that she was doing. It looked like a little bit like her reports were -- as he shared at that time -- a cut-and-paste, and so there were some real issues with that. And the second thing I recall was him talking about were these donor relations in particular, and, again, this idea that we really needed to as part of -- as we were entering this strategic planning process, thinking very concretely student outcomes as they related to all programs, particularly programs like pre-law at that point, which was a university level, not a college level program, and that's why it was in the provost's office -- or under the provost's office.

Q. Okay. So as it related to donor relations, did Dr. Sapp communicate to you anything that he thought that Professor McEvoy should have

Page 38

been doing, but she was not doing as the director of Pre-Law Program?

A.  Not at that time, no.

Q.  And as it related to Professor McEvoy's annual reports, did Dr. Sapp identify things that he thought that Dr. McEvoy should be doing differently in annual reports that she was not doing?

A.  I think what he shared -- I'll just stick to him for now and not talk about what I saw, but what he shared was, again, difficult kind of accessing any metrics, because the reports were so similar from year to year and didn't appear to have a great deal of care put into their completion.  So it was very difficult to kind of assess because they were not in the form that you would get or that you got from other programs.  Having been chair of the department of history for example, we had a blueprint to follow, and it was, you know, pretty fairly clear about what you needed to report, and, again, he shared that at that time his concern was that her reports were not terribly helpful in kind of identifying or addressing new directions for the program,

Page 39

what'd actually been accomplished, those kind of things, the kind of brass tack things you need to know at that level to kind of advocate for or to point to the successes of a program.

Q. When you met with Dr. Sapp in June of 2014, did he communicate to you that he had previously shared any of these concerns with Dr. McEvoy?

A. Yes, he did.

Q. Okay. And what did he tell you about that?

A. Just that he had shared those concerns.

Q. Did he provide you any information about how Dr. McEvoy responded to any of the areas he highlighted when he previously shared the concerns with her?

A. He did share, and, you know, I don't recall anything specifically. I do know that he shared that Dr. McEvoy could be difficult at times in addition to having difficulty getting in touch with her, that she had a little bit of a prickly personality and just warned that in working with her I needed to be aware of that. Because sometimes that could be an impediment of her understanding

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 40

wasn't being communicated and her acting on it. So kind of a general defensiveness. So, again, nothing -- he wasn't terribly specific about that. He just said none of those things would have been a surprise to her because he had shared those with her. And just kind of gave me that general word of advice in terms of working with her that she could be prickly.

Q. Okay. Okay. So, Dr. Williams, do you remember anything else about your discussions with Dr. Sapp in June of 2014 relating to Professor McEvoy's directorship of the Pre-Law Advisory Program that you haven't already testified about?

A. Not that I can recall right now.

Q. Did you prepare any documents at that time or take any notes as part of these discussions that you had with Dr. Sapp in June of 2014 relating to the Pre-Law Program?

A. Nothing that I would have retained.

Q. Okay. Does that mean that you did take notes at the time but did not retain them?

A. I'm what they call a scribbler. So I tend to write all over papers and in the margins.

Page 46

position as the director of the Pre-Law Program?

A. The first thing I recall is it was very difficult for my administrative assistant to schedule; so we went back and forth before we were finally able to get it scheduled. Now to be fair to Dr. McEvoy, it was in the summer; so, you know, it's not unusual for faculty to be scarce and difficult to contact, but it did take us a minute to get that scheduled.

Q. Okay. But ultimately you were able to schedule something with Dr. McEvoy in the summer of 2014 where you and she met in person; is that right?

A. That's correct.

Q. Okay. And what do you remember about that meeting?

A. I remember asking Dr. McEvoy to share what her goals were for the program and just give me her general assessment of the program. I remember talking with her in general about the Fairfield 2020 strategic planning process and the focus of student outcomes, mentioning how we wanted to be very, you know, strategic

Page 47

in the way that we were thinking about positioning university programs and then asked her about what her overall assessment was of some of the concerns that were shared about technology and health care and how she what she was doing to kind of align with that, how she felt about 3/3 programs which are programs where university students will do their first three years at their undergrad institution, and then two years at a law school and have that final year from -- or three years at a law school, and have that final year count toward their, their, their first year at their law school count toward their final year of their undergrad degree. So it was those kind of -- that kind of get acquainted, let's get to know each other, what are your goals for the program, here's what challenges have been shared with me, how do you feel about these initiatives that will likely be part of this 2020 strategic planning initiative.

Q.  When you first met with Dr. McEvoy in the summer of 2014, did you communicate to her the concern that Dr. Sapp had shared with you

Page 48

that some people have difficulty communicating with Dr. McEvoy and there was concerns about her availability and accessibility?

A. I believe we talked about it, and I believe she, again, I'm not sure on the timeline here because I, I do remember it being part of the conversation. I don't know how big of a part of the conversation it was at that time. It was really my get-acquainted with her that first meeting. I do remember sharing those concerns. I remember her kind of defending herself and, you know, immediately becoming a little defensive about it, but I can't recall the specifics.

Q. Okay. But you do have a specific recollection of you sharing with Dr. McEvoy in summer of 2014, when you met with her, the concerns that Dr. Sapp shared with you relating to Dr. McEvoy's alleged unavailability and accessibility and her responding to it by defending herself?

BY MR. STARR:

Objection to form of the question.

BY DR. WILLIAMS:

Page 49

I don't think that's --

BY MR. STEIGMAN:

Q. You can still answer Dr. Williams, if you understood --

BY DR. WILLIAMS:

A. I don't -- I understand the question. I don't think it's a fair characterization to say. I said she seemed to be a bit defensive. I didn't say she was defending herself. She just seemed -- you know, ordinarily when you have those conversations you're just trying to get a sense of the program, you would expect the person to be an a little bit more open to, especially with new leadership, and that's what we had across the board, a new provost, a new associate vice president for academic affairs. The only constant in that office at that point was Christine Siegel who was my colleague. So it was it was a little -- I think she was a little at that point defensive in the way that she talked about it and didn't you would expect -- or I would have expected -- and I had other conversations with other stakeholders where challenges were shared and

Page 50

they were a little bit more open to understanding that, you know, this was part of a whole idea of us being strategic and thinking how we could -- because the subtitle of 2020 was positioning for the future. So the whole question was How can we better position for the future? But it wasn't necessarily a conversation I would expect somebody to be defensive about, but she was a little defensive.

Q. And when you -- when you first met with Dr. McEvoy in the summer of 2014, did you share with her the concern that Dr. Sapp had shared with you about Dr. McEvoy's perceived unwillingness to engage with the development office?

A. I believe we did. We did talk about that.

Q. Okay. And when you say you talked about it, what did you say to her about that topic?

A. I don't recall. The problem I'm having with this is the timeline a little bit, because I can't remember. I just cannot be specific with regard to whether we had a subsequent conversation after I talked to development. So I don't -- I don't want to mistakenly lump

Page 51

together what became a running conversation as a result of some concerns that were raised by development in addition to what Dr. Sapp shared.  I do know it was part of our initial conversation.  The extent to which we talked about it, I can't recall.

Q.  Okay.  Is part of that, again, right now we're just focusing on the first meeting in the summer of 2014 when you presented Dr. McEvoy with concerns about engagement with the development office.  Do you remember what she said to you in response?

A.  I believe she talked about the kind of locus of that being one person and that she was, again, very defensive about it and said that she didn't see what the -- essentially she didn't see what the problem was.

Q.  Okay.  At that time what was your understanding of the problem with Professor McEvoy and the development office?  Again, right now I just talking about first meeting.

A.  Are you talking about the first meeting?  At that time I don't recall because, again, I had a subsequent meeting with development personnel that gave me a different

Page 52

understanding.  So I don't recall.

Q.  Okay.  That's fine.  And during that first meeting you had with Dr. McEvoy in the summer of 2014, did you inform her that you wanted her to do anything differently in connection with her preparation of the annual reports?

A.  No, we didn't.  At that point I was looking at the previous year's annual reports; so it wouldn't have been the time to talk about the next year at that point.

Q.  Okay.  And during the first meeting that you had with Dr. McEvoy in the summer of 2014, did you tell her that you wanted her to do anything different as it related to the subject matter of student outcomes?

A.  We talked about pursuing how I really wanted the Fairfield Pre-Law Program to pursue 3/3 programs, and we talked about making sure that pre-law, like all other programs, should be deeply engaged with and attuned to what was happening with Fairfield 2020, the positioning for the future.

Q.  Okay.  Other than the 3/3 programs, did you have any other specific suggestions to Dr. McEvoy that you wanted her to focus on in

Page 53

order to address any concerns about student outcomes?

A.  No, not at that point.  I think we might have talked briefly about -- she put on a couple of programs during the course of the year, and there was some suggestion that maybe she might do a better job, but, again, I don't -- that might have been a subsequent conversation.  I have to say I don't recall. I don't recall the specifics of that first meeting.  I met a lot of people that first month.  I had no reason at that point to be overly concerned, that was Professor Sapp's assessment, and I obviously took that under advisement, but it was also the summer, we had major strategic planning going on. Pre-law was a kind of a minor program in a very big portfolio.  So at that time, to be honest, I just don't recall the specifics of the conversation.

Q.  Okay.  You also previously testified that you had spoken with Dr. Babington as one of your initial steps to make your own assessment regarding the Pre-Law Program.  Do you have a specific recollection regarding what you and

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 56

after I came into the office, we were approached by two universities, Catholic University was one. I can't remember who the second was. And then later on I, approached Boston college and Georgetown, but Catholic University and Boston college were actually interested in having conversations with us about creating or establishing 3/3 programs. And at that time my understanding was that, and, again, you know, I'm coming into that position new -- that those -- that wasn't the first time we had been approached, it just hadn't been acted on up to that point. Of course, I took this to the provost, and she said this is something we need to pursue immediately. And I responded to Catholic University, I respond to Boston college, and I think I wrote Georgetown directly and asked about the possibility of establishing those types of programs, which would have addressed one of the key student outcome issues which was a clear pathway for Fairfield University into top tier law schools.

Q. Did you see it as Professor McEvoy's responsibility as the director of the Pre-Law

Page 57

Advisory Program in order the enter into 3/3 agreements with other colleges?

A. It, it certainly would have been something that I would have anticipated would have been on her radar because a big part of that job is student advising.  The challenges, if you go back to 2014 and we think about the landscape and legal education in 2014, there was an a lot of consternation around the fragility -- for lack of a better term -- in the legal profession and whether students who were coming through law school were getting a degree where they would be able to get high-paying jobs and be able to command the same type of lifestyles and income that a law degree once commanded.  We had several alums come back and complain.  It was one of my former students in particular who had earned a law degree and wasn't employed.  So there was this concern about making sure that we were ensuring that our students were getting opportunities given the cost of a Fairfield University education that would grant them access to A) law schools in a higher tier that would ensure at the very least that they

Page 58

would be viable and competitive for the best jobs, and then B) thinking very strategically how to lessen the burden and the cost associated with pursuing both an undergraduate degree at a private comprehensive university like Fairfield and then going on for law degree which were very expensive.  So, again, we were very much focused on students, very much focused on that.  You would assume, again, that a pre-law director -- because the people who were contacting us in some cases were, you know, in the provost's office, but in one case -- I think it was Catholic University, I'm pretty sure it was Catholic, although I'm not 1,000 percent sure -- it was the pre-law director who was reaching out.  But at the same time, those schools have law schools; so you can see that that was a priority for them as much as it was a priority for us, and certainly, you know, the -- you would anticipate that in doing that high level of advising, you would want to be able to offer students the opportunity particularly to have a chance to get into an expedited pathway to

Page 59

a top tier law school, and that's why we thought it was important. And, again, it didn't seem that there was any movement that had taken place on that front.

Q. So you -- do you believe that Director McEvoy as the director of the Pre-Law Advisory Program should have been trying to enter into 3/3 programs with other law schools or with law schools on behalf of Fairfield?

A. I do believe she should have been exploring the opportunities, yes.

Q. Once you became, you know, part of the administration at Fairfield in the September of 2014 and through the remainder of your tenure when you were part of the administration through 2017, did, did Fairfield University actually enter into any 3/3 programs with law schools?

A. No, not to my knowledge. Not while I was there, we did not.

Q. And the fact that Fairfield didn't enter into any 3/3 programs with law schools, that wasn't Dr. McEvoy's fault; right?

A. Can you -- I'm not sure I understand your question.

Page 67

A.  Those are the ones that I recall, yes.

Q.  Would the answer for why Fairfield University was not able to enter into any 3/3 programs with those additional law schools be identical to the information you provided regarding Catholic university, or would it be different?

A.  It would be the same.

Q.  Okay.  Other than that what you've already testified to, do you remember any other details about your initial communications with Dr. Babington about the Pre-Law Program?

A.  Not that I can recall.  The only other thing is that, you know, is that I think I shared is we did talk about that being Dr. McEvoy's final year and that might be -- it'd be appropriate at that point to start considering a change.  Again, reimagining the program, a change in leadership, new direction around the strategic initiatives I mentioned.

Q.  At that point in time, did you and Dr. Babington have specific ideas about how you thought the Pre-Law Advisory Program should be reimagined and changed around different

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 69

A. That's correct.

Q. Okay. Can you tell me when that occurred?

A. I couldn't tell you the date, I don't recall.

Q. Can you can you tell me more -- well, whatever you recall about the concern or complaint that you received from the development office?

A. I was contacted by a development officer who shared that he had some very specific concerns about the Pre-Law Program and that he wanted to meet with me to talk about those concerns.

Q. Okay. And who was that development officer?

A. His name was Christopher or Chris Pates.

Q. And as a development officer, what was Mr. Pates' responsibility?

A. The primary responsibility of Chris Pates was to raise funds for various programs at the University, and I believe his portfolio at that point included the Pre-Law Program.

Q. Okay. And what specific concerns about the Pre-Law Program did Chris Pates' team get to you?

A. Chris Pates shared three concerns which I saw as interrelated, but I'll share them

Page 70

nonetheless.  His first concern was that he had received complaints from alum about the direction of the program and the fact that the program did not seem to be addressing more contemporary issues in the study of the law.  He also shared that there was the possibility that some donors were resistant to continuing support programs because of the kind of lack of growth that they saw or Fairfield kind of being stuck and frozen in a way that was approaching certain issues, and then he also shared his concerns about Dr. McEvoy's resistance to him sharing those ideas and Dr. McEvoy's kind of prickliness and combativeness when he did reach out, when development did reach out to try to get, get some type of game plan and bring her into those conversations in a way that would help them address that as they were going out to try and raise revenue, not only for the program, but for the university.

Q.  Okay.  So regarding the first issue, do you know the identity of the alumnus who allegedly made a complaint to Mr. Pates --

A.  No.

Page 71

Q. -- about the program?

A. I, I apologize.  No, I do not.

Q. Do you have any more specific information about what the alum's complaint was regarding the direction of the Pre-Law Program?

A. At that time part of what Chris shared is that we were not -- the program appeared to be frozen.  Not, not his words, but, you know, kind of antiquated in a way that we were thinking about directions for law study, opportunities for student interns, pre-law advising around things like intellectual property, health care, emerging technology, those types of things that we seem to be kind of frozen in a -- in a -- in a model that was more 20th century, backward facing than 21st century.

Q. And have -- what was it about the Pre-Law Program that was frozen in those areas?

A. I think two things.  One was the pathway. So, again, we were very traditional, and by that I mean it was a focus on either you're going into criminal law or you're going into corporate law, and there was no clear way to engage.  For example, the biology student who

Page 72

might see law as an opportunity to be involved in health law policy or to engage a psych student in the say way, to think about public policy pathways through the study of law, to reimagine kind of law related fields that would combine minors, majors, and the pre-law program to give our students some distinctiveness so when they were applying to law school, they would have leg up on the competition. Of course, coming from a smaller school like Fairfield, again, as law school admissions were plummeting and schools in some cases were getting more selective, at least the highly sought after schools were getting more selective, and the lower tiers getting less selective, making sure that our students were competitive with those schools that are a bigger reach.

Q. How was the Pre-Law Advisory Program under Dr. McEvoy's directorship focused on criminal or corporate law to the exclusion of these other areas?

A. I would say that that really came from the director in the direction of the director, that Dr. McEvoy herself was very traditional

Page 73

and, again, that may have been a result of where she was and where she sat in relation to the university being in the business school.  We tend to academics -- this is no surprise here -- tend to focus our gaze in the area of where our training is, our specialization is.  To give you an example, with regard to myself as a historian, we tend to steer students to a graduate school and say You should get a graduate degree in history and not think about the emerging fields, emerging technology, other opportunities, and so on and so forth.  I think that was part of the critiques that was coming from the alums, part of what Chris was hearing in tems of donors who were saying that Fairfield doesn't seem to be kind of reimagining or recasting itself in a way to be responsive to the changing parameters of the legal field and new emerging opportunities for students that would give them the best opportunities to have a productive career in law which may include law school or may include a law degree toward some other purpose.

Page 74

Q. Do you have personal knowledge that Dr. McEvoy's advising that she was giving to students as the Director of Pre-Law Program was limited to advising students to pursue the law regarding criminal law or corporate law to the exclusion of these other areas?

A. Only what was shared with me; so anecdotal.

Q. So how would Mr. Pates know about the advising that Dr. McEvoy gave to individual students?

A. Mr. Pates was more directly engaged with alum many of whom were engaged with students in our program who were seeking internships or advising from those alums.  So he would have a better grasp of what was happening, and remember, I was still new to the program when Chris Pates shared those with me so at that point all that I would have known would have been anecdotal.  It's not something that would have been on my radar.  It wasn't part of my portfolio until that summer; so I didn't know.  It would not have been on my radar.  I would have been, you know, unaware of what was happening, because it's just -- is not something I would have been focusing

Page 75

on.

Q.  Do you have any understanding as to how an alum of Fairfield would have direct knowledge of what advising Dr. McEvoy was giving to students that allegedly steered them to only corporate or criminal law areas to the exclusion of other interests?

A.  You could just take a look at where students wound up and what they were doing to get a pretty clear portrait of that, and it's measured by where our students were going to school.  There were some alum, for example, that -- this was shared with me, again, I don't have specifics, I'm just sharing with you the way that this was shared with me -- who were disappointed in some of the destination schools that Fairfield students were coming out of, who felt that we should be preparing students for more prestigious law schools.  There were some who were concerned about monies they provided and whether those monies were being used to get students the best internship opportunities outside of more traditional pathways.  Again, those were not conversations that I would

Page 83

its primary focus on corporate and criminal law?

A.  Specifics -- I'm trying to think of if, again, it would be difficult for me to give you very concrete examples because it was so long ago.  But one of the things I could point to would be kind of the traditional advising that Dr. McEvoy provided to students, and, again, that's measurable.  You can look at it in the outcomes in terms of what students were going to into when they were going to law school from Fairfield.  But other than that, I don't think that I can provide you anything concrete.  I just don't recall.

Q.  And what do you know about the advising that Dr. McEvoy provided to students that reflected a primary focus on criminal and corporate law?

A.  What you saw were -- and I did have conversations with students to this regard. Students who also, again, were looking at this as kind of a very traditional pathway into the law, even as you were having alum come back and say Look, I got a law degree,

Page 84

and I can't get a job.  Look, I got a law degree, and right now it's intellectual property where you should be focused.  And, you know, people are -- even back in 2015 I remember this conversation about self-driving cars and folks saying, Look, you really need to start getting students to look at what are the legal parameters of these types of issues and not be talking about, you know, kind of the more traditional route.  So I think that's where it was manifested most acutely. And there were certainly students, again, I couldn't give you names, but there were students that I had conversations with who had also shared -- not so much concerns as much as having been told by others that, you know, you're not really -- you're, you're kind of prepared for a 19th century law career in the midst of a major change, and those students communicated some concerns around that and wondering whether they would -- and, again, as I shared, and my response, that is not a negative reflection on Dr. McEvoy as a teacher.  It's not a negative reflection on the preparation of these

Page 85

students on the program.  What it did show was kind of a tone deafness to our need to really be thinking about student outcomes in a way that provided us the best opportunity to make sure that our students were career-ready beyond this kind of traditional pathway of law school for the sake of practicing in one of those more traditional forms.  And, again, that would be the best that I could offer you in terms of, of, of the more concrete, but that is also in line with what Chris Pates shared, that alum were saying It just seems like you guys aren't thinking outside the box in terms of what it is and what students could actually accomplish if you reimagine this program a little bit.

Q. Do you have any personal knowledge of any advising that Dr. McEvoy provided to individual students that reflected a primary focus on corporate and criminal law?

A. I had several advisees.  I taught my constitutional legal history course while I was associate vice president.  I had several advisees who engaged with Dr. McEvoy.  You

Page 86

know, it's not -- it wasn't my purview as their professor in those classes to ask specifically about the advising they were getting.  It was my job to advise and to go to the pre-law director to talk about what they should be doing in terms of preparation or adequate preparation, not only for the LSAT, but for law school and opportunities. What I heard back from those students in many cases was that, you know, it was a more traditional pathway.  Now, again, that's anecdotal, but that was my experience, and I'm sure if you talked to those students, you would get them to, you know, share the same that it was kind of like, you know, this, this -- these are the staples.  And it was very difficult, as I mentioned, to just even get Dr. McEvoy to entertain a conversation about how we might address some of these concerns.  She was just rigidly focused on this is the way it's been done, and this is the way that we're gonna do it.

Q. So, Dr. Williams, were you ever personally present at any time when Dr. McEvoy advised students about law school and manifested a

Page 94

yes.

Q. Okay. Let's start with the meetings. So what do you specifically recall about any meetings that you had with Dr. McEvoy in the spring of 2015 about the Pre-Law Program?

A. Simply that we met and that there were continuing conversations about the direction of the program, and the kind of themes that really dominated that entire year, where were we on the 3/3, were we going to able to do this? Often Dr. McEvoy would just come and kind of share, you know, we did sit down and we were able to sit down -- share her planning for that end-of-the-year event and who she was planning on bringing in. That's what I remember, but, again, not, not -- it was a long time ago; so I don't recall specifics about those meetings.

Q. In the spring of 2015, do you remember communicating to Dr. McEvoy any perceived deficiencies in her performance as the Director of the Pre-Law Program?

A. I do remember telling -- the one I thing that I do recall us talking about was that that was her terminal year in terms of the

Page 98

remember at that time thinking that there was something inaccurate in what was contained in the report, do you?

A. No.

Q. During the 2014, 2015 academic year, did you ever communicate to Professor McEvoy what your expectations were for what should be included in the report she submitted to you in year-end?

A. No. Those reports were -- no. Those reports were standard. So every program director, every department chair, anyone in an administrative post -- it would not have been incumbent on anyone coming -- I became a department chair, no one had to tell me what to put in my report. That's just kind of, you know, the university has expectations, and you go through and you share what they've asked you in those reports, and that's what those reports should be a reflection of.

BY MR. STEIGMAN:

Q. Okay. What did -- what was not helpful about the report that Professor McEvoy submitted in May of 2015?

A. Well, I think part of it -- and if you just

Page 99

give me a second to review it because I haven't seen this in a couple years.

Q.  Take as much time as you need.

BY MR. STARR:

And we've been going for two hours.  It might be worth taking a bathroom break.

(Whereupon a break was taken.)

BY MR. STEIGMAN:

There's a question pending; right?

(WHEREUPON the court reporter read back.)

BY DR. WILLIAMS:

A.  The problem with the report is that it's a shopping list of things that Dr. McEvoy did throughout the year without any real strategic visioning or any attempt to engage with the priorities that had been shared. For example, the competitive summary and the historical introduction are problematic because they rehash her appointment as director from 2012 with no engagement in the fact that there had been a leadership change

Page 100

and we'd been asking for -- in line with Fairfield 2020 and this strategic plan -- for her to align the program with that strategic plan.  That's not here.  Under the section on strategic -- I'm on page 5 I believe -- strategic directions and university mission.  Again, and this was this was kind of -- one of the critiques of Dr. McEvoy.  It was the, the reports were -- they felt a little cut-and-pasted from year to year, formulaic, and there's nothing here about strategic direction or university mission center in a year when we spent an entire year talking about strategic planning.  So here was her opportunity to say This is what the university's articulating in terms of its strategic plan, here's how I see the Pre-Law Program positioned to contribute to positioning for the future.  There was none of that.  It was just some general observations about students in the program, and then you look at goals and potential growth, and it's the same thing.  So that's what I mean by it was disappointing.  Superficial.

Page 107

office.  And, you know, that's my recollection.  It's going back a couple -- a couple years so -- and I think she was also concerned about whether she would be maintaining the directorship of the program.

Q.  Okay.  But did you communicate to her that you perceived shortcomings in the report she submitted to you in May of 2015, or do you not remember?

A.  I recall specifically sharing that I felt it was a missed opportunity for her to align the program to 2020.  Beyond that, I do not recall.  I do know that I shared that.

Q.  Okay.  Do you remember how Professor McEvoy responded to you sharing that?

A.  I don't recall.

Q.  Okay.  Let's see. Dr. Williams, at that point in time in May of 2015, had you and Dr. Babington had conversations about offering the Directorship of the Pre-Law Advisory Program at Fairfield to somebody else other than Dr. McEvoy?

A.  I believe we had talked about it at that point, yes.

Q.  And do you remember that in approximately

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 108

May 2015 you offered the directorship of the Pre-Law Advising Program for the following year to Dr. Gwen Alphonso?

A. Yes, I do recall that.

Q. Okay. And at that point in time that you did that in May of 2015, why did -- what was the basis for the decision to offer the Directorship of the Pre-Law Program to Dr. Alphonso instead of Professor McEvoy going forward?

A. As I recall, it was threefold. One was an alignment, you know, the Pre-Law Program had been in the Dolan School of Business and in terms of the student outcomes that were very important to Provost Babington, central to our conversation and Fairfield 2020, it was felt at that time that it should be somebody in the College of Arts and Sciences that was administering the program, not only for greater efficiency because that was where the majority of faculty actually taught, but also because it would help to stimulate some of the innovation and creative around deeper engagement with health, with intellectual property, with engineering, with sciences, so

Page 109

on and so forth, and that was one of the considerations.  The second consideration was that Dr. McEvoy's time was up.  This was the end of her term.  It was a three-year term.  She was appointed in 2012.  That was the end.  It's not like over the course of that year in her report that you -- we just entered as Exhibit 2, you can see that there was no growth, at least in terms of her articulating any type of vision or -- here was her opportunity to really make a case in this final report about steering in a direction that is consistent with our positioning for the future, and we weren't seeing that visioning on her part.  But really it was about her time was just up, and this was the opportunity to think about a reimagination of this program and a shift in leadership.  And the third was a desire really to address some of the issues that had been raised by development and to think about how we could be more strategic in attracting funds for a program which we believed because we have such a large -- or had such a large and very active alumni base within the law community

Page 110

who might be willing to give more and get behind a program if we began to address some of those more forward-looking things that had been shared with Christopher Pates.  So the three things: Student outcomes No. 1, No. 2, that her term has ended and this was clearly within the purview of the provost to make the move at that time, and then No. 3, our desire consistent with Fairfield 2020 and consistent with what had been shared by Chris Pates to think about not only just our development goals, but our larger desire to create more efficiency in a program that would provide a broader rage of opportunities for students.

Q.  The decision to offer the directorship of the Pre-Law Program to Dr. Alphonso was made before you received Professor McEvoy's annual report that's marked as Exhibit 2; right?

A.  I don't recall.

Q.  Well, do you believe as you sit here today that the concerns that you perceived in the annual report that you described in your testimony before were one of the reasons that you decided to offer the Directorship of the Pre-Law Program to Gwen Alphonso in May of

Page 114

approached you with interest in taking over the directorship of the Pre-Law Program, or did you approach her to engage her interest first. Do you remember that information?

A. No, I don't know. I don't have any recollection of that.

Q. When -- well, as part of your initial engagement with Dr. Alphonso about her possibly taking over the directorship of the Pre-Law Program, do you remember anything that she said as part of that initial contact?

A. I believe Dr. Alphonso at that time was going up for tenure or promotion, or promotion and tenure and was reticent about taking on an administrative post before she had tenure, and so was unwilling at that time to take on that responsibility.

Q. Okay. Do you remember Dr. Alphonso communicating anything else to you about the Pre-Law Program or directorship of it in 2015?

A. Not that I can recall.

Q. Before you offered the directorship of the Pre-Law Program to Dr. Alphonso in 2015, had

Page 117

A. Yes, we did.

Q. Okay. And what you remember about that conversation that you had with Dr. Babington regarding that subject?

A. Well, we talked about Fairfield 2020, and we talked about what we could do with that position that would align with that but then not create the problem of putting someone in there on an interim basis as opposed to having somebody come in to kind of guide full-time. So the decision was made at that time that, since we were in the implementation phase of 2020, it wouldn't do any harm to maintain Dr. McEvoy in that position for an additional year.

Q. Okay. Madam Court Reporter, can you mark another exhibit.

(Whereupon an exhibit was marked.)

BY MR. STEIGMAN:

Q. Okay. Dr. Williams, the court reporter should have handed you a document that is marked as Exhibit 3, a two-page email chain. Do you have that in front of you?

Page 118

A. I do.

Q. Towards the bottom of page 1 is an email from yourself to Professor McEvoy Cced to Laura Martin dated June 10, 2015; right?

A. Correct.

Q. And that email follows onto the top of page 2; right?

A. Yes, it does.

Q. And is that an email that you sent to Professor McEvoy dated June 10, 2015?

A. Yes, it is.

Q. And prior to sending that email, did you review the content with Lynn Babington?

A. Yes, I did.

Q. And she approved a draft of this before you sent it?

A. I don't recall if -- I don't recall.

Q. Okay. In the second sentence of your email from June 10th to Professor McEvoy, you wrote just to be clear, this is a one-year appointment renewable at the discretion of the Provost's office pending annual review; right?

A. Correct.

Q. And was that a true statement?

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 119

A. It's a one-year appointment, and it's
renewable at the discretion of the provost,
absolutely. That's a true statement. It's
the provost's decision.

Q. Okay. And in the -- if you go to the second
page, I think it's the third to last sentence
in the bottom paragraph, do you see where you
wrote this is in no way a negative reflection
on your service to the university?

A. I do see that.

Q. Is that a true statement?

A. Yeah, absolutely, it's true. But I want to
be very clear about what service to the
university means. When academics take on
administrative roles, they are by virtue of
taking on that administrative responsibility
cutting out time that could be devoted to
research or other pursuits. That's important
service, and we recognize that, and we always
acknowledge -- or we should -- administrators
should always knowledge and -- at least --
even if the person isn't performing at the
highest capacity, their willingness to take
on that service. In Dr. McEvoy's case as in
the case of any department chair or program

Page 120

director, it's paid service, but it's service nonetheless. So it's not a negative reflection of her service to the university, but note I didn't say anything about her performance specifically. I talked about her service.

Q. Did you ever communicate to Professor McEvoy that the one-year renewal appointment did reflect a negative -- strike that -- Did you ever communicate to Professor McEvoy that the one-year renewal appointment did represent a negative reflection on her performance as Pre-Law Director in prior years?

A. All faculty appointments at Fairfield were at the provost of dean or provost. At any point the administrator could remove anyone from any of those programs. It's not pending annual review, it's not necessarily -- they serve at the pleasure of the dean or the provost. If the dean or the provost decides to make a switch, that can happen immediately. Her term was up. That's what I communicated. That was it. That was the end of it. The extension of that additional year -- two things I'd like to point out here. I

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 138

hear from you?

Q. Yes.

A. So as you can see, I called her which I intended to do, and I emailed which was standard practice for me in engaging with faculty, and this is generally how people would respond to me, either calling back or emailing balk, which she did.  So to answer your question, if I'm understanding it correctly, yes, I did receive a response from her.  I did call her.  I did email her, and I did receive a response June 10th of 2016.

Q. Okay.  After you received the response from Dr. Alphonso on June 10, 2016, that's at the top of the first page of Exhibit No. 7, did you and she speak further about opportunity to serve as the Director of the Pre-Law Program?

A. Yes, we did.

Q. And what do you remember about that communication you had with her?

A. I shared at that point what we were looking for in a Pre-Law Director.  I talked a lot about Fairfield 2020 needing somebody who would be willing to engage deeply with the

Page 139

development office to think very strategically about student outcomes and about a range of opportunities within the law specifically highlighting technology and health care.  Gwen talked a lot about what she would need in terms of release time and stipend and funding for speakers.  So it was that kind of -- kind of a broad-ranging, high-level conversation about what she would need to take the duty on and what we were looking for, what the provost was looking for in terms of, of a leader.

Q.  Okay.  Excuse me, Madam Court Reporter, can you read back the witness's answer to me.  I just want to make sure that I correctly heard something.

(WHEREUPON the court reporter read back.)

BY DR. WILLIAMS:

A.  But just to be clear, on that Friday, June 10th, that is still gauging her interest in whether she was interested in serving. She didn't have a, you know, we were talking

Page 158

A. She's talking about -- BLS was our shorthand for the Bachelor of Liberal Studies, which was a program that was floundering at the university.

Q. Okay.

A. But I honestly have no idea what she's talking about here.

Q. Okay. That's fine. I was just trying to see if I could get some more insight as to what the record was. You can put that one aside.

Dr. Williams, just so I'm sure that we have it on the record, as part of your testimony, the decision to not renew Dr. McEvoy's appointment as the Director of the Pre-Law Program beyond the 2015 to 2016 academic year was a decision made ultimately by Provost Babington; is that right?

A. That's correct. It was a decision made ultimately by Provost Babington with input from myself, but as I mentioned before, it's also a decision by virtue of the terms that were set by her appointment. Her time was up. So, yeah, it's ultimately the provost's discretion to make that call, but her time was also up. So it's not like she was, you

Page 160

That is true; right?

A. Yes, at that point if Provost Babington had reviewed the record and decided to continue with Sharlene McEvoy, it would have been her prerogative to do so.

Q. And 2016 did you make a recommendation to Provost Babington regarding whether Professor McEvoy's term as the Director of the Pre-Law Advising Program should be renewed?

A. Yes.  I thought I shared that.  Yes, I did.

Q. And your recommendation to the provost in 2016 was that Professor McEvoy's directorship should not be renewed at the end of 2015, 2016 academic year; right?

A. My recommendation to the provost was that we needed to find a director that would allow us to strategically align with the Fairfield 2020, and that in my estimation, Dr. McEvoy was not gonna be able to help us do that.

Q. Okay.  And do you remember approximately when you made that recommendation to Provost Babington?

A. I do not.  But obviously we've had we had that conversation.  We were having that conversation, but I don't recall a specific

Page 161

date.

Q. And, again, just to make sure that we have them on the record, can you tell me all of the reasons upon which you based your recommendation to the provost that Professor McEvoy should not receive a further renewal of her appointment as the Director of the Pre-Law Program beyond the 2015, 2016 academic year.

A. I've answered this, and I almost wish we could read it back, but I'll offer them again. Number one -- and I'm trying to be as clear as possible -- her time was up. It was a three-year appointment that began in 2012. She was appointed by Paul Fitzgerald. That period had ended. No faculty member in any department has a right to an automatic renewal. That's at the direction of the dean or provost. In her case it was the provost. That period was over. So it was appropriate at that point for the provost to make a move. Secondly, there were concerns with alignment with Fairfield 2020, the need for the university to be, as I shared earlier, preparing for the future and thinking very

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 162

strategically about student outcomes, how to best position Fairfield University students to be distinctive in the market and to be competitive for graduate and professional schools like law school.  Our thought at that time was that we needed leadership to help us address what was the third point, some of the concerns that had been raised by alum and by development about the kind of backward-looking program that we had, one that was focused very narrowly and very traditionally, wanting to expand that in the hopes of A) creating better opportunities for students and greater student outcomes, having a range of more prestigious universities that our students were admitted to, and then also putting us in a position perhaps to attract donor funds that would allow us to help supplement the activities of students in internships and other programs that would allow them to grow professionally and personally.  Those were the reasons that went into the decision to move away from Dr. McEvoy.  No other considerations.

Q.  And you thought that Dr. Alphonso would be

Page 163

better equipped to address those concerns and move forward as the Director of the Pre-Law Advising Program?

A.  Well, as I mentioned earlier, when I was talking about student outcomes and a desire to move the program from the Dolan School of Business to the College of Arts and Sciences where the majority of program faculty taught, it did make sense to have someone in the college direct the program, someone who would have, you know, who had been involved in other interdisciplinary programs, who would help make those connections and contacts more easily and to think about ways that we could, again, align with Fairfield 2020.  So, yes, those were -- that's kind of part of the student outcomes piece that I'm spelling out every time.  But it was also about increasing efficiencies, and we believed that that was one of the ways that could increase efficiencies, place it in the unit where the majority of faculty taught, where the majority of students were coming from, because the vast majority students were going onto law school were seeking Pre-Law were CAS

Page 164

students.  That didn't mean that you wanted to cut off pathways to other programs like nursing, like engineering, like the Dolan School of Business.  But what we weren't satisfied with, and what I think ultimately you want, is somebody who is thinking about more concrete ways to reach out to those students and to share the range of possibilities that the law would offer them as I mentioned earlier in science, technology, health, engineering, so on and so forth.

Q. At that time did you understand that Dr. Alphonso was younger that Dr. McEvoy?

A. No.  I don't make it a habit of knowing what people's ages are.  So that would not have been something that I would have considered.

Q. So you're testifying under oath that you didn't have a general awareness that Dr. Alphonso was not younger than Dr. McEvoy?

A. This might be inappropriate, but I'll share it regardless.  As a person of color, I don't show my age.  So people generally assume I'm much younger than I am.  That's taught me over the years to be very cautious about

Page 176

BY MR. STARR:

Objection. Asked and answered.

BY MR. STEIGMAN:

Q. So Dr. Williams, do you have knowledge of complaints by faculty members that students were not able to reach Dr. McEvoy by phone or email?

BY DR. WILLIAMS:

A. Not that I recall. Not to my knowledge.

Q. Okay. Dr. Williams, was one of the reasons that you recommended to Provost Babington that Professor McEvoy not receive a further renewal of her Directorship of the Pre-Law Advising Program because of any complaints that you received from any faculty member that a student was not able to reach Dr. McEvoy by phone or email?

A. No.

Q. Dr. Williams, do you have knowledge of any complaints by students that they were not able to -- strike that -- Do you have any knowledge of any complaints by students that Dr. McEvoy did not make herself available to meet with them regarding Pre-Law advising?

A. I referenced having heard, and it was a

Page 177

anecdotal.  I don't have emails or documentation of that.

Q.  Okay.  And who did you hear that from?

BY MR. STARR:

I want to object to this.  He's already gone over this testimony.  He's answered that question so --

BY MR. STEIGMAN:

Q.  So who did you hear that from, Dr. Williams,?

BY DR. WILLIAMS:

A.  I gave a very detailed answer earlier when I talked about that I thought.

Q.  I'm not sure that you've answered this specific question.

A.  Can you explain to me how the question is different.  I'm sorry.  Maybe I'm missing something.  I apologize.

Q.  So I do not believe we covered before that you were aware of complaints by students that Dr. McEvoy did not make herself available to discuss pre-law advise.

A.  I don't -- I shared earlier complaints that were given about the pre-law advising.  I do not recall, nor do I have evidence of students engaging me directly to complain

Page 178

about Dr. McEvoy not being present. I do, as I shared earlier, have a anecdotal stories from students who said they found it very difficult to get in touch with her to arrange time for advising. I don't have documentation of that.

Q. Dr. Williams, was one of the reasons that you decided to recommend to Provost Babington that she not further renew Dr. McEvoy's appointment as the Director of the Pre-Law Advising Program because of any complaints by students that Dr. McEvoy did not make herself available to discuss pre-law advising?

A. No.

Q. Dr. Williams, was one of the reasons that you recommended to Provost Babington that she not further renew Dr. McEvoy appointment as Director of Pre-Law Advising because of any complaints that Dr. McEvoy did not use the internet effectively?

A. No.

Q. Dr. Williams, was one of the reasons why you decided to recommend to Provost Babington that she not further renew Dr. McEvoy's appointment as the Director of the Pre-Law

Page 179

Program because the Pre-Law Advisory Program was not addressing new developments in the law?

A. Yes.

Q. Dr. Williams, did you have knowledge of any concerns of any members of Fairfield university's board that the Pre-Law Advisory Program was not addressing new developments in the law?

A. I testified to that. I shared what was shared with me from development from Mr. Pates and others. That was my -- that's how that was shared with me.

Q. Okay. So when you testified earlier about information that Christopher Pates conveyed to you that included concerns related to that subject matter from a board member or board members?

A. Are you talking about members of the university board or members of the Law Advisory Board?

Q. For right now, the university's board?

A. No. I never testified to anything about the university's board.

Q. Okay. So let's go back a couple questions so

Page 180

I can get this cleared up.  Did you have any knowledge of any concerns by any members of the university's board --

A.  No.

Q.  -- that the Pre-Law Program was not addressing new developments in the law when Dr. McEvoy was the director?

A.  I had no knowledge of the anyone at the university board.  I was -- what was shared with me were concerns that were articulated by the Law School Advisory Board.  Now, there may have been things that were articulated by people who are on the university board, that was never shared directly with me, and that would not have been a factor in my decision to not support, you know, Sharlene.

Q.  Okay.  And you mentioned the Law School Advisory Board.  Who were members of the Law School Advisory Board?

A.  I don't know.  Again, they're alum of the institution and donors to the Pre-Law Program, that's a development function, it wasn't something -- since I was running that program, you know, the AVP is responsible for managing the academic director and those

Page 181

types of things.  The people who engage with the alum are not, you know, typically not that level of university officer.  It would be the program director and development.

Q.  Okay.  And, again, I just want to clear this up.  So I apologize if you feel that you've answered this already, but I have a -- I'm not clear on it.  So did Mr. Pates or anybody else at the university communicate to you that the university's Law School Advisory Board had concerns that the Pre-Law Program was not addressing new developments in the law?

A.  Yes.

Q.  And were those concerns part of the reasons why you recommended to Provost Babington that she not further renew Dr. McEvoy's appointment as the director of the Pre-Law Program program beyond the 2015, 2016 academic year?

A.  I gave you a very specific accounting of what factors went into that decision; so that answer is no.  I shared the three things that factored into my recommendation, and all those things may have been concerns that were

Page 182

raised, they don't -- they were not things that were weighing heavily on me when I was making my recommendations. My recommendation was based on the three big things, the three big ticket items that I addressed when you asked earlier.

Q. Okay. Thank you.

Okay. Madam Court Reporter, I'd like to mark another exhibit. This one is defendant's response to plaintiff's first set of interrogatories and requests for production dated June 8, 2018.

(Whereupon an exhibit was marked.)

BY MR. STEIGMAN:

Q. Dr. Williams, this is a document that we received in discovery from Fairfield University's lawyers. I'm gonna ask you to turn to the second page.

A. I'm there.

Q. Okay. And do you see under No. 3 in the second paragraph your name is listed there?

A. I do.

Q. Okay. So this is a summary description of

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 186

the way appointments are made regarding academic positions at Fairfield?

A.  Well, that's more specific -- at Fairfield -- because this could be anywhere.  No.  I have nothing.  You know, the only other thing that I would share is what I said before is that these decisions are, you know, the idea that somebody is in a position for life is not standard operating procedure anywhere.  It certainly wasn't standard operating procedure in Fairfield.  I think there was a lot up upheaval and turnover at the University that prevented some of the normal channels from functioning in the ways that they should have or could have, but they don't change the fact that in this case, Dr. McEvoy's time was up.  And that's, I think, what's most pertinent was that her time was up.  That was communicated to her.  It should not have been a surprise to her.  And the things that I testified to where the things that went into my recommendation to Dr. Babington who ultimately made the decision.

Q.  Dr. Williams, is the advancement office something different than the development

Page 190

STATE OF MINNESOTA
                            CERTIFICATE
COUNTY OF HENNEPIN

I, Deanna Oaks, hereby certify that I reported the deposition of YOHURU WILLIAMS on the 6th of September, 2018 in St. Paul Minnesota, and that the witness was by me first duly sworn to tell the truth and nothing but the truth concerning the matter in controversy aforesaid;

That I was then and there a notary public for the County of Hennepin, State of Minnesota; that by virtue thereof I was duly authorized to administer an oath;

That the foregoing transcript is a true and correct transcript of my stenographic notes in said matter, transcribed under my direction and control;

That the cost of the original has been charged to the party who noticed the deposition and that all parties who ordered copies have been charged at the same rate for such copies;

That the reading and signing of the deposition was not waived;

That I am not related to any of the parties hereto, nor interested in the outcome of the action and have no contract with any parties, attorneys or persons with an interest in the action that has a substantial tendency to affect my impartiality;

WITNESS MY HAND AND SEAL this 14th day of September, 2018.

_____
Deanna Oaks, Court Reporter