# EXHIBIT 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SHARLENE MCEVOY,                              )
            Plaintiff,                        ) Civil Action No.
                                             ) 3:17-CV-01861-MPS
VS                                            )
                                             )
FAIRFIELD UNIVERSITY,                         )
            Defendant.                        )

DEPOSITION OF: Chris Pates
DATE:          September 7, 2018
HELD AT:       Madsen, Prestley & Parenteau, LLC
               402 Asylum Street
               Hartford, Connecticut

Reporter:  Wendy Allen, RMR, CRR, LSR #00221

APPEARANCES:


    Representing the Plaintiff:

        Madsen, Prestley & Parenteau, LLC
        402 Asylum Street
        Hartford, Connecticut 06103
        By:  Todd D. Steigman, Esq.
        tsteigmaan@mppjustice.com


    Representing the Defendant:

        Shipman & Goodwin LLP
        One Constitution Plaza
        Hartford, Connecticut 06103-1919
        By:  Gary Starr, Esq.
        gstarr@goodwin.com

INDEX

WITNESS:                                                    PAGE:

Chris Pates
    Direct Examination by Mr. Steigman            5

S T I P U L A T I O N S

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Commissioner before whom this deposition is taken is waived.

It is further stipulated that any defects in the notice are waived.

It is further stipulated that the reading and signing of the deposition transcript by the witness may be signed before any Notary Public.

the faculty member comes with a set vision it's great.  Sometimes they don't have one, so I'll do some research on it and I'll mention, did you know this is happening, this is happening.  Our alumni are involved in multiple institutions, so it's good to know what's happening at other places, so the questions centered around that.

Q    Do you remember anything specific that you shared during the meeting that you had identified as something other programs were doing?

A    Not specifically, no.

Q    I realize the meeting took place four years ago, but do you remember anything else specific that you said or asked during the meeting?

A    I remember the meeting was very odd.

Q    Okay.  In what way?

A    Professor McEvoy came to a business meeting dressed inappropriately.

Q    In what way was she dressed inappropriately, in your view?

A    She was wearing a hunting vest with a green T-shirt on and she was not wearing undergarments, and I know that because it was very easy to tell as she moved around in her chair.

Q    Anything else odd about the meeting?

A    Her response to questions were different than I had experienced before.  It was very much a meeting of we already do things well, we don't need to do anything differently.  Alumni can come -- I seem to remember asking about engaging alumni.  When you cultivate a relationship, you want them to engage with the program, so you talk to people about how they can do that, different ways they can be involved, whether that's speaking at a dinner or spending time with students, or whether she would be ready to go on donor visits with them.  You're basically interviewing the faculty member and assessing how you can work with them.

And so during that time I was inquiring about how we could build the recognition and cultivation pieces of the case, and every time I was suggesting something it was being sort of shut down before we even had a chance to brainstorm it.  And that was different.

I had been warned prior to the meeting by Hope Ogletree that Professor McEvoy could be confrontational, and that's why Hope was in the meeting.  We partnered, but I normally go to faculty meetings one-on-one alone.  And that was different, to have her bring cover to attend a faculty meeting,

but also what I had been warned about, I experienced.

Q    Prior to the meeting did Hope Ogletree say anything else to you about Professor McEvoy being confrontational?

A    I think she referred -- I used to say sometimes that people could be a strong cup of coffee, sort of saying they're, you know -- if an alumni was prickly on something, I'd say he's a strong cup of coffee.  I remember her either saying it to me or saying to me she can be a strong cup of coffee, something like that, which led me to believe, okay, I've never met her before, why -- basically I'm a little naive, saying why not, let's just meet, and she says, well, I'd like to come along with.  And after meeting her, it was almost like, she was not participatory in a way that I was used to.

Q    The "she" being Professor McEvoy?

A    Yes.  That would later be -- there was something else that happened with the case that that continued on.

Q    Okay.  So right now I just want to stay with this meeting itself.

A    Okay.

Q    Do you remember anything else that you said or asked during the meeting?

A    Yes.

Q    So what's the next time that you had an interaction with Professor McEvoy?

A    The next interaction I can remember would be emailing the case for support for Professor McEvoy to read it, and to give feedback on.

Q    And do you recall approximately when you did that?

A    Maybe four weeks after that meeting.  So it took a little time to put it together.  I had worked with Kevin Curtain on it.  Felt pretty good about the draft we were sending.  And had emailed her the document.

Q    And can you tell me a little bit about Kevin Curtain, why he was somebody that you worked with on the document?

A    Well, Jesuits pride themselves on their writing, and Kevin was an attorney who had supported the program.  He had an interest in potentially hosting events for the program in his office, so I was taking the opportunity to have someone, an experienced attorney who writes a lot who knew the University well and had been supporting the program help with the draft.  It's not something I have not done before.  I share drafts of proposals, and I just

did it with a donor last week, because you get their perspective while you're having that conversation. The proposal gets sharper, and then you share that proposal with other donors later.

Q    So about four weeks after the meeting you remember emailing Professor McEvoy a draft of the case statement?

A    Yes.

Q    Other than with Professor McEvoy, did you share a draft of the case statement with anybody else after you and Attorney Curtain worked on preparing it?

A    I did.  I may have called Sue Quinlivan during the drafting process.  I didn't interact directly with Sharlene McEvoy.  I did ask some questions to have passed on, and I think I sent some email with questions that didn't get a response, so I called, I copied Sue Quinlivan and asked her, and it had to do with -- in a case for support you have how the donors will be recognized, how they'll be involved, and we didn't have that in our case, so I was asking those types of questions, what do you think if we did this, could you ask Professor McEvoy if we could do that, that type of thing, can you follow up on an email that I sent here, trying to figure out if we could

build that section out in the case or not.

Q    And at that time Sue Quinlivan worked in the career services office --

A    She was the program coordinator, and Hope Ogletree had told me, if memory serves me right, that she got a lot of information through Sue.  It was a way she communicated with Professor McEvoy.

Q    So after you sent the draft of the case statement to Professor McEvoy, what was the next time that you had an interaction with her?

A    She sent the document back with very minor edits, and no real comments.  That, too, I thought was different.  There's usually some feedback, when you do this with a person who owns the program, and there was no feedback.

The only feedback -- and if I remember right -- and I wish I had a copy of the document, but there might have been a one word change in the five or six pages of narrative, but there were three changes in her bio.  So she had spent time editing her bio, but she didn't spend time amplifying the vision, which I just, again, I thought was strange, and it was certainly unusual in my experiences with faculty.

Q    When's the next time that you interacted with

Professor McEvoy?

A    I don't think we ever interacted again.

Q    You mentioned before, I believe, that she had complained about you.

A    She did, yeah.

Q    Or something like that.  So is that the next -- when did that complaint come to your attention?

A    I probably followed up with Sue Quinlivan again with some more questions after I didn't get that feedback, because it wasn't much longer after that that Wally Halas came into my office and said, I've had a complaint from one of the faculty.  And I deal with a lot of faculty, and I'm, who could this be?  And then he said it was Sharlene McEvoy had complained that I'd been pushing her and telling her how to run her program, I believe is what Wally said. And I said to Wally, there's nothing different that I'm doing with Sharlene McEvoy that I don't do with all the other faculty that I'm currently working with.  And I explained just like I did to you, there are sections of the case that are still weak, we need to figure out what we're going to do, because I'm certainly going to ask, how are we recognizing them for their donation.  Are we just putting in the

annual roll of donors?  Do they have a chance to involve with the students?  Can they speak at a -- do we want to try to get them to speak at a dinner?  We want to have events down in Washington where the prelaw students come.  There's a lot to go into working with a program director or faculty member or dean.  It really is a two-way street in communication.

So I've explained that to all Wally, and Wally said, well, just don't have any more interaction with her.  You can raise money with your relationships, but don't call her office anymore.  And I said to Wally, you should speak with Yohuru Williams.

Q    And in terms of getting the sequence of events, is it accurate that this complaint from Sharlene McEvoy came after her response that had minor edits and new role feedback, is that the --

A    Yes, it was definitely after that.

Q    Okay.  Do you disagree with the allegation that you were telling Professor McEvoy how to run the prelaw program?

A    That was not my intention.

Q    Had you made suggestions to her that she should do things differently in the prelaw program from the way that she had been doing them before?

A    In the absence of hearing a vision, I suggested things that were happening elsewhere that she might consider.  That could certainly be interpreted that way.  But we were at a point where I wasn't getting anything coming back, and that usually is enough to say, well, have you thought about this, have you thought about that.

Q    And those are the kinds of things that I asked you earlier in the deposition if you could specifically recall, and at this time you can't, right, the specific suggestions?

A    I can't really, other than it would have had to do with donors interacting with the program.  So can they come speak at the Bellarmine Society, could the donors supporting this.  And I think, remembering her say, she wanted younger lawyers to come in because they related better to students, and I said, but you have -- the younger lawyers don't have the support the way that some of the older lawyers who have the resources to support your program, and the wisdom, I mean they do run big firms, could talk to the students.  So it was that kind of back and forth.

And I think that happened during our meeting, if I remember right.  That's part of one of the questions I had said to her.  Because she was more,

prelaw program or law school for Fairfield?

A     No.  It would have been something we would have liked to start, because I was running the advisory boards for the rest of the University, and they were fundraising boards.

So there are different type of boards at universities.  There are ones that are just advise on academic issues but they don't get involved in fundraising.  When that's the board, I wouldn't spend any time with them.  They're there for other purposes.

Q     So as you sit here -- well, let me ask you, did any donors or potential donors make any statements to you that were critical of the prelaw advisory program at Fairfield under Professor McEvoy's leadership?

A     There may have been questions from people like Geri Buckley on getting involved, but I don't -- I don't remember the specifics.  I remember a conversation with Geri who wanted to get more involved, and this is -- this could be half an hour to explain, but Geri was on the board of an organization that has business people mentor entrepreneurs, and so he was saying could we do something like that in your law program, so we talked

a little bit about that, and that's maybe where I even got the idea of how do we get the alumni engaging with the students more, may have come from Geri.  Kevin Curtain and I talked a little bit about program elements when we were developing the case together.  And I think that would be it.

Q     What do you mean, program elements?

A     Well, the program has Bellarmine Society, had a student advising component.  I'm trying to think what the other -- there was some programatic elements of the prelaw program, and we talked about them, because when you have programatic elements, sometimes you can get a donor to sponsor it.  So the Bellarmine Society was already named, but can donors be underwriting the dinners.  That's the kind of stuff we'd talk about.

You think of offerings for donors when you analyze a program.  I do it now on the biomedical world, and have most of my career done that.  So you're figuring out how donors can be recognized for investing in genomic science, even though they don't completely understand it, and how you communicate back their investment.  It's a two-way street.  So this is something that we do, and then you talk to the donors about what they'd like to see, and you

talk to the program people about what can actually be done. So Geri and Kevin would probably have been the only two that I talked with. I can't remember anybody else in that alumni pool.

Q   Okay.

A   Oh, Dan Fitzgerald, I talked about it with Dan Fitzgerald.

Q   What did you speak about with Dan Fitzgerald as it related to the prelaw program?

A   I was trying to cultivate Dan to be a new donor to the program. And so Dan had been involved with the program, and he thought that the dinners -- the communication around the dinner, or something to do with his involvement didn't go as smoothly as he would have hoped. Something about his experience in that had not been -- he had a different -- just his experience wasn't great, involved with the dinner. And they would have these dinners with alumni to talk to the students of the Bellarmine Society, and Dan was one of the lawyers who had spoken at some point, but Dan was also in my portfolio.

Q   In any of your communications with Geri Buckley, did Mr. Buckley communicate to you any concerns or criticisms that he had about the actual prelaw advising program itself?

A    No.

Q    In any of your communications with Kevin Curtain, did Mr. Curtain communicate to you any concerns or criticisms that he had about the prelaw advisory program itself?

A    No.

Q    And in any of your communications with Dan Fitzgerald, did Mr. Fitzgerald communicate to you any concerns or criticisms that he had with the prelaw advisory program at Fairfield itself?

A    Only related to the dinner.  Either he thought that the topic could be different or the engagement with students could be different, but he had some suggestions for how that could be done a little differently.

Q    And do you remember what those suggestions were?

A    I don't specifically.

Q    Do you believe that you shared Mr. Fitzgerald's suggestions regarding how he thought the dinner could be done differently with anybody else at Fairfield?

A    I can only assume what I would have done.  I can't recall specifically.

Q    Other than -- strike that.

Did you ever communicate with any provost at Fairfield University regarding the prelaw program when Professor McEvoy was the director?

A    Lynn Babington was the provost, and we traveled together, but I can't remember if we talked -- ever talked about it or not.

Q    Other than Dr. Williams, did you speak with anybody else in the University administration regarding the prelaw program or any concerns regarding the prelaw program when Professor McEvoy was the director?

A    Wally Halas.

Q    What did you communicate to Mr. Halas?

A    Just updating him on things we could do and couldn't do, currently fundraising for the program. I would update him on all the areas, and I think D.C. being a territory, what we were going to do down in D.C. to cultivate relationships, so it did relate back, or a solicitation we just had with the program, so I communicated with Wally, I'm certain of that.

Q    In any of your communications with Mr. Halas, did you convey any criticisms that you had about the prelaw program itself under Professor McEvoy's directorship?

A    Probably shared the same that I did with

Yohuru, if we had someone that was more willing to communicate with donors. And donors give feedback, so you have to be able to take that feedback. Donors, they have ideas, and if you're not willing to listen to those ideas, donors get offended and they don't invest. You at least have to listen to the ideas. So yes, I definitely would have said something about that.

Q    The same kind of sentiment that you testified about earlier that you expressed to Dr. Williams, that you wished you had a prelaw director that you could take on donor visits with you, right?

A    Yes, I'm certain of that, yes.

Q    Other than that, did you communicate to Mr. Halas any concerns that you had about the prelaw program itself under Professor McEvoy's directorship?

A    No.

Q    Do you have knowledge of anybody else other than yourself communicating to Dr. Williams any concerns or criticisms regarding the prelaw program under Professor McEvoy's directorship?

A    No.

Q    Do you have any knowledge -- strike that.

Do you have any personal knowledge of the reasons why Professor McEvoy's directorship of the

CERTIFICATE OF REPORTER

I, Wendy Allen, a RMR, CRR/Notary Public within and for the State of Connecticut, do hereby certify there came before me, on the 7th day of September, 2018, the following named person, to wit:  Chris Pates, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and affixed my seal this 19th day of September, 2018.

_____
Wendy Allen, RMR, CRR

My commission expires:  April 30, 2020