**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHARLENE McEVOY<br><br>Plaintiff,<br><br>v.<br><br>FAIRFIELD UNIVERSITY<br>Defendant. | CIVIL ACTION NO.<br><br>3:17-cv-01861 (MPS)<br><br><br><br><br>JANUARY 11, 2019 |

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Defendant discriminated against Plaintiff because of her age (currently 68 years of age) and replaced her as the Director of the Pre-Law Advisory Program ("Program") with someone 27 years younger.  Plaintiff, Sharlene McEvoy, is a tenured full Professor at Defendant Fairfield University ("Defendant" or "Fairfield"), where she has been teaching since 1986.  Plaintiff established the Program in 2012, and served as its Director until 2016, at which time her appointment as Director was not continued.  As the record will reflect, Plaintiff did good work as the Director of the Program.  In the absence of any real justification for replacing Plaintiff as Director other than a desire to appoint someone significantly younger to the position, Defendant, and its decisionmakers, Dr. Lynn Babington and Dr. Yohuru Williams, have advanced a series of shifting, inconsistent, contradictory, and false explanations for their decision.  In the absence of actual evidence to support their claims, Defendant has recklessly manufactured false narratives, such as an allegation that the Program was only focused on corporate or criminal law, which are not only lacking any evidentiary support and obviously untrue, but which also reflect a total failure to actually evaluate the Program and Plaintiff's service as Director based on Plaintiff's actual performance.  Defendant's motion reflexively repeats the same empty slogans, "best

**ORAL ARGUMENT IS REQUESTED**

practices," "student-focused," "student-centric," and "student outcomes," but fails to support any of that jargon with specifics or evidence. Since there is abundant evidence that Defendant has manufactured false and pretextual criticisms of Plaintiff in order to conceal its true discriminatory motive, Defendant's motion must be denied.

The record evidence establishes a prima facie case of discrimination, and that Defendant's explanations are false or pretextual. There is more than sufficient evidence in the record to support a finding by a reasonable juror that Defendant's explanations are false or pretextual explanations. If a jury found in Plaintiff's favor on her claim of age discrimination, the record evidence presented in support of this opposition would be more than sufficient to support that verdict. Defendant has also failed to present the facts in accordance with the applicable legal standards governing motions for summary judgment as it has relied on facts that are in dispute, it has not resolved factual disputes in Plaintiff's favor, and it has not drawn permissible inferences in favor of Plaintiff. *See* D. Conn. L. Civ. R. 56(c). Defendant's moving papers are replete with factual claims that are disputed by Plaintiff. For those reasons, and the others set forth herein, the Court must deny Defendant's motion for summary judgment.

## II.     BACKGROUND

Plaintiff, who is currently 68 years of age, has been a professor at Fairfield since 1986. (Ex. E, McEvoy Declaration, ¶¶ 3-7.) She has been a full Professor since 1998. (*Id.* ¶ 7.) Plaintiff has taught a variety of law courses in the School of Business, as well as courses in an interdisciplinary American Studies graduate program in the College of Arts and Sciences. (*Id.* ¶ 8.) Plaintiff has a bachelor's degree in Political Science, as well as a Master's Degree in Political Science, a Master's Degree in Political Science/Public Administration, and a doctorate in Political Science/Public Administration. (*Id.* ¶¶ 9, 11-13.) Plaintiff also has a law degree and

is a member of the Connecticut bar.  (*Id.* ¶¶ 10, 14.)  Plaintiff has published extensively on various legal issues.  (*Id.* ¶ 16; Plaintiff's CV, Ex. A.)

        A.       <u>Pre-Law Advising Before Plaintiff Appointed as Director of Program</u>

Before 2012, there was no pre-law advising program at Fairfield.  (McEvoy Declaration. ¶ 26.)  In 2010, Plaintiff attended a meeting convened by Father Fitzgerald, the Sr. Vice President for Academic Affairs at the time, to review how Fairfield was handling advising for students regarding law school.  (*Id.* ¶ 20-21.)  The person who had been handling pre-law advising at that time, and for a number of previous years, told those in attendance that he was doing a "piss poor" job as the advisor.  (*Id.* ¶ 22-23.)  Nevertheless, Prof. Greenberg continued as the pre-law advisor for two more years, until the Spring of 2012, at which time Father Fitzgerald communicated that Prof. Greenberg was stepping down as the pre-law advisor and invited interested faculty members to apply for the position.  (*Id.* ¶ 24-25.)

In response to that invitation, Plaintiff submitted a proposal in the Spring of 2012 which outlined her ideas for a Pre-Law Advising Program if she were selected.  (*Id.* ¶ 27.)  Plaintiff then met with Father Fitzgerald and discussed her proposal, after which Father Fitzgerald appointed Plaintiff to the position of Director of Pre-Law Advising in July 2012.  (*Id.* ¶¶ 28-29; Def's Ex. 6.)

        B.       <u>After Appointment, Plaintiff Developed a Pre-Law Advising Program Which Exposed Students to Vast Opportunities Available Through a Legal Education</u>

After her appointment in 2012, Plaintiff took various actions to develop a Pre-Law Advising Program, in contrast to what had existed previously.  (Ex. E, McEvoy Declaration ¶ 30.)  Plaintiff established the St. Robert Bellarmine Pre-Law Society; put on various events each year regarding legal issues and the law school application process; set up an LSAT prep course with a provider who provided a discount for Fairfield students; improved the Fairfield website

3

regarding law school and the law school application process; created and published a newsletter called *De Jure* which included information regarding events that were being offered through the Program; created brochures and documentation to provide to students addressing various aspects of the law school application process; and offered LSAT boot camp, and a personal statement seminar. (*Id.* ¶¶ 31-36; Def's Ex. 7-10.) The Program also hosted student-lawyer alumni events (Def's Ex. 7, p. 2-3; Ex. E, McEvoy Declaration ¶ 109), and dinners for the Bellarmine Society which honored guests such as an alumni who became a U.S. District Court Judge (Def's Ex. 7, p. 5). The Program also established a mentoring program which provided opportunities for undergraduate students to communicate with a current alumnus for advice and interaction regarding the student's interest in law school. (Ex. E, McEvoy Declaration ¶ 85.) At the end of each year, Plaintiff submitted reports detailing the activities of the Program, in accordance with a template that she had obtained. (Def's Exs. 7-10; Ex. E, McEvoy Declaration ¶ 112.) In April of 2013, after Plaintiff's first year as Director, Father Fitzgerald congratulated her "again for what looks to be a very successful first year of . . . directorship of the pre-law program." (Ex. E, McEvoy Declaration ¶ 61; Pl's Ex. B.)

Through the various events and speakers, the Program exposed students to the wide variety of opportunities that can be pursued in the law, and that are afforded by a legal education. (Ex. 5, McEvoy Declaration ¶¶ 62-78.) The events and speakers also provided students opportunities to interact directly with legal issues outside of the classroom, to hear directly from individuals who practiced law, to learn about the various ways that law intersects with important issues in society, to interact directly with people who make decisions regarding law school admissions, and to learn how to be better prepared for success in law school after admission. (*Id.* ¶¶ 80-85.)

As the years progressed under Plaintiff's directorship, the Program put on different events and provided other opportunities for the benefit of the students.  For instance, in 2013-2014, there was a law school panel, and an alumni panel, and an event about financing a law school education presented by a representative of Fordham Law School, as well as another Bellarmine Society dinner which provided the students an opportunity to have a panel discussion with the honorees.  (Def's Ex. 8, pp. 1-2.)  Prior to the dinner, the women lawyers being honored at the event met with students and discussed their backgrounds and legal careers and interests.  (Ex. E, McEvoy Declaration ¶ 68.)

In the following year, 2014-2015, the Program offered off-campus events through which students could gain opportunities relevant to legal issues and a law school education.  For instance, students traveled to the Clark Art Institute to view one of the surviving copies of the Magna Carta, and original copies of the Declaration of Independent, the U.S. Constitution, the Emancipation Proclamation, and the Declaration of Human Rights.  (Def's Ex. 9, pp. 2-3.)  Students also traveled to Quinnipiac University School of Law to attend a mock trial demonstration, and a meeting with a Fairfield alumna and a professor and the Dean of the Law School.  (Def's Ex. 9, p. 3.)  On campus events included a personal statement seminar presented by the Dean of Admissions for the University of Connecticut School of Law who was also a Fairfield alumna.  (Def's Ex. 9, p. 3.)  That year, the Program offered a Law Day Luncheon at which students and alumni attended and had an opportunity to hear from and interact with honoree Lois Gibbs, who spoke about environmental issues.  (Def's Ex. 9, p. 4; Ex. E, McEvoy Declaration ¶ 70.)  Students also had an opportunity to hear the current Solicitor General, Noel Francisco, speak about religious freedom and the *Hobby Lobby* decision.  (Def's Ex. 9, p. 2; Ex. E, McEvoy Declaration ¶ 74.)

In the 2015-2016 academic year, the Program sponsored a trip to the Edward M. Kennedy Institute for the United States Senate at which students were able to interactively participate in various aspects of the political and legislative process, including taking votes on legislation and observing a reenactment of the debate over the Civil Rights Act of 1964.  (Def's Ex. 10, p. 2; Ex. E, McEvoy Declaration ¶ 78.)  Additional off-campus events included attending a play called *Defamation* in which the students were asked to play jurors who determined the outcome of the case (Def's Ex. 10, p. 3), and a visit to the American Museum of Tort Law at which students were exposed to various aspects of tort law, including toxic torts, sexual abuse cases, and product liability cases, (Def's Ex. 10, pp. 3-4; Ex. E, McEvoy Declaration ¶ 77).  That trip also offered students an opportunity to hear presentations by Ralph Nader, Mitchell Garabedian, and Jan Schlictman, who spoke, respectively, about consumer protection and product liability cases, sexual abuse cases and the Catholic Church, and environmental contamination litigation.  (Ex. E, McEvoy Declaration ¶ 77.)  On campus events included a law school admissions panel at which representatives from a number of area law schools were able to speak to students and answer the students' questions, as well as a lawyer alumni panel.  (Def's Ex. 10, p. 2; Ex. E, McEvoy Declaration ¶¶ 69, 83.)

As detailed in the annual reports she submitted, Plaintiff worked well with other Fairfield employees to develop the Program, and she credited them for their cooperation and assistance. (*See, e.g.,* Def's Ex. 7, p. 5.)  These individuals who worked with Plaintiff on the Program can confirm that the Program was successful under Plaintiff's directorship.  Sue Quinlivan, the Associate Director in the Academic and Career Development Center, (Quinlivan Depo. at 8-10), met with Plaintiff frequently to plan pre-law events when Plaintiff was the Director.  (Ex. O, Quinlivan Depo. at 12.)  Ms. Quinlivan identified a number of initiatives which Plaintiff helped

to establish, and which had not existed previously. (Ex. O, Quinlivan Depo. at 16, 18-21, 23-26, 33-34.)  Hope Ogletree, a major gifts officer at Fairfield who worked in the Development office (Ex. G, Ogletree Depo. at 10-13), worked with Plaintiff on some events for the Program, (Ex. G, Ogletree Depo. at 15-17).  These individuals who actually worked with Plaintiff on the Program believed that the events were successful, and they did not criticize Plaintiff's performance as Director of the Program.  (Ex. O, Quinlivan Depo. at 21, 27, 30, 32-33, 36; Ex. G, Ogletree Depo. at 16, 18, 23.)

       C.      <u>Plaintiff Also Provided Advising and Mentorship to Students</u>

In her role as Director of the Program, Plaintiff also met with students individually, and in group sessions, regarding advising for law school.  (Ex. E, McEvoy Declaration ¶ 37.)  As part of that process, she obtained information about GPA, LSAT scores, and other information related to the student's interest in pursuing a legal education.  (Def's Ex. 7, p. 5.)

Plaintiff was readily available to counsel, advise, and mentor students as Director of the Program, just as she has done in her years as a Professor.  (Ex. E, McEvoy Declaration ¶ 88.)  Plaintiff approached her advising consistent with her approach to teaching, and wanted to make sure that the students she advised were as well prepared as possible for success and advancement in their education and professional pursuits.  (*Id*. ¶ 59.)  She maintained regular office hours, but was also available by appointment.  Plaintiff's contact information was included on all written materials published in connection with the Program each semester, and was also on the Program's website.  (*Id.* ¶ 88.)

In addition to providing general advising regarding law school and the law school application process, a number of students asked Plaintiff to write letters of recommendation on their behalf, and Plaintiff assisted numerous students in the drafting and revision of their

personal statements.  (*Id.* ¶ 89.)  Many students expressed appreciation and gratitude for the

advice and counseling that Plaintiff provided, and students have sent cards thanking Plaintiff for

her assistance and guidance.  (Thank you notes, Ex. L; Def's Ex. 23.)  Plaintiff formed

mentoring relationships with students as Director, just as she has in her service as a Professor.

(Ex. E, McEvoy Declaration ¶¶ 90-93.)

When Plaintiff was Director of the Program, students were competitive applicants for

admission to law schools and Plaintiff received appreciation from numerous students who were

admitted to law school and were grateful for the assistance that Plaintiff provided.  (Ex. E,

McEvoy Declaration ¶ 99; Def's Ex. 23; Thank you notes, Ex. L.)

While serving as Director of the Program, Plaintiff taught an overload of courses in

almost every semester, and also taught courses in the summer and winter sessions.  (Ex. E,

McEvoy Declaration ¶¶ 38-56.)  In 2014, Plaintiff decided to forego a sabbatical to which she

was entitled to take while serving as Director.  (*Id.* ¶¶ 57-59.)

    D.      <u>Defendant Replaced Plaintiff with Significantly Younger Person</u>

In 2014, Plaintiff began reporting to Dr. Yohuru Williams in connection with her role as

the Director of the Program, who at that time was the Associate Vice President for Academic

Affairs.  (Ex. I, Williams Depo. at 17-18, 24-25.)  That same year, Dr. Lynn Babington became

Provost and supervised Dr. Williams.[1]  (Ex. I, Williams Depo. at 12-13; Ex. H. Babington Depo.

at 17-18.)  Before 2014, neither Dr. Williams nor Dr. Babington played any role in the

supervision of Dr. McEvoy as the Program's Director.  (Ex. I, Williams Depo. at 20-24; Ex. H,

---

[1] Dr. Babington was employed by Defendant for five years, from 2012 through 2017.  (Ex. H, Babington Depo. at 11.)  She began her tenure with Defendant as the Dean of the School of Nursing, and then became the Provost in 2014, and then became Interim President on January 1, 2017.  (Ex. H, Babington Depo. at 11-12.)

Babington Depo. at 14-17.)  Dr. Williams and Dr. Babington continued in positions of authority over Plaintiff as Director of the Program until 2016, when they replaced her with Dr. Gwen Alphonso, who is 27 years younger than Plaintiff.  (Def's Response Interrog. 6, Ex. J.)

Dr. Babington never personally communicated with Plaintiff regarding her directorship of the Program in the 2014-2015 academic year. (Ex. H, Babington Depo. at 30.) Dr. Babington never read any of the annual reports submitted by Plaintiff relating to the Program when she was at Fairfield. (*Id.* at 72-73.) Dr. Babington has never served as a pre-law advisor at any university of college and had no prior experiencing supervising someone responsible for pre-law advising other than at Fairfield University. (*Id.* at 13-14.)

In the 2014-2015 academic year, Plaintiff had some interaction with Dr. Williams regarding the Program, but Dr. Williams did not meet regularly with Plaintiff that year.  (Ex. E, McEvoy Declaration ¶ 106.)  Furthermore, at no time did Dr. Williams notify Plaintiff that he perceived deficiencies in Plaintiff's performance as Director of the Program.  (*Id.* ¶ 110.)

Unbeknownst to Plaintiff, in June 2015, Dr. Williams offered the Directorship to Dr. Gwen Alphonso, who declined the offer because she had not yet achieved tenure.  (Ex. I, Williams Depo. at 116.)  After Dr. Alphonso declined the directorship in 2015, Defendant offered the directorship to Dr. McEvoy for an additional year.  (*Id.* at 116-17.)  On June 10, 2015, Dr. Williams sent an e-mail informing Plaintiff that her appointment as the Director of the Program had been extended for an additional year, and was renewable at the discretion of the Provost's office pending annual review.  (Ex. I, Williams Depo. at 118-19; June 10, 2015 E-mail, Def's Ex. 17.)  Dr. Williams communicated to Plaintiff at the time that the extension for an additional year was not a negative reflection on her service to the University, which was true. (Ex. I, Williams Depo. at 119.)  Dr. Williams did not communicate to Plaintiff that the renewal

9

of her appointment for one additional year represented a negative reflection on her performance as the Director in prior years.  (Ex. I, Williams Depo. at 122.)

In the 2015-2016 academic year, Plaintiff continued reporting to Dr. Williams in her capacity as the Director of the Program.  (Ex. I, Williams Depo. at 125-26.)  However, after renewing Plaintiff's appointment for another year in June of 2015, Dr. Williams did not have any communications with Plaintiff relating to the Program at any point during the 2015-2016 academic year.  (Ex. I, Williams Depo. at 126; McEvoy Declaration ¶ 105.)  Dr. Babington does not have any recollection of having any conversations with Dr. Williams regarding Plaintiff's performance as the Director of the Program in the 2015-2016 academic year.  (Ex. H, Babington Depo. at 69.)  Similarly, Dr. Babington can't recall any specific recommendations that either she or Dr. Williams thought were appropriate to structure the program differently in order to make it more effective.  (Ex. H, Babington Depo. at 35-36.)

In June 2016, Provost Babington specifically asked Dr. Williams, "[d]oes this mean that you did not meet with [Plaintiff] this year or have knowledge of the Pre-Law activities?"  (June 15, 2016 E-mail from Provost Babington, Exhibit P.)  As part of his response, Dr. Williams wrote "As for pre-law you're right . . ." (June 15, 2016 e-mail, Ex. P), but he testified he has no recollection of ever responding to that question from the Provost.  (Ex. I, Williams Depo. at 149-51.)  The truth is that Dr. Williams never met with Plaintiff about the Program during the 2015-2016 academic year.  (Ex. E, McEvoy Declaration ¶ 105.)

Although the June 2015 letter informed Plaintiff that her appointment was renewable after a year, pending annual review, there was no review performed of Plaintiff's performance as Director at the conclusion of the 2015-2016 academic year.  (Ex. H, Babington Depo. at 73.)

In June 2016, Defendant offered the Director position to Dr. Alphonso. (Letter to Alphonso, Ex. K; Def's Response Interrog. 6, Ex. J.)

However, Dr. Williams never informed Plaintiff at any point in 2016 that her appointment as Director of the Program would not be renewed. (Ex. E, McEvoy Declaration ¶ 104.)

After Dr. Alphonso became the Director, the Program continued with the same programs that Plaintiff founded when she was the Director. (Ex. E, McEvoy Declaration ¶ 103.) In the 2016-2017 academic year, Dr. Williams continued to oversee the Program while Dr. Alphonso was the Director. (Ex. I, Williams Depo. at 152.) Dr. Williams has no recollection of Dr. Alphonso instituting any new initiatives after she became the Director that had not previously been a part of the Program, nor does Dr. Williams recall Dr. Alphonso making any changes to the Program in the 2016-2017 academic year. (Ex. I, Williams Depo. at 154.) Dr. Williams cannot remember any specific actions that Dr. Alphonso took in 2016-2017 as the Director of the Program to reimagine the Program or align the strategic vision of the Program to Fairfield 2020. (Ex. I, Williams Depo. at 155.) Dr. Babington was also unable to identify of any changes that Dr. Alphonso made to the Program after she was appointed, and is not aware of any directives she was given about changing the Program. (Ex. H, Babington Depo. at 97-99, 103-104.)

E.      Defendant's Series of False and Pretextual Explanations

Although in 2016, Defendant neither notified Plaintiff that she was being replaced as Director, nor provided her any explanation for why she was being replaced, since Plaintiff filed her claims of discrimination, Defendant, Dr. Williams, and Dr. Babington have produced a series of shifting, contradictory, false, and pretextual statements about why it replaced Plaintiff as Director with a significantly younger person.

1.      *False and Pretextual Assertions to CHRO*

a.      **False Claim of May 2016 Meeting**

In its response to Plaintiff's claim at CHRO, Defendant argued that her claim should be dismissed based on timeliness because Dr. Williams purportedly met with Plaintiff in May 2016 to notify her that her appointment would not be continued.  (Def's Ex. 24, p. 2.)  However, no such meeting ever occurred in May 2016, or at any other time since Dr. Williams never met with Plaintiff at any point during the 2015-2016 academic year.  (Ex. E., McEvoy Declaration ¶¶ 104-105.)  Even Dr. Williams could not recall ever communicating to Plaintiff that her appointment would not be continued.  (Ex. I, Williams Depo. at 132.)  Defendant falsely claimed that Dr. Williams met with Plaintiff in May 2016 and notified her of her non-reappointment in an effort to get her claims dismissed from CHRO, a claim that not even Dr. Williams could support.

b.      **Defendant's Own Decisionmakers Do Not Support Other Deficiencies Claimed at CHRO**

In trying to persuade the CHRO to dismiss Plaintiff's claims of age discrimination, Defendant argued that Plaintiff's performance suffered from a litany of deficiencies, including that (a) the Administration allegedly received complaints from faculty that students were complaining that they were unable to reach Plaintiff by phone or e-mail (Def's Ex. 24, p. 6); (b) the University received feedback from its Board and a law school advisory committee that the Program was not addressing new developments in the law and that the programs were not covering health care or technology issues (Def's Ex. 24, p. 6); (c) that she was not using the internet effectively (Def's Ex. 24, p. 5); and (d) that she was not working cooperatively with the Development office (Def's Ex. 24, p. 5).

Contrary to those representations made by Defendant to CHRO, Dr. Babington has no knowledge of any faculty member reporting that students had complained that they were not able

to reach Plaintiff by phone or e-mail when she was Director of the Program, and that was not the basis for her decision.  (Ex. H, Babington Depo. at 84-85.)  Dr. Babington similarly did not base her decision on any complaints that Plaintiff refused to make herself available to meet with students when she was the Director, or that Plaintiff did not use the internet effectively, or that Plaintiff did not work cooperatively with the Development office.  (Ex. H, Babington Depo. at 85-86.)  Dr. Babington also did not base her decision on any concerns from the University's Board, or any members of the law school advisory committee that the Program was not addressing new developments in the law, including issues relating to health care or technology. (Ex. H, Babington Depo. at 86-90.)

Similarly, Dr. Williams was not aware of any complaints by any faculty members that students were not able to reach Plaintiff by phone or e-mail, and he did not based his recommendation that Plaintiff not be reappointed on any such complaints.  (Ex. I, Williams Depo. at 176.)  Dr. Williams also did not base his recommendation that Plaintiff's appointment as Director not be renewed because of any complaints by students that Plaintiff did not make herself available to discuss pre-law advising.  (Ex. I, Williams Depo. at 178.)  Dr. Williams's recommendation that Plaintiff's appointment as Director not be renewed was also not based on any complaints that Plaintiff did not use the internet effectively.  (Ex. I, Williams Depo. at 178.)

Importantly, the representations made by Defendant to CHRO to advocate for dismissal of Plaintiff's claim are also not true, as Plaintiff did make herself available for students, she did work cooperatively with the Development office, she was addressing new issues in the law, and there is no evidence that she failed to use the internet effectively.  (Section II.B, II.C, *supra*; *see also* Ex. E, McEvoy Declaration ¶¶ 98, 99, 101, 108, 115.)

2.      *Dr. Williams Falsely Claims Program Focused on Corporate &*
*Criminal Law, and Attributes Concerns to Source Who Does Not Support*

Defendant and Dr. Williams also presented a false narrative that the Pre-Law Advisory

Program focused on corporate and criminal law, to the exclusion of other areas of the law.  (Ex.

I, Williams Depo. at 54-55.)  However, as detailed above, and in Plaintiff's Declaration, the

charge that the Pre-Law Advisory Program under Plaintiff's directorship was focused on

corporate or criminal law is completely false.  (Section II.B., *supra*; Ex. E, McEvoy Declaration

¶¶ 62-78)  Moreover, neither Dr. Williams nor anyone else from Fairfield University ever

expressed any such concern to Plaintiff before she filed her claims of discrimination.  (Ex. E,

McEvoy Declaration 101, 110.)

When asked to testify about how the Program was focused on either corporate law or

criminal law under Plaintiff's directorship, Dr. Williams failed to provide any specific

information to support his claim (Ex. I, Williams Depo. at 72-73, 82-83), but he did describe Dr.

McEvoy as "very traditional."  (Ex. I, Williams Depo. at 72.)  Importantly, Dr. Williams

admitted that he had no personal knowledge regarding the actual advice that Dr. McEvoy was

proving to students.  (Ex. I, Williams Depo. at 74.)

Dr. Williams also made false claims that he received concerns about the Pre-law Program

from a development officer named Christopher Pates. (Ex. I, Williams Depo. at 68-69.)

Christopher Pates was responsible for raising money for the University. (*Id.* at 69-70.)

According to Dr. Williams, Mr. Pates said that alumni had complained to him that the program

was not addressing contemporary issues in the law, that some donors were resistant to supporting

the program because it was "frozen." (*Id.*. at 70.)  Dr. Williams was not able to identify the

alumni who allegedly complained. (*Id.* at 70-71.)  But, according to Dr. Williams, the complaint

from alumni was allegedly that the program was "frozen . . . kind of antiquated in a way that we

14

were thinking about directions for law study, opportunities for student interns, pre-law advising around things like intellectual property, health care, emerging technology . . . frozen in a . . . model that was more 20th century, backward facing than 21st century." (Ex. I, Williams Depo. at 71.) When asked to further explicate what he meant by "frozen," Dr. Williams repeated the false refrain that the program was "very traditional," meaning "a focus on either you're going into criminal law or you're going into corporate law, and there was no clear way to engage." (Ex. I, Williams Depo. at 71.)

Dr. Williams attributed the basis for the criticism to alumni or members of the law school advisory board who had shared concerns with Mr. Pates, (Ex. I, Williams Depo. at 70, 178-81), but Mr. Pates denied that any alumni or Board members or law school advisory committee communicated any such concerns to him about the Program. (Ex. F, Pates Depo. at 45, 48-49, 54.) Mr. Pates also denies that he communicated any concerns about how Plaintiff ran the Program. (Ex. F, Pates Depo. at 38-39, 41-42.) Mr. Pates did not communicate any criticisms of the actual Program itself. (Ex. F, Pates Depo. at 41.) It is also not true, as Dr. Williams testified, that he expressed any concerns to Dr. McEvoy about a perceived focus on corporate or criminal law, and that Dr. McEvoy was dismissive of those concerns. (Ex. I, Williams Depo. at 82; Ex. E, McEvoy Declaration ¶ 101, 110.)

Dr. Williams's testimony regarding how alumni would have direct knowledge of what advice Plaintiff was providing to students which allegedly steered them to only corporate or criminal law areas also fails to support the allegation. (Ex. I, Williams Depo. at 75.) Contrary to Dr. Williams's testimony, looking "at where students would up and what they were doing to get a pretty clear portrait of that, and it's measured by where our students were going to school," (Ex. I, Williams Depo. at 75), does not provide any support for the charge that Dr. McEvoy was

15

advising students to focus on either corporate or criminal law, (Ex. E, McEvoy Declaration ¶ 62). Aside from the fact that Dr. Williams's response demonstrates a lack of awareness about law school and legal education, the reality is that the students who had graduated from Fairfield and gone on to law school since Dr. McEvoy became the Director of the Program in the 2012-2013 academic year had not even graduated from law school as of the summer of 2014 when Dr. Williams met with Mr. Pates in the summer of 2014 and claims that he formed these concerns. (Ex. E, McEvoy Declaration ¶ 62 & fn.1; Ex. I, Williams Depo. at 78-79.)

It is also not true, as Dr. Williams contends, that he expressed any concerns during a 2014 meeting with Plaintiff about technology or health care, or that certain people claimed to have difficulty communicating with her; nor did Dr. Williams express any concerns to Dr. McEvoy concerning the challenges associated with the Pre-Law Advisory Program or anything relating to the Fairfield 2020 strategic planning initiative or any allegations that Dr. McEvoy was unwilling to engage with the development office.  (Ex. I, Williams Depo. at 46-50; Ex. E, McEvoy Declaration ¶¶ 101, 110.)  Again, contrary to the narrative being spun by Dr. Williams and Defendant in response to Plaintiff's claims, Dr. Williams never spoke with Dr. McEvoy about making sure that the Pre-Law Advisory Program was deeply engaged with Fairfield 2020, or asked her to pursue anything relating to the Pre-Law Advisory Program and 3/3 programs with law schools.  (Ex. I, Williams Depo. at 52; Ex. E, McEvoy Declaration ¶¶ 101, 110.)  In fact, after making specific claims about what he discussed with Plaintiff during their first meeting in 2014, Dr. Williams later admitted that he did not recall the specifics of his first meeting with Dr. McEvoy in 2014.  (Ex. I, Williams Depo. at 53.)

Dr. Williams's contention that Plaintiff should bear some responsibility, as the Director of the Pre-Law Advisory Program, for the fact that Defendant did not enter into a formal 3/3

program with any law schools, is also absurd.  (Ex. I, Williams Depo. at 56-61.)  As part of an effort to justify that claim, Dr. Williams made claims regarding the curriculum and the faculty who taught in the Program, (Ex. I, Williams Depo. at 42-43, 63-66), but the Pre-Law Advisory Program did not have a curriculum, the Pre-Law Advisory Program did not have faculty who taught in the Program, and Dr. McEvoy did not have any authority or ability to dictate any particular curriculum.  (Ex. E, McEvoy Declaration ¶ 95.)  Dr. Williams's testimony on these subjects is devoid of any factual basis.  In fact, contrary to Dr. Williams's criticism of Plaintiff, Dr. Babington conceded that Plaintiff, as the Director of the Program, was not responsible for entering into 3/3 programs with law schools.  (Ex. H, Babington Depo. at 93-94.)

While Dr. Williams claimed to have performed his own assessment, he did not recall speaking with anyone else other than Dr. Babington, the development office, and Dr. McEvoy as part of that assessment. (Ex. I, Williams Depo. at 43-45.) An assessment that was limited to speaking with only Dr. Babington and the development office would not have provided for much of an assessment because Dr. Babington had no experience supervising someone responsible for pre-law advising, never spoke with Plaintiff about the Program, never reviewed any of the annual reports submitted for the Program, and relied on Dr. Williams for all of her information about the Program. (Ex. H, Babington Depo. at 13-14, 30, 72-73, 78-82.)  Similarly, communications with Mr. Pates about the Program would not have enabled Dr. Williams to make any informed judgments about the Program because Mr. Pates was not familiar with the Program and, by his own admission, Mr. Pates did not communicate any concerns about how Plaintiff ran the Program, or any criticisms of the Program itself.  (Ex. F, Pates Depo. at 38-39, 41-42, 45.)  Mr. Pates also concedes that he had no knowledge of the quality of the advising that Plaintiff was

providing to students, and knew that Plaintiff actually had a reputation for being very good one

on one with students.  (Ex. F, Pates Depo. at 35.)

       3.    *Defendant's False Claim that Program Was not Student-Focused and Failed to Use Best Practices*

Defendant's motion repeatedly relies on conclusory jargon such as "student-focused,"

and "best practices" to claim that it needed to replace Plaintiff as Director.  However, contrary to

Defendant's claims, the Program Plaintiff established and led was very student-focused, and

Defendant has not identified a single "best practice" that either Dr. Babington or Dr. Williams

suggested but she failed to adopt.

Dr. Babington claims that she decided to not re-appoint Plaintiff as the Director in 2016

because she wanted "the Program to be revised to reflect best practices, to be student-centric,

student-focused, so that . . . the outcomes for our students could be improved.  We did not feel

Dr. McEvoy was able to, in a directorship, lead the program in that way."  (Ex. H, Babington

Depo. at 76.)  As used by Dr. Babington, "student-centered means that a program is designed to

help students learn with experiences embedded in a program that helps students to achieve their

goals," and a program "where an advisor would be readily available, would have mentoring

relationships with individual students and groups of students, and would help them in their

development."  (Ex. H, Babington Depo. at 30.)

Based on any reasonable assessment, Plaintiff met the criteria of being student-centered,

as defined by Dr. Babington.  (Section II.C., *supra*; Ex. E, McEvoy Declaration ¶¶ 79-94; Def's

Ex. 23; Thank you notes, Exhibit L.)   Dr. Babington asserted that Plaintiff was not accessible to

students, but her basis for that claim is only what Dr. Williams told her.[2]  (Ex. H, Babington

---

[2] It is ironic that Defendant and Dr. Williams have made a point of challenging Plaintiff's alleged lack of availability when Dr. Williams is the person who failed to show up for a scheduled meeting that he was

Depo. at 78-82.)  Regardless of the source, the claim that Plaintiff was not accessible to students, or that the Program under her direction was not student-focused or student-centric, is simply not true.[3]  (Section II.C., *supra*; Ex. E, McEvoy Declaration ¶¶ 79-94, 98; Def's Ex. 23; Thank you notes, Exhibit L.)

When asked for specific facts to support the talking point about "best practices," Dr. Babington was not able to identify any best practices that Plaintiff was not instituting as Director, and she never made recommendations to the Program because it is not her field. (Ex. H, Babington Depo. at 77.) According to Dr. Babington, she determined that Plaintiff was not instituting best practices because the Program had allegedly been doing the same thing for years with the same outcomes and no changes had been made over the years and it was not student-focused or student-centric. (*Id.* at 77.) But the Program was only four years old, and Dr. Babington had no understanding as to whether Plaintiff improved the Program over what was in its place before 2012, and she never tried to find out. (*Id.* at 78.)

Neither Dr. Babington nor Dr. Williams ever expressed any concerns to Plaintiff about the Program not being "student-focused," "student-centric," or failing to adopt "best practices." Nor did Dr. Babington or Dr. Williams ever suggest any changes to the Program to cure any perceived deficiencies in those areas, or any ways in which they thought the Program could be re-imagined.  (Ex. E, McEvoy Declaration ¶ 111; Ex. I, Williams Depo. at 67-68.)

4.    *Plaintiff Was Not Replaced Because of Fairfield 2020*

---

supposed to attend in Plaintiff's office, and did not even contact Plaintiff to let her know that he would be unable to attend the meeting as planned.  (Ex. E, McEvoy Declaration ¶ 113; Ex. C.)

[3] Plaintiff was available even when she was not on campus because she provided her personal phone numbers to Dr. Williams's office, (Ex. E, McEvoy Declaration ¶ 98), and to people she worked with such as Sue Quinlivan (Ex. O, Quinlivan Depo. at 47).

Dr. Williams claims that he recommended that Dr. McEvoy not be renewed as the Director of the Program because he believed that Defendant needed to find a Director for the Program that would allow Defendant to strategically align with Fairfield 2020, and that he did not believe Plaintiff would be able to achieve that. (Ex. I, Williams Depo. at 160.) Dr. Williams testified that his recommendation to not continue Plaintiff's term as Director of the Program was based, in part, on concerns with alignment with Fairfield 2020 and the need for the University to prepare for the future and think strategically about student outcomes and help to best position Fairfield University students to be distinctive in the market and to be competitive for graduate and professional schools like law school. (Ex. I, Williams Depo. at 161-62.)

The invocation of Fairfield 2020 by Defendant and Dr. Williams is undermined by Dr. Babington, who denied that any of the changes associated with Fairfield2020 played any direct role in the decision to offer Plaintiff an additional one year appointment, as asserted in the June 2015 letter to Plaintiff. (Ex. H, Babington Depo. at 62.) Dr. Babington indicated that Fairfield 2020 was only indirectly related to the decision because every program was reviewed at that time to determine whether changes were appropriate. (Ex. H, Babington Depo. at 62-63.)

A comparison of Defendant's treatment towards the much younger Dr. Alphonso further underscores that Defendant's criticism of the Program under Plaintiff's direction as lacking a vision and not being aligned with Fairfield 2020 is a pretextual sham. Before Dr. Williams offered the Program directorship to Dr. Alphonso in May of 2015, there is no evidence that Dr. Alphonso conveyed anything to Dr. Williams which caused him to conclude that she had ideas to innovate the Program in areas of health care, sciences, information technology, or intellectual property, and Dr. Williams has no such recollection of such an interaction. (Ex. I, Williams Depo. at 114-15.) Before Dr. Williams offered the Program directorship to Dr. Alphonso in

20

2015, there is no evidence that Dr. Alphonso articulated to Dr. Williams her vision for reimagining or growing the Pre-Law Program, and Dr. Williams has no recollection of such an interaction.  (Ex. I, Williams Depo. at 115.)  Before Dr. Williams offered the Program directorship to Dr. Alphonso in 2015, Dr. Alphonso had not expressed any ideas she had to improve student outcomes in the Program.  (Ex. I, Williams Depo. at 115-16.)  Before Dr. Williams offered the Program directorship to Dr. Alphonso in 2015, Dr. Alphonso had not expressed any ideas she had to align the Program with goals and strategic vision of Fairfield 2020.  (Ex. I, Williams Depo. at 116.)

After Dr. Alphonso communicated in May of 2015 that she could not serve as the Director of the Program at that time, (May 12, 2015 E-mail, Def's Ex. 20), Dr. Williams did not communicate with Dr. Alphonso about serving as Director of the Program again until the following year, when he wrote to her on June 10, 2016 about her interest in serving as the Director, (Ex. I, Williams Depo. at 137; June 10, 2016 E-mail, Exhibit N).

By June 14, 2016, Defendant had decided to offer the Program Director position to Dr. Alphonso, and Dr. Alphonso had accepted the offer.[4]  (Ex. I, Williams Depo. at 142-43.)  The letter to Dr. Alphonso confirming the details of her appointment as Director of the Program is devoid of any statements communicating to Dr. Alphonso that she was expected to focus on the areas in which Defendant has identified as deficiencies in Plaintiff's performance as Director of the Program.  (Letter to Dr. Alphonso, Exhibit K.)  For instance, the letter to Dr. Alphonso does

---

[4] When Dr. Williams and Dr. Alphonso spoke in June 2016 regarding her serving as the Director of the Program, Dr. Alphonso indicated that she would need a course release so that she would be required to teach fewer courses if she agreed to serve as the Director.  (Ex. I, Williams Depo. at 140.)  The offer letter to Dr. Alphonso confirms that she was given a course release to serve as the Director of the Program. (Letter to Dr. Alphonso, Exhibit K.)  In contrast, Defendant never offered Plaintiff a course release to serve as the Director of the Program.  In fact, Plaintiff taught an overload of courses in each year that she served as the Director of the Program.  (Ex. E, McEvoy Declaration ¶¶ 38-53.)

not communicate any expectations that she make the program more aligned with any strategic vision associated with Fairfield 2020, or make changes to the Program to adopt best practices that were not already being implemented, or make any changes to the Program to make it more student-focused, or student-centric.  In fact, the content of the letter is similar to the content of the letter that Plaintiff received when she was appointed Director of the Program, except that Dr. Alphonso received the benefit of a course release, while Plaintiff actually taught extra courses while she served as Director.  (Letter to Dr. McEvoy, Def's Ex. 6; Letter to Dr. Alphonso, Exhibit K; Ex. E, McEvoy Declaration ¶¶ 38-53.)

Dr. Williams testified that he believed Dr. Alphonso would better align the Program to the strategic vision of Fairfield 2020 than Plaintiff because she was involved in Public Administration.  (Ex. I, Williams Depo. at 167.)  However, Plaintiff has a Master's degree and a Doctorate degree in Political Science and Public Administration.  (Ex. E, McEvoy Declaration ¶¶ 12-13.)  When asked to identify something specific about Dr. Alphonso that caused him to conclude that she would be better able to address the issues he had identified, such as better student outcomes, than Plaintiff, Dr. Williams's answer focused on the assertion that Plaintiff's time was up, but that does not provide a rationale for believing that Dr. Alphonso possessed attributes which were lacking in Plaintiff and which would help deliver better student outcomes. (Ex. I, Williams Depo. at 168.)  Dr. Williams also knew that Plaintiff taught in interdisciplinary programs before, including as part of the American Studies Program based in the College of Arts and Sciences.  (Ex. I, Williams Depo. at 166; Ex. E, McEvoy Declaration ¶ 8.)

5.    *Deposition Testimony Revealed Age Bias*

Certain deposition testimony, particularly that of Dr. Williams, reinforces the presence of age bias in this case.  Dr. Williams repeatedly used words or phrases during his deposition to

describe Plaintiff, or the Program under her directorship, that reveal age bias, including "antiquated," "19th century law career," "20th century," "traditional," "backward looking," and "frozen." (Ex. I, Williams Depo. at 71, 72, 84, 112, 161-62.)  Since none of those characterizations of the Program under Plaintiff's directorship are accurate, it is reasonable to infer that Dr. Williams described the Program with such adjectives because of Plaintiff's age. (Ex. E, McEvoy Declaration ¶ 100.)

Dr. Williams also had difficulty answering the direct question of whether he understood that Dr. Alphonso was younger than Plaintiff, but on his third opportunity to answer, he ultimately acknowledged that he was aware that Plaintiff was older than Dr. Alphonso.  (Ex. I, Williams Depo. at 164-65.)  It is a reasonable inference that Dr. Williams was evasive when presented with a direct question about Plaintiff's age because he knew that Plaintiff's age, and the age difference between Plaintiff and the person he recruited to replace Plaintiff, was a factor in his decision.  Dr. Babington also had difficulty responding to the direct question of whether she understood at the time that Dr. Alphonso was younger than Plaintiff.  (Ex. H, Babington Depo. at 40.)  She first responded by saying she was "confused" by the question, and later said the question "makes no sense," but she also acknowledged that she knew that Dr. Alphonso was younger than Plaintiff.  (Ex. H, Babington Depo. at 40.)

## III.   STANDARD OF REVIEW

Summary judgment is a "drastic provisional remedy."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  *See also Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 172 (2d Cir. 2005)(characterizing summary judgment as a "drastic procedural weapon").  The Court must resolve all factual disputes, and draw all permissible inferences, in favor of the non-moving party.  *Patterson v. County of Oneida*, 375 F.3d 206, 219

(2d Cir. 2004). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224. "[A] trial court must be cautious about granting summary judgment to an employer." *Id..* "[A]ffidavits and positions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id. See also* D. Conn. L. Civ. R. 56(c).

## IV.   ARGUMENT

### A.   Under ADEA, A But For Reason is A Motivating Factor that Made a Difference

The ADEA makes it unlawful for any employer covered by the act "to discharge any individual … because of such individual's age." 29 U.S.C. § 623.  In *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167 (2009), the Supreme Court held that the mixed motive, burden shifting, method of proof was not applicable to ADEA cases, unlike in Title VII discriminations cases, 42 U.S.C. § 2000e-2, because Congress did not amend the ADEA when amending Title VII following the decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  *Gross v. FBL Financial Services, Inc.,* 557 U.S. at 181. *Gross* also instructed that the words "because of" required a "but for" standard of causation to prove claims brought under the ADEA. [5]  *Gross* cited *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) as support for this holding.  In *Reeves,* the Supreme Court explained, "When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the

---

[5] The actual holding was set forth as follows:  "We hold that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

24

employer's decision.' *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S. Ct. 1701, 123

L.Ed.2d 338 (1993). That is, the plaintiff's age must have 'actually played a role in [the

employer's decisionmaking] process and had a determinative influence on the outcome.' *Ibid.*"

*Id* at 141.  More recently, in *Burrage v. U.S.*, -- U.S. --, 134 S. Ct. 881 (2014), the Supreme

Court referred to *Gross* as follows:

> Given the ordinary meaning of the word "because," we held that § 2000e–3(a) "require[s] proof that the desire to retaliate was [a] but-for cause of the challenged employment action." *Nassar, supra,* at ——, 133 S. Ct., at 2528. The same result obtained in an earlier case interpreting a provision in the Age Discrimination in Employment Act that makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Relying on dictionary definitions of "[t]he words 'because of' "—which resemble the definition of "results from" recited above—we held that "[t]o establish a disparate-treatment claim under the plain language of [§ 623(a)(1) ] ... a plaintiff must prove that age was [a] 'but for' cause of the employer's adverse decision." *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L.Ed.2d 119 (2009).

*Id.* 134 S. Ct. at 888-889.  So, *Gross* holds age must be shown as a "but for" factor without the

possibility of using the "mixed motive" method of proof in ADEA cases.

Having eliminated the "the mixed-motive analysis as to ADEA claims, 'a plaintiff

bringing a disparate-treatment claim pursuant to the ADEA' satisfies this burden by presenting

facts, which 'taken in [his] favor, suffice to ... [show that] a triable issue [exists] as to whether

[his] age was a "but for" cause of [his] termination.' *Gorzynski,* 596 F.3d at 106 (quoting *Gross,*

557 U.S. at 180, 129 S. Ct. 2343) (internal quotations omitted)." *Delaney v. Bank of Am. Corp.*,

766 F.3d 163, 168 (2d Cir. 2014).  In the absence of an outright admission of using age as a

factor, or other direct evidence, an employee may rely upon indirect evidence viewing the record

as a whole to indicate the reason offered for the employment decision is unworthy of belief, a

"pretext," along with any other evidence of discrimination, using the *McDonnell Douglas* burden shifting analysis to establish "but for" causation.   "In 'pretext' cases, the plaintiff must present facts sufficient to remove the most likely *bona fide* reasons for an employment action —the familiar *McDonnell Douglas v. Green* factors. 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53 & 253 n. 6, 101 S. Ct. 1089, 1093 & 1094 n. 6, 67 L.Ed.2d 207 (1981). …. This may be done either by persuading the trier of fact that a discriminatory reason more likely than not motivated the employer, or by persuading the trier of fact that the employer's proffered explanation is unworthy of belief. *Burdine,* 450 U.S. at 256, 101 S. Ct. at 1095; *McDonnell Douglas,* 411 U.S. at 805, 93 S. Ct. at 1825." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992).  "Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802, 93 S. Ct. 1817. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if [he] can show that the employer's determination was in fact the result of discrimination. *Holcomb,* 521 F.3d at 138." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).

In *Delaney v. Bank of Am. Corp., supra,* the Second Circuit explained that the condition that a plaintiff's age must be the "but for" cause of the adverse employment action is not equivalent to a requirement that age was the employers only consideration, but rather that the adverse employment action would not have occurred without it.  *Id.* at 169, *quoting Fagan v. U.S. Carpet Installation, Inc.,* 770 F.Supp.2d 490, 496 (E.D.N.Y.2011).  As recognized by a court in this District, "In terms of establishing age as the but for cause of the employer's action,

26

age must be 'an antecedent but for which the result in question would not have occurred,' even if it 'combines with other factors to produce the result, so long as the other factors alone would not have done so — if, so to speak, it was the straw that broke the camel's back.' *Burrage v. United States*, —— U.S. ——, 134 S. Ct. 881, 888, 187 L.Ed.2d 715 (2014)." *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 338 (D. Conn. 2016). *Gross* also made clear that "[t]here is no heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion that age was the "but-for" cause of their employer's adverse action, see 29 U.S.C. § 623(a)," and the Supreme Court did not intend to suggest otherwise. *Gross,* 557 U.S. 167, 189. The District Court must evaluate the case by looking at the record as a whole. *Friedman v. Swiss Re Am. Holding Corp.*, 2016 WL 1072494, at *2 (2d Cir. Mar. 18, 2016) (District Court erred by viewing each piece of evidence in isolation). "In assessing whether, age-related bias was the 'but-for' cause of Herbert's termination, it is important to examine the chain of events that led to the actual termination and what role [the decision-maker], who Plaintiff contends was biased against his age, played in those events." *Herbert v. Nat'l Amusements, Inc.*, 833 F. Supp. 2d 192, 201 (D. Conn. 2011). It is also the case that discriminatory intent "can be inferred from 'the historical background of the decision' and from 'the specific sequence of events leading up to the challenged decision. *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 49 (2d Cir.2002).' " *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d at 179.

B.      Plaintiff's Prima Facie Case of Age Discrimination

"The initial burden is on the plaintiff to establish a prima facie case. In order to establish a prima facie case, "a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Schnabel*, 232 F.3d 83,

27

87 (2d Cir.2000) (citing to *Woroski*, 31 F.3d 105, 108). It is important to note that, at this stage, the "burden of proof that must be met to establish a prima facie case is minimal." *Id*. (citing to *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir.1999))." *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 256 (D. Conn. 2013).

Defendant does not specifically argue that Plaintiff has failed to establish a prima facie case of discrimination, (Doc. No. 26, p. 11), but it is obvious that she has done so. Plaintiff is a member of the protected class, as she is currently 68 years of age, and was born in 1950. (Ex. E, McEvoy Declaration ¶¶ 3-5.) Plaintiff was qualified for the position as she was appointed to the Director position, and served in the role for four years before she was replaced. Dr. Babington concedes that Plaintiff was qualified for the position, and Dr. Williams admitted that Plaintiff did "good work" and "admirable work" as Director. (Ex. H, Babington Depo. at 59; Ex. I, Williams Depo. at 144-45.) Plaintiff suffered an adverse employment action when Defendant replaced her as Director, and Plaintiff's replacement is 27 years younger than Plaintiff. (Def's Response Interrog. No. 6, Ex. J.) *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)(*citing Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)("Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination")); *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 257 (D. Conn. 2013)(age difference between plaintiff and replacement creates a prima facie case for proving age discrimination claim).

In addition, an inference of age bias can be drawn from the deposition testimony by at least one of the decisionmakers, Dr. Williams, which reveals age bias and evidence that Plaintiff's age, and the relative age difference between Plaintiff and Dr. Alphonso, was a factor that made a difference in the decision. (Section II.E.5, *supra*.)

C.      Defendant's Explanations Are Pretext for Age Discrimination

In order to conceal the true discriminatory reason for the action taken against Plaintiff, Defendant has advanced numerous false and pretextual assertions and arguments.  As the United States Supreme Court explained in *Reeves v. Sanderson*, evidence that the employer has advanced a pretextual explanation in response to a claim of discrimination can itself be probative of a discriminatory motivation.

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See *id.*, at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992); *see also Wilson v. United States*, 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. *Cf. Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147–48 (2000).

Plaintiff "may show pretext by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' *Bombero v. Warner–Lambert Co.,* 142 F.Supp.2d 196, 203 n. 7 (D. Conn. 2000)." *DeAngelo v. Yellowbook*

29

*Inc.*, 105 F. Supp. 3d 166, 177-78 (D. Conn. 2015).  Evidence used to establish the prima facie case is also relevant to the issue of pretext.  *Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d at 253.

As set forth above, and in the attached 56(a)(2) statement and supporting documents, Defendant has advanced a litany of demonstrably false statements and pretextual narratives that are riddled with weaknesses, implausibilities, inconsistencies, incoherences, or contradictions. Defendant falsely claimed to the CHRO that Plaintiff had been notified of her non-reappointment to argue that her claims were untimely.  (Section II.E.1, *supra*.)  Defendant falsely claimed the existence of complaints that Plaintiff did not make herself accessible to students, that members of a Board or law school advisory committee complained that the Program was not addressing new developments in the law, that Plaintiff was not using the internet effectively, and that Plaintiff did not work cooperatively with the development office.  (Section II.E.1, *supra*.)

Dr. Williams repeatedly provided false testimony that the Program under Plaintiff's direction focused on corporate and criminal law, despite abundant record evidence demonstrating the opposite.  (Section II.E.2, *supra*.)  Dr. Williams's claims about an alleged focus on corporate and criminal law are not only proven false by Plaintiff's declaration and the available documents, such as the annual reports submitted by Plaintiff, but Chris Pates, the person whom Dr. Williams identified as the source for his claims, also failed to corroborate the allegation.  (Section II.E.2, *supra*.)

Throughout its motion and memorandum, Defendant repeatedly asserts, in conclusory fashion and without specific evidentiary support, the mantra that the Program under Plaintiff's direction was not student-focused, student-centric, and did not utilize best practices.  However, none of those claims has any merit, and is belied by the evidence.  (Section II.E.3, *supra*.)

Defendant's claim that it decided to replace Plaintiff as the Director because of the need for a strategic vision aligned with Fairfield 2020 is similarly without credibility. (Section II.E.4, *supra.*) As with Defendant's other claims, none of these issues were raised with Plaintiff when she served as the Director. (McEvoy Declaration ¶ 110.) Dr. Williams's claim that he performed an assessment of the Program which allegedly informed Defendant's determinations simply cannot be believed. (Pl's 56(a)(2) Stmt. ¶ 20.) The surfeit of false and incorrect statements made by Dr. Williams regarding the Program cannot be reconciled with an assessment actually being performed. The fact that Defendant selected the significantly younger Dr. Alphonso for the position, without any discussion or proffer from her regarding how she intended to address any of the areas of the Program about which Dr. Williams and Dr. Babington feigned concern, and received an appointment letter very similar to that which Plaintiff received and which did not communicate an expectation to address any areas of alleged concern, speaks volumes about whether Dr. Williams and Dr. Babington were actually concerned about the Programs' performance in those areas, or whether those professed concerns about the Program were just a pretext to replace Plaintiff with a significantly younger Director. (Section II.E.4, *supra*.)

The various contradictions and inconsistencies in Defendant's various explanations are also evidence of shifting explanations, from which pretext can be inferred. *Weiss v. JPMorgan Chase & Co.*, 332 Fed. Appx. 659, 663 (2d Cir. June 5, 2009). The explanations offered by Dr. Williams and Dr. Babington deviated from the explanation offered by Defendant at CHRO. The explanations offered by Dr. Williams and Dr. Babington also deviated from each other. The multitude of criticisms expressed by Dr. Williams and Dr. Babington also stands in stark contrast

to what they communicated to Plaintiff regarding her performance as Director when she held the position.

The evidence supports a conclusion that Defendant, including Dr. Williams and Dr. Babington, neither judged Plaintiff on her actual job performance as Director, nor actually evaluated the Program as it actually developed under Plaintiff's leadership.  Instead, the evidence supports a conclusion that Dr. Williams and Dr. Babington made incorrect and false statements, and flawed assumptions about Plaintiff and the Program under her directorship based on Plaintiff's age, and preferred Dr. Alphonso because she was younger.  As other courts have recognized, the ADEA was specifically intended to prohibit employers from making "irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance."  *Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 699 (1st Cir. 1983).  *See also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610-611 (1993)(ADEA intended to combat discrimination against people based on incorrect beliefs and assumptions about older workers which are not supported by objective facts, and not on merits of actual performance).

There is additional reason to believe that Defendant's false and pretextual justifications for replacing Plaintiff with the significantly younger Dr. Alphonso are connected to Plaintiff's more advanced age, and her relative age as compared to Dr. Alphonso.  Dr. Williams used a number of adjectives to describe Plaintiff or the Program which are suggestive of age bias, including "traditional," "backward-looking," "antiquated," "stuck in the 20th century," and preparing students for a 19th century law career.  (Section II.E.5, *supra*; Rule 56(a)(2) Stmt. ¶ 60.)  Since none of these statements have any basis in fact, it is reasonable to infer that Dr. Williams was influenced to make those statements because he is biased against Plaintiff based on

her age.  Although those terms can be benign in some contexts, a reasonable fact-finder could infer that Dr. Williams's repeated usage of those particular phrases as a basis to criticize the 68 year old Plaintiff, when none of the criticisms were supported by the facts, is suggestive of age bias against Plaintiff.  *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)(whether manager's use of "boy" to refer to African-American worker was discriminatory, or benign, depended upon context and circumstances).

A reasonable fact-finder could also infer consciousness of guilt from Dr. Williams's evasiveness and difficulty answering the direct question of whether he understood that Plaintiff was older than Dr. Alphonso.   In other contexts, courts have recognized that consciousness of guilt can be inferred from evasive behavior or responses.  *U.S. v. Schlesinger*, 372 F. Supp. 2d 711, 724 (E.D.N.Y. 2005).  "Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct."  *Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2d Cir. 1995).

At various points, Defendant seeks to bolster its case by attributing various statements, thoughts, determinations, findings, and concerns to Dr. David Sapp.  (Doc. No. 26, pp. 3-5, 12; Doc. No. 25, ¶¶ 17-18.)  The Court should not consider that evidence as presented by Defendant because the statements are inadmissible hearsay.  F.R.E. 801, 802.  Furthermore, Defendant seeks to offer what Dr. Sapp, thought, found, and was concerned about through testimony by Dr. Williams, who is not competent to testify about Dr. Sapp's thoughts, findings, and concerns and such testimony from Dr. Williams about Dr. Sapp's thoughts, findings, and concerns is not admissible. Dr. Sapp's thoughts and concerns are also not relevant under F.R.E. 401 and F.R.E. 402 because Dr. Sapp left Fairfield in 2014 and was not involved in the decision to not re-appoint Plaintiff in 2016 and to replace Plaintiff with Dr. Alphonso in 2016.  As a non-

decisionmaker, Dr. Sapp's personal beliefs and lay opinions are irrelevant and not probative as to what actually motivated the individuals who made the decision, Dr. Williams and Dr. Babington. *Jacobs v. General Electric Co.*, 275 Conn. 395, 407-408 (2005).

Defendant cannot take advantage of the same actor inference here. (Doc. No. 26, p. 16.) Contrary to what Dr. Williams actually communicated to Plaintiff in the June 2015 letter to Plaintiff, Dr. Babington did not intend the appointment as Director for another year to be renewable at her discretion after another year. (Ex. H, Babington Depo. at 60-61.) Neither Dr. Williams nor Dr. Babington ever met with Plaintiff regarding the Program in the 2015-2016 year and could not even bring themselves to notify Plaintiff that her appointment was not being renewed. Although the June 2015 letter informed Plaintiff that her appointment was renewable after a year, pending annual review, there was no review performed of Plaintiff's performance as Director at the conclusion of the 2015-2016 academic year. (Ex. H, Babington Depo. at 73.) While Plaintiff was appointed for one more year in 2015 by Dr. Babington and Dr. Williams, the appointment was made in bad faith. When all reasonable inferences are drawn in Plaintiff's favor, as they must be for purposes of this motion, the appointment of Plaintiff for one additional year does not help to absolve Defendant of discrimination; to the contrary, it represents additional evidence of mistreatment and bad faith by Dr. Williams and Dr. Babington towards Plaintiff.

The fact that the director positions are filled at the discretion of the Provost or the Dean also does not give Defendant a license to discriminate on the basis of age. (Doc. No. 26, p. 21.) If employees who are at will are protected against age discrimination, which they are, then so are people employed in director positions at Fairfield.

34

Finally, the evidence does not support Defendant's claim that Dr. Alphonso has made extensive changes to the Program.  (Doc. No. 26, p. 28.)  At most, Sue Quinlivan's testimony upon which Defendant relies supports the conclusion that Dr. Alphonso has publicized certain aspects of the Program differently than Plaintiff, who took steps to publicize the Program through the *De Jure* newsletter, among other ways.  However, Ms. Quinlivan's testimony does not provide any indication that Dr. Alphonso has made any substantive changes to the actual Program itself in ways that would be expected if the Program actually needed to address all of the alleged shortcomings which Defendant claims existed when Plaintiff was Director.  The reason is that the deficiencies alleged in the Program by Dr. Williams and Dr. Babington did not actually exist when Plaintiff was Director, and so there was no need to provide Dr. Alphonso with a mandate to remedy those flaws which did not exist.  In actuality, when Plaintiff was Director of the Program, Dr. Babington and Dr. Williams considered the Program's biggest flaw to be the age of its Director.  They decided to remedy that problem by replacing Plaintiff with a Director who was 27 years younger.  The various attacks leveled against Plaintiff by Defendant, and by Dr. Williams and Dr. Babington, are merely designed to cover-up and obscure that truth.

Defendant's motion should be denied because it is premised on factual disputes which must be resolved in favor of Plaintiff, and against Defendant, and because Defendant fails to permit all permissible inferences in Plaintiff's favor.  Plaintiff has established a prima facie case of discrimination, and Defendant does not even argue otherwise.  Since there is abundant record evidence from which a reasonable factfinder could conclude that Defendant's various explanations for the decision, and its various criticisms of Plaintiff and her directorship of the Program, are false, inconsistent, contradictory, incoherent, implausible, unsupported, and pretextual, Defendant's motion must be denied.

## V.   CONCLUSION

For the foregoing reasons, the Court must deny Defendant's motion for summary judgment.

PLAINTIFF,
Sharlene McEvoy

By:___/s/ *Todd D. Steigman*_____
Todd D. Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
Email: tsteigman@mppjustice.com

## CERTIFICATION OF SERVICE

I hereby certify that on this 11th day of January, 2019, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

_____ __*/s/ Todd D. Steigman*_____
Todd D. Steigman