**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SHARLENE McEVOY

                **Plaintiff,**

v.

FAIRFIELD UNIVERSITY
                **Defendant.**

**CIVIL ACTION NO.**

**3:17-cv-01861 (MPS)**

**JANUARY 11, 2019**

**PLAINTIFF'S RULE 56(a)(2) STATEMENT IN OPPOSITION**
**TO MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)(2) of the District of Connecticut, Plaintiff Sharlene

McEvoy, through her undersigned counsel, submits the following in response to Defendant's

Motion for Summary Judgment (Doc. No. 24) and the Statement of Material Facts filed by

Defendant in support of the same (Doc. No. 26).  Since numerous material facts are in dispute,

Defendant's Motion for Summary Judgment must be denied.

**I.**        **Plaintiffs' Response to Defendants' Purported Statement of Undisputed Facts**

1.        Fairfield University, founded by the Society of Jesus, is a coeducational

institution of higher learning whose primary objectives are to develop the creative intellectual

potential of its students and to foster in them ethical and religious values and a sense of social

responsibility. Fairfield University educates its students through a variety of scholarly and

professional disciplines. All of its schools share a liberal and humanistic perspective and a

commitment to excellence. Fairfield University's undergraduate schools provide students with a

broadly based general education curriculum with a special emphasis on the traditional humanities

as a complement to the more specialized preparation in disciplines and professions provided by

the major programs. Affidavit of Mark Guglielmoni, Exhibit 1.

**Response**:  **Admitted.**

2.      Sharlene McEvoy's date of birth is July 6, 1950. 26(f) report of undisputed facts, Exhibit 2.

**Response**:  **Admitted.**

3.      Dr. McEvoy has a law degree from the University of Connecticut and a master's degree in political science and a Ph.D. in Public Administration/Political Science from the University of California at Los Angles. 26(f) report of undisputed facts, Exhibit 2.

**Response**:  **Admitted.**

4.      Dr. McEvoy began teaching at Fairfield University on or about September 1, 1986 teaching business law and in 1998, she was promoted to the rank of Professor in the Dolan School of Business. 26(f) report of undisputed facts, Exhibit 2.

**Response**:  **Although the evidence cited does not establish all these facts, Admitted.**

5.      In May 2012, Senior Vice President for Academic Affairs Dr. Paul J. Fitzgerald, SJ, sought to make changes to the Pre-Law Advisory Program and sought applications from the faculty following the decision by Dr. Don Greenberg to step down as the Faculty Director of the Pre-Law Advising Program. McEvoy Tr. 16-18, Exhibit 3; Exhibit 4.

**Response**:  **Admitted in part.  Denied that Father Fitzgerald sought to make changes to the Pre-Law Advisory Program in 2012 because there was no such Program in 2012 before Plaintiff was appointed and established a "Program."  (Ex. D, McEvoy Depo. at 18; Def's Ex. 3; Ex. E, McEvoy Declaration, ¶¶ 25-30.)**

6.      Dr. McEvoy applied for the position and submitted a plan to Father Fitzgerald. Exhibit 5.

**Response**:  **Admitted.**

7.     After reviewing the plan and meeting with Dr. McEvoy, on July 3, 2012, Dr. Fitzgerald appointed her to a three year term (beginning July 1, 2012 and concluding June 30, 2015) as Director of the Pre-Law Advisory Program. Exhibit 6.

**Response**:  **Admitted.**

8.     The position had a $10,000 per year stipend and a budget for the program of $10,000 per year. Exhibit 6.

**Response**:  **Admitted.**

9.     Dr. Fitzgerald outlined some of his expectations for the Pre-Law Advisory Program. These included the formation of a Pre-Law Club with twice annual meetings, with Fairfield University alumni as speakers; the gathering and analyzing data on GPA's [grade point averages], LSAT scores and relative success in gaining admissions to law schools assess outcomes; and the giving of the best advice and guidance to students. Dr. McEvoy was advised to work with the Institutional Research Department to collect and organize data; to increase the number of internships; to reconnect with Fairfield alumni to foster support for undergraduate pre-law students; and to work with the Advancement Division which will help and provide guidance regarding connecting to alumni. Exhibit 6.

**Response**:  **Admitted in part.  Father Fitzgerald's July 3, 2012 letter, identified as Defendant's Exhibit 6, stated that he was impressed by Plaintiff's proposal in which she highlighted her initial plans and ideas, including some of the items identified in this paragraph, and then identified certain offices and departments which could be helpful.**

10.     As a program director she was expected to submit an annual report on the program. Guglielmoni Affidavit, Exhibit 1.

**Response**: **Denied that the record evidence cited by Defendant establishes this fact, but admitted that Plaintiff submitted annual reports when she was the Director of the Pre-Law Advising Program. (Pre-Law Annual Reports, attached as Defendant's Exhibits 7-10.)**

11. Dr. McEvoy's reports did not provide the type of data that Dr. Fitzgerald had indicated that he wanted. The reports did not provide a vision for the program nor any data or analysis on the success of students seeking admission to law school. Exhibits 7-10.

**Response**: **Denied. The record evidence cited by Defendant in support of this paragraph does not establish these facts. The annual reports that Plaintiff submitted were aligned with the template for annual reports that Plaintiff had obtained. (Ex. E, McEvoy Declaration, ¶ 112.)**

12. In 2013, David Sapp became the Associate Vice President for Academic Affairs. As Associate Vice President, Dr. Sapp oversaw initiatives on undergraduate retention and graduation, academic support services, and student-faculty collaborative research. He supervised two federal TRIO programs to support low-income and first generation students; and he shepherded several donor gifts to support faculty-student mentorship of research. He was also responsible for overseeing the Pre-Law Advisory Program. Guglielmoni Affidavit, Exhibit 1.

**Response**: **Plaintiff lacks sufficient knowledge to admit or deny all of the facts asserted in this paragraph. The citation to the Affidavit also does not comply with the specific citation rule of Local Rule 56(a)(3) of the District of Connecticut.**

13. After submitting her annual report for 2012-2013, Dr. McEvoy responded to Dr. Sapp's request for additional information about student LSAT scores, the impact of the LSAT boot camp, the students participating in internships or the job shadow program, the goals that she

had for the next two academic years, and the names of the students she had counseled. She provided that information on July 23, 2013. Exhibit 11. This information was never submitted in the annual reports in subsequent years. Exhibits 7-10.

**Response**: **Admitted in part. Plaintiff admits that Exhibit 11 is an e-mail that she sent to Dr. Sapp, although the document is not complete because the content of one of the attachments is missing. Plaintiff denies that Defendant's characterization of Exhibit 11, and Exhibits 7-10, is completely accurate. Plaintiff's annual reports aligned with the template for the reports that she had obtained. (Ex. E, McEvoy Declaration ¶ 112.) When Dr. Sapp specifically asked Plaintiff to provide additional information in 2013, Plaintiff provided what she could in order to respond to his request. (Def's Ex. 11.) However, Plaintiff did not include additional specific information about specific students in her annual reports because she had concerns regarding confidentiality of student information and the requirements of FERPA, and the template for annual reports did not call for her to provide specific information about individual students, such as their LSAT test scores. (Ex. E, McEvoy Declaration ¶ 112.) Furthermore, as Defendant's Exhibit 11 reflects, LSAT score information could only be obtained if students volunteered the information. (Def's Ex. 11.) Accordingly, Plaintiff cannot be faulted for failing to provide that information.**

14.    Several of the annual reports either estimated the number of students who attended programs or made no mention of how many students attended. In her 2012-2013 Report there was no report on the number of students who attended the first student-alumni event of the Major-Minor Information Fair. Exhibit 7. The Report for 2013-2014 did not indicate how many students participated in the St. Robert Bellarmine Pre-Law School Distinguished Alumni Awards

dinner held on April 3, 2014. Exhibit 8. The Report for 2014-2015 did not indicate how many students participated in the Personal Statement Seminar. Exhibit 9.

**Response**: **Admitted, but Plaintiff was never informed at the time that she was required to include specific information about the number of students in her annual reports. (Ex. E, McEvoy Declaration ¶ 112.)**

15.    Dr. Fitzgerald left Fairfield University to become President of the University of San Francisco in June 2014. Dr. Lynn Babington, who had been dean of the School of Nursing, was then named Senior Vice President of Academic Affairs in July 2014 and became Provost in July 2015. This was a change in title, but not a change in responsibilities. Guglielmoni Affidavit, Exhibit 1; Babington Tr. 11-12, Exhibit 12.

**Response**: **Admitted.**

16.    At about that same time, Dr. Sapp left the University for a position at Loyola Marymount University in Los Angeles. Before Dr. Sapp left, Dr. Babington named Dr. Yohuru Williams to be Associate Vice President of Academic Affairs, succeeding Dr. Sapp. Guglielmoni Affidavit, Exhibit 1; Williams Tr. 35-40, Exhibit 13.

**Response**: **Admitted.**

17.    As part of the transition, Dr. Sapp shared his concerns for the Pre-Law Advisory Program with Dr. Williams. Williams Tr. 39-40, Exhibit 13; McEvoy Tr. 47-48, Exhibit 3. In 2013 and 2014, Dr. Sapp voiced concerns about the direction of the Pre-Law Advisory Program and Dr. McEvoy's effectiveness in that role. Williams Tr. 29-37, Exhibit 13. Dr. Sapp expressed to Dr. Williams that he was concerned about the direction of the program. He thought it was not responding to changing avenues for the preparation for law school and was frozen around corporate and criminal law. Williams Tr. 29, Exhibit 13. Dr. Sapp found that Dr. McEvoy was

not effectively engaging alumni nor reaching out to law schools so Fairfield could serve as a pipeline for student admissions. He was concerned about student outcomes. Williams Tr. 32, Exhibit 13.

**Response**:  **Objection. Inadmissible Hearsay that does not qualify as admissible evidence that the Court can consider under Rule 56.  Plaintiff also objects to this paragraph as irrelevant and inadmissible because Dr. Sapp did not make any of the decisions that are at issue in this case, and therefore, what he said, or what he found, is not relevant to whether the actual decisionmakers, Dr. Williams and Dr. Babington, were motivated by Plaintiff's age in making decisions about her appointment.  Plaintiff also denies that the facts asserted in the last sentence of this paragraph are supported or established by the record evidence cited by Defendant.  Plaintiff also objects to that sentence because Dr. Williams, whose deposition testimony is cited by Defendant in support of that sentence, is not a competent witness to testify regarding what "Dr. Sapp found . . ."  Plaintiff also denies the truth of the matters asserted, and Dr. Sapp did not communicate any such concerns to Plaintiff.  (Ex. E, McEvoy Declaration ¶ 115, 117.)**

18.     Dr. Sapp thought that the program should be reimagined with more focus on student outcomes; donor relations; and metrics as it was difficult to assess the effectiveness of the program as Dr. McEvoy's annual reports were not terribly helpful in identifying new directions and what had been accomplished. Dr. Sapp also shared with Dr. Williams that Dr. McEvoy could be difficult to work with, difficult to get in touch with; and was generally defensive about the Program. Williams Tr. 39-40, Exhibit 13.

**Response**:  **Objection.  This paragraph is not admissible evidence that the Court can consider under Rule 56 because it is hearsay, because Dr. Williams is not a competent**

**witness to testify regarding what "Dr. Sapp thought . . .", and because what "Dr. Sapp thought . . ." is irrelevant because Dr. Sapp was not a decisionmaker regarding the adverse action at issue in this case, and therefore, his thoughts are not relevant to proving whether the actual decisionmakers, Dr. Williams and Dr. Babington, were motivated by Plaintiff's age.**

19.     Prior to Dr. Sapp leaving Fairfield University, Dr. Williams and Dr. Sapp met with Dr. McEvoy in the spring of 2014 to discuss the Program. During the meeting Dr. McEvoy was asked whom she thought should be her successor as director as her 3 year term would be up the following spring. Dr. McEvoy did not suggest anyone nor did she ask why she would not be continuing in the position. McEvoy Tr. 82-84, Exhibit 3.

**Response**:  **Denied in part.  Plaintiff testified that there was very little substantive discussion about the program and that there was not really any other discussion about the program.  (Ex. D, McEvoy Depo. at 83-84; Def's Ex. 3.)**

20.     During the 2014-2015 academic year, Dr. Williams did his own assessment of the Pre-Law Advising Program and met with Dr. McEvoy regularly throughout the year. Williams Tr. 46-48, 79-80, Exhibit 13. He asked Dr. McEvoy to share her goals and provide her general assessment of the Program. He talked about the Fairfield2O2O strategic plan, the need to focus on student outcomes and the need to be strategic with University programs. He expressed his concerns that the Program should include a focus on technology and health care as areas that students should be thinking about for their law careers. Williams Tr. 46-47, Exhibit 13. In these discussions, Dr. Williams found Dr. McEvoy to be defensive about her efforts. Williams Tr. 48, Exhibit 13.

8

**Response**:  **Denied.  While Dr. Williams claimed to have performed his own assessment, he did not recall speaking with anyone else other than Dr. Babington and the development office and Dr. McEvoy as part of that assessment.  (Ex. I, Williams Depo. at 43-45.)  An assessment that was limited to speaking with only Dr. Babington and the development office would not have provided for much of an assessment because Dr. Babington had no experience supervising someone responsible for pre-law advising, never spoke with Plaintiff about the Program, never reviewed any of the annual reports submitted for the Program, and relied on Dr. Williams for all of her information about the Program. (Ex. H, Babington Depo. at 13-14, 30, 72-73, 78-82.)  Similarly, communications with Mr. Pates about the Program would not have enabled Dr. Williams to make any informed judgments about the Program because Mr. Pates was not familiar with the Program and, by his own admission, Mr. Pates did not communicate any concerns about how Plaintiff ran the Program, or any criticisms of the Program itself.  (Ex. F, Pates Depo. at 38-39, 41-42, 45.)  Mr. Pates also concedes that had no knowledge of the quality of the advising that Plaintiff was providing to students, and knew that Plaintiff actually had a reputation for being very good one on one with students.  (Ex. F, Pates Depo. at 35.)  Also, Dr. Williams's deposition testimony revealed a lack of understanding of the Program, which belies any claim that he performed an assessment of it. (Ex. E, McEvoy Declaration ¶¶ 95, 100, 105, 106, 114, 115.)**

21.    When they discussed how to better position the program for the future, in Dr. Williams's opinion, Dr. McEvoy did not see what the problems were. Dr. McEvoy continued to indicate that she thought that the Program was doing well. Williams Tr. 48-53, Exhibit 13.

**Response**:  **Denied that these facts are established in the deposition transcript cited by Defendant.  Denied that these facts are accurate.  (Ex. E, McEvoy Declaration ¶¶ 100-101, 105-106, 110-111, 114-116.)  See also Response to Paragraph No. 20, above.**

22.    Dr. Williams spoke to others familiar with the Program, including Christopher Pates of the Advancement Office, and did his own assessment of the Program. Williams Tr. 46-48, 69-70, 79-80, Exhibit 13.

**Response**:  **Denied that Christopher Pates was familiar with the Program.  Mr. Pates never attended a pre-law program event.  (Ex. F, Pates Depo. at 18.)  Mr. Pates' only interaction with Plaintiff regarding the Program was limited to a single meeting in the summer of 2014 regarding the development of a case statement, and then some e-mail correspondence shortly thereafter regarding the case statement.  (Ex. E, McEvoy Declaration ¶ 118; Exhibit M.)  Denied that Dr. Williams ever did his own assessment of the Program.  For instance, Dr. Williams's deposition testimony reflected a stunning level of ignorance regarding the Program.  (Ex. E, McEvoy Declaration, ¶ 95.)  See also Response to No. 20, above.**

23.    Dr. Williams found that Dr. McEvoy had not gathered and analyzed data on student GPA's [grade point averages], LSAT scores, or their success in gaining admission to law schools. There was no assessment of outcomes in order to give the best advice and guidance to students. She was not reporting on student LSAT scores or their grade point averages and was not analyzing student efforts in seeking admission to law school. She was not reporting on where students were applying, where they were being accepted and where they were attending. She did no analysis of information about the students seeking to go to law school. Her annual reports provided no analysis to determine what improvements were occurring in gaining admission to

law schools. Williams Tr. 83-86, 98-99, Exhibit 13 and Exhibits 7-9; McEvoy Tr. 26-31,39, Exhibit 3.

**Response**:  **Denied.  Dr. McEvoy did collect and analyze data regarding student's GPA's and information relating to the LSAT, as well as other information that would be pertinent to a student's candidacy for admission to law school.  (Ex. D, McEvoy Depo. at 24-26, 76-77.)  Plaintiff also possessed information regarding law schools at which students were accepted, and not accepted.  (Ex. D, McEvoy Depo. at 27-28; Def's Ex. 23.)  That type of information was not included in Plaintiff's annual reports to Dr. Williams because the template for the annual reports did not call for the inclusion of that type of information, and Plaintiff considered it to be confidential, and Dr. Williams never asked Plaintiff to provide that information to him or include it in her annual reports.  (Ex. E, McEvoy Declaration ¶ 110, 112.)  However, the fact that the information was not included in the annual reports submitted to Dr. Williams does not mean that Plaintiff did not collect and analyze the information in connection with her advice and guidance to students.  Williams did not inform Dr. McEvoy that he wanted her to do anything differently in connection with the preparation of her annual reports, and never communicated to Plaintiff what information should be included in her annual report.  (Ex. I, Williams Depo. at 52, 98.)**

24.    She had not increased the number of internship opportunities for students and did not work with the Advancement Office to connect and engage alumni and to assist in fundraising. McEvoy Tr. 39, Exhibit 3. Dr. Williams found that there were several concerns being raised about the Pre-Law Advising Program. There were accounts that students were unable to reach Dr. McEvoy or that she did not respond in a timely manner to them. Because her office was in the Dolan School of Business and her office hours were on Mondays, Tuesdays and

11

Wednesdays in the late afternoon, undergraduates in the College of Arts and Sciences found it difficult to drop in on her. As she did not have a computer at home or access to email at home, she was not easy to reach, particularly as she was not on campus on Thursdays or Fridays. McEvoy Tr. 13-14, Exhibit 3.

**Response**: **Denied.  Plaintiff did work with the Advancement Office to connect and engage alumni.  (Ex. E, McEvoy Declaration ¶ 108.)  It was not Plaintiff's job to do fundraising.  (Ex. G, Ogletree Depo. at 18; Ex. E, McEvoy Declaration ¶ 107.)  Plaintiff also denies that she was not available to students, and that her office location was not readily accessible to students.  (Ex. E, McEvoy Declaration¶¶ 35-37, 88-90, 97.)   The evidence cited by Defendant in this paragraph also does not even support the facts asserted.**

25.     Dr. McEvoy also did no research on what other colleges and universities were doing for their pre-law students and was defensive when suggestions were made about improving the Program. McEvoy Tr. 58-59, Exhibit 3; Pates Tr. 22-24, Exhibit 14.

**Response**: **Denied that Plaintiff was defensive when suggestions were made about improving the Program.  By his own admission, Chris Pates was only concerned with raising money and did not have any complaints about Plaintiff's performance as the Director of the Program or criticisms of the Program itself, and understood that Plaintiff was very good with the students.  (Ex. F, Pates Depo. at 34-35, 38, 41-42.)**

26.     There were issues concerning her relationship with the Advancement Office, which is responsible for raising funds for the University and, in particular, for the endowment to support the Pre-Law Advising Program. She was defensive about any suggestions to improve the Program and provided no assistance in developing a case statement that was to be used for fund

raising. Williams Tr. 69-75, Exhibit 3; Pates Tr. 27-29, Exhibit 14; Admissions #28; Exhibit 15; McEvoy Tr. 63, Exhibit 3.

**Response**:  **Denied. Plaintiff did not have issues with the Advancement Office, as she worked well with Hope Ogletree and Gerry Derbyshire of the Advancement office.  (Ex. E, McEvoy Declaration ¶ 108.)  Plaintiff did complain once in 2014 about Chris Pates from the Advancement Office, (Ex. E, McEvoy Declaration ¶ 119), but Chris Pates was only concerned with raising money and did not have any complaints about Plaintiff's performance as the Director of the Program or criticisms of the Program itself, and understood that Plaintiff was very good with the students.  (Ex. F, Pates Depo. at 34-35, 38, 41-42.)  Plaintiff also denies that she was asked to provide assistance on the case statement. (Ex. D, McEvoy Depo. at 63.)**

27.    Dr. McEvoy thought the Program was fine the way it was. Pates Tr. 23, Exhibit 14; McEvoy Tr. 59-60, Exhibit 3.

**Response**:  **Admitted, given the fact that the Program had only been established in 2012.**

28.    Dr. McEvoy did no analysis of the programs that were being offered by the Pre-Law Advisory Program as to how they helped students get into law school or why attendance was so low for the programs. Exhibits 7-10; McEvoy Tr. 39, 72, 77-78, 80-81, 116-118, 140, Exhibit 3.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.**

29.     There was a concern that students were not getting accepted into first tier law schools and that Dr. McEvoy was not doing anything to increase the possibility that students would be admitted to those law schools. Williams Tr. 56-59, Exhibit 13.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.  As stated in the passive voice, without identifying who in particular may have had such a concern, this statement is irrelevant and not admissible evidence.  This statement also does not identify "first tier law schools" and is therefore incredibly vague.  Plaintiff also denies that she was not doing anything to increase the possibility that students would be admitted to good law schools, and would be competitive applicants for admission to law schools.  (Ex. E, McEvoy Declaration¶ 80, 99.)  As Defendant's Exhibit 23 demonstrates, Plaintiff was providing assistance and advising to students which helped students get accepted into very good law schools.  (Def's Ex. 23.)**

30.     While Dr. McEvoy had indicated in her plan submitted to Dr. Fitzgerald that one of the things she was going to do was to create a mentorship and internship program so that students could experience what the practice of law was like, Dr. McEvoy did not create such a program. McEvoy Tr. 152. 153, Exhibit 3.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.**

31.     The "mentorship" program Dr. McEvoy created was an effort to try to connect graduates of Fairfield University who were in law school with current students who were visiting the law school or had questions about law school. Under Dr. McEvoy, the mentorship program was an informal system by which current students would contact Ms. Quinlivan to see if there were a Fairfield graduate at a law school that he/she might be interested in applying to. Ms.

14

Quinlivan would then contact a Fairfield graduate at the law school to see if the law student would be willing to speak with the current student about the law school experience or if they were visiting the campus to meet with the current student. There were no formal guidelines and no monitoring or reporting on what happened after the contact information was provided. Quinlivan Tr. 50-53, Exhibit 16; McEvoy Tr. 67-71,118, Exhibit 3.

**Response**:  **Admitted.**

32.     The idea of a mentorship program that Dr. Babington and Dr. Williams had in mind was quite different from what Dr. McEvoy referred to as a mentorship program. The mentorship program that the University was seeking was a formal program in which lawyers would meet with students, share their experiences and provide guidance to the current students. It might also provide an opportunity to work with the lawyer to see what could be done with a law degree. This is consistent with what Dr. Fitzgerald had discussed in the appointment letter. Exhibit 6.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.  There is no evidence identified in this paragraph to support the claims about what Dr. Babington and Dr. Williams had in mind regarding a mentorship program.  Also, neither Dr. Babington nor Dr. Williams ever communicated to Plaintiff any information about what they wanted in terms of a mentorship program.  (Ex. E, McEvoy Declaration ¶ 116.)  Also, students did participate in the job shadow program with attorneys and law firms.  (See Defendant's Exhibit 11.)**

33.     Dr. Williams did not think that the Program was effective as it could be. The Program was not sufficiently student focused, there was no data submitted to determine what

15

was being accomplished, and there was no articulation of a vision for improving the program. Williams Tr. 160, Exhibit 13.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.  Plaintiff also denies the truth of what is asserted in this paragraph with respect to the alleged criticisms of the Program.  (Ex. E, McEvoy Declaration ¶¶ 32-37, 94, 105, 108, 110, 112.)**

34.     In the spring of 2015 as Dr. McEvoy's three year term was about to be up, Dr. Babington and Dr. Williams discussed the Program and what would make it better and who would be the best person to lead the Program. Williams Tr. 67, 94, Exhibit 13. That spring the University was completing a strategic plan, called Fairfield2O2O, with an emphasis on making the University more student-centric and improving student outcomes. Babington Tr. 58, Exhibit 12.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.**

35.     Dr. McEvoy thought Farifield2O2O was a fund raising program. She did not participate in any discussion or meeting about the plan. McEvoy Tr. 109, Exhibit 3.

**Response**:  **Admitted.**

36.     Dr. Williams and Dr. Babington concluded that Dr. McEvoy's term was up and the Pre-Law Advisory Program needed new leadership. Dr. McEvoy had not provided any strategic visioning or shown any attempt to engage with the priorities established by the fairfield2O2O strategic plan. Williams Tr. 98-99, Exhibit 13.

**Response**:  **Denied that the evidence cited in this paragraph establishes the facts asserted in this paragraph.  Moreover, Dr. Babington testified that Fairfield 2020 did not**

16

directly play a role in the decision to only offer Plaintiff an additional one year appointment in 2015, and was only indirectly relevant because of an initiative to review all programs at Fairfield.  (Ex. H, Babington Depo. at 62.)  Neither Dr. Babington nor Dr. Williams ever communicated with Plaintiff about Fairfield 2020 or the need to provide a strategic vision for the Program.  (Ex. E, McEvoy Declaration ¶ 114.)

Also denied that the decision to appoint Dr. Alphonso as Dr. McEvoy's replacement had anything to do with Fairfield 2020 or strategic visioning.  Before Dr. Williams offered the Program directorship to Dr. Alphonso in 2015, there is no evidence that Dr. Alphonso articulated to Dr. Williams her vision for reimagining or growing the Pre-Law Program, and Dr. Williams has no recollection of such an interaction.  (Ex. I, Williams Depo. at 114-15.)  Before Dr. Williams offered the Program directorship to Dr. Alphonso in 2015, Dr. Alphonso had not expressed any ideas she had to improve student outcomes in the Program.  (Ex. I, Williams Depo. at 115-16.)  Before Dr. Williams offered the Program directorship to Dr. Alphonso in 2015, Dr. Alphonso had not expressed any ideas she had to align the Program with goals and strategic vision of Fairfield 2020.  (Ex. I, Williams Depo. at 116.)

After Dr. Alphonso communicated in May of 2015 that she could not serve as the Director of the Program at that time, (May 12, 2015 E-mail, Def's Ex. 20), Dr. Williams did not communicate with Dr. Alphonso about serving as Director of the Program again until the following year, when he wrote to her on June 10, 2016 about her interest in serving as the Director, (Ex. I, Williams Depo. at 137; June 10, 2016 E-mail, Exhibit N).

By June 14, 2016, Defendant had decided to offer the Program Director position to Dr. Alphonso, and Dr. Alphonso had accepted the offer.  (Ex. I, Williams Depo. at 142-43.)

**The letter to Dr. Alphonso confirming the details of her appointment as Director of the Program is devoid of any statements communicating to Dr. Alphonso that she was expected to focus on the areas in which Defendant has identified as deficiencies in Plaintiff's performance as Director of the Program.  (Letter to Dr. Alphonso, Exhibit K.)  For instance, the letter to Dr. Alphonso does not communicate any expectations that she make the program more aligned with any strategic vision associated with Fairfield 2020, or make changes to the Program to adopt best practices that were not already being implemented, or make any changes to the Program to make it more student-focused, or student-centric. In fact, the content of the letter is similar to the content of the letter that Plaintiff received when she was appointed Director of the Program, except that Dr. Alphonso received the benefit of a course release, while Plaintiff actually taught extra courses while she served as Director.  (Letter to Dr. McEvoy, Def's Ex. 6; Letter to Dr. Alphonso, Exhibit K; McEvoy Declaration ¶¶ 38-53.)**

**Dr. Williams testified that he believed Dr. Alphonso would better align the Program to the strategic vision of Fairfield 2020 than Plaintiff because she was involved in Public Administration.  (Ex. I, Williams Depo. at 167.)  However, Plaintiff has a Master's degree and a Doctorate degree in Political Science and Public Administration.  (McEvoy Declaration ¶¶ 12-13.)  When asked to identify something specific about Dr. Alphonso that caused him to conclude that she would be better able to address the issues he had identified, such as better student outcomes, than Plaintiff, Dr. Williams's answer focused on the assertion that Plaintiff's time was up, but that does not provide a rationale for believing that Dr. Alphonso possessed attributes which were lacking in Plaintiff and which would help deliver better student outcomes.  (Ex. I, Williams Depo. at 168.)  Dr. Williams**

18

**also knew that Plaintiff taught in interdisciplinary programs before, including as part of the American Studies Program based in the College of Arts and Sciences. (Ex. I, Williams Depo. at 166; McEvoy Declaration ¶ 8.)**

37.    Dr. Babington and Dr. Williams were concerned with improving student outcomes, wanted the Program to reflect the strategic plan, wanted to create more efficiency by having the Program run by someone in the College of Arts and Sciences where more faculty taught law related courses, wanted to provide a broader range of opportunities for students to distinguish themselves from students from other colleges and universities, and wanted the Director to more effectively work with the development office to raise funds to support the Program and implement best practices. Williams Tr. 67, 109-110, Exhibit 13.

**Response**:  **Denied. (Ex. E, McEvoy Declaration ¶¶ 108, 110, 111, 114, 115, 120, 122.)   Dr. Babington and Dr. Williams wanted to replace Plaintiff as the Director of the Program with Dr. Alphonso because Dr. Alphonso was significantly younger (approximately 27 years younger) than Plaintiff. (Ex. J, Def's Response Interrogatory No. 6.)  See also Response to No. 36, above.**

38.    For Dr. Babington the goal was to improve the Program, implement best practices, and be student-centered. For her a change was needed. It was her view that while the Program "wasn't bad the way it was. It just wasn't good." Babington Tr. 58, Exhibit 12.

**Response**:  **Denied. (Ex. E, McEvoy Declaration ¶ 111.)  See also Responses to Nos. 36 and 37, above.  Dr. Babington wanted to replace Plaintiff as the Director of the Program with Dr. Alphonso because Dr. Alphonso was significantly younger (approximately 27 years younger) than Plaintiff. (Ex. J, Def's Response Interrogatory No. 6.)**

**Based on any reasonable assessment, Plaintiff met the criteria of being student-centered, as defined by Dr. Babington.  (Ex. H, Babington Depo. at 30; McEvoy Declaration ¶¶ 79-94; Def's Ex. 23; Thank you notes, Exhibit L.)   Dr. Babington asserted that Plaintiff was not accessible to students, but her basis for that claim is only what Dr. Williams told her.  (Ex. H, Babington Depo. at 78-82.)  Regardless of the source, the claim that Plaintiff was not accessible to students, or that the Program under her direction was not student-focused or student-centric, is simply not true.[1]  (Section II.C., *supra*; McEvoy Declaration ¶¶ 79-94, 98; Def's Ex. 23; Thank you notes, Exhibit L.)**

**When asked for specific facts to support the talking point about "best practices," Dr. Babington was not able to identify any best practices that Plaintiff was not instituting as Director, and she never made recommendations to the Program because it is not her field.  (Ex. H, Babington Depo. at 77.)  According to Dr. Babington, she determined that Plaintiff was not instituting best practices because the Program had allegedly been doing the same thing for years with the same outcomes and no changes had been made over the years and it was not student-focused or student-centric.  (Ex. H, Babington Depo. at 77.) But the Program was only four year old, and Dr. Babington had no understanding as to whether Plaintiff improved the Program over what was in its place before 2012, and she never tried to find out.  (Ex. H, Babington Depo. at 78.)**

**Neither Dr. Babington nor Dr. Williams ever expressed any concerns to Plaintiff about the Program not being "student-focused," "student-centric," or failing to adopt "best practices."  Nor did Dr. Babington or Dr. Williams ever suggest any changes to the**

---

[1] Plaintiff was available even when she was not on campus because she provided her personal phone numbers to Dr. Williams's office, (McEvoy Declaration ¶ 98), and to people she worked with such as Sue Quinlivan (Quinlivan Depo. at 47).

**Program to cure any perceived deficiencies in those areas, or any ways in which they thought the Program could be re-imagined.  (McEvoy Declaration ¶ 111; Ex. I, Williams Depo. at 67-68.)**

39.    Dr. Babington and Dr. Williams discussed several candidates to lead the Program. They were familiar with Dr. Gwendoline Alphonso, who had a reputation for being an innovative teacher, whose courses students really enjoyed and were frequently oversubscribed. Babington Tr. 38-40, Exhibit 12.

**Response**:  **Denied that the evidence cited in support of this paragraph establishes all of the facts asserted in this paragraph.  Furthermore, Dr. Alphonso's reputation is not admissible and is irrelevant to the issues in this case.  The University has thought so highly of Plaintiff's teaching that it has consistently asked her to teach extra courses to more students.  (McEvoy Declaration ¶¶ 17-19, 38-55.)  Also, although she denied that it was one of the reasons that she decided to replace Plaintiff as the Director of the Program, Dr. Babington claimed that Plaintiff was not a well-respected scholar because she did not publish in peer review publications.  (Ex. H, Babington Depo. at 40-41.)  But that is not true.  (Ex. E, McEvoy Declaration ¶ 102.)**

40.    Dr. Alphonso also had a law degree and taught Political Science and Public Policy in the College of Arts and Sciences. Guglielmoni Affidavit, Exhibit 1.

**Response**:  **Admitted.**

41.    Dr. Babington and Dr. Williams decided to offer the position to Dr. Alphonso. After Dr. Williams spoke with Dr. Alphonso about the directorship, Dr. Alphonso declined the offer as she was going to be applying for tenure in the 2015-2016 school year, indicated that she would consider it in the future. Williams Tr. 107-108, 114, Exhibit 13.

<u>Response</u>:  **Admitted.**

42.      After Dr. Alphonso turned down the directorship, Dr. Babington and Dr. Williams discussed extending for one more year Dr. McEvoy's time as the director. They felt that while she was not doing a bad job and that the position could be done much better, having her remain for an additional year would not be harmful while the Fairfield2O2O strategic plan was being implemented. With Dr. Babington's authorization, Dr. Williams offered Dr. McEvoy a one-year extension until June 30, 2016, which she accepted. Exhibit 17; Williams Tr. 117, Exhibit 13.

<u>Response</u>:  **Denied in part.  Dr. Williams testified that Plaintiff did "good work" and "admirable work" as Director of the Program.  (Ex. I, Williams Depo. at 144-45.)  Dr. Babington testified that Plaintiff had proven that she could adequately run the Program. (Ex. H, Babington Depo. at 58.)  In Defendant's Exhibit 17, Dr. Williams wrote that the additional one year appointment was "in no way a negative reflection on [Plaintiff's] service to the University."  (Def's Ex. 17.)  Dr. Williams also wrote to Plaintiff that her appointment was for an additional year, renewable at the discretion of the Provost's office pending annual review.  (Def's Ex. 17.)**

**Also denied that Dr. Babington and Dr. Williams had any legitimate concerns with Plaintiff's performance as Director, or ever communicated any such concerns to Plaintiff. See Response Nos. 20, 36-38, above.**

**Defendant and Dr. Williams have made false claims about the Program, such as that the Pre-Law Advisory Program focused on only corporate and criminal law, to the exclusion of other areas of the law.  (Ex. I, Williams Depo. at 54-55.)  However, the charge that the Pre-Law Advisory Program under Plaintiff's directorship was focused on corporate or criminal law is completely false.  (McEvoy Declaration ¶¶ 62-78; Def's Exs. 7-**

10.)  Moreover, neither Dr. Williams nor anyone else from Fairfield University ever expressed any such concern to Plaintiff before she filed her claims of discrimination. (McEvoy Declaration ¶¶ 101, 110.)

When asked to testify about how the Program was focused on either corporate law or criminal law under Plaintiff's directorship, Dr. Williams failed to provide any specific information to support his claim (Ex. I, Williams Depo. at 72-73, 82-83), but he did describe Dr. McEvoy as "very traditional."  (Ex. I, Williams Depo. at 72.)  Importantly, Dr. Williams admitted that he had no personal knowledge regarding the actual advice that Dr. McEvoy was proving to students.  (Ex. I, Williams Depo. at 74.)

Dr. Williams also made false claims that he received concerns about the Pre-law Program from a development officer named Christopher Pates.  (Ex. I, Williams Depo. at 68-69.)  Christopher Pates was responsible for raising money for the University.  (Ex. I, Williams Depo. at 69-70.)  According to Dr. Williams, Mr. Pates said that alumni had complained to him that the program was not addressing contemporary issues in the law, that some donors were resistant to supporting the program because it was "frozen."  (Ex. I, Williams Depo. at 70.)  Dr. Williams was not able to identify the alumni who allegedly complained.  (Ex. I, Williams Depo. at 70-71.)  But, according to Dr. Williams, the complaint from alumni was allegedly that the program was "frozen . . . kind of antiquated in a way that we were thinking about directions for law study, opportunities for student interns, pre-law advising around things like intellectual property, health care, emerging technology . . . frozen in a . . . model that was more 20th century, backward facing than 21st century."  (Ex. I, Williams Depo. at 71.)  When asked to further explicate what he meant by "frozen," Dr. Williams repeated the false refrain that the program was "very traditional,"

23

meaning "a focus on either you're going into criminal law or you're going into corporate law, and there was no clear way to engage." (Ex. I, Williams Depo. at 71.)

Dr. Williams attributed the basis for the criticism to alumni or members of the law school advisory board who had shared concerns with Mr. Pates, (Ex. I, Williams Depo. at 70, 178-81), but Mr. Pates denied that any alumni or Board members or law school advisory committee communicated any such concerns to him about the Program.  (Ex. F, Pates Depo. at 45, 48-49, 54.)  Mr. Pates also denies that he communicated any concerns about how Plaintiff ran the Program.  (Ex. F, Pates Depo. at 38-39, 41-42.)  Mr. Pates did not communicate any criticisms of the actual Program itself.  (Ex. F, Pates Depo. at 41.)  It is also not true, as Dr. Williams testified, that he expressed any concerns to Dr. McEvoy about a perceived focus on corporate or criminal law, and that Dr. McEvoy was dismissive of those concerns.  (Ex. I, Williams Depo. at 82; Ex. E, McEvoy Declaration ¶¶ 101, 110.)

It is also not true, as Dr. Williams contends, that he expressed any concerns during a 2014 meeting with Plaintiff about technology or health care or that certain people claimed to have difficulty communicating with her; nor did Dr. Williams express any concerns to Dr. McEvoy concerning the challenges associated with the Pre-Law Advisory Program or anything relating to the Fairfield 2020 strategic planning initiative or any allegations that Dr. McEvoy was unwilling to engage with the development office.  (Ex. I, Williams Depo. at 46-50; Ex. E, McEvoy Declaration ¶¶ 101, 110.)  Dr. Williams never spoke with Dr. McEvoy about making sure that the Pre-Law Advisory Program was deeply engaged with Fairfield 2020, or asked her to pursue anything relating to the Pre-Law Advisory Program and 3/3 programs with law schools.  (Ex. I, Williams Depo. at 52; Ex. E, McEvoy Declaration ¶¶ 101, 110.)  In fact, after making specific claims about what he

24

**discussed with Plaintiff during their first meeting in 2014, Dr. Williams later admitted that
he did not recall the specifics of his first meeting with Dr. McEvoy in 2014.  (Ex. I, Williams
Depo. at 53.)**

**Dr. Williams's contention that Plaintiff should bear some responsibility, as the
Director of the Pre-Law Advisory Program, for the fact that Defendant did not enter into a
formal 3/3 program with any law schools, is also not supported.  (Ex. I, Williams Depo. at
56-61.)  As part of an effort to justify that claim, Dr. Williams made claims regarding the
curriculum and the faculty who taught in the Program, (Ex. I, Williams Depo. at 42-43, 63-
66), but the Pre-Law Advisory Program did not have a curriculum, the Pre-Law Advisory
Program did not have faculty who taught in the Program, and Dr. McEvoy did not have
any authority or ability to dictate any particular curriculum.  (Ex. E, McEvoy Declaration
¶ 95.)  Dr. Williams's testimony on these subjects is devoid of any factual basis.  In fact,
contrary to Dr. Williams's criticism of Plaintiff, Dr. Babington conceded that Plaintiff, as
the Director of the Program, was not responsible for entering into 3/3 programs with law
schools.  (Ex. H, Babington Depo. at 93-94.)  See also Response to No. 20, above.**

43.    Dr. McEvoy's 2014-2015 annual report continued to recount the history of the
Program and listed the programs that had been offered. There was still no analysis of the
effectiveness of the programs in helping students get into law school or of students' grade point
averages, LSAT scores or admissions. Exhibit 9.

**Response**:  **Denied in part.  The 2014-2015 annual report discussed several
initiatives that were directly related to helping students get into law school, including LSAT
prep, and presentations from law school admissions representatives.  (Def's Exhibit 9.)
While the annual report did not include specific information regarding specific students'**

**grade point averages and LSAT scores or law school admissions, Dr. Williams never communicated to Plaintiff that such information should have been included in the annual report, the template Plaintiff obtained did not call for the inclusion of such information in the annual reports, and Plaintiff had concerns relating to the confidentiality of student information.  (Ex. E, McEvoy Declaration ¶ 112; Ex. I, Williams Depo. at 52, 98.)**

44.     In the fall of 2015, Dr. Williams was appointed the Interim Dean of the College of Arts and Sciences. The Dean of the College of Arts and Sciences is the chief academic and administrative officer of the College, responsible for overall planning and operations. This includes the educational activity of the College, its curricula courses and methods of instruction, supervision of all faculty and staff personnel within the College, as well as overseeing all budgetary matters. Additionally, the Dean serves on the Rank and Tenure Committee when promotion and/or tenure of faculty members within the College are under consideration. The Dean is responsible for the overall supervision of 16 departments, more than 190 faculty and staff, and Assistant and Associate Deans. The departments the Dean oversees are: Biology, Chemistry, Communications, Economics, English, History, Math, Modern Languages, Philosophy, Physics, Politics, Psychology, Religious Studies, Sociology, and Visual & Performing Arts. Williams Tr. 12, Exhibit 13; Guglielmoni Affidavit, Exhibit 1.

<u>Response</u>:  **Admitted in part.  Denied that the Dean serves on the Rank and Tenure Committee.  (Ex. E, McEvoy Declaration ¶ 123.)**

45.     The Pre-Law Advisory Program continued under Dr. Williams' direction, but was now centered in the College of Arts and Sciences. Dr. Williams was also responsible for overseeing other programs, including Black Studies, Hispanic Studies, Women's Studies. Guglielmoni Affidavit, Exhibit 1.

**Response**:  **Denied in part.  The Pre-Law Program was always a University-wide Program, and that did not change when Dr. Williams's title changed.  (Ex. E, McEvoy Declaration ¶¶ 96, 121.)**

46.     Despite the addition of trips to museums, a play and movies, Dr. Babington and Dr. Williams still were focused and concerned with improving student outcomes, wanted the Program to reflect the new University strategic plan, wanted it to be more student focused, and wanted to have the Program reflect best practices. They wanted to create more efficiency by having the Program run by someone in the College of Arts and Sciences where more faculty taught law related courses, wanted to provide a broader range of opportunities for students to distinguish themselves from students from other colleges and universities, and wanted the Director to more effectively work with the Advancement office to raise funds to support the Program. In short, their goal was to improve the Program, implement best practices, and be student-centered. Williams Tr. 160-164, Exhibit 13. In their opinion the Program under Dr. McEvoy was only adequate. Williams Tr. 109-110, 164, Exhibit 13; Babington Tr. 58, Exhibit 12.

**Response**:  **Denied.  Neither Dr. Babington nor Dr. Williams ever communicated any of those concerns to Plaintiff.  (Ex. E, McEvoy Declaration ¶¶ 110, 111.)  The concerns identified in this paragraph are also not true.  The Program was student-centered and student-focused under Plaintiff's directorship.  (Ex. E, McEvoy Declaration¶¶ 31-37, 66-89.)  Other than using it as a conclusory talking point, Defendant has not identified a single "best practice" that Dr. Williams or Dr. Babington believed should have been adopted as part of the Program, but was not being followed by Plaintiff when she was Director.  (Ex. E, McEvoy Declaration ¶ 111.)  It had never been Plaintiff's responsibility to be a**

27

**fundraiser for the program, (Ex. G, Ogletree Depo. at 18, 33-34), and neither Dr. Williams nor Dr. Babington ever asked Plaintiff to perform any fundraising, (Ex. E, McEvoy Declaration ¶ 107). Also, Dr. Williams testified that Plaintiff did "good work" and "admirable work" as the Director of the Program. (Ex. I, Williams Depo. at 144-45.) It is also not true that more law courses were taught by faculty in the College of Arts and Sciences. In actuality, most of the law related courses are taught by faculty in the School of Business, who are lawyers. (Ex. E, McEvoy Declaration ¶ 120.) The evidence cited by Defendant in this paragraph also does not establish the truth of all of the facts asserted in this paragraph. See also Responses to Nos. 20, 36-38, and 42, above.**

47.     In the spring of 2016, Dr. Williams met with Dr. Babington. They discussed the continuing issues with Dr. McEvoy's performance and the need to reinvigorate the Program and give the Program a new direction. They wanted to institute best practices and revise and revamp the Program to be more student-centered, student-focused and to improve outcomes for our students. Williams Tr. 176-182, 186, Exhibit 13. They believed that the Program had been doing the same thing for years with the same outcomes; and was not student focused nor student centric. The Program was also not improving the connection with alumni and finding internships for students. Babington Tr. 77, Exhibit 12.

**Response:  Denied.  See response to Nos . 20, 36-38, 42, and 46, above.  Also, the evidence cited by Defendants in this paragraph also does not establish the truth of all of the facts asserted in this paragraph.**

48.     Dr. Williams and Dr. Babington concluded a change was needed and believed that Dr. Alphonso could improve the Program. Babington Tr. 75, Exhibit 12.

**Response**:  **Denied.  (Ex. I, Williams Depo. at 114-116; Ex. E, McEvoy Declaration ¶¶ 110-111, 114-115.)  Dr. Babington wanted to replace Plaintiff as the Director of the Program with Dr. Alphonso because Dr. Alphonso was significantly younger (approximately 27 years younger) than Plaintiff.  (Ex. J, Def's Response Interrogatory No. 6.).  See also Responses to Nos. 20, 36-38, 42, and 46, above.**

49.     Dr. Babington and Dr. Williams thought that Dr. Alphonso would be able to make the Program more student-centric, would introduce best practices, would work at improving student outcomes, would develop and provide mentorship opportunities, and improve the working relationship with the Advancement Office. Babington Tr. 75-78, Exhibit 12; Williams Tr. 176-182, 186, Exhibit 13.

**Response**:  **Denied.  (Ex. E, McEvoy Declaration ¶¶ 31-37, 66-89, 108-109, 111, 114; Ex. I, Williams Depo. at 114-116.)  Dr. Babington wanted to replace Plaintiff as the Director of the Program with Dr. Alphonso because Dr. Alphonso was significantly younger (approximately 27 years younger) than Plaintiff.  (Ex. J, Def's Response Interrogatory No. 6.)  See also Responses to Nos. 20, 36-38, 42, 46, above.**

50.     As a result, following discussions with Dr. Alphonso about her interest in becoming the Director and what the University wanted to accomplish with the Program, Dr. Alphonso was offered and accepted an appointment to a three-year term beginning in 2016. Williams Tr. 138-139, 158, Exhibit 13.

**Response**:  **Admitted in part, Denied in part.  Plaintiff denies the phrase "as a result."  See Response to No. 49, above.  Plaintiff also denies that there were discussions with Dr. Alphonso about "what the University wanted to accomplish with the Program." (Ex. I, Williams Depo. at 114-116.)**

51.    During Dr. McEvoy's directorship she did not survey students seeking their opinions about the programs that were offered and she did not seek input from students on what they would like to see that would assist in the law school application process. She did not analyze data from students' grades, LSAT scores and where they were applying to law school and getting admitted. McEvoy Tr. 26-31, 39, Exhibit 3; Quinlivan Tr. 58, Exhibit 16. She did not make the St. Robert Bellarmine Society, the Pre-Law club, into a student led group or even provide students with leadership opportunities. Quinlivan Tr. 62, Exhibit 16.

**Response**:  **Denied in part.  Students had leadership opportunities at the events at which they served as moderators.  (Ex. E, McEvoy Declaration ¶ 82.)  Dr. McEvoy did collect and analyze data regarding student's GPA's and information relating to the LSAT, as well as other information that would be pertinent to a student's candidacy for admission to law school.  (Ex. D, McEvoy Depo. at 24-26, 76-77.)  Plaintiff also possessed information regarding law schools at which students were accepted, and not accepted.  (Ex. D, McEvoy Depo. at 27-28; Def's Ex. 23.)  That type of information was not included in Plaintiff's annual reports to Dr. Williams because the template for the annual reports did not call for the inclusion of that type of information, and Plaintiff considered it to be confidential, and Dr. Williams never asked Plaintiff to provide that information to him or include it in her annual reports.  (Ex. E, McEvoy Declaration ¶ 112; Ex. I, Williams Depo. at 52, 98.)  However, the fact that the information was not included in the annual reports submitted to Dr. Williams does not mean that Plaintiff did not collect and analyze the information in connection with her advice and guidance to students.**

52.    During the time that Dr. McEvoy was the Director of the Program, she never established any summer or semester internships. Admissions #46 and 47, Exhibit 15.

30

**Response: Admitted.**

53.     During the 2015-2016 school year, Dr. McEvoy did not contact Dr. Williams or Dr. Babington about extending her appointment as Director beyond June 30, 2016. Admissions, #42, 51-56, Exhibit 15.

**Response: Admitted.**

54.     While Dr. McEvoy was aware that she had only a one-year appointment as the Director of the Pre-Law Advisory Program that was to end June 30, 2016, between April and July, she did not try to reach Dr. Williams or Dr. Babington to find out whether she would be continuing in the position after June 30, 2016. Admissions, #42, 43, 51-56, Exhibit 15.

**Response: Admitted.**

55.     In July 2016, Dr. McEvoy saw that the stipend for the directorship was not in her paycheck. After this discovery, she did not try to reach Dr. Williams or Dr. Babington to find out whether she would be continuing in the position. Admissions #42, 51-56, Exhibit 15.

**Response: Admitted.**

56.     Director positions are filled at the discretion of the Provost and/or a Dean of the College. They are generally time limited so that each program can be changed to reflect new thinking and to better align with the University's strategic plan and, in particular, the needs of the students. It is the general practice of the University to rotate these administrative assignments among the faculty. Guglielmoni Affidavit, Exhibit 1.

**Response: Denied in part.  Some directors are permitted to stay in their roles for many years, particularly programs such as the Pre-Law Program that is a University-wide program, as opposed to a program that is housed in a single school or college of the**

31

**University.  (Ex. J, Def's Interrogatory Response Nos. 4, 5; Ex. E, McEvoy Declaration ¶ 121.)**

57.     In 2012, in the College of Arts and Sciences, there were Directorships for Black Studies, Latin American & Caribbean Studies, and Women, Gender & Sexuality Studies. Dr. Williams was the Director of the Black Studies Program in 2012-2014, after which Johanna Garvey was appointed the Director. She served three years and then was co-director with Dr. Elizabeth Hohl. Dr. Dina Franeschi and Dr. Anibel Torres were the co-directors of Latin American & Caribbean Studies in 2012; in 2013 Dr. Dina Franeschi and Dr. William Vasquez were the co-directors; in 2014 Dr. Gisela Gil-Egui and Dr. Vasquez were the co-directors; in 2015 Dr. Gil-Egui and Edrik Lopez were the co-directors; in 2016 Dr. Franeschi and Dr. Vasquez were the co-directors; and in 2017 Dr. Michelle Farrell and Dr. Vasquez were the co-directors. Dr. David Gudelunas was the director of the Women, Gender & Sexuality Studies Program from 2012 through 2014; in 2015 and 2016 Dr. Anna Lawrence and Dr. Emily Orlando were the co-directors; and in 2017 Dr. Orlando was the director. Guglielmoni Affidavit, Exhibit 1.

**Response:  Admitted, but irrelevant.  These programs are not relevant or comparable because they are all academic programs housed in a single college, the College of Arts and Sciences.  Conversely, the Pre-Law program was a University-wide program that is not housed in a single college or school of the University, and it is not an academic program with a curriculum like these programs.  (Ex. E, McEvoy Declaration ¶¶ 95-96.)**

58.     The Honors Program is under the supervisor of the Provost as it is a University-wide program, as had been the Pre-Law Advising Program prior to it being reassigned to the College of Arts and Sciences. John Thiel was the Director on the Honors Program in 2012 and

was succeeded by Dr. Laura Nash and Dr. Giovanni Ruffini in 2018. Guglielmoni Affidavit, Exhibit 1.

**Response**:  **Admitted in part.  John Thiel was the Director of the Honors Program for 18 years before he was replaced.  (Ex. E, McEvoy Declaration ¶ 121.)  Plaintiff also denies that the Pre-Law Program was reassigned to the College of Arts and Sciences, as it remained a University-wide program that was not housed in any single college or school of the University.  (Ex. E, McEvoy Declaration ¶ 96.)**

59.    Since becoming the Director, Dr. Alphonso has surveyed students about the programs they attended to determine whether they felt the program was valuable and to seek input on what programs they might like to see. She has heavily marketed the presentations being offered and has made presentations about the Pre-Law Advising Program to the Advisory Board of the College or Arts and Sciences and the Department Chairs in that College. She has directed that mailings go to area alumni about the Program and invited their support and participation. She has worked on introducing a Legal Studies Minor. She hosted an alumni networking event. She has initiated tracking of students who have expressed an interest in a legal career from their first year to help craft their resumes, internships experiences and to meet with students early in the college attendance to encourage better academic performance so that they can be admitted to higher tier, more prestigious law schools. Quinlivan Tr. 43-45, Exhibit 16.

**Response**:  **Plaintiff denies that the evidence cited in this paragraph actually demonstrates all of the facts asserted in this paragraph.  For instance, Sue Quinlivan, who works in Career Services, testified that "we" did a mailing to alumni and "we" will be hosting an alumni event, but this paragraph asserts that Dr. Alphonso directed or did those things.  Ms. Quinlivan's testimony does not demonstrate that fact.  Moreover, what Dr.**

33

**Alphonso has done as Director when she has not been supervised by Dr. Babington and Dr. Williams is not relevant to whether they were motivated by discriminatory age bias in 2016 when they decided to not continue Plaintiff's appointment as the Director.  As of when they made that decision, Dr. Williams had no information about what Dr. Alphonso intended to do differently on the factors that he claimed were the basis for his decision.  (Ex. I, Williams Depo. at 114-116.)  See also Responses to Nos. 20, 36-38, 42, 46, above.**

**Dr. Williams has no recollection of Dr. Alphonso instituting any new initiatives after she became the Director.  (Ex. I, Williams Depo. at 152, 154-55.)**

60.     Dr. McEvoy has no evidence that her age was discussed by Dr. Babington or Dr. Williams or that either of them or anyone else made any age related comments to her or about her. McEvoy Tr. 88-89, Exhibit 3.

**Response:  Denied in part.  During Dr. Williams's deposition, which occurred after Plaintiff's deposition testimony identified in support of this paragraph, Dr. Williams made a number of statements evidencing age bias against Plaintiff, including false statements that the Program she directed was "backward-looking," "traditional," "frozen," "stuck in the 20th century," and preparing students for a "19th century law career." (Ex. I, Williams Depo. at 70, 71, 73, 75, 83, 84, 85, 86, 89, 112, 162, 171.)**

## II.     Disputed Issues of Material Fact

61.     During Plaintiff's tenure as Director of the Pre-Law Advising Program, she never conveyed to any of the students she was advising that the pursuit of law should be focused on either corporate or criminal law. (Ex. E, McEvoy Declaration ¶¶ 62-78.)  To the contrary, as Director of the Pre-Law Advising Program, Plaintiff scheduled many events that provided students with the opportunity to explore areas of law other than corporate or criminal law and

34

speak with practitioners in these areas of law, including: a dinner with a federal District Court Judge, The Honorable Raymond Dearie; a dinner with women from the first Fairfield graduating class which included women, who went on the careers in various areas of law; events featuring lawyers who practiced employment law, sports law, mass torts, and general civil practice; and panel presentations which included a panelist who attended law school and now works at a financial firm, and a panelist who works as a lawyer advising non-profit organizations regarding laws, rules and regulations relating to non-profit organizations.  (Ex. E, McEvoy Declaration ¶¶ 62-69, 72.)

62.    The Pre-Law Advising Program, under Plaintiff's direction, also held luncheon events featuring activist Lois Gibbs, who spoke of her involvement with environmental activism, and Father James Manship who discussed his work with a Yale Law School Clinic to protect the civil rights of individuals being harassed by the East Haven Police Department. Pre-Law Advising Programs also attended two Red Mass events on campus, one featuring a presentation by the Solicitor General of the United States on the *Hobby Lobby* case which touched on health law and religious freedom, the other featuring a presentation on issues related to immigration law by Father Ryscavage, S.J.  (Ex. E, McEvoy Declaration ¶¶ 70, 71, 74, 75.)

63.    The Pre-Law Advising Program also organized several trips, including: a trip to the American Museum of Tort Law, where students were exposed to various aspects of tort law, including toxic torts, sexual abuse cases and product liability cases, with presentations by Ralph Nader on consumer protection and product liability, by Mitchell Garabedian on sexual abuse cases and the Catholic Church, and by Jan Schlichtman on environmental contamination litigation; a trip to the Edward M. Kennedy Institute for the Study of the United States Senate, where students were exposed to and interactively participated in various aspects of the political

and legislative process; and trip to the Clark Art Institute which includes exhibits on the Magna Carta, the Declaration of Independence, the U.S. Constitution, the Emancipation Proclamation and the U.N. Declaration of Human Rights. (Ex. E, McEvoy Declaration ¶¶ 76-78.)

64.    Plaintiff and the Pre-Law Advising Program were student-centered.  (Ex. E, McEvoy Declaration ¶¶ 79-94.)  Programs and Events scheduled by the Plaintiff and the Pre-Law Advising Program, including the multiple dinners, luncheons, panel presentations, trips and Red Mass participation, provided opportunities and experiences for students to achieve their goals and be better prepared to pursue issues relating to the law, and to make better decisions about pursuing a law school education and to enhance their prospects for admission to law school. (Ex. E., McEvoy Declaration ¶¶ 79-83.) The Program also prepared brochures, newsletters and written materials for the benefit of students considering law school education, answering questions regarding the application process, the necessary requirements, the importance of personal statements and letters of recommendation and the career paths available to law school graduates. The Program also created a law school mentoring program which provided opportunities for undergraduate students to communicate and pair with current law school students, and negotiated a relationship with Powerscore, a company which provided LSAT prep courses on campus at a discount for Fairfield University students. (Ex. E, McEvoy Declaration ¶¶ 84-86.)

65.    As Director of the Pre-Law Advising Program, Plaintiff made herself available to counsel, advise and mentor students, including: maintaining regular office hours and scheduling off-hour appointments when necessary; including her contact information on all written materials, brochures and newsletters, and the University's website; providing her cell phone number to Dr. Williams' assistant so that his office, or students contacting his office, could reach

her by cell phone when she was not on campus; writing letters of recommendation and assisting students in the drafting and revision of personal statements for law school application; and scheduling events to expose students to a wide variety of areas of law and promote opportunities for students to meet and interact with alumni, law students, attorneys, activists, judges and political leaders.  (Def's Exhibit 23; Ex. E, McEvoy Declaration ¶¶ 80-91, 98; Exhibit L.)

66.    Both as Director of the Pre-Law Advisory Program and as a Professor at the University, Plaintiff has formed mentoring relationship with individual students and groups of students. She has served as advisor for students for their capstone course. She has mentored students through her service on the University's Fulbright Committee for twelve years prior to being appointed as Director of the Pre-Law Program, working with the students on their personal statements, project statements and scholarship applications. She has served as faculty member and advisor for a number of students who were pursuing independent study and research. Plaintiff has consistently formed mentoring relationships with students as a faculty member and it was no difference in connection with her service as Director of the Pre-Law Advisory Program. (Ex. E, McEvoy Declaration ¶¶ 90-93.)

67.    The Pre-Law Program was not a major, minor or concentration; it did not have any set curriculum. The Pre-Law Program was not something that students completed by passing a certain set of courses; students could graduate from Fairfield University and go on to law school without have taken a single undergraduate law class. There was no Pre-Law Program faculty because it was not an academic department, and it was not housed in any department or in any school. As Director, Plaintiff did not have the ability to dictate curriculum or content or course offering to any department, school or faculty member. (Ex. E, McEvoy Declaration ¶ 95.)

37

68.    Although Plaintiff was a Professor in the School of Business, the Pre-Law Program was not a Program in the School of Business or based in the School of Business when she was Director. It was a University-wide program available to any student in the University. The Program did not move to the College of Arts and Sciences when Dr. Alphonso was appointed as the new Director in 2016. (Ex. E, McEvoy Declaration ¶ 96.)

69.    Plaintiff's office in the School of Business is located on campus and is readily accessible to students on campus; it is as convenient, if not more convenient, than the location of Dr. Alphonso's office. (Ex. E, McEvoy Declaration ¶ 97.)

70.    When Plaintiff was Director of the Program, Fairfield University students were competitive applicants for admissions to law schools and she received appreciation from numerous students who were admitted to law school due to the assistance she provided to them in the process. The Program provided numerous opportunities to help increase their likelihood of success in the admission to law school, including the LSAT prep course, multiple presentations from law school admissions representatives, programs on personal statements required in the application process, and advice and mentoring regarding applications and helping students develop and improved the content of their personal statements and other application materials. (Ex. E., McEvoy Declaration ¶ 99; Def's Ex. 23; Thank you notes, Ex. L.)

71.    When Plaintiff was Director of the Program, it was not "backward-looking" or "frozen" or "traditional." Dr. Williams' repeated use of those terms during his deposition, without any basis in fact, reflected ageism and age bias against Plaintiff.  The Program did not exist before Plaintiff created it in 2012, and Dr. Williams' comments in 2014 are inconsistent with the fact that the Program had only been in existence for two years. (Ex. E, McEvoy Declaration ¶ 100.)

38

72.    At no time during her tenure as Director of the Program did Dr. Williams or anyone else from Fairfield University communicate to Plaintiff that there were concerns regarding the Program's failure to focus on areas of law involving healthcare or technology. Plaintiff is familiar with legal issues and has done research and published articles on legal issues involving health care and the law and technology and the law. Under her directorship, the Program exposed students to legal issues in healthcare and technology, including the Solicitor General's talk on the Affordable Care Act and the Hobby Lobby case; Kelly Fitzpatrick's talk on tort cases involving medical devises and pharmaceutical products causing injuries to people; multiple speakers on legal issues involving contamination and toxic tots; speakers on the role of regulation of advancing technologies and the protection of citizens and consumers from improperly or non-regulated technologies. (Ex. E, McEvoy Declaration ¶ 101.)

73.    Plaintiff received a voicemail from Sue Quinlivan after Dr. Alphonso's appointment as the new Director in February 2016, which communicated, in part, that She and Dr. Alphonso had been doing the same programs Plaintiff had founded. (Ex. E, McEvoy Declaration ¶ 103.)

74.    Plaintiff never met with Dr. Williams in May of 2016 regarding her status as Director of the Pre-Law Program. Dr. Williams never informed her at any point in 2016 that her appointment would not be renewed. (Ex. E, McEvoy Declaration ¶ 104.)

75.    The claims of Dr. Williams and Dr. Babington that Plaintiff was not student-centered and student-focused are in stark contrast to Dr. Williams' and Dr. Babington's behavior. Dr. Babington never met with Plaintiff a single time regarding the Program when Plaintiff was Director. They failed to attend almost all of the Pre-Law Program events, except for a brief appearance by Dr. Babington at one law school fair organized by the Office of Career Planning,

and a brief appearance by Dr. Williams at a luncheon featuring Lois Gibbs so that Dr. Williams could meet her. The Administration's failure to attend the events demonstrated to the students that the Program was not considered sufficiently important to warrant an appearance by the Administration. The Program was so unimportant that Dr. Williams never met with Plaintiff during her final year as Director during 2015-2016, and neither Dr. Williams nor Dr. Babington felt the need to notify Plaintiff that her appointment as Director was not being renewed.  (Ex. E, McEvoy Declaration, ¶ 105.)

76.     At no time during her directorship of the Program was Plaintiff informed that it was her job to raise money for the program. (Ex. E, McEvoy Declaration ¶ 107.)

77.     Plaintiff did work cooperatively with the Development Office in their efforts to support the University and the Program. She worked well with Gerry Derbyshire and Hope Ogletree and many members of the team, planning dinners in 2013 and 204, and reconnecting with alumni to foster support for pre-law students as well as arranging on-campus speaking engagements for alumni who are attorneys and judges for stuents interested in law or attending law school. (Ex. E, McEvoy Declaration ¶¶ 108, 109.)

78.     Dr. Williams did not at any time notify Plaintiff of perceived deficiencies in her performance as Director of the Pre-Law Program; he never expressed concerns regarding her availability or difficulty in communicating with her; that the Program was not student-centered or student-focused; that the Program was failing to address new developments in the law regarding healthcare or technology; that the Program was not aligned with the strategic vision of Fairfield2020; that Plaintiff needed to take action to help secure 3/3 programs with law schools; that the annual reports submitted by Plaintiff failed to meet expectations, or needed to be

changed; that the Program was too focused on corporate and criminal law; or that Plaintiff needed to work better with the Development Office. (Ex. E, McEvoy Declaration, ¶ 110.)

79.    Neither Dr. Babington nor Dr. Williams every discussed issues of "best practices." "Student-centric", "new vision," or "improvement in student outcomes" with Plaintiff when she was Director of the Pre-Law Program. Neither Dr. Babington nor Dr. Williams ever suggested that the Program adopt any specific "best practice" or suggested that Plaintiff make changes to the Program to make it more "student-focused" or "student-centric." (Ex. E, McEvoy Declaration ¶ 111.)

80.    As Director of the Pre-Law Advising Program, Plaintiff submitted annual reports that aligned with the template for annual reports she had obtained. The template did not call for specific information about individual students such as LSAT score, or the specific numbers of students who attended every event; Plaintiff was not notified at the time of submission that she needed to include such information, and she had concerns about including specific academic information in the annual reports, such as test score, because of concerns of student confidentiality and compliance with FERPA. (Ex. E, McEvoy Declaration ¶ 112.)

81.    Not only did Dr. Williams never notify Plaintiff that he had difficulty with communicating with her or that she was unavailable, he actually failed to show up for a scheduled meeting with Plaintiff. (Ex. E, McEvoy Declaration ¶ 113; Exhibit C.)

82.    At no time did Dr. Babington or Dr. Williams have any conversations or communications with Plaintiff regarding Fairfield2020. (Ex. E, McEvoy Declaration ¶ 114.)

83.    At no time did Dr. Babington or Dr. Williams communicate to Plaintiff that any members of the University's Board, or a law school advisory committee, had any concerns about the Pre-Law Program. (Ex. E, McEvoy Declaration ¶ 115.)

84.      Neither Dr. Babington nor Dr. Williams ever communicated to Plaintiff any information about what they wanted in terms of a mentorship program. Mentorship and internship programs with practicing attorneys for undergraduate students were difficult to establish because attorneys and law firms interested in such arrangements drew from students already in law school. (Ex. E, McEvoy Declaration ¶ 116.)

85.      Christopher Pates was not familiar with the Pre-Law Program. He never attended a pre-law program event. His only interaction with Plaintiff regarding the Program was limited to a single meeting in summer of 2014 regarding the development of a case statement, and limited email correspondence shortly thereafter regarding the case statement. (Ex. E, McEvoy Declaration ¶ 118; Exhibit M.)  The e-mail correspondence, and Sue Quinlivan's response, reflects that Mr. Pates had prepared a misleading case statement, and was interested in using the *De Jure* newsletter to current students to enhance fundraising.  (Exhibit M.)

86.      Plaintiff did not complain about Mr. Pates because he was asking questions about the Program. Rather, she expressed concerns about Mr. Pates because he was trying to dictate changes that were primarily intended to use the Program as a fundraising vehicle for the University. Plaintiff wanted to make sure that the Program remained focused on helping the students and providing students with experiences, advice and opportunities that could put them in the best position to make good decisions about pursuing a law school education, and being as successful as possible if they pursued a law school education. Plaintiff did not agree with Mr. Pates desire to change the newsletter to include information designed solely for the purpose of assisting fundraising efforts. Plaintiff also felt that although it was important to have events with experienced lawyers and judges, it was equally important to have events with recent graduates in the legal profession, with more recent and current experience on the law school application

42

process and law school experience. Although recent graduates might not have accumulated as much material wealth as lawyers and judges who had been in the legal profession for decades (ant therefore not as attractive as donor candidates), their experiences would provide more relatable and recent experiences which allowed them to share suggestions about opportunities and courses at Fairfield that they found helpful in preparing for application to and attending law school. (Ex. E, McEvoy Declaration ¶ 119.)

PLAINTIFF,
Sharlene McEvoy

By:____/s/ *Todd D. Steigman*_____
Todd D. Steigman (ct26875)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel: (860) 246-2466
Fax: (860) 246-1794
Email: tsteigman@mppjustice.com

## CERTIFICATION OF SERVICE

I hereby certify that on this 11th day of January, 2019, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing]. Parties may access this filing through the Court's system.

_____*/s/ Todd D. Steigman*_____
Todd D. Steigman