# EXHIBIT D

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


_____
                                *
SHARLENE McEVOY                 *    CIVIL ACTION NO.
        Plaintiff              *    3:17-CV-01861 (MPS)
                                *
    vs.                         *
                                *
FAIRFIELD UNIVERSITY            *    AUGUST 14, 2018
        Defendant              *
_____*



                    DEPOSITION
                        OF
                SHARLENE MCEVOY



        Taken before Sandy K. Visentin, Registered
Professional Reporter and Notary Public in and for the
State of Connecticut, pursuant to the Federal Rules of
Civil Procedure, at the law offices of Shipman & Goodwin,
LLP, One Constitution Plaza, Hartford, Connecticut, on
Tuesday, August 14, 2018, commencing at 9:47 a.m.








                Sandy K. Visentin, LSR, RPR
                      CSR No. 234

A P P E A R A N C E S


REPRESENTING THE PLAINTIFF:

MADSEN, PRESTLEY & PARENTEAU, LLC
402 Asylum Street
Hartford, CT   06103
(860) 246-2466
     By:   Todd Steigman, Esq.
           tsteigman@mppjustice.com


REPRESENTING THE DEFENDANT:

SHIPMAN & GOODWIN, LLP
One Constitution Plaza
Hartford, CT   06103-1919
(860) 251-5000
     By:   Gary S. Starr, Esq.
           gstarr@goodwin.com

program?

A.    Well, it wasn't really a program at that point, I should say.  There was a Pre-Law Advisor, who was Don Greenberg, and he told Father Fitzgerald that he was doing, and I'm quoting him now, "a piss poor job of advising."

Q.    Did Don Greenberg say that in a meeting?

A.    Yes.

Q.    Did anyone else comment on the Pre-Law Advising?

A.    No one said anything in response that I can recall to that.

Q.    And then it was two years later that Father Fitzgerald sought --

A.    Yes.  Yes, it was quite a time lapse.

        [Defendant's Exhibit 1:  Marked for
        identification.]


BY MR. STARR:

Q.    Dr. McEvoy, I'm showing you what's been marked as Defendant's Exhibit 1 and ask you if you can identify that?

A.    Yes, this is my work.

Q.    And can you be more specific about this --

they had attended.

Q.    Just their names?

A.    Their names, their classes, their majors.

Q.    Is that the same information that Sue Quinlivan was maintaining as well?

A.    Yes.

Q.    Was there other information that you maintained on students who were members?

A.    Yes.  When students would come to me for advising, I would have a sheet and I would get information from them about their grade point averages, whether they had taken the LSAT, when they planned to take the LSAT, had they had any experience working in a law-related field, a summer job let's say, what law schools they were interested in attending.

Q.    Any other information that you maintained?

A.    Well, I would also talk to them about their financial situation.  In other words, once they departed Fairfield were they going to have any student loans outstanding.  Because I reminded them that law school was expensive and it might be burdensome to assume additional debt.

Q.    Did you keep this information on a computer?

A.    No, I kept it in a sheaf and then I destroyed it once I left the decision.  It contained a lot of

personal information that I did not want to get into the wrong hands.

Q.    Did the documents that you destroyed include documents related to people who had not yet graduated?

A.    They were currently students.  They discussed with me their grade point averages, what their majors were, whether they were minoring in something, also what their weak spots were in terms of their studies.

Q.    And you did not turn that over to your successor?

A.    No.  I regarded it as confidential.

Q.    Did you ask the students whether they wanted to have that information shared?

A.    No, because I felt that they were confiding in me, especially the information about their averages and also their financial situation.

Q.    Did you discuss with anyone --

A.    No.

Q.    -- before you destroyed --

A.    No.

Q.    So these were just paper records?

A.    It was kind of for my own use to get a feel for what the student's situation was so I could better advise them as to which law schools they might apply

to, because some schools were more generous with financial aid than others were.

Q.   And how many students did you have records on?

A.   I had about 30 students visit me.  Although that varied sometimes, sometimes it was 25, sometimes it was 30.

Q.   And would these be one-time events or --

A.   Well, sometimes people would come back for another visit, depending on what their plans were. Some people abandoned the idea of going to law school. Some people decided they wanted to finish with Fairfield and then work for a while before making any decisions.

Q.   Did you keep any records with respect to how many people came back more than once?

A.   No, just informally.  Because if I saw them more than once, I knew they were probably on the verge of applying and we were going to be working on personal statements and applications and things of that nature.

Q.   Of the 25 to 30 students that visited you a year, how many of them came back more than once?

A.   Maybe four or five.

Q.   The next point that you indicated in your proposal to Father Fitzgerald is that you keep records

of students from which majors have an interest in law school.

Did you record and report to anyone what majors were more likely to be sending people to law school or not?

A.   No, Sue Quinlivan then kept that information.

Q.   Did you discuss it with Sue Quinlivan or --

A.   No, not really, because we were going to serve every major at the University; no matter who came to me I was going to talk to them and advise them.

Q.   Did you keep records of who was successful in getting admitted to law school?

A.   Again, post-graduation survey was done by Career Planning.

Q.   Did you get information about where students were --

A.   Informally.

Q.   And did you record it anyplace?

A.   No.

Q.   Did you record anyplace where students actually went to law school?

A.   No, we just learned anecdotally where students were accepted to.  And sometimes they would not go to law school right away; they would be accepted but might defer.

Q.   Did you record information on students who got admitted but then deferred?

A.   We knew a few of those people, informally again.

Q.   Did you keep track of schools that Fairfield students were not admitted to?

A.   Yes.  I knew the schools that they would have a difficult time getting admitted to.

Q.   Well, that's not exactly my question.

A.   All right.

Q.   Did you track the schools that students applied to but were not accepted to?

A.   Yes.

Q.   And where did you keep those records?

A.   They were, again, informal records.

Q.   Did you report that information to anybody?

A.   Well, at one point we had been contacted by the Yale School of Law about getting our students to apply, and I had a question of whether or not they had a realistic chance of getting in there in the first place.  Because none of our students recently, to my knowledge, had applied there and been successful.  And I did invite the representative to come to one of our law school fairs and they declined.

Q.   What, if anything, did you do with the

THE WITNESS:  Not with me.

[Defendant's Exhibit 4:  Marked for identification.]

BY MR. STARR:

Q.   Dr. McEvoy, I'm showing you what's been marked as Exhibit 4, can you identify that?

A.   Yes.  It's a Case Statement prepared by, I believe, Advancement in hopes of raising funds for the program.

Q.   And had you seen that before?

A.   I got a copy of it.

Q.   Did you participate in its preparation?

A.   No.

Q.   Did anyone seek your input?

A.   No.

Q.   Did you send any comments to anyone about it?

A.   No.

Q.   Do you recall about when you saw it?

A.   It might have been in September of 2014.

Q.   And do you know what, if anything, the Case Statement was used for?

A.   No.

Q.   Did you inquire about what the Case Statement

A.   Yes.  It was a very intensive 80 hours of instruction plus homework, so you really had to devote a lot of time to it.

Q.   It also talks about a Personal Statement seminar?

A.   Yes.

Q.   Who conducted the Personal Statement seminar?

A.   I invited Ellen Keane Rutt, who was an alumni of Fairfield and she was the I think mission representative, I'm not sure what the exact title was, to present a discussion of what the Personal Statement should include.

Q.   And then it talks about the second Student-Lawyer Alumnus event, and what was your role in that event?

A.   Again, it was suggested by the Alumni people, Patrick Marano was our guest, and I prepared questions for our student moderator to ask of Patrick and then, of course, get the discussion rolling so students could jump in.

Q.   In the last paragraph of the report, it talks about your gathering statistics on students, their LSAT scores, their GPA, their major, their minor, what law schools they may be interested in attending, so that you could have greater insight for assessing what Fairfield

students chances of admission to law school were.  Was that data organized in any formal way?

A.    It was just from the sheets that I filled out when the students came in, and I could see where they were eventually accepted, where their GPA's were, where their LSAT's were so I could get a feel for what to tell the next group of students.

Q.    Was there any kind of analysis that said that for a particular law school when someone got admitted we found that their LSAT scores were in this range or their GPA was in this range, so that someone could take a summary sheet and be able to quickly gather this information, or was this something that you had a feel for?

MR. STEIGMAN:  Objection.

THE WITNESS:  I had a feel for once --

MR. STEIGMAN:  Go ahead.

BY MR. STARR:

Q.    You can answer.

A.    I urged the students to go to the law schools' websites because they contained parameters for GPA's and LSAT scores.

Q.    Did you have a discussion with either Dr. Sapp or Dr. Williams about what successes Fairfield was

A.    It took place in Canisius.  I think it was Canisius 300, the office there.

Q.    Is that Dr. Sapp's office complex?

A.    Yes.

Q.    And what do you recall occurring at the meeting?

A.    Well, Dr. Sapp went on at some length about his interest in baseball.

Q.    If he's going to move to Los Angeles, that's not a bad thing.

A.    No, he's an Atlanta Braves fan.

Q.    Okay.

A.    And that went on for some time, and Dr. Williams seemed very disengaged and there was very little substantive discussion about what this report said or about the program.  And then toward the end of that meeting, Dr. Sapp said, Who do you want your successor to be?

Q.    He asked you that question?

A.    Yes.

Q.    And what was your response?

A.    I was taken aback, and I pointed out that I was only at the end of my second year as Pre-Law Director, I can't speak to my replacement.

Q.    I understand that.  What did you say to

Dr. Sapp?

A.   I don't know if I said anything.  I just was surprised, I guess.  I don't know.  Because he suggested a couple of names.

Q.   What names did he suggest?

A.   Gwen Alphonso and Debra Strauss.

Q.   And did you respond about either of them?

A.   No.

Q.   Was there any other discussion in this meeting with Dr. Sapp and Dr. Williams about the Pre-Law Program?

A.   Not really.

Q.   Did you ask about your continuing position?

A.   Well, I was going to continue for at least another year because my appointment was for three years.

Q.   No, I understand that.  Did you ask or raise the question of whether at the end of the three years you would be considered for continuing?

A.   No.

Q.   Did you ask any questions at all about your future as the Director of the Pre-Law Program in your meeting with Dr. Williams and Dr. Sapp?

A.   Did I ask them about my future?

Q.   Yes.

A.   No.

JURAT


        I, SHARLENE MCEVOY, have read the foregoing transcript of the testimony given at my deposition on August 14, 2018, and it is true and accurate to the best of my knowledge and belief as originally transcribed and/or with the changes as noted on the attached Errata Sheet.



Aug 3, 2018
DATE                              SHARLENE MCEVOY


        Subscribed and sworn to before me this 31st day of _____August_____, 2018.



                              _____
                              Notary Public


My Commission Expires: 11/30/20\_


REPORTER: Sandy Visentin, RPR
          CSR No. 234

ERRATA SHEET

I, SHARLENE MCEVOY, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief:

| CORRECTION | PAGE | LINE | REASON |
|---|---|---|---|
| Nork | 59 | 25 | present tense |
| would | 66 | 2 | subjunctive |
| was | 48 | 5 | tense |
| Kripitis | 71 | 18 | spelling |
| who | 73 | 13 | before suggested |
| it tries | 75 | 12 | "they try" not grammatical |
| admissions | 76 | 9 | not "mission" |
| no "can" | 89 | 25 | |
| Tellis | 99 | 8 | spelling |
| Lani Guinier | 106 | 11 | spelling |
| less | 139 | 13 | not let's |
| Nabetz | 146 | 4 | spelling |

Aug 31, 2018
DATE

Sharlene McEvoy
SHARLENE MCEVOY

At ___Shelton_____ in said County of
___FAIRFIELD___, CT___, this 31st day of __August__,
2018, personally appeared SHARLENE MCEVOY, and made oath to the truth of the foregoing corrections.

Before me, __James D. McAtee__, Notary Public.

My Commission Expires: __11/30/2018__

REPORTER:  Sandy Visentin, CSR No. 234

164

ERRATA SHEET

I, SHARLENE MCEVOY, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief:

| CORRECTION | PAGE | LINE | REASON |
|---|---|---|---|
| 2010 | 17 | 1 | Date incorrect |
| the | 22 | 8 | not "a" |
| duplication | 23 | 23 | noun |
| sheet | 24 | 24 | sheet of paper |
| position | 24 | 25 | in place of decision |
| Testmaster | 32 | 21 | singular |
| " | 33 | 1 | " |
| to our | 39 | 16 | eliminate "be" |
| Geri | 41 | 16 | spelling |
| or | 49 | 16 | not "of" |
| 2014 | 55 | 21 | not 2015 |
| 2015 | 55 | 25 | not 2016 |

Aug 31, 2018

DATE

Sharlene McEvoy

SHARLENE MCEVOY

At Shelton                                    in said County of
Fairfield, CT                , this 31st day of August,
2018, personally appeared SHARLENE MCEVOY, and made oath to the truth of the foregoing corrections.

Before me, James D. Profetees, Notary Public.

My Commission Expires: 11/30/20 8

REPORTER:  Sandy Visentin, CSR No. 234

ERRATA SHEET

I, SHARLENE MCEVOY, do hereby certify that the following corrections and additions are true and accurate to the best of my knowledge and belief:

| CORRECTION | PAGE | LINE | REASON |
|---|---|---|---|
| forty | 147 | 12 | mistake in number |
| they | 159 | 3 | not "xe" |
| ~~Lori~~ Laurie | 159 | 6 | spelling |

Aug 31, 2018
DATE

Sharlene M'Evoy
SHARLENE MCEVOY

At Shelton in said County of FAIRFIELD CT, this 31st day of August, 2018, personally appeared SHARLENE MCEVOY, and made oath to the truth of the foregoing corrections.

Before me, James D McAleer, Notary Public.

My Commission Expires: 11/30/2018

REPORTER: Sandy Visentin, CSR No. 234

STATE OF CONNECTICUT   :
                       :  ss
COUNTY OF NEW HAVEN    :

        I, SANDY K. VISENTIN, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to notice there came before me on August 14, 2018, the following-named person to wit: SHARLENE MCEVOY, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this transcript is a true record of the testimony given by the witness.

        I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

_____        DATED:  August 20, 2018
Sandy K. Visentin
LSR, RPR and Notary Public
CSR No. 234

My Commission Expires:
August 31, 2021