# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHARLENE McEVOY | **CIVIL ACTION NO.** |
| **Plaintiff,** | **3:17-cv-01861 (MPS)** |
| v. | |
| FAIRFIELD UNIVERSITY | |
| **Defendant.** | **JANUARY 11, 2019** |

## DECLARATION OF SHARLENE McEVOY

1. I, Sharlene McEvoy, am the Plaintiff in the above-captioned matter. I make this declaration based on my own personal knowledge.

2. I declare under penalty of perjury that the foregoing is true and correct.

3. My year of birth is 1950.

4. I am currently 68 years of age.

5. In June of 2016, I was 65 years of age.

6. I am currently employed as a tenured full Professor at Fairfield University ("Fairfield").

7. I have been employed as a professor at Fairfield University since 1986. I was originally hired in 1986 as an Assistant Professor. In 1992, I was promoted to Associate Professor and granted tenure. I was promoted to full Professor in 1998.

8. I have taught a variety of undergraduate and graduate courses, including, but not limited to, the Legal Environment of Business; Environmental Law and Policy; Employment Law and Discrimination in the Workplace; Advanced Studies in the Uniform Commercial Code, the Law of Financial Transactions and Business Organizations; the Law of Contracts, Sales and Property. I have taught a number of interdisciplinary

courses, including courses in the American Studies Graduate Program such as Civil Liberties I and II, and the Supreme Court in the 1960s.

9. I received a bachelor's degree in Political Science from Albertus Magnus College.

10. I graduated with a Juris Doctor from the University of Connecticut School of Law in 1975.

11. I received a Master's Degree in Political Science from Trinity College in 1980.

12. In 1982, I received a Master's Degree in Political Science/Public Administration from UCLA.

13. In 1985, I received a doctorate (PhD) in Political Science/Public Administration from UCLA.

14. I have been a member of the Connecticut bar since 1975. I am still a member of the Connecticut bar, in good standing.

15. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

16. As set forth in detail on my CV, I have published extensively on various issues relating to the law, and attended and presented papers at conferences relating to the law.

17. During my tenure at Fairfield, I have typically taught more than the usual load of courses per semester, and my classes are often oversubscribed.

18. Typically, a full-time professor at Fairfield will teach three courses per semester, with two preparations per semester.

19. I have consistently taught more than the normal course load during my tenure at Fairfield. In addition to often teaching more than three courses per semester, I also regularly teach courses in summer and winter sessions.

20. In the Spring of 2010, Father Fitzgerald, the Senior Vice President for Academic Affairs, convened a meeting attended by myself and various faculty who taught courses related to the law.

21. The purpose of the meeting in the Spring of 2010 was to review how Fairfield was handling advising for students regarding law school.

22. At that time, and for a number of years before that meeting, Don Greenberg, a non-lawyer, was serving as the Advisor for Fairfield students who were interested in pursuing law school.

23. At the meeting, Professor Greenberg stated to Father Fitzgerald and the others in attendance, including myself, that he was doing a "piss poor" job as the Advisor.

24. Despite that admission from Professor Greenberg, he continued to serve as the Advisor for students interested in pursuing law school until the Spring of 2012.

25. In the Spring of 2012, Father Fitzgerald communicated that Don Greenberg was stepping down as the Advisor for students interested in pursuing law school and invited faculty members who were interested to apply for the position of Pre-Law Advisor.

26. At that time in the Spring of 2012, Fairfield had an Advisor for students interested in pursuing law school, but Fairfield did not have a Pre-Law Advising Program.

27. In response to the invitation from Father Fitzgerald, I submitted a proposal in the Spring of 2012 which outlined what I envisioned for a Pre-Law Advising Program if I were selected.

28. After I submitted my proposal, I met with Father Fitzgerald regarding the proposal that I submitted.

29. Subsequently, Father Fitzgerald offered me the position.

30. After I was hired, I began working to establish a Pre-Law Advising Program at Fairfield, which did not exist previously.

31. As the Director of the Pre-Law Advising Program, I established the St. Robert Bellarmine Pre-law Society at Fairfield.

32. Under my directorship, the Pre-Law Advising Program put on a number of events each year regarding legal issues and the law school application process.

33. Under my directorship, we also addressed LSAT prep by setting up an LSAT prep course with Powerscore, which taught an LSAT prep course at Fairfield and offered a discount for Fairfield students.

34. Under my directorship, we also worked to enhance and improve the Fairfield website regarding law school and the law school application process.

35. Under my directorship, we also created and published a newsletter called *De Jure*. *De Jure* included information regarding events relating to the law and the law school application process that were being put on by the Pre-Law Advising Program. *De Jure* included my contact information, including office phone and e-mail address. It also included the mission statement of the St. Robert Bellarmine Pre-Law Society.

36. Under my directorship, we also created brochures and documentation to provide to students which addressed various aspects of the law school application process, including brochures about personal statements. The brochures and documentation included my contact information, including office number and e-mail address.

37. As the Director of the Pre-Law Advising Program, I also met with students individually, and in group sessions, regarding advising for law school.

38. In addition to my additional responsibilities to establish a Pre-Law Advising Program at Fairfield, and then serve as the Director of the Pre-Law Advising Program after it was established, I continued teaching an overload of courses.

39. In the Fall of 2012, my first semester as the Director of the Pre-Law Advising Program, I taught a total of six graduate and undergraduate courses, one of which was serving as the advisor for students completing their thesis, or capstone course.

40. After the Fall 2012 semester, I taught a course in the winter session in January 2013.

41. In the Spring of 2013, I taught four courses, in addition to supervising independent study with students.

42. In the summer of 2013, I taught three courses, one of which was advising a student on their thesis, or capstone course.

43. In the Fall of 2013, I taught five courses.

44. In the winter session in January 2014, I taught one course.

45. In the Spring of 2014, I taught five courses.

46. In the summer of 2014, I taught one course, in addition to serving as an advisor for a student's independent study course.

47. In the Fall of 2014, I taught five courses.

48. In the winter of 2015, I taught one course.

49. In the Spring of 2015, I taught four courses.

50. In the summer session in 2015, I taught one course.

51. In the Fall of 2015, I taught five courses.

52. In the winter of 2016, I taught one course.

53. In the Spring of 2016, I taught three courses.

54. In the summer of 2016, I taught one course.

55. Since the summer of 2016, I have continued teaching an overload of courses in every semester, in addition to teaching a course in each winter and summer session.

56. In addition to continuing to teach all of these courses, and establishing and then serving as the Director of the Pre-Law Advising Program, I was also required to continue producing research and publications, which I did.

57. During the years in which I was the Director of the Pre-Law Advising Program, from 2012 through 2016, I was also eligible to take a sabbatical in 2014. However, I decided to forego that sabbatical when I was the Director of the Pre-Law Advising Program. Not only did I decline to take a sabbatical, but I agreed to teach an overload of courses in the semester when I could have taken a sabbatical.

58. In the Fall of 2008, I was approved to take a sabbatical, but decided to teach an overload of four courses that semester instead of taking the sabbatical to which I was entitled.

59. My willingness to teach all of these extra courses, and forego sabbaticals, is a reflection of my strong work ethic, and my desire to serve the University, and its students, to the best of my ability. I want to make sure that the students who I teach and who I advise are as well prepared as possible for success and advancement in their educational and professional pursuits.

60. Part of the reason that I consistently agree to teach an overload of courses is because I know that if the students are not taught by me in these courses, the classes that I teach will be most likely taught by adjunct professors. Based on my experience, I believe that students are better served being taught by a full-time faculty member than an adjunct professor.

61. After I was appointed as Director of the Pre-Law Advising Program, I received praise for my performance as Director. For instance, in April 2013, after my first year as Director, Father Fitzgerald congratulated me "again for what looks to be a very successful first year of . . . directorship of the pre-law program." A copy of that e-mail is attached hereto as Exhibit B to this Declaration.

62. During my tenure as Director of the Pre-Law Advising Program, I never conveyed to any of the students I was advising that the pursuit of law should be focused on either corporate or criminal law. Moreover, the proposition advanced by Dr. Williams in his deposition testimony that it was possible to conclude that I was steering students to corporate or criminal law based on where they went to law school reflects a profound ignorance about any advice that I gave to students, as well as about law school itself. It is likely that a student's ultimate decision to focus on corporate or criminal law would not ultimately be made until after the student had been exposed to courses in corporate or criminal law, or after the student gained experiences in corporate or criminal law through a law school clinic, or internship experience.[1]

63. In fact, to the contrary, I took various actions as the Director of the Program to expose students to many areas of law other than corporate or criminal law.

64. When I advised students about possibly pursuing a law school education, I explored with students what their interests were and why they wanted to go to law school. However,

---

[1] Additionally, since it typically takes at least three years to complete a law education on a full-time basis, the students who had graduated from Fairfield and gone on to law school since I became the Director of the Program in the 2012-2013 academic year had not even graduated from law school as of the summer of 2014 when Dr. Williams met with Mr. Pates in the summer of 2014 and claims that he formed these concerns.

during those conversations, I never viewed it as my role to steer any students towards a focus on either corporate or criminal law.

65. In my experience, encouraging undergraduate students to focus on either corporate or criminal law, before they had even attended law school and focused their interests through law school courses in any areas, would have been completely premature and absurd.

66. Additionally, through the various events and activities that we put on through the Pre-Law Advising Program when I was the Director, students were exposed to various aspects of the law, and opportunities in the law, other than just corporate or criminal law.

67. For instance, we organized a dinner at which we honored a federal District Court Judge, The Honorable Raymond Dearie, who met with and spoke with students before the dinner.

68. We also held a dinner honoring pioneering women at Fairfield who were in the first graduating classes from Fairfield which included women, and who when went onto law school and became lawyers. Prior to the dinner, these women met with and spoke with students. They spoke with the students about their backgrounds and their legal careers and interests. That group included women whose careers and backgrounds were not limited to only corporate and criminal law, and exposed students to the variety of things that people can do with a law degree.

69. We also held events at which different types of lawyers came and spoke to the students about the type of law that they practiced. Those events included lawyers who practiced employment law, sports law, mass torts, and general civil practice. We also had a panelist who attended law school and who worked at a financial firm. We also had a

panelist who worked as a lawyer advising non-profit organizations regarding the laws, rules, and regulations relating to non-profit organizations.

70. We also held a law school luncheon event at which an activist named Lois Gibbs spoke and met with students about her involvement with environmental activism. She was famous for her activism related to Love Canal, and she addressed how the legal and political process can be used to effect change relating to issues of social concern, including environmental issues.

71. We also held a luncheon at which Father James Manship was honored for his role in helping to protect the civil rights of individuals who alleged they were being harassed by members of the East Haven Police Department. Father Manship spoke about how he worked with a Clinic from the Yale Law School to bring actions against East Haven regarding alleged civil rights violations by East Haven Police Department.

72. We also held events at which alumni who were currently in law school spoke to students about the law school experience. In connection with a mock trial event at Quinnipiac University Law School, the students were able to meet with the law students from Quinnipiac, as well as with a Professor and a Dean from the Quinnipiac University Law School.

73. When I was Director of the Pre-Law Advising Program, we also prepared written materials for the students which highlighted that a law school education can be an avenue to many different career paths.

74. The Pre-Law Program also attended a Red Mass[2] event on campus at which Noel Francisco, the current Solicitor General of the United States, spoke to the students about the *Hobby Lobby* case.

75. The Pre-Law Program also attended a Red Mass on campus at which the speaker, Father Ryscavage, S.J., spoke to students about issues relating to immigration law.

76. We also organized trips at which interested students were exposed to various areas of the law other than corporate or criminal law.

77. For instance, we organized a trip to the American Museum of Tort Law in Winsted, Connecticut. At that museum, students were exposed to various aspects of tort law, including, but not limited to, toxic torts, sexual abuse cases, and product liability cases. In addition to visiting the museum, students also benefited from presentations by Ralph Nader, Mitchell Garabedian, and Jan Schlichtman. Mr. Nader spoke about consumer protection and product liability issues. Mitchell Garabedian, who is profiled in the movie Spotlight, spoke about sexual abuse cases and the Catholic Church. Jan Schlichtman, who was involved in the case which was profiled in the movie, A Civil Action, spoke about environmental contamination litigation.

78. We also organized a trip to the Edward M. Kennedy Institute for the Study of the United States Senate in Boston, at which students were exposed to, and were able to interactively participate in, various aspects of the political and legislative process. We also visited the

---

[2] The Red Mass is an annual event going back to medieval times in which the Bishop asks the Holy Spirit to bring wisdom to judges, lawyers, and law students. The event is sponsored by the diocese. After the Mass, the invited speaker addresses legal issues related to Catholic teachings.

Clark Art Institute in Williamstown, Massachusetts, which was exhibiting the 800 year old copy of the Magna Carta in addition to original copies of the Declaration of Independence, U.S. Constitution, Emancipation Proclamation, and the U.N. Declaration of Human Rights. Those events exposed students to issues well beyond corporate or criminal law.

79. I disagree with the claim that I was not "student-centered," or that the Program under my directorship was not "student-centered."

80. When I was the Director of the Program, the Program provided many opportunities and experiences for students to achieve their goals and be better prepared to pursue issues relating to the law, and to make better decisions about pursuing a law school education, and to enhance their prospects for admission to law school.

81. The various trips that the Program sponsored and organized were examples of operating a student-centered program because they provided opportunities that could not be replicated in the classroom, and exposed students directly to issues in the law, and a variety of opportunities that are available through a legal education.

82. When I was the Director, the Program also sponsored multiple events on campus each semester at which lawyers and non-lawyers came to speak directly to the students about their experiences in issues relating to the law, and various ways in which a legal education can provide opportunities in a multitude of areas in society. These events were student-centered because the provided information directly to the students about important ways that people have used the law to improve the lives of other people and advance important issues of public concern. Students had opportunities to interact with, and speak directly with, the participants in the events. Another way in which the

programs were student-centered was that the events were moderated by students in the Program.

83. The Program also sponsored events at which current law students, and law school representatives, spoke directly to students about applying to school, attending law school, and succeeding in law school. These programs provided opportunities for students to ask questions to, and speak directly with, the law students and the law school representatives. These programs were incredibly student-centered because the programs were all about the students and helping the students to be better prepared to apply to law school, have success in applying to law school, be better prepared for law school, and make better decisions about pursuing a law school education. The Program also sponsored programs about financing a law school education at which students could hear directly from, and ask questions directly to, a law school representative, as well as a program about personal statements required by the law school application at which students could hear directly from, and ask questions directly to, a law school representative.

84. The Program also prepared brochures, newsletters, and written materials for the benefit of students who were considering a law school education. The materials tried to answer questions for students considering law school, such as whether to pursue a particular major, whether there are requirements for attending law school, what is involved in the law school application process, the importance of a personal statement and letters of recommendation as part of the application, and what jobs are available for law school graduates.

85. When I was the Director of the Program, we also created the law school mentoring program which was student-centered because it provided opportunities for undergraduate

students interested in law school to communicate with a current law school student who was an alumnus of Fairfield University and who could be available to provide advice and guidance, answer questions that the undergraduate student may have, and also facilitate a campus visit to the law school being attended by the alumnus.

86. When I was the Director of the Program, we also negotiated a relationship with PowerScore, a company which provided an LSAT prep course, which agreed to provide an LSAT prep course directly on campus, and also arranged for a partial subsidy for Fairfield University students to pay for the PowerScore LSAT prep course so that the course was more affordable and available to as many students as possible. This was part of a student-centered approach because it was another way in which the Program tried to set Fairfield University students up for success and enhance their prospects for admission to law school.

87. At the Red Mass, students had opportunities to interact and communicate and mingle directly with attendees from the Fairfield County Bar.

88. When I was the Director of the Program, I was readily available to counsel, advise, and mentor students, just as I have done in my years as a Professor at Fairfield. I maintained regular office hours at which students could meet with me and seek advice and counseling. I was also available by appointment for any student who wanted to meet with me and wanted to meet at a time when I did not have office hours. My contact information, including phone number and e-mail address, was included on all written materials, brochures, and newsletters that were published and distributed in connection with the Program each semester. My contact information, including phone number and e-mail address, was also included on the portion of the website dedicated to the Pre-Law

Program. Many students have expressed appreciation and gratitude for the advice and counseling that I have provided to them. Students have sent cards thanking me for my assistance and guidance.

89. In addition to providing general advising regarding law school and the law school application process, a number of students asked me to write letters of recommendation on their behalf, and I assisted numerous students in the drafting and revision of their personal statements.

90. Both as the Director of the Program, and as a Professor at the University, I have formed mentoring relationships with individual students, and groups of students. Anyone who says otherwise is ignorant about me, and my service to Fairfield University and its students.

91. Another example of the types of mentoring relationships that I form with students is the fact that students solicit me to serve as their advisor for capstone course. While that course is not specifically part of the Pre-Law Program, it is illustrative of my service as a mentor to students more generally, and my willingness to be available to help and support students as they try to achieve their goals.

92. Another example of mentoring relationships that I have been able to form with students is through my service on the University's Fulbright Committee, of which I was member for twelve years before being appointed as Director of the Pre-law Program. Through my service on that Committee, I would work with students pursuing the Fulbright Scholarship directly on their personal statement, as well as on their project statement or scholarship application. The mentorship that I provided to students through the Fulbright Committee was extensive, and required hours and hours of dedication and commitment.

My approach to mentoring students who sought my advice and counseling in my capacity as the Director of the Program was to be just as helpful and supportive and mentoring to those students as I had been as member of the Fulbright Committee.

93. I have also agreed to serve as a faculty member and advisor for numerous students who were pursuing independent study and research. This is another way in which I have worked with students individually as an advisor and mentor with respect to the independent study project or curriculum being pursued by the student. Independent studies are, by definition, student-centered and require the ability and willingness to form and fulfill mentoring relationships with individual students. I have consistently formed such relationships with students as a faculty member, and it was no different in connection with my service as Director of the Pre-Law Program. It is important for me to work just as hard with each student in both my capacities as a professor, and when I was the Director of the Pre-Law Program.

94. When I was Director of the Program, it was student-centered and student-focused and we responded to feedback from students. Also, after the second year of my directorship, the decision was made to organize a law day luncheon the following two years in order to make the events more focused on the students, and less focused on alumni who were able to help the development office raise money.

95. The Pre-Law Program did not have any set curriculum. The Pre-Law Program was not a major, it was not a minor, and it was not a concentration. There is no required major in order to be admitted to law school. Students can be admitted to law school with a variety of educational experiences and accomplishments, whether their majors are in the humanities, the sciences, mathematics, technology, engineering, nursing, business, or

others. The Pre-Law Program was not something that students completed by passing a certain set of courses. Students could graduate from Fairfield University without ever taking a law course and still go on to attend law school. The Pre-Law Program also did not have faculty who taught in the Program because it was not an academic department, and the Program was not housed in any department or in any school. As Director of the Pre-Law Program, I did not have the ability to dictate curriculum or content or course offering to any department or school or faculty member. Accordingly, the deposition testimony by Dr. Williams regarding the curriculum of the Pre-law Program, and the faculty who taught in the Program, has no basis in fact, and is completely confounding to me as the Director of that Program.

96. Although I was a Professor in the School of Business, the Pre-Law Program was not a Program in the School of Business when I was the Director, and the Program was not based in the School of Business when I was the Director. The Pre-Law Program is a University-wide Program available to any student in the University. When Dr. Alphonso was appointed as the new Director of the Program in 2016, the Program did not move from the School of Business to the College of Arts and Sciences despite the fact that she is a faculty member in the College of Arts and Sciences.

97. Even though my office is located in the School of Business, the location of my office is on campus and is readily accessible to any student on campus. Depending on where a student lives, or is taking classes, my office in the School of Business could be as convenient, or more convenient, than the location of Dr. Alphonso's office in the College of Arts and Sciences. If a student lives off-campus, as most seniors who are pursuing law school do, my office location in the School of Business is actually more convenient than

the College of Arts and Sciences because the parking is better and more available in close proximity to the School of Business.

98. I reject the notion that I was unavailable, and did not return phone calls or e-mails. If I was not available by phone, and did not return phone calls or e-mails from people, I could not be a successful and tenured full Professor at Fairfield University, and have remained so for decades. I also provided my personal cell phone number to Dr. Williams' assistant so that his office, or students who contacted his office, were able to reach me by cell phone even when I was not on campus.

99. When I was Director of the Program, Fairfield University students were competitive applicants for admission to law schools and I received appreciation from numerous students who were admitted to law school and were grateful for the assistance I provided to them in that process. The Program provided numerous opportunities to help increase students' likelihood of success of being admitted to law school, including helping to facilitate an LSAT prep course that was partially subsidized, arranging for multiple presentations to students from law school admissions representatives, presenting programs on the personal statement required by law school applications, and providing thorough advice and guidance and mentoring regarding the law school applications and the helping the students develop and improve and content of their personal statements and application materials.

100.      When I was Director of the Program, the Program was not "backward-looking" or "frozen" or "traditional." In my view, Dr. Williams' repeated use of those terms during his deposition, without any basis in fact, reflected ageism and age bias against me. The Program did not exist before I created it in 2012. Accordingly, for Dr. Williams to

contend that a Program that was only two years old in 2014 when he began supervising it was "traditional" and "backward-looking" and "frozen" is inconsistent with the fact that the Program had only been in existence for two years.

101.    At no time during my tenure as Director of the Program did Dr. Williams or anyone else from Fairfield University communicate to me that there were concerns regarding the Program's failure to focus on areas of the law involving healthcare or technology. Contrary to such a contention, I am familiar with legal issues relating to healthcare and technology and the law and have done research and published articles on issues involving technology and the law and issues involving health care and the law. Moreover, under my directorship, the Program did expose students to issues involving health care and the law, and technology and the law and regulatory issues involving the same. For instance, the current Solicitor General, Noel Francisco, talked about the litigation involving the Affordable Care Act and the *Hobby Lobby* case, which is directly related to health care law. Another attorney who presented at a different event, Kelly Fitzpatrick, talked to students about her experiences handling tort cases involving medical devices and pharmaceutical products which caused injuries to people. Multiple speakers presented to students regarding legal issues involving contamination and toxic torts which also presented issues related to healthcare and the law. The Program also provided students with opportunities to learn about the role of regulation of advancing technologies and protection of citizens and consumers from technologies and products which may be harmful if not sufficiently regulated. There were numerous issues presented on such topics at the American Museum of Tort Law in Winsted, CT, and Ralph Nader spoke directly to the students about those issues.

102.     I believe I am a well-respected scholar. I have been a tenured faculty member at Fairfield University for more than 30 years. In order to be promoted to Associate Professor, and then a full Professor, I was required to demonstrate a record of quality scholarship. As a Professor at Fairfield University, I am required to maintain a record of scholarly publications and presentations and remain active in my field. As a faculty member in the Dolan School of Business, I am obliged by AACSB (American Association of Collegiate Schools of Business) accreditation standards to maintain a record of scholarly presentations and publications. Consistent with standards, I demonstrate a consistent output of scholarship for many years, which continues to this day. I have published numerous journal articles and book chapters and made presentations at dozens of conferences. Since 2003, I have been the editor-in-chief of the *Northeast Journal of Legal Studies in Business*, which is a peer-reviewed, blind-refereed publication.

103.     I received a voicemail message from Sue Quinlivan after Dr. Alphonso had been appointed as the Director of the Program. In that message, from February 2016, Ms. Quinlivan communicated, in part, that "Gwen and I are going to be working on the pre-law day. Really we've been doing the programs that you founded when we worked together . . ."

104.     I never met with Dr. Williams in May of 2016 regarding my status as the Director of the Pre-Law Program. Dr. Williams never informed me at any point in 2016 that my appointment as Director of the Program would not be renewed.

105.     It is striking to me that Dr. Williams and Dr. Babington would criticize me for allegedly not being student-centered and student-focused as Director of the Pre-Law

Program when Dr. Babington never met with me a single time regarding the Program when I was the Director. Dr. Babington and Dr. Williams failed to even attend the Pre-Law Program events, with the exception of Dr. Babington making a brief appearance in 2014 at a single law school fair organized by the Office of Career Planning, and Dr. Williams briefly appeared at a luncheon because he wanted to meet the speaker, Lois Gibbs. Neither Dr. Babington nor Dr. Williams congratulated any students on any of their successes at any of the Pre-Law Program events. The Program was so unimportant to Dr. Williams that he never met with me a single time in my final year as Director in 2015-2016 regarding the Program. The Administration's failure to attend the events demonstrated to the students that the Program was not sufficiently important to warrant an appearance by the Administration. The Pre-Law Program was so unimportant to Dr. Williams and Dr. Babington that they did not even feel the need to notify me, as the Director, that my appointment would not be renewed. My directorship of the Program was student-centered, and student-focused, and I demonstrated that commitment to the students by establishing the Program, creating the Bellarmine Society, organizing and developing events, organizing and developing trips, organizing and developing a variety of speakers and presenters who could provide valuable information that would be helpful to the students, investing hours and hours of my time attending all of the events, meeting and advising and mentoring students in individual and group sessions, helping students with their applications, and various other ways.

106. Dr. Williams did not meet with me regularly during the 2014-2015 academic year.

107. At no time during my directorship of the Program was I informed that it was my job to raise money for the Pre-Law Program.

108.    However, I did work cooperatively with the Development Office in their efforts to support the University and the Program. I worked well with Gerry Derbyshire and Hope Ogletree, and many members of the team, in connection with the dinners in 2013 and 2014. When the decision was made to move from the dinners to law day luncheons which could be more focused on the students, and less focused on alumni, the Development Office was not involved in those events because they were not fundraising vehicles.

109.    When I was Director of the Program, we did work to reconnect with alumni to foster support for pre-law students and we did arrange for alumni who are lawyers and judges to attend events on campus to present and speak with current students interested in the law or attending law school.

110.    At no time did Dr. Williams notify me that he perceived deficiencies in my performance as the Director of the Pre-Law Program. Dr. Williams never expressed concerns to me that I was not available as the Director of the Program, or that he had difficulty communicating with me; or that the Program was not student-centered, or student-focused; or that the Program was failing to address new developments in the law regarding healthcare or technology; or that the Program was not aligned with the strategic vision of Fairfield 2020; or that I needed to take any action to help secure a 3/3 program with any law schools; or that the annual reports I submitted failed to meet expectations and that I needed to change the manner in which I was doing annual reports; or that the Program was too focused on corporate or criminal law; or that I needed to work better with the Development Office.

111.     While Defendant's motion for summary judgment repeats the same conclusory talking points over and over, such as "best practices," "student-centric," "new vision," and "improvement in student outcomes," neither Dr. Babington nor Dr. Williams ever discussed any of those issues with me when I was Director.  Furthermore, neither Dr. Babington, nor Dr. Williams, ever suggested that the Program adopt any specific "best practice," that we were not already following.  Similarly, neither Dr. Williams nor Dr. Babington ever suggested that I make any changes to the Program to make it more "student-focused," or "student-centric."

112.     As Director of the Pre-Law Advising Program, I submitted annual reports that aligned with the template for annual reports that I had obtained.  The template for the annual reports did not call for me to provide specific information about individual students such as students' LSAT scores, or the specific number of students who attended every event, and I was not notified at the time that I needed to include such information in my annual reports.  I also had concerns about including specific academic information in the annual reports about individual students, such as test scores, because of concern for student confidentiality and compliance with FERPA.

113.     Not only did Dr. Williams never notify me that he had difficulty communicating with me or that I was unavailable, but he actually failed to show up for a scheduled meeting that he and I were supposed to have in my office.  After waiting for some time for Dr. Williams to arrive, I contacted his office and was informed by his assistant that he would not be able to attend the meeting that had been scheduled.  (A copy of that e-mail correspondence from February 18, 2015 reflecting that Dr. Williams simply did not show up for our scheduled meeting is attached hereto as Exhibit C.)  Dr. Williams never

contacted me to let me know that he would not be able to attend our meeting as scheduled.

114. At no time did Dr. Babington or Dr. Williams ever have any conversations or communications with me regarding Fairfield 2020.

115. At no time did Dr. Babington or Dr. Williams ever communicate to me that any members of the University's Board, or a law school advisory committee, had any concerns about the Pre-Law Program.

116. Neither Dr. Babington nor Dr. Williams ever communicated any information to me about what they wanted in terms of a mentorship program. It was difficult to establish a mentorship or internship program with practicing attorneys for undergraduate students because attorneys and law firms interested in such arrangements could use students who were already in law school instead of undergraduate students.

117. Dr. Sapp did not communicate to me the concerns that are identified in paragraph 17 of Defendant's Rule 56(a)(I) Statement.

118. I do not believe that Christopher Pates was familiar with the Program. Mr. Pates never attended a pre-law program event. Mr. Pates' only interaction with me regarding the Program was limited to a single meeting in the summer of 2014 regarding the development of a case statement, and then some e-mail correspondence shortly thereafter regarding the case statement.

119. I did not complain about Mr. Pates because he was asking questions about the Program. Rather, I expressed concerns about Mr. Pates because he was trying to dictate changes that were primarily intended to use the Program as a fundraising vehicle for the University. In contrast, I wanted to make sure that the Program remained focused on

helping the students and providing the students with experiences and advice and opportunities that could put the students in the best position to make good decisions about pursuing a law school education, and be as successful as possible if they pursued a law school education. I also did not agree with his desire to change the *De Jure* newsletter which was distributed to current students to publicize Pre-Law Program events occurring during each semester to include information designed to help fundraising efforts. It was also my view that, while we certainly had events at which experienced lawyers and judges spoke directly to students, it was important for certain events to focus on inviting alumni in the legal profession who were recent graduates. While more recent graduates might not have accumulated as much material wealth as lawyers or judges who had been in the legal profession for decades, and therefore might not be as attractive as donor candidates, they had more recent and current experience on the law school application process, and what it was like to attend and succeed in law school. The more recent alumni graduates had more relatable and recent experiences at Fairfield which allowed them to share suggestions about opportunities and courses at Fairfield that they found to be helpful preparation for law school. Consequently, it was important to me that we host events regarding law school and the law school application process at which recent alumni were the guests to meet with and speak with the students. I wanted to keep the Program student-focused, not fundraising focused.

120.    It is also not true that more law courses were taught by faculty in the College of Arts and Sciences. In actuality, most of the law related courses are taught by faculty in the School of Business, who are lawyers.

121. It is not true that Defendant rotates all Director positions in a specific number of years. For instance, Professor John Thiel was the Director of the University's Honor's Program for 18 years. The Honor's Program, like the Pre-Law Program, is a University-wide Program that is not housed out of a single college, such as the College of Arts and Sciences or the School of Business. The programs identified by Defendant in paragraph 57 of its Rule 56(a)(1) statement are not relevant or comparable because they are all academic programs housed in a single college, the College of Arts and Sciences. Conversely, the Pre-Law program was a University-wide program that is not housed in a single college or school of the University, and it is not an academic program with a curriculum like those programs.

122. I believe that Dr. Babington and Dr. Williams wanted to replace me as the Director of the Program with Dr. Alphonso because she is significantly younger than me, and they are now advancing other false and pretextual reasons for the decision in order to cover up their true and unlawful motivation.

123. I have served on the Rank and Tenure Committee and Deans do not serve on the Rank and Tenure Committee.

124. I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 9, 2019.


_____
Sharlene McEvoy