# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SHARLENE MCEVOY,               )
       Plaintiff,           ) Civil Action No.
                           ) 3:17-CV-01861-MPS
VS                              )
                             )
FAIRFIELD UNIVERSITY,       )
       Defendant.          )

DEPOSITION OF: Chris Pates
DATE:            September 7, 2018
HELD AT:        Madsen, Prestley & Parenteau, LLC
                   402 Asylum Street
                   Hartford, Connecticut

Reporter:   Wendy Allen, RMR, CRR, LSR #00221

APPEARANCES:


    Representing the Plaintiff:

       Madsen, Prestley & Parenteau, LLC
       402 Asylum Street
       Hartford, Connecticut 06103
       By:  Todd D. Steigman, Esq.
       tsteigmaan@mppjustice.com


    Representing the Defendant:

       Shipman & Goodwin LLP
       One Constitution Plaza
       Hartford, Connecticut 06103-1919
       By:  Gary Starr, Esq.
       gstarr@goodwin.com

started to get distributed because we had more

activity, more prospects.  I couldn't handle all the

schools, so some people took some of them.

Q    So other than yourself, how many other people

in the office of advancement were performing a

similar function as you of trying to solicit and

obtain money from donors and alumni?

A    The whole office was I believe 38 people.

Seven had focus on major gifts.

Q    And would you characterize your focus also

being on major gifts?

A    Yes, absolutely.

Q    Did that seven include you?

A    Yes.

Q    Mr. Pates, did you ever attend law school?

A    No.

Q    When was the first time that you had any

interaction with the prelaw program at Fairfield?

A    I had heard about the program in staff

meetings when we were talking about donors, and I had

read about the program through interactions with

donors in our database.  The first time I -- I never

attended a prelaw program event, and I had heard

about the program directly from alumni who had

supported it.  The order of how those all happened,

Professor McEvoy, was the purpose of the suggestions that you were making that you thought it would help -- that the changes you were suggesting would help to raise more money for the program?

MR. STARR:  Object to the form of the question.

BY MR. STEIGMAN:

Q    Do you understand the question, or should I ask it differently?

A    Please.

Q    You mentioned before that you had made some suggestions to Professor McEvoy for the prelaw program, right?

A    Yes.  Suggestions, or I asked questions about things we might -- she might consider incorporating.

Q    And to the extent that you made suggestions or you asked her to consider incorporating certain things, was the purpose of you advancing those suggestions or identifying those considerations because you thought that if those changes were adopted, it would help to raise more money for the prelaw program?

A    Absolutely.

Q    Did you have any personal knowledge regarding the quality of the advising that the students were

receiving through the prelaw program?

A    Not directly from students.  I had -- she had a reputation for being very good one-on-one with the students.  That was shared with me by Hope, by Yohuru, and maybe somebody else, but that was the general representation, reputation that I had heard, very good with the students.

Q    So you were testifying before that Wally Halas notified you that this complaint had been made, and he said that you should just refrain from communicating with Sharlene McEvoy in the future, but then you suggested that Mr. Halas speak with Dr. Williams, right?

A    I did.

Q    And so do you have knowledge as to whether Mr. Halas communicated with Dr. Williams pursuant to your suggestion?

A    I don't.

Q    At any point in time did you communicate with Dr. Williams --

A    Yes.

Q    -- regarding the prelaw program?

And approximately -- or strike that.

How did that communication between you and Dr. Williams take place?

A     Probably several times over the course of our working together.  I don't know the exact number of times, but that was the fundamental thing, is we had -- I can go out with him to see donors and I can go with the faculty member to see, you know, the alumni that they interact with, but I can't go with this specific director to see the donors who are going to support the program.  So we had to approach donor relations slightly differently.

Q     And these visits that you went on with Dr. Williams, they were during the period of time when Dr. Williams was the interim dean for the College of Arts and Sciences, is that right?

A     Yes.

Q     Other than that concern -- strike that.

Other than that sentiment that you identified, that you wished you had a director of the prelaw program that you were able to take on donor visits, did you ever communicate any other concerns to Dr. Williams regarding Professor McEvoy or her directorship of the prelaw program?

A     No.  I had suggested at one point, there was an attorney that was nearby, and whenever she -- her contract had completed or she had stepped down, that there was an attorney nearby that might be a good

one, maybe they want to get volunteer attorneys to be the program director, that would alleviate some of the budget.

So I was suggesting things always relative to fundraising, because that would be my -- how she ran the program is not -- is not what I was about.  I was about how can we get the director to interface with donors, and how can we get donors to interface with the program, because if you spend time in it, with it, you're going to invest more money.

Q    When you said that you had suggested at one point an attorney that was nearby that may be a good candidate to consider to lead the prelaw program, was that somebody who was a member of the Fairfield University faculty or --

A    No, it was a private, private attorney. Someone I was trying to get to support the program, but also, I said this is someone who might get involved, and I said we're looking -- when we're raising money we're looking at a budget and we're seeing how those funds come in, but also how you can relate, and at one point I think I suggested to Yohuru down the road when -- because it was always about her contract, when her contract would be completed, we didn't think she was going to renew.

well, what if this, what if that, in terms of if we had a director we could take out, we could have an event in D.C. and the director could host it with all the alumni there.  Those types of conversations.

Do I remember the specific words?  No.  But the general tenor was -- the general tone of the conversation was always, how can we raise more money for the program.

Q    So other than, you know, those kinds of statements that you just testified about, you don't remember making any other statements to Dr. Williams regarding Professor McEvoy and her directorship of the prelaw program?

A    No.

Q    Do you remember ever communicating to Dr. Williams any criticisms that you had of the actual prelaw advising program itself?

A    No.

Q    Do you remember communicating to Dr. Williams any criticisms that you had of Professor McEvoy's performance as the director of the prelaw advising program?

A    Relative to what?

Q    Relative to her performance as the director of the program.

A    No, I don't.  My only statements to Yohuru

about Professor McEvoy had to do with the director's

ability to raise money, not operate the program.

Q    Did you participate in any discussions with

Dr. Williams regarding whether Professor McEvoy's

term as the director of the prelaw program should be

renewed or not renewed?

A    Yes.

Q    And what do you remember about those kind of

conversations that you had with Dr. Williams?

A    I remember that the -- she was on a three-year

contract that was going to conclude like in another

six months, and it was my understanding that her

contract was not going to be renewed.

Q    Is that something Dr. Williams said to you?

A    I believe that was his plan.  That's -- I only

knew it from him, and I believe that was his plan.

Q    When you said that it was your understanding

that her contract was not going to be renewed, what

was the basis for that understanding you had?

A    I think Yohuru was hopeful to get someone in

that fundraising would be part of their role.

Q    During any of the communications that you had

with Dr. Williams regarding Professor McEvoy and the

prelaw program, did Dr. Williams ever make any

Chris Pates

program.  And at that point our primary focus being the prelaw endowment.

Q    During the time that Professor McEvoy was the director of the prelaw program, did anyone other than Dr. Williams make any statements to you that were critical of the prelaw program under Professor McEvoy's directorship?

A    No.

Q    Did any members of Fairfield University's board make any statements to you that were critical of the prelaw program under Professor McEvoy's leadership?

A    No.

Q    Are you familiar with something referred to as the prelaw program advisory board or advisory committee, do you have understanding what I'm talking about?

A    No.  There was a -- there was a group that got involved with the Bellarmine Society dinners.  That's the only group that I was -- like a kitchen cabinet of people that Sharlene McEvoy went to for those dinners.  But I do not believe that it was a formal structure.

Q    So you're not aware of any advisory board or advisory committee that had anything to do with the

talk to the program people about what can actually be done.  So Geri and Kevin would probably have been the only two that I talked with.  I can't remember anybody else in that alumni pool.

Q    Okay.

A    Oh, Dan Fitzgerald, I talked about it with Dan Fitzgerald.

Q    What did you speak about with Dan Fitzgerald as it related to the prelaw program?

A    I was trying to cultivate Dan to be a new donor to the program.  And so Dan had been involved with the program, and he thought that the dinners -- the communication around the dinner, or something to do with his involvement didn't go as smoothly as he would have hoped.  Something about his experience in that had not been -- he had a different -- just his experience wasn't great, involved with the dinner. And they would have these dinners with alumni to talk to the students of the Bellarmine Society, and Dan was one of the lawyers who had spoken at some point, but Dan was also in my portfolio.

Q    In any of your communications with Geri Buckley, did Mr. Buckley communicate to you any concerns or criticisms that he had about the actual prelaw advising program itself?

A    No.

Q    In any of your communications with Kevin Curtain, did Mr. Curtain communicate to you any concerns or criticisms that he had about the prelaw advisory program itself?

A    No.

Q    And in any of your communications with Dan Fitzgerald, did Mr. Fitzgerald communicate to you any concerns or criticisms that he had with the prelaw advisory program at Fairfield itself?

A    Only related to the dinner.  Either he thought that the topic could be different or the engagement with students could be different, but he had some suggestions for how that could be done a little differently.

Q    And do you remember what those suggestions were?

A    I don't specifically.

Q    Do you believe that you shared Mr. Fitzgerald's suggestions regarding how he thought the dinner could be done differently with anybody else at Fairfield?

A    I can only assume what I would have done.  I can't recall specifically.

Q    Other than -- strike that.

about the programatic future.

Q    Okay.  And during any of the interactions that you had with any of those donors, do you recall any of them communicating to you any concerns or criticisms that they had about the prelaw program itself under Professor McEvoy's directorship?

A    No, other than the one I mentioned before.

Q    And that was Dan Fitzgerald's about the dinner?

A    About the experience he had had at the dinner.

Q    Other than that, nothing else, right?

A    No.

Q    And how about any volunteers, did you interact with anyone who you would consider a volunteer regarding --

A    Not to the -- not related to this program. And I worked with a lot of volunteers with other parts of the University.  I'm trying to think on the -- Harry Rosetto.  Harry Rosetto was on the College of Arts and Sciences board, and I believe he invested in the prelaw program, but he was not interested in doing it again.

Q    Did Mr. Rosetto communicate to you any concerns or criticisms that he had about the prelaw program?

CERTIFICATE OF REPORTER

I, Wendy Allen, a RMR, CRR/Notary Public within and for the State of Connecticut, do hereby certify there came before me, on the 7th day of September, 2018, the following named person, to wit:  Chris Pates, who was by me duly sworn to testify to the truth and nothing but the truth; that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and affixed my seal this 19th day of September, 2018.

_____
Wendy Allen, RMR, CRR

My commission expires:  April 30, 2020