# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


SHARLENE MCEVOY,                    )
        Plaintiff,                  )  Civil Action No.
                                    )  3:17-CV-01861 (MPS)
                VS                  )
                                    )
FAIRFIELD UNIVERSITY,               )
        Defendant.                  )




            DEPOSITION OF:  HOPE OGLETREE
            DATE:           September 13, 2018
            HELD AT:        SHIPMAN & GOODWIN, LLP
                            265 Church Street
                            New Haven, Connecticut












        Reporter:  Tina Davis, LSR #00221
            Cassian Reporting, LLC
                21 Oak Street
        Hartford, Connecticut 06106
                860-595-7462

APPEARANCES:


        Representing the Plaintiff:


                MADSEN, PRESTLEY & PARENTEAU, LLC
                402 Asylum Street
                Hartford, Connecticut 06106
                By: TODD D. STEIGMAN, ESQ.
                        tsteigman@mppjustice.com



        Representing the Defendant:


                SHIPMAN & GOODWIN, LLP
                One Constitution Plaza
                Hartford, Connecticut 06103-1919
                By:  GARY STARR, ESQ.
                        gstarr@goodwin.com

Case 3:17-cv-01861-MPS   Document 30-9   Filed 01/11/19   Page 4 of 17

A   No, I have not.

Q   Okay.  Do you have any understanding as to what this case is about?

A   I believe that it is a case revolving around age discrimination.

Q   Okay.  How did you gain that understanding?

A   I believe you stated it in your piece to me.

Q   Okay.  That's a letter from my office you're referring to?

A   Correct.

Q   Okay.  That's signed by Patt Tharpe, a paralegal in my office?

A   Correct.

Q   And along with that letter is a subpoena; right?

A   Correct.

Q   Okay.  Other than that letter from my office that had a reference regarding age discrimination, do you have any other basis for understanding this case is about age discrimination or anything about that?

A   Not a thing.

Q   Okay.  Ms. Ogletree, you were formerly employed by Fairfield University; right?

A   Correct.

Q   During what years were you employed by

Fairfield University?

A From 2007 to 2015.

Q Okay. At the time that you left in 2015, what position did you have at the University?

A I was the interim director of major gifts working under the interim vice president, Mark Reed.

Q Okay. During what period of time did you have the title of the interim director of major gifts?

A For a year.

I was the associate director previous to that and the assistant director previous to that. And in 2007 was hired as a major gifts officer.

Q Okay. So when did your position change from major gift's officer to --

A Assistant --

Q -- assistant director?

A I don't have it exactly in front of me, but I would think it was about three years later. And then another year later to the associate. And then there was change that occurred, which is why I became the interim director of major gifts.

Q Okay. So I understand that these may be rough estimates of the dates.

A Uh-huh.

Q But I just want to make sure that I have the

timeline correct. So you were the major gifts officer at Fairfield from 2010 to -- 2007 until 2010; right?

A 2007 through 2015. All those other positions are also major gifts officer positions.

Q Okay.

A They just have managerial and parts to them.

Q Okay. But in 2010 you became the assistant director for major gifts?

A I'll go home and find out exactly what that date is for you. But yes. I was promoted twice.

Q Okay.

A And the third time was because the vice president at the time, Stephanie Frost, left, which is why the vice president who reported to Father Bernard, Mark Reed, took on the interim vice presidency of development, along with everything else that he did. And I reported directly to him. So there was a shift because people were leaving.

Q Okay.

A Okay?

Q Can you just generally describe for me what your job responsibilities were as a major gifts officer?

A Sure.

So at Fairfield a major gifts officer is

somebody who can cultivate and develop gifts from alumni, parents, and friends at a $10,000 a year or better level. And so part of what I did with five schools was work with all of the deans to figure out what their priorities were so that we could develop gift conversations for alumni who had graduated from those particular parts of the university.

So I worked a great deal in the business school, Dolan School of Business.

And because Fairfield did not have a law school, one of the constituencies that we were working to develop were people who had left Fairfield as undergraduates and gone on to law school so that we might engage them. And that's where the prelaw program came into my bailiwick or my -- there was an opportunity there. And that is how I interacted with Sharlene.

Q Prior to Sharlene McEvoy becoming the director of the prelaw advisory program at Fairfield University, did you have any interactions with any prelaw program at Fairfield?

A Not really.

Part of what this was about was working to create a joint experience where I could help her find alumni and alumnae who were lawyers and bring them

students focused in preliminary, understanding they were coming out of not only a business school but, as I think about it, potentially, across the whole undergraduate piece of what Fairfield offered. Not everyone is in the law school -- in the business school is now thinking about a law degree; right?

So I'm not so -- I have no real understanding where all of her potential students came from. But that was -- we were looking to figure out a way that we could highlight what she was doing and that I could use it as a way of engagement for alumni, period.

Q Do you have any recollection of working with Sharlene McEvoy on any dinners for the Bellarmine Society?

A So that would have been another engagement where -- what I do recall is the event that we did create -- and she found the speaker, and I found the alumni -- that we did in the alumni house.

Q Do you recall any other details about that event?

A Yes. So I would meet with her in her office, and we would discuss what we were working to accomplish. And one of the things that I was very concerned about was that our students be well prepared so that when they were interacting with alumni they

would be presenting their best selves. And so we talked about dress code, something as basic as dress code. And she gave me a little push back on that. But I said, you know, I wear my big girl suit and so do you, and that's part of what we need to be doing to reflect what is expected of our students.

And what was interesting at Fairfield, for me, was, within the business school, we had, actually, an etiquette dinner every year that students were encouraged to attend. And I found that somewhat surprising. But I didn't find it surprising when I got there. And I realized, in particular, our young women really needed some guidance as to what was acceptable dress, et cetera, in the business world in particular.

So that was one of our more interesting interactions. But I think we worked pretty well. She did what she did on her side of the house, and I did what I did on mine. And they were successful.

Q    When you say they were successful --

A    The events were successful.

Q    And those are events that you worked with Professor McEvoy on organizing for the prelaw program?

A    Yes.

Q    Okay. And those events that you just

referred to, would that include the dinner for the Bellarmine Society?  Did you work with her on that?

A    You know what?  I can't remember what -- we had so many events and so many dinners.  If she said I did, then I did.  I mean, I can't remember what date that was or what ever.  I believe that I worked with her two times on two events.

Q    Okay.

A    So whatever we called them, we called them.

Q    Okay.  And one of those events that you recall working with Professor McEvoy on was this event at the alumni house?

A    Correct.

Q    Okay.

A    That's where it was held.

Q    Other than working with Professor McEvoy on these two events, do you remember any other occasions when you worked with her on issues relating to the prelaw program?

A    Not really.  I mean, there would be -- you know, there were five schools at Fairfield.  And what my job was, was to figure out how best to engage alumni from each of those schools to raise money.  So that was my opportunity to work with her in that particular vein.  But beyond that, there would have

been no reason for me to be with her.

Q    Okay.  And you weren't Professor McEvoy's supervisor in any capacity; right?

A    No.  We were colleagues on two sides of our university.

Q    Do you know whether it was ever conveyed to Professor McEvoy that her role as the director of the prelaw advising program included the responsibility to raise money?

A    No.  I don't -- no.  I'm the fundraiser. This was -- this was a positive opportunity to highlight a program that she was running.

Q    During the time that you were at Fairfield and you had occasion to interact with the prelaw program, did you ever form a personal view on the quality of Professor McEvoy's performance as the director of that program?

A    No.  That's not my responsibility -- it's not my responsibility, and it would not have been something that would have been asked of me.

Q    When you were at Fairfield University, did you communicate any criticisms of the prelaw program to anybody else at Fairfield?

A    I don't think I did criticisms.  I think -- I think Sharlene has a personality that sometimes is

Case 3:17-cv-01861-MPS    Document 30-9    Filed 01/11/19    Page 12 of 17

writing -- putting anything in writing.  We're having a conversation, and I'm -- on my side, and I'm saying this is the way it works with my side of the house. If you want to work with me, this is the way we're going to do it from this perspective.  I'm not going to tell you how to prepare your students academically, but I am going to input what has to happen for events and what the protocol and the ambiance needs to be.

Q   Okay.  Through these various interactions that you had with her, you believe that you and Professor McEvoy were ultimately able to work well together and put on good events that were good for the university and good for the students?

A   The two events that we did worked out very well.

Q   Do you have any recollection as to whether those two events resulted in any money being raised on the positive side of the ledger for the University?

A   That I actually went back and looked very briefly at my own portfolio, and I didn't see any money specifically for it.  But what occurs is that it often takes multiple years of engaging people.  So simply because you'd have someone show up the first year wouldn't necessarily mean there would be a gift forthcoming.

Professor McEvoy to share the database so that she --
with any follow up on mentorships?

A    I would not be allowed to share that
database.

So part of why it was important for these
events to have people come to them is that then there
would have been a natural and acceptable way for her
to connect with those potential lawyers who had come.

Q    Okay.

A    And then that would be an open and correct
way for her to interact with them to create possible
mentorships, if that was possible.

Q    And do you know what follow up, if any,
Professor McEvoy had to foster those alumni
connections for mentorships?

A    I don't know what her follow up was.

Q    Okay.

A    But, in part, some of that follow up would
have been something that we would have expected our
students to do, as well.

Q    Okay.  What support, if any, did
Professor McEvoy provide you in fundraising efforts?

A    It wasn't her job.  It really wasn't her job.

Creating these relationships between the
academic side of the house and fundraising was

something that was not new at Fairfield.  But when we had specific small programs, like the prelaw program, in the totality of the business school, this was a new path.  She wasn't hired to be a fundraiser.  She was hired to be a professor.

And while professors, often times, write grants and applications for corporations -- even though we had corporation foundation gift officers -- that was nothing that she and I discussed, nor did I have any expectation that she would fundraise.

If she had a couple of connections to law firms or corporations that she thought maybe I could, you know, reach out to, that would have been one thing.  But it was not a part of her job description, in my understanding, ever.

Q   Okay.  Did you participate in any discussions with Professor McEvoy about ways in which the prelaw program might be improved?

A   Gary, I honestly can't recall.  I mean, I think, you know, we're going around the bend her on these two events.  That would have been the nucleus of my experience with her, and that would have been where we would have grown this program's fundraising capabilities, depending on how those events unfolded. And that's really part of why I also wanted her to be

JURAT

I, HOPE OGLETREE, do hereby certify that the foregoing testimony taken on September 25, 2018, is true and accurate, including any corrections noted on the corrections page, to the best of my knowledge and belief.

_Hope Ogletree_
HOPE OGLETREE

At _Fairfield_ in said county of _Fairfield_, this _17th_ day of _October_, 2018, personally appeared HOPE OGLETREE, and she made oath to the truth of the foregoing corrections by her subscribed.

Before me, _Beverley Chester_, Notary Public
My commission expires: _June 30th, 2019_

TRANSCRIPT CORRECTIONS

REPORTER:    Tina Davis

CASE:        SHARLENE MCEVOY
             VS
             FAIRFIELD UNIVERSITY

PAGE LINE        CORRECTION                    REASON

11 2        date change 2007-2014

12 3        date change 2007-2014

20  10

NAME: Hope Ogletree

DATE: 10/18/18

Case 3:17-cv-01861-MPS   Document 30-9   Filed 01/11/19   Page 17 of 17

CERTIFICATE OF REPORTER

I, Tina Davis, Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify there came before me, on the 13th day of September, 2018, the following named person, to wit:  HOPE OGLETREE, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

WITNESS my hand and affixed my seal this 25th day of September, 2018.

Tina Davis, LSR

My commission expires:  September 30, 2022