# EXHIBIT H

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SHARLENE MCEVOY,                 )   CIVIL ACTION NO.:
                                 )   3:17CV01861 (MPS)
                                 )
                Plaintiff,       )
                                 )
        vs.                      )
                                 )
FAIRFIELD UNIVERSITY,            )
                                 )
                                 )
                Defendant.       )
_____    )

**TELEPHONIC DEPOSITION OF LYNN BABINGTON, Ph.D.**

        Taken on behalf of Plaintiff, Sharlene McEvoy, at Chaminade University, 3140 Waialae Avenue, Honolulu, Hawaii, commencing at 8:09 a.m., on Friday, August 31, 2018, pursuant to Notice.

BEFORE:     ADRIANNE IGE KURASAKI, CSR 388
            Registered Professional Reporter
            Hawaii CSR #388; California CSR #11470

APPEARANCES *(via Teleconference)*:


     For Plaintiff, Sharlene McEvoy:

          TODD D. STEIGMAN, ESQ.
          Madsen, Prestley & Parenteau, LLC
          402 Asylum Street
          Hartford, Connecticut  06103
          (860)246-2466
          tsteigman@mppjustice.com


     For Defendant, Fairfield University:

          GARY STARR, ESQ.
          Shipman & Goodwin, LLP
          One Constitution Plaza
          Hartford, Connecticut  06103-1919
          gstarr@goodwin.com

Q    Okay.  And prior to that, were you employed at Fairfield University?

A    I was.

Q    And during what period of time were you employed at Fairfield University?

A    I'll have to think of the exact date.  I started on June 1st.  I'll back it up for a minute.

I was the dean for the school of nursing for two years.  I'll get the date in a moment.  Then I became the provost for two and a half years, then I was the interim president.  And I left there June 30th, 2017.  So let's see.  I was there five years.  So that must have been '12 -- June 1st, 2012.

Q    Okay.  So June 1st, 2012 is when you started your employment at Fairfield University; is that correct?

A    Correct.  And I finished June 30th, 2017.

Q    Okay.  And for the first two years of your employment at Fairfield University, you were the dean of the school of nursing; is that right?

A    Correct.

Q    Okay.  And then you became provost of Fairfield University and you were the provost for two and a half years, did you say?

A    Correct.

Q    Okay.  So does that mean that you became provost in 2014?

A    Yes.  July 1st, 2014 actually it might have been June 1st, 2014.  June or July.  I don't remember.

Q    Okay.  And then do you remember the approximate date that you became interim president?

A    January 1st, 2017.

Q    Okay.  And, Dr. Babington, did you leave your employment at Fairfield University voluntarily or involuntarily?

A    Voluntarily.

Q    And at the time that you left Fairfield University, did you enter into any contracts or agreements with the university?

A    Not with Fairfield University, no.

Q    Okay.  After you left your employment at Fairfield University, did you enter into contracts with anybody else?

A    My current employer, Chaminade University of Honolulu.

Q    Okay.  So there's currently no contractual provision, that you're aware of, that requires you to cooperate with Fairfield University in connection with the defense of this case; is that correct?

A   Correct.

Q   And after you left your employment at Fairfield University, did the university still owe you any money?

A   No.

Q   Dr. Babington, during your employment at Fairfield University, were you ever subjected to any discipline?

A   No.

Q   Have you ever been involuntarily terminated from any previous employer?

A   No.

Q   And as far as you know, has any employee ever made a complaint of discrimination against you?

A   No.

Q   Dr. Babington, can you briefly summarize your educational background for me.

A   I have a bachelor's of science in nursing earned at the University of Michigan.  I have a master's in nursing from the University of Washington and a Ph.D. in nursing and health services research from the University of Washington.

Q   Okay.  And what year did you get your doctorate?

A   1995.

Q   Okay.  Dr. Babington, have you ever served as a

pre-law advisor at any university or college?

A    No.

Q    Have you ever supervised anyone who was serving as the director of a pre-law advisor at the university or college other than at Fairfield University?

A    No.

Q    Dr. Babington, is it your understanding that Dr. McEvoy was appointed to be the director of the pre-law advisory program at Fairfield University in 2012?

A    Correct.

Q    And did you have any involvement at all in appointing Dr. McEvoy to that position in 2012?

A    No.

Q    Do you know who did appoint Dr. McEvoy to that position in 2012?

A    I wouldn't know for sure, but I would assume David Sapp, who was the assistant provost or associate provost, who worked for Paul Fitzgerald, who was the provost.

Q    Okay.  Dr. Babington, during today's deposition, if you need to speculate to a fact that you don't personally know in order to answer a question, you can just tell me that you don't know because I'm only asking for information you personally know.  I'm

not asking you to speculate about things you don't personally know. Okay?

A     Okay.

Q     During the 2012 and 2013 academic years at Fairfield University, you were the dean of the school of nursing; right?

A     Correct.

Q     And in that capacity during that academic year of 2012-2013, did you play any role in the supervision of Dr. McEvoy as the director of the pre-law advisory program at Fairfield?

A     I did not.

Q     Okay. Do you know who was responsible for supervising Dr. McEvoy as the director of the pre-law advisory program in that year?

A     No, I would be speculating.

Q     Okay. During the 2012 and 2013 academic year at Fairfield, did you make any complaints to anybody at Fairfield University regarding Dr. McEvoy's performance as the director of the pre-law advisory program?

A     No.

Q     In that academic year of 2012 to 2013, do you have any knowledge of any complaints that were made to university administration regarding Dr. McEvoy's performance as the director of the pre-law advisory

program?

A    No.

Q    Do you have any knowledge of anything that Dr. McEvoy did to improve the pre-law advisory program at Fairfield University in academic year 2012 to 2013?

A    No.

Q    Do you have any knowledge of any positive things about what anybody said of Dr. McEvoy's performance as the director of the pre-law advisory program in academic year 2012 to 2013 at Fairfield?

A    No.

Q    In the 2013 to 2014 academic year at Fairfield University, were you still the dean of the school of nursing?

A    I was.

Q    Okay.  And in that academic year, 2013 to 2014, did you have any involvement in the supervision of Dr. McEvoy as the director of the pre-law advisory program?

A    No.

Q    Do you know who was responsible for supervising Dr. McEvoy as the director of the pre-law advisory program at Fairfield in the 2013-2014 academic year?

A    I do not.  I would be speculating.

Q    In the 2013 to 2014 academic year at Fairfield

University, do you have any knowledge of anybody complaining about Dr. McEvoy's performance as the director of the pre-law advisory program?

A    No.

Q    During the 2013-2014 academic year at Fairfield, did you complain to anybody else about Dr. McEvoy's performance as the director of the pre-law advisory program at Fairfield?

A    No.

Q    In the 2013-2014 academic year at Fairfield, do you have knowledge of anything that Dr. McEvoy did to try and improve the pre-law advisory program?

A    No.

Q    And in the 2013-2014 academic year at Fairfield, do you have any knowledge of any positive statements that anybody made about Dr. McEvoy's performance as the director of the pre-law advisory program?

A    No.

Q    In either of the two years that you served as the dean of the school of nursing, did you have any interactions personally with Dr. McEvoy as faculty members of the college?

A    No.

Q    Okay.  In the 2014 to 2015 academic year is

when you became promoted to the provost; right?

A    Correct.

Q    And so starting with 2014 to 2015 academic year, did you have any involvement in the supervision of Dr. McEvoy as the director of the pre-law advisory program?

A    Yes.  As the chief academic officer, all academic programs come underneath the provost.

Q    Okay.  And the pre-law advisory program would fall within the scope of what you defined as an academic program; correct?

A    Correct.  Correct.

Q    Okay.  And just focusing still on the 2014 to 2015 academic year, what did you personally do to supervise Dr. McEvoy as the director of the pre-law advisory program in that year?

A    I didn't directly supervise Dr. McEvoy at all, but I supervised the person who she reported to, was part of this person's portfolio of responsibilities, Dr. Yohuru Williams.

And when Dr. David Sapp left that position to which Dr. Yohuru Williams stepped into, they, you know, had sort of a hand-off.  In other words, Dr. David Sapp gave a rundown of all of the responsibilities he had and the current status of those various programs, and

pre-law advisory program was student-centered, can you explain what you meant by that term "student-centered"?

A       That's a term I used.  I doubt that Dr. Williams used that term.  In my view, "student-centered" means that a program is designed to help students learn with experiences embedded in a program that helps students to achieve their goals.

So in my view, a student-centered program would be one where an advisor would be readily available, would have mentoring relationships with individual students and groups of students, and would help them in their development.

Q       Okay.  And based on what Dr. Williams reported to you, his assessment was that the pre-law advisory program under Dr. McEvoy's directorship in the 2014-2015 academic year did not satisfy those criteria for how you just defined student-centered; is that right?

A       Correct.

Q       During the 2014-2015 academic year, did you ever personally communicate with Dr. McEvoy regarding her directorship of the pre-law advisory program?

A       No, not to my recollection.

Q       During the 2014-2015 academic year, do you have any knowledge of Dr. Williams meeting with Dr. McEvoy

Q    -- during that academic year?

A    I do recall being available to students, responding to e-mails, and evaluating the program for its effectiveness.

Q    Okay.  What did you mean by the last recommendation to evaluate the program for effectiveness?

A    To look at how the program was structured, look at best practices, and consider making some changes.

Q    Do you have any knowledge of any specific recommendations that Dr. Williams thought were appropriate in order to structure the program differently to make it more effective?

A    I don't have recollection of any of those details.

Q    Okay.  During any of your meetings with Dr. Williams during the 2014-2015 academic year, do you remember that either yourself or Dr. Williams identified any specific changes that should be made to the pre-law advisory program so that it could be structured differently and become more effective?

A    I don't have the program details in front of me right now, but I do recall looking at how it was structured and talking about changes that could have occurred.  I don't have any recollection of those

details right now.

Q    And did either yourself or Dr. Williams prepare any documents at that time that memorialized any changes to the program that either you or he thought were appropriate?

A    I don't recall.

Q    And when you and Dr. Williams had this practice of meeting approximately twice a month during the 2014 to 2015 academic year, were any minutes or notes kept to keep track of what was discussed and what was decided at those --

A    There were no --

Q    -- (indiscernible).

A    There were no formal minutes.  I had files and I kept notes of things we discussed to follow up on at the next meeting.

Q    Okay.  And would those notes and files have included issues relating to the pre-law advisory program?

A    Yes.

Q    Okay.  And when you kept those notes and files in the 2014 and 2015 academic year, were they handwritten? were they typed? saved electronically on a computer?  How were they stored?

A    Handwritten, in files.

excellent teacher, very dynamic, well-liked by students, and very creative in her teaching.

Q    Any other reasons that you remember that caused you and Dr. Williams to identify Dr. Alphonso as a candidate in the spring of 2015?

A    Not to my recollection.

Q    Did you also understand at that time that Dr. Alphonso was younger than Dr. McEvoy?

A    I'm confused by that question.

Q    Okay.  Well, did you understand at that time --

A    It's obvious.

Q    -- Dr. Alphonso --

A    The question makes no sense.  I knew both of them.  Of course I knew she was younger.

Q    Okay.  That's all I wanted to know.

Did you also understand that Dr. McEvoy was a lawyer?

A    Yes.

Q    Okay.  Do you believe that Dr. McEvoy was a well-respected scholar?

A    I do not believe she was a well-respected scholar.

Q    Why do you say that?

A    Because all of her publications are in a journal that is part of a professional organization to

which she's on the board of.  That's not peer review publications.

Q    How did you make that determination?

A    In reviewing her CV.

Q    When did you do that?

A    When we were looking at qualifications of people.

Q    So in the same time period in the spring of 2015, you reviewed Dr. McEvoy's CV?

A    Correct.

Q    And at that time, you determined that she was not a well-respected scholar?

A    I'm not a lawyer.  I cannot judge.  I was not judging her scholarship.  You asked me if I thought she was a well-respected scholar, and I said "No."

I'm not an attorney nor am I a scholar in her area.  I have no business evaluating it.  My opinion is she wasn't a well-respected scholar.

Q    Okay.  Your opinion that Dr. McEvoy was not a well-respected scholar, is that one of the reasons why you decided to replace her as the director of the pre-law advisory program?

A    Absolutely not.

Q    At that time in the spring of 2015, Dr. McEvoy was a full professor; right?

serving as the director of the pre-law advisory program at any point in the 2014-2015 academic year?

A    Not to my recollection.

Q    Is it the case that after Dr. Alphonso declined the offer to serve as the director of the pre-law advisory program in the spring of 2015, that the decision was made to offer Dr. McEvoy additional time as the director of the program; right?

A    A one-year extension.

Q    And who made that decision to offer Dr. McEvoy a one-year extension?

A    Dr. Williams.

Q    Okay.  Did he make that decision with your approval?

A    Yes.

Q    And why did you feel that it was appropriate to approve a one-year extension for Dr. McEvoy to serve as the director of the pre-law program at that time?

A    Our goal was to improve the program and make it state of the art, best practice, student-centered.  It wasn't bad the way it was.  It just wasn't good.  And Dr. McEvoy had proven that she could adequately run the program.

But we definitely wanted a change and Dr. Alphonso had indicated that when she received -- if

she was successful in being promoted and earning tenure, that she would be interested in then taking leadership of the program.

Q     Okay.  Dr. Babington, do you believe that Dr. McEvoy was qualified to serve as the director of the pre-law advisory program?

A     Yes.

Q     Are you familiar with a written communication that Dr. Williams sent to Dr. McEvoy in June of 2015 offering her the position on one-year appointment to serve as the director of the pre-law advisory program at the director --

(Cell phone interruption.)

THE COURT REPORTER:  Say that question again, Counsel.

BY MR. STEIGMAN:

Q     Dr. Babington, are you familiar with a written communication from Dr. Williams to Dr. McEvoy in June of 2015 offering her an additional one-year appointment as the director of the pre-law program, renewable at the discretion of the provost office pending annual review?

A     I never saw the document at that time. However, I have that in my possession right now.  So I didn't see it till a couple weeks ago.

Q      Okay.  You understand my question?  So you didn't approve it before it was sent; right?

A      The actual e-mail, no.

Q      Okay.  At the time that Dr. McEvoy was offered the additional one-year extension in June of 2015, did you, as the provost, consider that appointment to be renewable for an additional period of time at the discretion of provost office pending further review after an additional one year?

A      No.

Q      Okay.  Why not?

A      Dr. Williams and I had discussed that we wanted new leadership for that program so that it would be state of the art, best practice, student-centered.  And Dr. McEvoy was not the person who was able to take it to that level.  And we had intended on offering the position to Dr. Alphonso after the one-year extension of Dr. McEvoy being director.

Q      Okay.  So you indicated a moment ago that you did not review the June 2015 e-mail from Dr. Williams to Dr. McEvoy offering a continued one-year appointment at the time, but you have seen it recently, within the last few weeks; right?

A      Correct.

Q      Okay.  And so are you familiar, based on your

recent review of the document, that Dr. Williams wrote to Dr. McEvoy at the time that the one-year appointment is in no way a negative reflection on your service to the university?

A      I saw that.

Q      And is that an accurate statement?

A      Yes.

Q      So your testimony here today is that the continued appointment of one year was not intended to be renewable at the discretion of your office pending an annual review; that no matter what Dr. McEvoy did during the 2015-2016 academic year, she was not going to continue as the director after that year; is that correct?

A      I did not say that.

Q      Okay.  But it was not your understanding at the time in June of 2015 that the one-year appointment of Dr. McEvoy to serve as the director of the pre-law advisory program was to be renewable at your discretion pending annual review.  You were intending it to be a term of one-year appointment that was not renewable; is that correct?

A      That's what I intended, yes.

Q      Okay.  Dr. Babington, are you familiar with the Fairfield 2020?

A     Yes.

Q     Can you just briefly describe for us what Fairfield 2020 is?

A     The strategic plan, moving Fairfield -- building a sustainable future for Fairfield.  That was the strategic plan.  I, as the provost, and executive vice president for the university co-led the development of that.  There were multiple task forces who came up with recommendations as to where the university should go in the future.  And I believe we came up with six areas as focus for the next five years for the strategic plan.  It was to take the university through the year 2020.

Q     And did any of the changes associated with Fairfield 2020's strategic initiative play a role in the decision to only offer Dr. McEvoy an additional one-year appointment?

A     No.  Not directly.

Q     How about indirectly?

A     The goal of Fairfield 2020 was to be student-centered, using best practices to provide the best educational programs and outcomes for our students.  That meant reviewing -- and all of our programs and making changes where appropriate.

       So in that context, every program was reviewed

and multiple directorships were changed during that time.

Q    Dr. Babington, do you have any knowledge as to whether Dr. Williams ever met with Dr. McEvoy at the end of the spring 2015 semester and communicated why she was only being renewed for a one-year appointment?

A    I have no knowledge of that.

Q    Do you have any knowledge of Dr. Williams ever communicating to Dr. McEvoy in the spring of 2015 what she would need to do in the 2015-2016 academic year in order to continue her appointment beyond one year?

A    No.

Q    In your mind, was there anything Dr. McEvoy could do in the 2015-2016 academic year in order to be renewed as the director of the pre-law advisory program beyond that one additional year?

A    If the program was reviewed and best practices were implemented and changes were made to the program that made it more student-focused with measurable student outcomes, then, yes, I suppose her contract could have been renewed.

Q    Did you ever personally communicate that to Dr. McEvoy in 2015 or 2016 --

A    No.

Q    -- that in order for -- why not?

Q    Okay.  So in 2015-2016 academic year, Dr. Williams' title changed, but he still remained the person that directly supervised Dr. McEvoy as the director of the pre-law advisory program; right?

A    That's correct.

Q    And as a consequence of his position change, you met with Dr. Williams less frequently in 2015 and 2016 than you had done the previous year; right?

A    Individually.  But I met with him in groups with other committees we were on.

Q    And in any of the group meetings you attended with Dr. Williams, did you and he have any conversations regarding Dr. McEvoy's performance as the director of the pre-law advisory program?

A    Not in the group meetings.  That would be like the provost cabinet, the dean's councils.  We wouldn't have discussed in a group an individual faculty or program.

Q    Okay.  In any individual meetings you had with Dr. Williams in the 2015-2016 academic year, do you remember having specific conversations with him regarding Dr. McEvoy's performance as the director of the pre-law advisory program in the 2015-2016 academic year?

A    I have no recollection.

A       That's correct.

Q       At the beginning of the deposition, I believe you referenced that you had reviewed some annual reports regarding the pre-law program?

A       I never said -- no.  We never talked about annual reports.

Q       Okay.  At the beginning oh of the deposition, you said that you had reviewed some documents.  I thought that you had said that you reviewed -- in preparation for today's deposition, that you had reviewed some annual reports regarding the pre-law program.  Am I misremembering that?

A       Either that or I'm misremembering it.  Actually, I did review those annual reports, but I never said that today.  I said I reviewed some documents that were sent to me.

        But to answer your question, the annual reports were sent to me and I read them.  I've never seen them before.

Q       Okay.  So just to make sure I'm clear.  I don't want there to be a disconnect on the record about what I'm asking or what you're testifying.

        During the time that you were the provost and Dr. McEvoy was the director of the pre-law advisory program, did you review any annual reports that she

submitted regarding what was done in the pre-law advisory program during the previous academic year?

A    To my best recollection, those reports did not come to me, so I wouldn't have read them at the time. They were used for the specific directors or the supervisors to put together their annual report.

I had -- it's likely that I have seen one of them or maybe more of them at the time because Yohuru may have shared them with me.  I cannot recall.

Q    Okay.  At the conclusion of the 2015-2016 academic year, did you and Dr. Williams conduct a review of Dr. McEvoy's performance as the director of the pre-law advisory program for the previous year?

A    No.  That wouldn't be my practice to conduct a review of somebody else's employee.

Q    At the conclusion of the 2015-2016 academic year, do you know if Dr. Williams performed a review of Dr. McEvoy's performance as the director of the pre-law advisory program for that previous year?

A    I don't know the answer to that.

Q    Do you know whether, at the conclusion of the 2015-2016 academic year, whether Dr. Williams ever notified Dr. McEvoy that she was not going to receive a continued appointment as the director of the pre-law advisory program?

Q      Okay.  And so why did you not reappoint her?

A      We -- I just explained the entire reason.

MR. STARR:  Asked and answered.

THE WITNESS:  I think what you have to understand is this wasn't the only case.  There was another program that I worked with the dean and we did exactly the same thing.  We're looking for best practices to revise the program to make it student-centric and student-friendly.  And if it resulted in somebody not being reappointed but somebody being appointed that we felt would better match those outcomes that we were hoping to attain, we did so.

BY MR. STEIGMAN:

Q      Okay.  So Dr. Babington, why did you decide to not reappoint Dr. McEvoy at the conclusion of the 2015-2016 academic year?

A      In looking at -- I already answered that, but I'll answer it again.

In reviewing the pre-law program as it currently stood, we were looking for the program to be revised to reflect best practices, to be student-centric, student-focused, so that our students -- the outcomes for our students could be improved.  We did not feel Dr. McEvoy was able to, in a directorship, lead the program in that way.

(Cell phone interruption.)

THE WITNESS:  That's not my phone.

BY MR. STEIGMAN:

Q    Okay.  Dr. Babington, were there any particular best practices that you felt that Dr. McEvoy was not instituting when she was the director of the pre-law advisory program?

A    I'm not a pre-law advisor, so I would leave it to somebody to investigate best practices, make recommendations for changes to a program to meet what best practices are.  I would never have made specific recommendations to the program.  It's not my field.

Q    But did you make a determination that Dr. McEvoy was not instituting best practices when she led the pre-law program?

A    Correct.

Q    Okay.  So how did you determine that Dr. McEvoy was not instituting best practices when she was the director of the pre-law program?

A    The program had been doing the same thing for years with the same outcomes.  It wasn't student-focused, student-centric.  We were not improving our connection with our alumni and finding internships for our students.  No changes had been made over the years.

Q     Okay.  And what years are we talking about, just so I'm clear.

A     The years that Dr. McEvoy was the director of the program.

Q     And how many years do you believe she was the director?

A     Beginning in 2012.  Fall of 2012.

Q     Do you believe that Dr. McEvoy improved the program over what was in its place before 2012?

A     I don't know.

Q     Did you ever endeavor to find out --

A     No.

Q     -- what the pre-law program looked like before 2012?

A     No.

Q     When you testified that you determined that the pre-law program was not student-centered, what did you mean by that?

A     In my view, a student-centered program is one that provides the development, mentorship, to help students achieve their goals.  And Dr. McEvoy's inaccessibility, slowness in responding or not responding at all to e-mails and not being available on campus to our undergraduate students at the time that they are on campus was evidence to me that that's not

student-friendly or student-centered.

Q     And the fact that you had just identified Dr. McEvoy being inaccessible, slowness in responding, not responding, and not being available to students when they needed her to be available, is that -- are those determinations that you made personally or were you relying on Dr. Williams' determinations as to those deficiencies --

MR. STARR:  Object to the form of the question.

MR. STEIGMAN:  -- in arriving at --

THE WITNESS:  I --

MR. STARR:  Dr. Babington, you can answer that.

THE WITNESS:  Dr. -- I was relying on Dr. Williams.

BY MR. STEIGMAN:

Q     Okay.  So you never personally made a determination that Dr. McEvoy was inaccessible to students; right?

A     I'm not sure what you mean by "personally."

Q     Well, did you reach your own personal conclusion that Dr. McEvoy was inaccessible to students?

A     Based on the information I had, that is the conclusion I came to.

Q     Okay.  And what's the information that you had

that allowed you to form that conclusion?

A     Dr. Williams provided me with data that indicated that students said that Dr. McEvoy was not accessible by e-mail; that she wasn't on campus, mostly on campus on weekends and evenings and not during the days when our undergraduate students who participate in that program are on campus.

Q     Okay.  And what data did Dr. Williams provide to you in support of those points?

A     I don't recall.

Q     Do you recall Dr. Williams providing you any documents in support of those findings or was this information that Dr. Williams verbally relayed to you?

A     I don't recall.

Q     But is it correct that all of the factors that you just identified of Dr. McEvoy being inaccessible to students, being slow to respond or not responding at all, not being available to students was entirely based on information that Dr. Williams presented to you?

A     No, that's not true.  I could have heard that from other people as well.  I don't recall.

Q     But at this point, you don't remember any other source providing you that information other than Dr. Williams; is that right?

A     I don't remember any other specific -- no, I

don't right now.

Q     Are there any documents that you can think of that might refresh your recollection of somebody else other than Dr. Williams communicating to you that Dr. McEvoy was not accessible or not available or slow to respond or not responding at all?

A     I'm not sure what kind of documents you're talking about.

Q     Well, neither do I.  I'm just asking you if you in your mind can think of documents that might help you remember what you can remember today about that.  There may not be any, but I'm just asking you if you can think of some.

A     I cannot --

MR. STARR:  Objecting to the form of his question.  Okay.

You can answer his question.

THE WITNESS:  I can't really answer that question.  I mean do I think that there could be documents, e-mails from somebody to me that may have related that.  There could have been.  I -- you know, but I don't -- I don't know.

BY MR. STEIGMAN:

Q     Okay.  As of right now, you can't think of any particular e-mail that any particular person sent you

communicating that Dr. McEvoy was inaccessible to students; right?

A     I cannot.  And since I have no access to my Fairfield e-mail, I would not even be able to search those.

Q     Okay.  And as of right now, you can't think of any particular e-mail that any particular person sent you communicating that Dr. McEvoy was slow to respond or to not respond at all when people tried to reach her; right?

A     I cannot recall.

(A recess was taken from 10:26 a.m. to 10:30 a.m.)

BY MR. STEIGMAN:

Q     Dr. Babington, when Dr. Alphonso was appointed to succeed Dr. McEvoy in 2016 as the director of the pre-law advisory program, Dr. Alphonso received a course release for the spring 2017 semester.  Do you recall that?

A     I wouldn't have known those details.

Q     Okay.  You don't remember sending a letter --

A     My office probably sent a letter --

Yes, I'm sure my office sends a letter for course releases that came from my office.  Do I remember the details of her particular course release, no.

A    Can you repeat the question.

Q    Sure.  Can you remember any specific faculty members who reported that students had complained they were not able to reach Dr. McEvoy by phone or e-mail went she was the director of the pre-law advisory program?

A    I can't remember any faculty directly contacting me.

Q    Okay.  Can you remember any specific faculty members communicating that information to Dr. Williams when Dr. McEvoy was the director of the pre-law advisory program?

A    I would -- I have no knowledge of any faculty member contacting Dr. Williams.

Q    Okay.  When Dr. McEvoy was the director of the pre-law advisory program, do you have any knowledge of any faculty members reporting to the administration of Fairfield University and complaining that students were not able to reach Dr. McEvoy by phone or e-mail?

A    Not to my recollection.

Q    And when you made the determination at some point by the end of spring semester in 2016 that Dr. McEvoy would not continue to serve as the director of the pre-law advisory program, did you base that decision on any complaints from any faculty members

that students were not able to reach Dr. McEvoy by phone or e-mail when she was the director of the pre-law advisory program?

A    No.

Q    When you made the decision at some point by the end of the spring semester in 2016 that Dr. McEvoy would not continue to serve as the director of the pre-law advisory program, was one of the factors that you relied upon to support that decision any complaints that Dr. McEvoy refused to make herself available to meet with students as the director of the pre-law advisory program?

A    No, I believe -- no, I believe I already told you why we chose Dr. Alphonso for the directorship of this program, just like we changed other directorships at the same time.

Q    That's fine.  If the answer to my question is no, you can just say that and we'll move on.

When you made the decision to -- strike that.

When you made the decision at some point by the end of the spring semester of 2016 that Dr. McEvoy would not continue as the director of the pre-law advisory program, was one of the factors that you relied upon to make the decision or determination that Dr. McEvoy did not use the internet effectively?

A       No.

Q       When you made the decision at some point by the end of the spring semester of 2016 that Dr. McEvoy would not continue as the director of the pre-law program, was one of the factors that you relied upon for that decision a determination that she did not work cooperatively with the development office of the university?

A       No.

Q       When you made the determination at some point by the end of spring semester of 2016 that Dr. McEvoy would not continue as the director of the pre-law advisory program, was one of the factors that you relied upon the existence of concerns from other administrators at the university that the pre-law program was not addressing new developments in the law?

A       New developments in the law?  I'm not sure what you mean by that.

Q       Okay.  How about when you made the determination by the end of the spring semester of 2016 that Dr. McEvoy would not continue as the director of the pre-law program, was one of the factors that you relied upon for that decision any concerns from other administrators at the university that the pre-law program was not addressing new developments in the law

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii   (808)524-2090

regarding health care?

A    No.

Q    Okay.  And when you made the determination that Dr. McEvoy would not continue as the director of the pre-law advisory program, was one of the factors that you relied upon a determination that the pre-law advisory program was not addressing new developments in the law regarding technology issues?

A    No.

Q    During the time that Dr. McEvoy served as the director of the pre-law program, were you aware that any other administrators at the university were concerned that the pre-law advisory program was not addressing new developments in the law regarding health care?

A    You already asked me that.  I said no.

Q    Okay.  Does Fairfield University -- strike that.

At the time that you were the provost and Dr. McEvoy was the director of the pre-law program, did Fairfield University have a Board?

A    A board of directors?  What do you mean "a Board"?

Q    Yes, that could be an example.  Yes.  Did they have a board of directors?

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

A     Yes.

Q     Okay.  By the time that you made the determination that Dr. McEvoy would not continue as the director of the pre-law program by the end of spring 2016 semester, was one of the factors that you relied upon in making that decision any concerns from any member of the board of directors that the pre-law program was not addressing new developments in the law regarding health care?

A     I have no recollection of conversations with the board about this program.

Q     So you have no knowledge of any member of the Board communicating any concerns regarding Dr. McEvoy's stewardship of the program?

A     I have no recollection.

Q     Okay.  And I may get the same answer.  That's fine.  But I have to go through these issues, so bear with me.

By the time that you made the determination by the end of the spring 2016 semester that Dr. McEvoy would not continue as the director of the pre-law program, was one of the factors that you relied upon any concern by any board member that the pre-law program was not addressing new developments regarding technology?

A    Not to my recollection.

Q    During the time you were the provost at Fairfield and Dr. McEvoy was the director of the pre-law program, was there something called the law school advisory committee that you're familiar with?

A    I recall a law school advisory committee.

Q    Okay.  And what do you recall about the law school advisory committee at that time?

A    Not much.

Q    Okay.  Can you tell me anything you remember about it.

A    I believe that they were advisory to the pre-law program and helping students as they move towards decision to apply to law school.  That's my recollection.

Q    Okay.  And do you remember what the composition of the law school advisory committee was at that time?

A    No.

Q    Was it faculty members or -- okay.

MR. STARR:  I'm sorry, I couldn't hear the answer.

THE WITNESS:  No.

BY MR. STEIGMAN:

Q    Okay.  Dr. Babington, at the time that you made the determination at some point by the end of spring

2016 semester that Dr. McEvoy would not continue as the director of the pre-law program, were you aware of any concerns by any members of the law school advisory committee that the pre-law program was not addressing new developments in the law?

A      I have no recollection.

Q      So at that same point in time, when you made the determination that Dr. McEvoy would not continue as the director of the pre-law program by the some point in the spring 2016 semester, did you have any knowledge of any concerns from the law school advisory committee that the pre-law advisory program was not addressing new developments regarding health care or technology?

A      No.

Q      Dr. Babington, as part of the discovery process in this case, Fairfield University has identified you as a witness, and one of the topics which Fairfield University indicated you may have knowledge about is the way that academic appointments are made at Fairfield University.  I'm sorry.  Strike that.

One of the topics on which Fairfield University indicated that you may have relevant knowledge is the way that appointments are made regarding academic positions at Fairfield University.  Do you know what information you may have regarding that topic that

about and how it was structured, what kinds of things it delivered for our students.  So, yes, I just don't remember all the details of those -- of that particular program.  Did I at the time know what the program was all about, yes.

Q    Okay.  Yeah, that's fair.  I'm just asking about what you can remember today.

So other than what you've already testified to about, do you currently have any recollection of any additional information regarding your familiarity with the pre-law advisory program and any discussions about the program that you had with Dr. Williams?

A    No.  One other thing, as part of the pre-law advisory program, we wanted to develop some relationships with law schools and I had been working in that direction with Fordham and Georgetown for our students to have an early entry into law school.  And I worked directly with the provosts at those particular institutions to develop those relationships.  And to my knowledge, once I left they were not continued.

Q    Okay.  Is what you were trying to do in terms of working with those law schools and communicating directly with the provosts of those schools to try and achieve that objective, is that something that you feel Dr. McEvoy should have been doing when she was the

director of the pre-law program?

A     No.

Q     So at this point, other than what you've already testified to, can you think of any other knowledge that you currently possess regarding your familiarity with the pre-law advisory program at Fairfield, any discussions about the program you had with Dr. Williams?

A     No.

Q     Okay.  So another subject matter on which Fairfield University has indicated you may have relevant knowledge and may be called to testify as a witness about is the following:  In conjunction with Dr. Williams, you and he decided to extend Dr. McEvoy's appointment as director for one year beyond her term after Dr. Alphonso declined to take the director position in 2015 to 2016 and then to appoint Dr. Gwen Alphonso as the director the following year.

So again, other than what you've testified to, can you presently recall any other information regarding that subject matter that you haven't already offered during today's deposition?

A     No.

Q     And then the final area on which Fairfield University indicated that you may have relevant

A       Correct.

Q       And did you say you continued on as the provost until January 1st of 2017?

A       Yes.

Q       Okay.  And when you became the interim president, did you still retain the responsibility of indirectly supervising the pre-law directorship position?

A       No.

Q       Do you know who assumed that role that you previously held?

A       Yes.  Dr. Christine Siegel.

Q       Okay.  But once Dr. Alphonso was appointed to be the director of the pre-law advisory program in 2016, you remained the provost for one additional semester for the fall 2016 semester; right?

A       Correct.

Q       During that period of time when you remained the provost and Dr. Alphonso was the director of the pre-law advisory program, did you have any direct communications with Dr. Alphonso regarding the program?

A       I did not.

Q       During that semester when you continued on as the provost and Dr. Alphonso was the director of the pre-law advisory program, did you become aware of any

changes that Dr. Alphonso made to the pre-law advisory program?

A     I don't recall.

Q     When you served as the interim president at Fairfield from January 1st, 2017 until June 30th, 2017, did you have any direct communications with Dr. Alphonso regarding the pre-law advisory program?

A     Not to my recollection.

Q     And during the period of time that you served as interim president of Fairfield from January 1st, 2017 until June 30th, 2017, did you become aware of any changes that Dr. Alphonso had made to the pre-law advisory program?

A     Not that I recall.

Q     And in the 2016-2017 academic year when Dr. Alphonso was the director of the pre-law program, who did she report directly to?

A     I don't know.  I know for the time period that I was the provost, she continued to report to Dr. Williams.  But for the -- so I'm assuming she reported to him for that whole year.

Q     At some point Dr. Williams left Fairfield and went to another institution; right?

A     Yes, but that was at the end of the academic year.

Q    Okay.

A    In June maybe.  Something like that.

Q    In the fall 2016 semester when you were still the provost and Dr. Alphonso still reported directly to Dr. Williams in her capacity as the director of the pre-law program, do you remember any specific information that Dr. Williams reported to you about any changes that Dr. Alphonso had made to the pre-law program?

A    I don't recall.

Q    During that fall 2016 semester, do you recall anything specific that Dr. Williams communicated to you about the pre-law program at all?

A    I don't recall.

MR. STEIGMAN:  Okay.  Dr. Babington, at this point, I do not have any further questions for you.  Attorney Starr may have a question or some questions.  But at this point I conclude my examination.

THE WITNESS:  Thank you.

MR. STARR:  Yeah, I do have a couple.  I have a couple of questions if we're okay on time.

THE WITNESS:  I'm fine.

EXAMINATION

BY MR. STARR:

Q    Dr. Babington, you were -- okay.

provost office?

A    Correct.

Q    If you -- okay.

Were there any other directorships that were directly in the provost office when you were provost?

A    Catholic studies.  But that was a permanently appointed endowed professorship.  The center for Catholic studies at Fairfield is a totally endowed center and the faculty member that holds that appointment is by virtue of an academic appointment, not an administrative appointment, if you will.  It's more a deep dive into the scholarship.

Oh, also the center for Judaic studies.  Again, that was a permanently appointed administrative position.

So, no, besides the pre-law program, there were no programmatic areas that were held directly in the provost office.  They typically sat in the schools, as now the -- I assume right now, the prehealth law program -- or pre-law program sits within arts and sciences.

Q    Okay.  Do you know whether or not, when Dr. Alphonso was appointed the directorship of the pre-law advisory program, she was given any directives as to what she should do to change the program?

A      I don't know.  I'm not aware of any specific directives that she was given.

MR. STARR:  Okay.  I have no other questions.

MR. STEIGMAN:  Okay.  No additional questions for me.

(Discussion held off the record.)

MR. STEIGMAN:  This is Attorney Steigman, in addition to the original of the transcript, the only thing I need is a PDF.  You can e-mail the PDF to me.

THE COURT REPORTER:  Okay.  Thank you.

And Mr. Starr?

MR. STARR:  Yes, I'd like a PDF if you would.

My e-mail address is -- no, I don't need a hard copy.  My e-mail address -- I can send the PDF to Dr. Babington.

MR. STEIGMAN:  Would you do me a favor and send your contact information.

THE COURT REPORTER:  I will.  Thank you.

(Deposition concluded at 11:08 a.m.)

WITNESS CERTIFICATE

I, LYNN BABINGTON, Ph.D., do hereby certify that I have read the foregoing pages, inclusive, and corrections, if any, were noted by me; and that same is now a true and correct transcript of my testimony.

Dated _____ 10-1-18 _____

_____
LYNN BABINGTON, Ph.D.

Signed before me this ___1st___

day of ___October___, 20_18___.

_____
my commission expires 4/26/2021

NOTARY
PUBLIC
TAMMY P. N. HOHU
Comm. No.
09-150
STATE OF HAWAII

Sharlene McEvoy v Fairfield University
Civil Action No. 3:17CV01861 (MPS)
Deposition of LYNN BABINGTON, Ph.D.
Taken on August 31, 2018.

Doc. Date: 10/1/18     # Pages 1

Notary Name: Tammy P.N. Hohu     1st Circuit

Doc. Description Witness Certificate

_____    10/1/2018
Notary Signature                  Date

NOTARY
PUBLIC
TAMMY P. N. HOHU
Comm. No.
09-150
STATE OF HAWAII

RALPH ROSENBERG COURT REPORTERS, INC.
Honolulu, Hawaii    (808)524-2090

CASE: _____ NO: _____

DEPOSITION OF: _____ DATE TAKEN: _____

## CORRECTION SHEET

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 103 | 19 | prelaw not prehealth law | there is no prehealth |
| 9 | 14 | appointment (appoint) | law program |
| 29 | 20 | spoken (spoke) | |
| 39 | 24 | teach (teacher) | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(If additional space is needed, attach a blank sheet)

Signature of Deponent: _~~Babza~~_ Date: 10/1/18

## CERTIFICATE

_____ Please be advised that the deponent signed and/or made corrections to the deposition within 30 days of notification.

_____ Please be advised that 30 days have expired and the deponent has failed to read and sign the deposition.

_____ Please be advised that signature and/or corrections received are **not** being filed with the deposition because they were received and/or signed after 30 days of notification.

_____ Please be advised that the above-named case is going to trial and/or hearing and the deponent has not read and signed the deposition before the filing of this transcript with the Court.

DATED: _____, Honolulu, Hawaii.

CSR NO. 179

RALPH ROSENBERG COURT REPORTERS, INC.

1001 Bishop Street, Suite 2460 American Savings Bank Tower, Honolulu, HI 96813
Phone: (808) 524-2090 / Fax: (808) 524-2596

CERTIFICATE

I, ADRIANNE IGE KURASAKI, C.S.R., in and for the State of Hawaii, do hereby certify:

That on Friday, August 31, 2018, at 8:09 a.m., appeared before me LYNN BABINGTON, Ph.D., the witness whose testimony is contained herein; that, prior to being examined, the witness was by me duly sworn or affirmed; that the proceedings were taken down by me in computerized machine shorthand and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

This 104-page Deposition of LYNN BABINGTON, Ph.D., dated August 31, 2018, was subscribed and sworn to before me this 18th day of September, 2018, in the First Circuit of the State of Hawaii, by Adrianne Ige Kurasaki.

_____
Adrianne Ige Kurasaki, CSR 388
State of Hawaii