# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Civil Action No. 3:17-CV-01861 (MPS)

- - - - - - - - - - - - - - - - - - - - - -

Sharlene McEvoy, an individual,

Plaintiff,

vs.

Fairfield University,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

YOHURU WILLIAMS

- - - - - - - - - - - - - - - - - - - - - -

Taken September 6, 2018      By Deanna Oaks

Page 2

APPEARANCES:


MADSEN, PRESTLEY & PARENTEAU, LLC
402 Asylum Street
Hartford, Connecticut  06103
Phone:  860.246.2466
Fax:  860.246.1794
Email:  tsteigman@mppjustice.com
By:  Mr. Todd Steigman
      For the Plaintiff



SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut  06103
Phone:  860.251.5000
Fax:  860.251.5316
Email:  gstarr@goodwin.com
By:  Mr. Gary S. Starr
      For the Defendant

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 12

end in June of 2017?

A. Yes, it did.

Q. And what was the last position you held at Fairfield?

A. Interim Dean of the College of Arts and Sciences.

Q. Did you say interim dean?

A. Interim dean, yes.

Q. Okay. And during what period of time did you hold the position of interim Dean of the College of Arts and Sciences at Fairfield?

A. For -- let's see -- 2015. September of 2015 to June of 2017.

Q. Did you consider that a long period of time to be interim dean?

A. It's not unusual by academic standards.

Q. Okay. And before September of 2015, what was the position that you held at Fairfield?

A. And actually, I think I have to clarify that. I don't think it was September. It must have been -- there was a dean in place who was replaced; so it must have been June of 2015 to June of '17 that I was interim dean. Before serving as interim dean, I was an associate vice president for academic

Page 13

affairs.  I took that position on in June of -- or excuse me -- September of '14 and was in that position from September of '14 through June of '15.

Q.  Okay.  And, Dr. Williams, in your capacity as the interim Dean of the College of Arts and Sciences, who did you report to?

A.  I reported to the provost at that time, Dr. Lynn Babington.

Q.  Okay.  And during your tenure as the Associate Vice President of Academic Affairs who did you report to?

A.  I reported to the provost, Dr. Lynn Babington.  You asked about the interim dean period too.  I actually reported for the first year to Dr. Lynn Babington, she then became interim president, and in the second part of my tenure, the last part of my tenure as interim dean, I reported to the interim provost.  Her name is escaping me.

Q.  Christine Siegel?

A.  Yes, Christine Siegel.  Yes.

Q.  Do You recall when your reporting relationship changed from Lynn Babington to Christine Siegel?

Page 20

in that capacity.  We just -- as being part of that same program and the curriculum that the graduate students were taking, I think everybody was aware of the people that taught in that program.  It was a relatively small boutique American Studies Program at the University.

Q.  And during that time that you you and Professor McEvoy both taught courses as part of the American Studies Graduate Program, what type of subject matter did Professor McEvoy teach as part of that program?

A.  I believe she taught a graduate course on Supreme Court.

Q.  Did you ever co-teach any courses with Professor McEvoy?

A.  No, I did not.

Q.  Okay.  Dr. Williams, I want to go back to the 2012, 2013 academic year.  During that year you had no responsibility for supervising Professor McEvoy in her capacity as the Director of the Pre-Law Advisory Program at Fairfield; correct?

A.  That is correct.

Q.  During that academic year in the 2012 to 2013

Page 21

academic year, did you have any communications with anybody else at Fairfield who you understood to be the supervisor of Professor McEvoy as the director of the Pre-Law Program?

A.  Could you repeat your question.

Q.  Sure.  During the 2012, 2013 academic year, even though you were not responsible for supervising Professor McEvoy in her capacity as the director of the Pre-Law Program, did you have any communications with anybody else at Fairfield about Professor McEvoy in her performance as the director of that program with the person that you understood to be responsible for supervising her?

A.  No, I did not.

Q.  During the 2012, 2013 academic year, did you ever complain to anybody about Dr. McEvoy's performance as the director of the Pre-Law Advisory Program?

A.  No, I did not.

Q.  And during the 2012 to 2013 academic year, did anybody ever complain to you about Dr. McEvoy's performance as the director of Pre-Law Advisory Program?

Page 22

A.  No.

Q.  During the 2012 to 2013 academic year, did you have any knowledge that anybody at Fairfield had made any complaints regarding Dr. McEvoy's performance as the director of the Pre-Law Advisory Program?

A.  No.

Q.  During that same academic year, 2012 to 2013, did you have any knowledge of anything that Dr. McEvoy had done to try and improve the Pre-Law Advisory Program at Fairfield?

A.  No.  Well, actually, the only thing I knew -- I taught a constitutional legal history course; so I would get political science students and history students who were interested in pre-law, and I would often advise them to go and talk to Dr. McEvoy about the program about the Pre-Law Program. She was in the business school so -- and I was in the College of Arts and Sciences.  So that would have been the extent of my engagement in that regard, and it would be sending students there.  But I don't recall anybody specifically for the '12 or '13 year.

Q.  Okay.  During the 2012, 2013 academic year,

Page 23

did you have knowledge of anybody at Fairfield saying anything positive about Dr. McEvoy's performance as the director of the Pre-Law Program?

A. No.

Q. Okay. Moving forward to the 2013 to 2014 academic year. At this point you still had no responsibility for supervising Dr. McEvoy in her capacity as the director of the Pre-Law Program at Fairfield; is that right?

A. That's correct.

Q. Okay. In that year do you know who was responsible for supervising Dr. McEvoy in her capacity as the director of the Pre-Law Program?

A. I believe it was Dr. David Sapp.

Q. Okay. During the 2013 to 2014 academic year, did you have any communications with David Sapp relating to Professor McEvoy's performance as the director of the Pre-Law Advisory Program at Fairfield?

A. No, I did not.

Q. Okay. During the 2013 to 2014 academic year, did anybody complain to you about Professor McEvoy's performance as the director of the

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 24

Pre-Law Advising Program at Fairfield?

A.  No.

Q.  During the 2013 to 2014 academic year, did you have knowledge of complaints by anybody at Fairfield regarding Professor McEvoy personally as the director of Pre-Law Advisory Program?

A.  No.

Q.  During that same academic year, 2013 to 2014, did you have knowledge of anything that Professor McEvoy had done to try and improve the Pre-Law Advisory Program at Fairfield?

A.  No.

Q.  During the same academic year of 2013 to 2014, do you have knowledge of positive statements made by anybody at Fairfield University regarding Dr. McEvoy performance as the director of Pre-Law Advisory Program?

A.  Not, not that I recall.

Q.  And during that year, 2013 to 2014 academic year, did you have any direct communications with Professor McEvoy as it related to her directorship of the Pre-Law Advisory Program?

A.  Not that I recall.

Q.  Okay.  And then the 2014 to 2015 academic

Page 42

in the process of kind of getting my own sense, talking to the provost about 2020, evaluating the program, talking to other program faculty, I also had input from development which was very concerned about going about Dr. McEvoy's leadership and the direction the program was going in.

Q.  Okay.  So you said that you took actions to make your own assessment.  What did you do in order to make your own assessment of the Pre-Law Program after your initial meeting with Dr. Sapp about it?

A.  Well, I had my secretary, Helen, set a meeting -- excuse me -- my administrative assistant set a meeting with Dr. McEvoy.  I wanted to talk to her directly.  I reviewed at that time the annual reports which Dr. Sapp had provided.  I talked to a few people, again, nothing high-level about the program and their sense of the program.  Again, I would not be -- it was so long ago, it would be difficult for me to, you know, it wasn't so much a deep dive as much as who's teaching in the program, what is the -- what are the courses that are currently outlined, were

Page 43

there opportunities as I was kind of thinking of it curricularly.  I teach American constitutional legal history; so it's not necessarily outside of my training to kind of look at that anyway, and I was one of the contributors to that program through a course; so, you know, that's what I mean about doing an assessment.  It wasn't a formal assessment.  It wasn't anything that I had a super, super, deep, deep dive on, but I did make -- immediately -- arrangements to sit down with Dr. McEvoy.  I did look at the curriculum, and then, as I said, I was,  you know, fairly quickly approached by development and they had their own concerns. And I did read through the annual reports that were provided to me.

Q.  Okay.  So one of the things that you mentioned you did in order to make your own assessment was that you talked to a few people about the program in order to get their sense of the program.  Who were the people that you spoke with?

A.  Dr.  Babington was the primary person.  I mean, wanted to get a sense of where the

Page 44

provost was in terms of what she thought about this as a priority, and I believe -- I'm having a hard time remembering all the players at that time. The main person I spoke to was Dr. Babington, again, because we were in that strategic planning process, and I wanted to get a sense from her about what she thought about where these academic programs fit into our broader conception of the pillars of our strategic plan which was student outcome and how we could do better in that regard. So she was the main person that I sat down with. The other conversations were, you know, I would probably characterize as informal check-ins with a few people and, again, I can't be very specific because it was a long time ago. I just don't recall.

Q. So you don't recall anybody else that you spoke to regarding the program other than Dr. Babington? I understand that you said that you had a meeting with Dr. McEvoy. We'll get to that. And I understand that you said that development shared some concerns with you. We'll get to that. But other than Dr. Babington, did you have communications

Page 45

with anybody else as part of your effort to get a sense of the program from other people?

A. Not that I can recall. I can't recall the specifics. They would have been, I mean, I did this with all of the programs that were under my purview -- just kind of check-ins to just kind of say to people that were associated with the program How's everything going? Very informal. It wasn't like -- you know, at that point I had a brand new portfolio, a number of programs were under my purview, three of which were federally funded, which took a lot of attention, you know, I wasn't focusing on pre-law at that point as being an issue. It would become an issue later, but I wasn't focused on it being an issue in that moment.

Q. Okay. So let's talk about your first meeting with Dr. McEvoy. In relating to her directorship of the Pre-Law Program, you said at some point you had a meeting with her directly; right?

A. Yes.

Q. So what do you recall about your first meeting with Professor McEvoy relating to her

Page 46

position as the director of the Pre-Law Program?

A. The first thing I recall is it was very difficult for my administrative assistant to schedule; so we went back and forth before we were finally able to get it scheduled. Now to be fair to Dr. McEvoy, it was in the summer; so, you know, it's not unusual for faculty to be scarce and difficult to contact, but it did take us a minute to get that scheduled.

Q. Okay. But ultimately you were able to schedule something with Dr. McEvoy in the summer of 2014 where you and she met in person; is that right?

A. That's correct.

Q. Okay. And what do you remember about that meeting?

A. I remember asking Dr. McEvoy to share what her goals were for the program and just give me her general assessment of the program. I remember talking with her in general about the Fairfield 2020 strategic planning process and the focus of student outcomes, mentioning how we wanted to be very, you know, strategic

Page 47

in the way that we were thinking about positioning university programs and then asked her about what her overall assessment was of some of the concerns that were shared about technology and health care and how she what she was doing to kind of align with that, how she felt about 3/3 programs which are programs where university students will do their first three years at their undergrad institution, and then two years at a law school and have that final year from -- or three years at a law school, and have that final year count toward their, their, their first year at their law school count toward their final year of their undergrad degree. So it was those kind of -- that kind of get acquainted, let's get to know each other, what are your goals for the program, here's what challenges have been shared with me, how do you feel about these initiatives that will likely be part of this 2020 strategic planning initiative.

Q.  When you first met with Dr. McEvoy in the summer of 2014, did you communicate to her the concern that Dr. Sapp had shared with you

Page 48

that some people have difficulty communicating with Dr. McEvoy and there was concerns about her availability and accessibility?

A.  I believe we talked about it, and I believe she, again, I'm not sure on the timeline here because I, I do remember it being part of the conversation.  I don't know how big of a part of the conversation it was at that time.  It was really my get-acquainted with her that first meeting.  I do remember sharing those concerns.  I remember her kind of defending herself and, you know, immediately becoming a little defensive about it, but I can't recall the specifics.

Q.  Okay.  But you do have a specific recollection of you sharing with Dr. McEvoy in summer of 2014, when you met with her, the concerns that Dr. Sapp shared with you relating to Dr. McEvoy's alleged unavailability and accessibility and her responding to it by defending herself?

BY MR. STARR:

Objection to form of the question.

BY DR. WILLIAMS:

Page 49

I don't think that's --

BY MR. STEIGMAN:

Q.  You can still answer Dr. Williams, if you understood --

BY DR. WILLIAMS:

A.  I don't -- I understand the question.  I don't think it's a fair characterization to say.  I said she seemed to be a bit defensive.  I didn't say she was defending herself.  She just seemed -- you know, ordinarily when you have those conversations you're just trying to get a sense of the program, you would expect the person to be an a little bit more open to, especially with new leadership, and that's what we had across the board, a new provost, a new associate vice president for academic affairs.  The only constant in that office at that point was Christine Siegel who was my colleague.  So it was it was a little -- I think she was a little at that point defensive in the way that she talked about it and didn't you would expect -- or I would have expected -- and I had other conversations with other stakeholders where challenges were shared and

Page 50

they were a little bit more open to understanding that, you know, this was part of a whole idea of us being strategic and thinking how we could -- because the subtitle of 2020 was positioning for the future.  So the whole question was How can we better position for the future?  But it wasn't necessarily a conversation I would expect somebody to be defensive about, but she was a little defensive.

Q.  And when you -- when you first met with Dr. McEvoy in the summer of 2014, did you share with her the concern that Dr. Sapp had shared with you about Dr. McEvoy's perceived unwillingness to engage with the development office?

A.  I believe we did.  We did talk about that.

Q.  Okay.  And when you say you talked about it, what did you say to her about that topic?

A.  I don't recall.  The problem I'm having with this is the timeline a little bit, because I can't remember.  I just cannot be specific with regard to whether we had a subsequent conversation after I talked to development.  So I don't -- I don't want to mistakenly lump

Page 52

understanding.  So I don't recall.

Q.  Okay.  That's fine.  And during that first meeting you had with Dr. McEvoy in the summer of 2014, did you inform her that you wanted her to do anything differently in connection with her preparation of the annual reports?

A.  No, we didn't.  At that point I was looking at the previous year's annual reports; so it wouldn't have been the time to talk about the next year at that point.

Q.  Okay.  And during the first meeting that you had with Dr. McEvoy in the summer of 2014, did you tell her that you wanted her to do anything different as it related to the subject matter of student outcomes?

A.  We talked about pursuing how I really wanted the Fairfield Pre-Law Program to pursue 3/3 programs, and we talked about making sure that pre-law, like all other programs, should be deeply engaged with and attuned to what was happening with Fairfield 2020, the positioning for the future.

Q.  Okay.  Other than the 3/3 programs, did you have any other specific suggestions to Dr. McEvoy that you wanted her to focus on in

Page 52

understanding.  So I don't recall.

Q.  Okay.  That's fine.  And during that first meeting you had with Dr. McEvoy in the summer of 2014, did you inform her that you wanted her to do anything differently in connection with her preparation of the annual reports?

A.  No, we didn't.  At that point I was looking at the previous year's annual reports; so it wouldn't have been the time to talk about the next year at that point.

Q.  Okay.  And during the first meeting that you had with Dr. McEvoy in the summer of 2014, did you tell her that you wanted her to do anything different as it related to the subject matter of student outcomes?

A.  We talked about pursuing how I really wanted the Fairfield Pre-Law Program to pursue 3/3 programs, and we talked about making sure that pre-law, like all other programs, should be deeply engaged with and attuned to what was happening with Fairfield 2020, the positioning for the future.

Q.  Okay.  Other than the 3/3 programs, did you have any other specific suggestions to Dr. McEvoy that you wanted her to focus on in

Page 53

order to address any concerns about student outcomes?

A.  No, not at that point.  I think we might have talked briefly about -- she put on a couple of programs during the course of the year, and there was some suggestion that maybe she might do a better job, but, again, I don't -- that might have been a subsequent conversation.  I have to say I don't recall. I don't recall the specifics of that first meeting.  I met a lot of people that first month.  I had no reason at that point to be overly concerned, that was Professor Sapp's assessment, and I obviously took that under advisement, but it was also the summer, we had major strategic planning going on. Pre-law was a kind of a minor program in a very big portfolio.  So at that time, to be honest, I just don't recall the specifics of the conversation.

Q.  Okay.  You also previously testified that you had spoken with Dr. Babington as one of your initial steps to make your own assessment regarding the Pre-Law Program.  Do you have a specific recollection regarding what you and

Page 54

Dr. Babington talked about as far as your initial communication with her about the Pre-Law Program?

A.  I do.  We spoke at length about privileging student outcomes in our engagement with all the programs at the university level to be consistent with Fairfield 2020, and Dr. Babington in particular was very interested in making sure that, not only we had good metrics, but we were providing students the best opportunity in all fields from nursing, to pre-law, to other pre-professions, engineer, you name it, to have the widest opportunities.  Any program that didn't do that immediately, you know, for her was something that we needed to focus on and think about and how could we better do that in number of ways, because that was what the whole positioning for the future was all about.  And so pre-law in that sense, because we didn't have any articulated 3/3 agreements, and, in fact, we had been approached and had not followed through on that.  We didn't have -- we had these complaints about us not really offering

Page 55

significant opportunities for students to explore law avenues other than corporate or criminal.  Because we had the complaints from development, this was something that she was concerned about, and she said we would definitely keep that on our radar and think about making a change since, as David Sapp shared, it was Dr. McEvoy's last year, there was no need to do anything in that year immediately.  We had other -- she's a new provost, I'm a new AVP, we had other things going on including a strategic plan.  But just to put it on -- make a note, this is an area where we, we need to pay attention and we need to be able to move if necessary if we need to, because we want to emphasize those student outcomes, we want to emphasize positioning for the future, we want to make sure students have the broadest range of opportunities.

Q.  Dr. Williams, did you say that there had been an opportunity offered to Fairfield in order to engage in a 3/3 agreement with another law school that was not pursued by Fairfield?

A.  I -- shortly after -- I apologize -- shortly

Page 56

after I came into the office, we were approached by two universities, Catholic University was one.  I can't remember who the second was.  And then later on I, approached Boston college and Georgetown, but Catholic University and Boston college were actually interested in having conversations with us about creating or establishing 3/3 programs. And at that time my understanding was that, and, again, you know, I'm coming into that position new -- that those -- that wasn't the first time we had been approached, it just hadn't been acted on up to that point.  Of course, I took this to the provost, and she said this is something we need to pursue immediately.  And I responded to Catholic University, I respond to Boston college, and I think I wrote Georgetown directly and asked about the possibility of establishing those types of programs, which would have addressed one of the key student outcome issues which was a clear pathway for Fairfield University into top tier law schools.

Q.  Did you see it as Professor McEvoy's responsibility as the director of the Pre-Law

Page 57

Advisory Program in order the enter into 3/3 agreements with other colleges?

A.  It, it certainly would have been something that I would have anticipated would have been on her radar because a big part of that job is student advising.  The challenges, if you go back to 2014 and we think about the landscape and legal education in 2014, there was an a lot of consternation around the fragility -- for lack of a better term -- in the legal profession and whether students who were coming through law school were getting a degree where they would be able to get high-paying jobs and be able to command the same type of lifestyles and income that a law degree once commanded.  We had several alums come back and complain.  It was one of my former students in particular who had earned a law degree and wasn't employed.  So there was this concern about making sure that we were ensuring that our students were getting opportunities given the cost of a Fairfield University education that would grant them access to A) law schools in a higher tier that would ensure at the very least that they

Page 58

would be viable and competitive for the best jobs, and then B) thinking very strategically how to lessen the burden and the cost associated with pursuing both an undergraduate degree at a private comprehensive university like Fairfield and then going on for law degree which were very expensive.  So, again, we were very much focused on students, very much focused on that.  You would assume, again, that a pre-law director -- because the people who were contacting us in some cases were, you know, in the provost's office, but in one case -- I think it was Catholic University, I'm pretty sure it was Catholic, although I'm not 1,000 percent sure -- it was the pre-law director who was reaching out.  But at the same time, those schools have law schools; so you can see that that was a priority for them as much as it was a priority for us, and certainly, you know, the -- you would anticipate that in doing that high level of advising, you would want to be able to offer students the opportunity particularly to have a chance to get into an expedited pathway to

Page 59

a top tier law school, and that's why we thought it was important. And, again, it didn't seem that there was any movement that had taken place on that front.

Q. So you -- do you believe that Director McEvoy as the director of the Pre-Law Advisory Program should have been trying to enter into 3/3 programs with other law schools or with law schools on behalf of Fairfield?

A. I do believe she should have been exploring the opportunities, yes.

Q. Once you became, you know, part of the administration at Fairfield in the September of 2014 and through the remainder of your tenure when you were part of the administration through 2017, did, did Fairfield University actually enter into any 3/3 programs with law schools?

A. No, not to my knowledge. Not while I was there, we did not.

Q. And the fact that Fairfield didn't enter into any 3/3 programs with law schools, that wasn't Dr. McEvoy's fault; right?

A. Can you -- I'm not sure I understand your question.

Page 60

Q. Sure. The fact that at the time that you left Fairfield University, Fairfield University had not entered into any 3/3 agreements with any law schools, do you believe that that was Dr. McEvoy's fault.

A. No, not directly her fault, but you expect in academic positions for a lot of stuff that gets done is driven by faculty who direct programs, and you expected that those faculty will have their kind of ears to the ground about new trends and new developments that offer the best opportunities, opportunities for students. Around 2014 there was a lot of emphasis and interest nationally around these types of programs particularly within the Jesuit, the 28 Jesuit colleges and universities as part of that network, and this idea that this would give students at schools like Fairfield, Catholic, Scranton a leg up. So it's certainly not her responsibility alone, but it also wasn't like she was driving that conversation or pushing that forward in a way that would have put us in a better position to be able to close the deal. Ultimately if you're thinking about

Page 61

assessing blame for it, that doesn't fall squarely on a director, but if you've got that push from a director, if that's coming from the bottom up, it's a lot easier to get those things through.

Q. Well, you said that you personally communicated with other law schools about establishing 3/3 programs; right?

A. I did.

Q. And as a result of your own personal efforts, you weren't able to establish any 3/3 programs between Fairfield and any other law school; right?

A. The problem is that faculty control the curriculum, and so ultimately there are things that can be initiated by a dean or provost, but at the end of day, the driver for that has to be faculty, has to be program faculty. If you don't have program faculty who are willing or able to do that, or who are unwilling to do that, that can be a great impediment to get those programs through. It's not like Dr. McEvoy and I didn't talk about this and I didn't share that as a priority or something that I thought would

Page 63

the university for the future to be better able to say to an incoming freshman Here's the range of opportunities available to you, here's what we -- you can do if you're interested in a career in law, and we didn't do that.

BY MR. STEIGMAN:

Madam Court Reporter, could you please read back that last question.

(WHEREUPON the court reporter read back.)

BY MR. STEIGMAN:

Q.  Okay.  Dr. Williams, is this answer to that question no, that you weren't able to establish any 3/3 programs with law schools as a result of your efforts?

A.  The answer to that question is no.  The clarification on that is that that is not the dean or the associate vice president's role. When those opportunities come through at that level, they should be filtered down to faculty who ultimately should drive that, who have to build consensus, it has to go through faculty government structures.  Those things

Page 64

are not executed at that level all the time;
so, yes, technically that's true, but then
you also have to look beneath that position
and say Who should have been responsible for
driving that and executing that even if I
were 1,000 percent on board, which I was, and
there should be evidence of the letters that
I wrote and my responses to those programs,
if you don't have faculty driving that, it's
not gonna materialize into a program, into an
agreement.

Q.  Do you have an understanding as to why
Fairfield University didn't ultimately enter
into a 3/3 program with Catholic University
law school during the period of time you were
part of the university's administration?

A.  I would say probably a combination of things
including too much turn over in the provost's
office, the Fairfield 2020 initiative, kind
of a lack of inertia on the part of the
director and the program faculty and it was a
very volatile time at the University.  There
were some faculty labor issues that had
manifested themselves.  So, and then, of
course, we had that big strategic planning

Page 65

process, the unconformability with the board and faculty over that.  There are a number of things that accounted for it, but the ultimate thing is that we dropped the ball.  We didn't get it done.  Could we have gotten it done?  Yes.  We should have gotten it done.  It didn't get done.

Q.  Is part of your answer you assign some of the responsibility to program faculty?  Did I understand your answer correctly?

A.  Yes, you understood me correctly.

Q.  Okay.  And who, who would did you think -- who would be included as program faculty as you use that term?

A.  The program director, Dr. McEvoy, and the faculty who taught in the program, and the faculty advisory board.  This is something, again, that you would expect faculty to be concerned about in looking for opportunities to create those pathways.  That -- that's where that's, you know, usually where that's driven.  We had law programs contacting us, but you cannot do that by a state of complete -- by just signing an agreement.  You have to have buy-in from the faculty because they

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 66

control the curriculum.  They have to agree to counting that final year as credit, they have to, because those are things that faculties control -- the curriculum, it's part of faculty governance, which is the bedrock of university administration and how universities do business.  So you can have leadership that is on fire for an initiative, but ultimately you are dependent on your faculty to drive those programs forward.  Now was there enough done to, you know, if you asked that on the other side to, to communicate that as a priority, I believe there was.  It just didn't get done.  There's blame to share on all spaces for that.

Q.  Okay.  And during the time that Dr. McEvoy was the director of the Pre-Law Advisory Program, did she oppose entering into any 3/3 programs with any law schools?

A.  No.  The answer to your question is no.  But she also didn't follow-up on any of those initiatives.

Q.  Okay.  And the other law schools that I believe you said you wrote to were Georgetown University and Boston College; right?

Page 67

A.  Those are the ones that I recall, yes.

Q.  Would the answer for why Fairfield University was not able to enter into any 3/3 programs with those additional law schools be identical to the information you provided regarding Catholic university, or would it be different?

A.  It would be the same.

Q.  Okay.  Other than that what you've already testified to, do you remember any other details about your initial communications with Dr. Babington about the Pre-Law Program?

A.  Not that I can recall.  The only other thing is that, you know, is that I think I shared is we did talk about that being Dr. McEvoy's final year and that might be -- it'd be appropriate at that point to start considering a change.  Again, reimagining the program, a change in leadership, new direction around the strategic initiatives I mentioned.

Q.  At that point in time, did you and Dr. Babington have specific ideas about how you thought the Pre-Law Advisory Program should be reimagined and changed around different

Page 68

initiatives?

A.  We didn't talk too deeply about it.  I think we did think about, you know, the program at that point had been in the business school and there was some question as to why it was in the business school.  That might have accounted for the kind of corporate direction in thinking about maybe it should be in the College of Arts and Sciences.  It had been in the business school as I understand under the previous director as well, and yet the majority of the courses were taught in the college, and that would be one way to kind of broaden the program and broaden it's appeal. I don't think we got much further than that, maybe talking about some potential people in the college who at that point could be tapped to, to possibly take over the leadership of the program.  But, again, not, you know, nothing overly specific at that point.

Q.  Okay.  And then you also said that during the time that you were making your initial assessment regarding the Pre-Law Program, you received a complaint or a concern from the development office; is that correct?

Page 68

initiatives?

A. We didn't talk too deeply about it. I think we did think about, you know, the program at that point had been in the business school and there was some question as to why it was in the business school. That might have accounted for the kind of corporate direction in thinking about maybe it should be in the College of Arts and Sciences. It had been in the business school as I understand under the previous director as well, and yet the majority of the courses were taught in the college, and that would be one way to kind of broaden the program and broaden it's appeal. I don't think we got much further than that, maybe talking about some potential people in the college who at that point could be tapped to, to possibly take over the leadership of the program. But, again, not, you know, nothing overly specific at that point.

Q. Okay. And then you also said that during the time that you were making your initial assessment regarding the Pre-Law Program, you received a complaint or a concern from the development office; is that correct?

Page 69

A.  That's correct.

Q.  Okay.  Can you tell me when that occurred?

A.  I couldn't tell you the date, I don't recall.

Q.  Can you can you tell me more -- well, whatever you recall about the concern or complaint that you received from the development office?

A.  I was contacted by a development officer who shared that he had some very specific concerns about the Pre-Law Program and that he wanted to meet with me to talk about those concerns.

Q.  Okay.  And who was that development officer?

A.  His name was Christopher or Chris Pates.

Q.  And as a development officer, what was Mr. Pates' responsibility?

A.  The primary responsibility of Chris Pates was to raise funds for various programs at the University, and I believe his portfolio at that point included the Pre-Law Program.

Q.  Okay.  And what specific concerns about the Pre-Law Program did Chris Pates' team get to you?

A.  Chris Pates shared three concerns which I saw as interrelated, but I'll share them

Page 70

nonetheless. His first concern was that he had received complaints from alum about the direction of the program and the fact that the program did not seem to be addressing more contemporary issues in the study of the law. He also shared that there was the possibility that some donors were resistant to continuing support programs because of the kind of lack of growth that they saw or Fairfield kind of being stuck and frozen in a way that was approaching certain issues, and then he also shared his concerns about Dr. McEvoy's resistance to him sharing those ideas and Dr. McEvoy's kind of prickliness and combativeness when he did reach out, when development did reach out to try to get, get some type of game plan and bring her into those conversations in a way that would help them address that as they were going out to try and raise revenue, not only for the program, but for the university.

Q. Okay. So regarding the first issue, do you know the identity of the alumnus who allegedly made a complaint to Mr. Pates --

A. No.

Page 71

Q. -- about the program?

A. I, I apologize. No, I do not.

Q. Do you have any more specific information about what the alum's complaint was regarding the direction of the Pre-Law Program?

A. At that time part of what Chris shared is that we were not -- the program appeared to be frozen. Not, not his words, but, you know, kind of antiquated in a way that we were thinking about directions for law study, opportunities for student interns, pre-law advising around things like intellectual property, health care, emerging technology, those types of things that we seem to be kind of frozen in a -- in a -- in a model that was more 20th century, backward facing than 21st century.

Q. And have -- what was it about the Pre-Law Program that was frozen in those areas?

A. I think two things. One was the pathway. So, again, we were very traditional, and by that I mean it was a focus on either you're going into criminal law or you're going into corporate law, and there was no clear way to engage. For example, the biology student who

Page 72

might see law as an opportunity to be involved in health law policy or to engage a psych student in the say way, to think about public policy pathways through the study of law, to reimagine kind of law related fields that would combine minors, majors, and the pre-law program to give our students some distinctiveness so when they were applying to law school, they would have leg up on the competition.  Of course, coming from a smaller school like Fairfield, again, as law school admissions were plummeting and schools in some cases were getting more selective, at least the highly sought after schools were getting more selective, and the lower tiers getting less selective, making sure that our students were competitive with those schools that are a bigger reach.

Q.  How was the Pre-Law Advisory Program under Dr. McEvoy's directorship focused on criminal or corporate law to the exclusion of these other areas?

A.  I would say that that really came from the director in the direction of the director, that Dr. McEvoy herself was very traditional

Page 73

and, again, that may have been a result of where she was and where she sat in relation to the university being in the business school. We tend to academics -- this is no surprise here -- tend to focus our gaze in the area of where our training is, our specialization is. To give you an example, with regard to myself as a historian, we tend to steer students to a graduate school and say You should get a graduate degree in history and not think about the emerging fields, emerging technology, other opportunities, and so on and so forth. I think that was part of the critiques that was coming from the alums, part of what Chris was hearing in tems of donors who were saying that Fairfield doesn't seem to be kind of reimagining or recasting itself in a way to be responsive to the changing parameters of the legal field and new emerging opportunities for students that would give them the best opportunities to have a productive career in law which may include law school or may include a law degree toward some other purpose.

Page 74

Q.  Do you have personal knowledge that Dr. McEvoy's advising that she was giving to students as the Director of Pre-Law Program was limited to advising students to pursue the law regarding criminal law or corporate law to the exclusion of these other areas?

A.  Only what was shared with me; so anecdotal.

Q.  So how would Mr. Pates know about the advising that Dr. McEvoy gave to individual students?

A.  Mr. Pates was more directly engaged with alum many of whom were engaged with students in our program who were seeking internships or advising from those alums.  So he would have a better grasp of what was happening, and remember, I was still new to the program when Chris Pates shared those with me so at that point all that I would have known would have been anecdotal.  It's not something that would have been on my radar.  It wasn't part of my portfolio until that summer; so I didn't know.  It would not have been on my radar.  I would have been, you know, unaware of what was happening, because it's just -- is not something I would have been focusing

Page 75

on.

Q.  Do you have any understanding as to how an alum of Fairfield would have direct knowledge of what advising Dr. McEvoy was giving to students that allegedly steered them to only corporate or criminal law areas to the exclusion of other interests?

A.  You could just take a look at where students wound up and what they were doing to get a pretty clear portrait of that, and it's measured by where our students were going to school.  There were some alum, for example, that -- this was shared with me, again, I don't have specifics, I'm just sharing with you the way that this was shared with me -- who were disappointed in some of the destination schools that Fairfield students were coming out of, who felt that we should be preparing students for more prestigious law schools.  There were some who were concerned about monies they provided and whether those monies were being used to get students the best internship opportunities outside of more traditional pathways.  Again, those were not conversations that I would

Page 78

development," do you mean opportunities to get more money from alums?

A.  Correct.

Q.  Did you ever communicate to Dr. McEvoy during the period of time that it was her responsibility to help to raise money for the Pre-Law Program?

A.  We -- I'm not sure I understand your question.

Q.  Okay.  Can you tell me what part of it I need to work on?

A.  You said -- well, actually let's start by just having you repeat it.

Q.  Sure.  During this period of time, did you ever communicate to Dr. McEvoy that it was part of her responsibility as the Director of Pre-Law Program to help to raise money for the program?

BY MR. STARR:

Object to the form of question.  During what period of time?

BY MR. STEIGMAN:

Q.  We're talking fall of 2014; right?  Summer, fall of 2014.  That's when this communication with Mr. Pates took place; right?

Page 79

BY DR. WILLIAMS:

A.  Correct.  It would have been.  What I did share with her was that it was important for her to engage with development, and part of the that engagement facilitated the work of development to raise funds.  That's the same expectation you would communicate to any director in that role that you've got to work with your development officers because they're out raising the curriculum money necessary for programs to provide opportunities for students.  And that, that would have been -- that's what we would have talked about.  Did she have a specific responsibility?  As a program director for a program which was of high interest and where you have significant alum interest and some alum who were willing to give, it's the same expectation of anyone.  Yeah, you have to engage and play nice with your development officers.

Q.  Okay.  And approximately when do you believe you communicated that to Dr. McEvoy?

A.  It was at that point in the summer of 2014 -- or because this is when most of this -- or,

Page 82

needed, and she wasn't convinced that, you know, these new directions were where the, you know, the program should be headed.  That was the crux of her response.

Q.  Okay.  And just so I'm clear, when you said that she wasn't convinced that the new directions is where the program should be headed, what new directions were you referring to?

A.  I'm referring to specifically to her response to the idea that corporate and criminal were not the kind of primary pathways; so some of the things that, you know, we talked about when we met, I believe, were around this idea that were there ways to -- as Chris was suggesting and as what he was saying alums were sharing -- reimagine the program that would allow students to explore a range of other possibilities for the law, and Sharlene's kind of response to that was "I'm not convinced."  So you know that, that, that was her response.

Q.  Dr. Williams, can you provide any more specifics as to how the Pre-Law Program under Professor McEvoy's directorship manifested

Page 83

its primary focus on corporate and criminal
law?

A.  Specifics -- I'm trying to think of if,
again, it would be difficult for me to give
you very concrete examples because it was so
long ago.  But one of the things I could
point to would be kind of the traditional
advising that Dr. McEvoy provided to
students, and, again, that's measurable.  You
can look at it in the outcomes in terms of
what students were going to into when they
were going to law school from Fairfield.  But
other than that, I don't think that I can
provide you anything concrete.  I just don't
recall.

Q.  And what do you know about the advising that
Dr. McEvoy provided to students that
reflected a primary focus on criminal and
corporate law?

A.  What you saw were -- and I did have
conversations with students to this regard.
Students who also, again, were looking at
this as kind of a very traditional pathway
into the law, even as you were having alum
come back and say Look, I got a law degree,

Page 84

and I can't get a job.  Look, I got a law degree, and right now it's intellectual property where you should be focused.  And, you know, people are -- even back in 2015 I remember this conversation about self-driving cars and folks saying, Look, you really need to start getting students to look at what are the legal parameters of these types of issues and not be talking about, you know, kind of the more traditional route.  So I think that's where it was manifested most acutely. And there were certainly students, again, I couldn't give you names, but there were students that I had conversations with who had also shared -- not so much concerns as much as having been told by others that, you know, you're not really -- you're, you're kind of prepared for a 19th century law career in the midst of a major change, and those students communicated some concerns around that and wondering whether they would -- and, again, as I shared, and my response, that is not a negative reflection on Dr. McEvoy as a teacher.  It's not a negative reflection on the preparation of these

Page 85

students on the program.  What it did show was kind of a tone deafness to our need to really be thinking about student outcomes in a way that provided us the best opportunity to make sure that our students were career-ready beyond this kind of traditional pathway of law school for the sake of practicing in one of those more traditional forms.  And, again, that would be the best that I could offer you in terms of, of, of the more concrete, but that is also in line with what Chris Pates shared, that alum were saying It just seems like you guys aren't thinking outside the box in terms of what it is and what students could actually accomplish if you reimagine this program a little bit.

Q.  Do you have any personal knowledge of any advising that Dr. McEvoy provided to individual students that reflected a primary focus on corporate and criminal law?

A.  I had several advisees.  I taught my constitutional legal history course while I was associate vice president.  I had several advisees who engaged with Dr. McEvoy.  You

Page 86

know, it's not -- it wasn't my purview as their professor in those classes to ask specifically about the advising they were getting.  It was my job to advise and to go to the pre-law director to talk about what they should be doing in terms of preparation or adequate preparation, not only for the LSAT, but for law school and opportunities. What I heard back from those students in many cases was that, you know, it was a more traditional pathway.  Now, again, that's anecdotal, but that was my experience, and I'm sure if you talked to those students, you would get them to, you know, share the same that it was kind of like, you know, this, this -- these are the staples.  And it was very difficult, as I mentioned, to just even get Dr. McEvoy to entertain a conversation about how we might address some of these concerns.  She was just rigidly focused on this is the way it's been done, and this is the way that we're gonna do it.

Q.  So, Dr. Williams, were you ever personally present at any time when Dr. McEvoy advised students about law school and manifested a

Page 89

Q.  Was Dr. McEvoy still the Pre-Law director --

A.  Yes, she was.

Q.  -- when he shared this information with you?

A.  Yes, she was.

Q.  And, and the information that this student conveyed to you was that the advising that Dr. McEvoy had provided him was focusing primarily on corporate and criminal law pathways to law school?

A.  The advising that the Pre-Law Program provided of which Dr. McEvoy was the director was more traditionally focused is how I would characterize it.

Q.  And what does that mean "more traditionally focused"?

A.  Criminal and corporate.

Q.  And can you provide anymore specifics about how the Pre-Law Program under Dr. McEvoy's directorship was focusing on criminal and corporate law?

A.  No.

Q.  Okay.  Dr. Williams, during any of your standing meetings with Dr. McEvoy in the 2014 to 2015 academic year -- right now that's all I want to have you answer about -- do you

Page 98

remember at that time thinking that there was something inaccurate in what was contained in the report, do you?

A.  No.

Q.  During the 2014, 2015 academic year, did you ever communicate to Professor McEvoy what your expectations were for what should be included in the report she submitted to you in year-end?

A.  No.  Those reports were -- no.  Those reports were standard.  So every program director, every department chair, anyone in an administrative post -- it would not have been incumbent on anyone coming -- I became a department chair, no one had to tell me what to put in my report.  That's just kind of, you know, the university has expectations, and you go through and you share what they've asked you in those reports, and that's what those reports should be a reflection of.

BY MR. STEIGMAN:

Q.  Okay.  What did -- what was not helpful about the report that Professor McEvoy submitted in May of 2015?

A.  Well, I think part of it -- and if you just

Page 112

that I referred to is simply evidence of what we had been seeing and what I had been sharing. But those three things collectively help to support the case for why we needed a change in leadership at that time and why we pursued a change in leadership at that time.

Q. So just so I'm clear, the shortcomings that you testified about earlier in the annual report that has been marked as Exhibit 2 were not part of the reason why you decided to offer the directorship to Gwen Alphonso in May of 2015; is that correct.

A. Just so I'm clear, the annual report itself, no. The behavior and the problems that it highlights, yes. The kind of backward-looking, traditional, not engaged with 2020, not thinking about strategic visioning, the report itself is a reflection of. It is not the reason. It's a reflection of what we were already seeing that would have made it very problematic for anyone to continue in that role who held similar views. We were looking for, again, positioning for the future and thinking about those types of things. So the report, no. The ideas that

Page 114

approached you with interest in taking over
the directorship of the Pre-Law Program, or
did you approach her to engage her interest
first.  Do you remember that information?

A.  No, I don't know.  I don't have any
recollection of that.

Q.  When -- well, as part of your initial
engagement with Dr. Alphonso about her
possibly taking over the directorship of the
Pre-Law Program, do you remember anything
that she said as part of that initial
contact?

A.  I believe Dr. Alphonso at that time was going
up for tenure or promotion, or promotion and
tenure and was reticent about taking on an
administrative post before she had tenure,
and so was unwilling at that time to take on
that responsibility.

Q.  Okay.  Do you remember Dr. Alphonso
communicating anything else to you about the
Pre-Law Program or directorship of it in
2015?

A.  Not that I can recall.

Q.  Before you offered the directorship of the
Pre-Law Program to Dr. Alphonso in 2015, had

Page 115

Dr. Alphonso conveyed anything to you that caused you to conclude that she had ideas to innovate the programs in areas of, you know, health care, sciences, information technology, intellectual property?

A.  I wouldn't have -- I wouldn't have been talking to her about that or been in a position to be talking to her about that at that point.  You're saying prior to May of 2015?

Q.  I'm saying prior to you offering the directorship to her.

A.  No.

Q.  Okay.  Prior to you offering the directorship to Dr. Alphonso in 2015 did, Dr. Alphonso articulate to you her vision for reimagining or growing the Pre-Law Program?

A.  I don't recall.

Q.  Prior to you offering the Directorship of the Pre-Law Program to Dr. Alphonso, did Dr. Alphonso articulate to you ideas she had to improve student outcomes in the Pre-Law Program?

A.  In pre-law specifically, yes, but, but also in political science generally.  And it was

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 116

part of a, just a general discussion, it
wasn't focused on pre-law though.

Q.  Okay.  Well, right now I'm just asking you
about pre-law.

A.  Then no.  The answer is no.

Q.  Okay.  Prior to you offering the directorship
of the Pre-Law Program to Dr. Alphonso in
2015, did Dr. Alphonso articulate to you
ideas she had to align the Pre-Law Program
with goals and strategic vision of Fairfield
2020?

A.  No.

Q.  Okay.  So after you offered the directorship
of the Pre-Law Program to Dr. Alphonso in
2015, as you indicated a few moments ago, she
declined the opportunity to take on the
position at that time because she had other
things she needed to focus on relating to her
tenure status; right?

A.  Yes, that's my recollection.  Yes.

Q.  Okay.  And so after Dr. Alphonso declined the
opportunity to take over the directorship in
2015, did you and Dr. Babington have an
additional conversation about what to do with
the director position at that point?

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 117

A. Yes, we did.

Q. Okay. And what you remember about that conversation that you had with Dr. Babington regarding that subject?

A. Well, we talked about Fairfield 2020, and we talked about what we could do with that position that would align with that but then not create the problem of putting someone in there on an interim basis as opposed to having somebody come in to kind of guide full-time. So the decision was made at that time that, since we were in the implementation phase of 2020, it wouldn't do any harm to maintain Dr. McEvoy in that position for an additional year.

Q. Okay. Madam Court Reporter, can you mark another exhibit.

(Whereupon an exhibit was marked.)

BY MR. STEIGMAN:

Q. Okay. Dr. Williams, the court reporter should have handed you a document that is marked as Exhibit 3, a two-page email chain. Do you have that in front of you?

Page 118

A. I do.

Q. Towards the bottom of page 1 is an email from yourself to Professor McEvoy Cced to Laura Martin dated June 10, 2015; right?

A. Correct.

Q. And that email follows onto the top of page 2; right?

A. Yes, it does.

Q. And is that an email that you sent to Professor McEvoy dated June 10, 2015?

A. Yes, it is.

Q. And prior to sending that email, did you review the content with Lynn Babington?

A. Yes, I did.

Q. And she approved a draft of this before you sent it?

A. I don't recall if -- I don't recall.

Q. Okay. In the second sentence of your email from June 10th to Professor McEvoy, you wrote just to be clear, this is a one-year appointment renewable at the discretion of the Provost's office pending annual review; right?

A. Correct.

Q. And was that a true statement?

Page 119

A. It's a one-year appointment, and it's renewable at the discretion of the provost, absolutely. That's a true statement. It's the provost's decision.

Q. Okay. And in the -- if you go to the second page, I think it's the third to last sentence in the bottom paragraph, do you see where you wrote this is in no way a negative reflection on your service to the university?

A. I do see that.

Q. Is that a true statement?

A. Yeah, absolutely, it's true. But I want to be very clear about what service to the university means. When academics take on administrative roles, they are by virtue of taking on that administrative responsibility cutting out time that could be devoted to research or other pursuits. That's important service, and we recognize that, and we always acknowledge -- or we should -- administrators should always knowledge and -- at least -- even if the person isn't performing at the highest capacity, their willingness to take on that service. In Dr. McEvoy's case as in the case of any department chair or program

Page 122

of the reality of the way that things ran at Fairfield and most institutions where academic directors, even deans, anyone under the provost serves under the pleasure of the provost, the provost serves at the pleasure of the president.  That's how it works.

Q.  So, Dr. Williams, did you ever communicate to Professor McEvoy that the one-year renewal appointment did represent a negative reflection on her performance as the Director of the Pre-Law Program in previous years?

A.  I thought I answered your question, but I -- I'm just gonna answer it, no.  If I'm understanding your question correctly, no, I did not communicate that to her.  What I did communicate to her was that her term was up, which was ultimately the purview of the provost's office to decide whether or not to continue with her in that role.

Q.  Other than your June 10, 2015, email with Professor McEvoy that's reflected in Exhibit No. 3, did you have any verbal communications with her in which you outlined the fact that her previous appointment had ended and that she was being offered a one-year renewal?

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 125

had mentioned previously was that there was some conversation about why the Pre-Law Program, the majority of which the faculty were from the College of Arts and Sciences was in the School of Business.  So at that point, the provost recommended that the Director of the Pre-Law Program report to the interim dean and moved Sharlene's portfolio down to the the dean's office, but she was still in a quasi role because even though she was reporting to the dean, the ultimate authority for that didn't change from the provost.  It was still the provost's decision about the appointment or extension of a contract, so on and so forth.  So her reporting structure changed.  It became reporting to the dean, but then the dean basically recommending up to the provost or engaging with the provost about the program.

Q.  Okay.  So does that mean that the answer to the question is yes, in the 2015, 2016 academic year even though your position changed to interim Dean of the College of Arts and Sciences that you retained responsibility for supervising Professor

Page 126

McEvoy in her capacity as the Director of Pre-Law Program?

A.  Yes.

Q.  What happened during that 2015, 2016 academic year?  Do you remember having any communications with Professor McEvoy relating to the Pre-Law Program?

A.  No.

Q.  Do you remember having any meetings with Professor McEvoy during the 2015, 2016 academic year regarding the Pre-Law Program?

A.  I don't recall.

Q.  I'm sorry, it came across fuzzy.  Was that "I don't recall"?

A.  I don't recall, yes.

Q.  Okay.  Thank you Madam Court Reporter, at this point, I'd like to mark another exhibit.

(Whereupon an exhibit was marked.)

BY MR. STEIGMAN:

Dr. Williams, you've been handed by the court reporter a document marked as Exhibit 6 for your deposition.  It should be entitled on the first page report of the Pre-Law Program Sharlene McEvoy

Page 132

appointment in the 2015, 2016 academic year?

A.  I can tell you what I recall, which is that the provost -- I do remember the provost wanting to know if we had communicated that to Professor McEvoy and us having a difficult time getting in touch with Professor McEvoy. So at that point I had a different administrative assistant, and we were trying -- Fran -- and we were trying to get in touch with Professor McEvoy and were not able to get in touch with her.  And that was a consistent theme that I had with her over the course of my engagement with her in those roles, in both roles.

Q.  Okay.  So does that mean that the answer is no, that you never personally communicated to Professor McEvoy that her employment would not be further renewed after the completion of the 2015, 2016 academic year?

A.  I simply don't recall.  And I can tell you -- I know for a fact we had trouble getting in touch with her.  I can't -- I have no recollection specifically of that.

Q.  Okay.  Did you ever send Professor McEvoy an email informing her that her appointment

Page 137

Q. Okay. And so this date of that email was June 10, 2016. And so do you remember having any communications with Dr. Alphonso regarding the Pre-Law Program between May 12, 2015, the date of her email to you that starts on page 2 and June 10th, 2016, the date of your email on the bottom of the first page?

A. I'm sorry. I'm having a hard time following your question, because the one is from June -- is May 12, 2015, the second one is from June 10th, 2016?

Q. Correct. So if you use those two dates as brackets, after you received the email from Dr. Alphonso from May 12, 2015, did you have any communications with her regarding the Pre-Law Program before you sent her that email on June 10, 2016?

A. None that I can specifically recall.

Q. And then Dr. Alphonso responded to you on June 10, 2016, saying that she's interested and trying to set up a time to talk to you further about the opportunity; right?

A. Yeah. That you were talking about the Friday June 10th, 2016, where it begins lovely to

Page 140

around those issues.

Q.  Okay.  And, Dr. Williams, when you mentioned release time as one of the things that Dr. Alphonso said that she would be looking for if she was gonna take over the directorship?

A.  Mm hmm.

Q.  Does that mean like a course release where she would have to teach fewer courses?

A.  Yes.

Q.  And during the time that you supervised Dr. McEvoy as the Director of the Pre-Law Program, did Dr. McEvoy receive any course releases?

A.  To be honest with you, I don't recall, but I would be remiss if I didn't mention that as part of the negotiation process for any administrative post, faculty are free to engage the dean or provost or other university officer about what their specific needs are in order to take on that administrative post.  Sometimes that can involve a stipend alone, sometimes if the person is working on a book project, or has other duties and responsibilities such as serving in another capacity, that can be done

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 142

A.  Mm hmm.

Q.  Numbered at the bottom is Fairfield 1346.  I just want to make sure we have the same document.

A.  I'm looking at the same document.

Q.  Okay.  And so this is an email from Kimberly Baer to yourself June 14, 2016; right?

A.  It is, yes.

Q.  And what role did Kimberly Baer have at that point that necessitated her involvement in pre-law advising?

A.  She was, I think, working in a -- as Dr. Babington's administrative assistant.

Q.  Okay.  And in this email Kimberly Baer wrote to you and the first sentence she says, I just talked with Lynn about the transition from Sharlene to Gwen, and she suggested it would be best if you called Sharlene to thank her for serving as Pre-Law Advisor the past four years and to let her know that Gwen Alphonso has agreed to take on the role, and then it continues; right?

A.  Mm hmm, yes.

Q.  So by the date of this email June 14, 2016, a decision had apparently been made to offer

Page 143

the pre-law directorship to Dr. Alphonso?

A.  Yes.

Q.  And Dr. Alphonso had accepted the offer; right?

A.  I think Dr. Alphonso, based on what I'm reading here, has agreed to take on the role -- must have accepted at that point, yes.

Q.  Okay.  And as we talked about before, you don't recall ever being able to reach Dr. McEvoy to notify her that she did not receive further appointment for the directorship of the Pre-Law Program at that time period; right?

A.  That is correct.

Q.  Okay.  At the tail end of the first paragraph of Exhibit No. 9, do you see Ms. Baer -- I hope I'm pronouncing that right -- said -- then ask what would be convenient for her to meet with or call Gwen to let her know about the all great work that's been done over the last four years?

BY MR. STARR:

Yeah, you read it wrong.

BY MR. STEIGMAN:

Did I?

Page 144

BY MR. STARR:

Yeah, you said "what" as opposed to "when."

BY MR. STEIGMAN:

Okay.  I'll read it again.  Do you see where as part of that Ms. Bear wrote then ask when would be a convenient -- looks like there should be "time" there, but I don't see it -- for her to meet with or call Gwen to let her know about all the great work that's been done over the past four years.  Do you see where I read that from.

BY DR. WILLIAMS:

I do.

BY MR. STEIGMAN:

Q.  Okay.  Would you agree with that sentiment that great work has been done in the Pre-Law Program over the past four years?

A.  Obviously I think that Dr. McEvoy did good work in Pre-Law, and obviously there are things that you can point to that indicate that she did good work.  Her time was still up in 2015, and Kim Baer is an administrative assistant and a wonderful person, but she wouldn't have had the granular detail.  I think she like everyone else was highly cognisant of the fact -- hyper cognisant of

Page 145

it including the provost and myself that you want to thank people for service.  Because, again, these are not highly stipend positions.  In fact, pre-law, as I keep mentioning, is a relatively low-level administrative position at Fairfield University.  These are really service positions with a stipend.  We're not talking about being a dean or a provost or anything like that.  So to answer your question, yes, I agree that Sharlene did admirable work in her four years as director.  That doesn't mean that she was director for life.  Those positions have term limits for a reason.  As I've mentioned on previous occasions, those people serve at the pleasure of the provost or the dean, and it's the prerogative of provost or the dean at that point to extend or to deny the extension of that, and that's what happened in this case.

Q.  Okay.  Madam Court Reporter, I'd like to mark another exhibit.  This is a two-page document.  The first page is an email from Kimberly Baer dated June 14th, 2016, at 4:05 p.m. to Yohuru, subject Pre-Law Letter for

Page 149

BY DR. WILLIAMS:

A. Okay.

Q. Okay. Ready?

A. Yup, I am.

Q. Okay. A the bottom of the first page of Exhibit 11 is email from yourself to Catherine O'Donnell and Cced to a number of individuals dated June 15th of 2016 at 11:50 a.m.; do you see that?

A. Yes.

Q. Okay. And then in response to that in the middle of the first page on that same day, 12:01 p.m., Provost Babington responded in an email to you. Do you see her response that has two paragraphs there?

A. I do.

Q. And in the second paragraph Dr. Babington wrote to you that you have been managing the Pre-Law Program since moving to the dean's position it is my understanding that you will continue to do. So the letter to Gwen will come from my office indicating that you will be working with her on the Pre-Law Program. Does this mean that you did not meet with Sharlene this year or have knowledge of the

Page 150

Pre-Law activities -- question mark -- I suggest you ask her for an annual update and also let her know that she will have to meet with Gwen to handle the stewardship of the program.  Thanks!  Lynn.  Do you see where I read that from?

A.  I do.

Q.  And in responding to Dr. Babington, did you answer her question where she asked does this mean that you did not meet with Sharlene or have knowledge of the Pre-Law activities?

A.  I didn't answer that question but, Provost Babington and I talked regularly; so we may have had had a phone conversation on the same day.  I actually don't know, but in this document I do not answer that question.

Q.  Okay.  Do you have a recollection of answering that question in some other way outside of this document?

A.  No -- well, what I can tell you is this. Because of the administrative change that we made, this would have been something that I would have regularly report to the provost when I was in her office.  I moved down to the dean's office, and it's not unusual given

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 151

that she changed the reporting structure that she would not know about that. She wouldn't have been getting regular reports from me about my engagement with Sharlene. So this is just Lynn not being aware. It doesn't mean that what Lynn writes here is the case.

Q. Okay. But do you have a recollection of responding to the provost's question that --

A. No. I do not have a recollection of that.

Q. -- in --

A. I cut you off. I apologize. Could you repeat the last part of your question.

Q. Yes. Do you have a recollection of responding to that question for the provost in some occasion other than this document?

A. Not that I recall.

Q. And moving upwards on the email chain, still on the first page. It looks like you responded to Dr. Babington, June 15, 2016, at 12:11 p.m. Do you see your response there?

A. I do.

Q. Okay. And in the third line down in your response, you began a sentence by saying, as for Pre-Law, you are right, and then you continued on in the sentence. Can you tell

**Deposition of Yohuru Williams - 9/6/2018**
**Sharlene McEvoy v. Fairfield University**

Page 152

me what you meant there when you said as for
Pre-Law you are right?

A.  I'm responding to her it's my understanding
you will continue to do so -- you've been
managing the Pre-Law Program since moving to
the dean's position, it's my understanding
you will continue to do so -- yup, you're
right, Sharlene's budget line never changed,
so on so forth.

Q.  Okay.  Thank you.  Dr. Williams, you
continued on at Fairfield as the interim Dean
of the College of Arts and Sciences through
June of 2017; right?

A.  That's correct.

Q.  And during the 2016, 2017 academic year, did
you supervisor Dr. Alphonso in her capacity
as the Director of Pre-Law Program?

A.  I did.  She was still one of my reports.

Q.  Okay.  And during that academic year, when
you continued -- strike that -- During that
academic year when you supervised Dr.
Alphonso in her capacity as the Director of
Pre-Law Program in 2016, 2017 academic year,
did you meet with Dr. Alphonso on a regular
basis regarding the Pre-Law Program?

Page 154

recall the frequency with which I met with various actors because the number wasn't that great.

Q. Okay. So based on that clarification, does that mean that you don't have a specific recollection with meeting with Dr. Alphonso regarding the Pre-Law Program in either semester in the 2016, 2017 academic year?

A. No. I have specific recollection of meeting with her. I can't tell you the dates or the frequency.

Q. Okay. And during the first semester, which would be fall 2016, do you recall Dr. Alphonso initiating any new initiatives as the Director of the Pre-Law Program that had not been done previously?

A. Doctor -- not -- not that I recall. I had other things happening; so not that I recall.

Q. Okay. And how about in the spring 2017 semester? Do you recall Dr. Alphonso putting in place any initiatives regarding a Pre-Law Program that'd not been done previously?

A. Not to my recollection. I just don't recall.

Q. Do you remember any changes that Dr. Alphonso made to the Pre-Law Program in the 2016, 2017

Page 155

academic year?

A. To be honest with you, as I think I shared earlier, there was tremendous change and upheaval at the University in that year. So much so, that I can't in any specific way recall. I mean, there was the president's departure, an interim president, the announcement about the search for a dean, my decision to go elsewhere to take a position someplace else; so I just -- I just don't recall. I apologize, but I don't remember.

Q. In the time period from June of 2016, the months in which Dr. Alphonso was appointed to be Director of Pre-Law Advising until you departed Fairfield University in June of 2017, do you remember communicating to Dr. Alphonso what expectations you had for reimagining the Pre-Law Program and aligning its strategic vision to Fairfield 2020?

A. Yes, I do.

Q. But as you sit here today, can you remember any specific actions that Dr. Alphonso took as the Director of Pre-Law advising during that period of time to achieve those goals that you set out for her?

Page 160

That is true; right?

A.  Yes, at that point if Provost Babington had reviewed the record and decided to continue with Sharlene McEvoy, it would have been her prerogative to do so.

Q.  And 2016 did you make a recommendation to Provost Babington regarding whether Professor McEvoy's term as the Director of the Pre-Law Advising Program should be renewed?

A.  Yes.  I thought I shared that.  Yes, I did.

Q.  And your recommendation to the provost in 2016 was that Professor McEvoy's directorship should not be renewed at the end of 2015, 2016 academic year; right?

A.  My recommendation to the provost was that we needed to find a director that would allow us to strategically align with the Fairfield 2020, and that in my estimation, Dr. McEvoy was not gonna be able to help us do that.

Q.  Okay.  And do you remember approximately when you made that recommendation to Provost Babington?

A.  I do not.  But obviously we've had we had that conversation.  We were having that conversation, but I don't recall a specific

Page 161

date.

Q.  And, again, just to make sure that we have them on the record, can you tell me all of the reasons upon which you based your recommendation to the provost that Professor McEvoy should not receive a further renewal of her appointment as the Director of the Pre-Law Program beyond the 2015, 2016 academic year.

A.  I've answered this, and I almost wish we could read it back, but I'll offer them again.  Number one -- and I'm trying to be as clear as possible -- her time was up.  It was a three-year appointment that began in 2012.  She was appointed by Paul Fitzgerald.  That period had ended.  No faculty member in any department has a right to an automatic renewal.  That's at the direction of the dean or provost.  In her case it was the provost.  That period was over.  So it was appropriate at that point for the provost to make a move.  Secondly, there were concerns with alignment with Fairfield 2020, the need for the university to be, as I shared earlier, preparing for the future and thinking very

Page 162

strategically about student outcomes, how to best position Fairfield University students to be distinctive in the market and to be competitive for graduate and professional schools like law school.  Our thought at that time was that we needed leadership to help us address what was the third point, some of the concerns that had been raised by alum and by development about the kind of backward-looking program that we had, one that was focused very narrowly and very traditionally, wanting to expand that in the hopes of A) creating better opportunities for students and greater student outcomes, having a range of more prestigious universities that our students were admitted to, and then also putting us in a position perhaps to attract donor funds that would allow us to help supplement the activities of students in internships and other programs that would allow them to grow professionally and personally.  Those were the reasons that went into the decision to move away from Dr. McEvoy.  No other considerations.

Q.  And you thought that Dr. Alphonso would be

Page 164

students.  That didn't mean that you wanted to cut off pathways to other programs like nursing, like engineering, like the Dolan School of Business.  But what we weren't satisfied with, and what I think ultimately you want, is somebody who is thinking about more concrete ways to reach out to those students and to share the range of possibilities that the law would offer them as I mentioned earlier in science, technology, health, engineering, so on and so forth.

Q.  At that time did you understand that Dr. Alphonso was younger that Dr. McEvoy?

A.  No.  I don't make it a habit of knowing what people's ages are.  So that would not have been something that I would have considered.

Q.  So you're testifying under oath that you didn't have a general awareness that Dr. Alphonso was not younger than Dr. McEvoy?

A.  This might be inappropriate, but I'll share it regardless.  As a person of color, I don't show my age.  So people generally assume I'm much younger than I am.  That's taught me over the years to be very cautious about

Page 165

engaging people in that regard.  Furthermore, the university had a very vigorous program that went over things like sexual harassment and other workplace discriminatory behaviors which were a violation of federal law.  I worked in my unit to ensure that we maintained the highest standards with regard to that.  I would never be engaged in that type of behavior.  So no, I did not consider Dr. McEvoy's age.  I did not ask Dr. McEvoy's age.  I don't know how old Dr. McEvoy is now.  It is not something that factored into that decision.

Q.  So, Dr. Williams, I didn't ask you whether you considered her age or whether it was a factor in the decision.  I'm asking you whether you had a general awareness that Dr. McEvoy was older than Dr. Alphonso.  Just an awareness.

A.  I have a real problem with that question, but I'll answer it, but I have a real problem with the question.  I think the question assumes a lot.  But, of course.  Yes, I did.

Q.  Okay.  Thank you.

A.  I mean, she was junior faculty, obviously.

Page 166

So Dr. McEvoy is a full professor.  That alone in most cases indicates -- and Dr. McEvoy is a known quantity at the institution.  She'd be there a long time; so of course I knew that.  I knew that coming in, but that doesn't mean that I was focused on her age in any way.

Q.  Do you believe that Dr. Alphonso would be able to better connect with students who were interested in law because she was closer in age to them?

A.  No.

Q.  Dr. Williams, you testified before that you and Dr. McEvoy had both taught courses as part of the American Studies Graduate Program at Fairfield; is that right?

A.  That's correct.

Q.  And is the American Studies Program at Fairfield an interdisciplinary program?

A.  Yes, it is.

Q.  Do you know if Dr. McEvoy has had other experiences teaching as part of the interdisciplinary programs at Fairfield other than in the American Studies Program?

A.  I don't know.  I don't know.  I have no

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 167

knowledge of that.

Q. Okay. Dr. Williams, what were the reasons that you believed that Dr. Alphonso would be better able to align the Pre-Law Program to the strategic vision of Fairfield 2020 than Dr. McEvoy?

A. I think that there were, you know, two things that I was thinking about specifically in that moment. One was the fact that she was in the College of Arts and Sciences in the political science department which tended to furnish a large number of students interested in pre-law, but also because she was also gonna be involved in public administration. So the idea was here's somebody who was in the college who would then be able to, again, think about some of synergies and connections with other things that were happening around public administration which touched health, technology, law, and other areas. So the idea then was, again, to maximize efficiency by thinking about a director who by the very nature of their work was in a position to do so. I think secondly, the other consideration for me was simply that Dr.

Page 168

Alphonso, when you looked at her and what her research, and what she was interested in, her academic training, what she brought to the table, her publications, was a fine director. I mean, those credentials mapped up to the position. Having said that -- and I want to be very clear about this -- credentialing for academic programs can be interesting endeavor for universities because those decisions aren't always driven specifically by how well a person maps up, but what they'll be able to do administratively, and our hope at that time was that administratively Dr. Alphonso would be able to move us in a direction of addressing the Fairfield 2020 initiative and thinking about, again, those strategic outcomes for students.

Q. But was there something specific about Dr. Alphonso that caused you to conclude that she would be better able to address those issues such as student outcomes than Dr. McEvoy?

A. Dr. McEvoy's time was up. So we were moving in a different direction. The idea is whenever you're doing that that sometimes people bring new ideas that allow them to see

Page 171

applying to law school were still basically those who had been advised by Dr. McEvoy. You would have to wait until that second year, really, of Gwen's full term to see what those outcomes were and what the metrics would be related to that. I wasn't there for that, and so I don't know.

Q. As part of one of your earlier answers, you used the phrase more "prestigious law schools" of trying to get students admitted to from Fairfield. What did you mean by more prestigious schools?

A. I think in 2014 there was a conversation about whether universities large -- I'm not just talking about Fairfield, but across the board were doing students a disservice by them getting degrees at institutions where it would be very difficult for them to be competitive for jobs in the best firms. Now, again, that's a very traditional pathway, but it was a real concern. The price tag -- and this is a continuing conversation in higher ED now for higher education is very high. So when we talked about making students career-ready, we had to be thinking as an

Page 176

BY MR. STARR:

Objection.  Asked and answered.

BY MR. STEIGMAN:

Q.  So Dr. Williams, do you have knowledge of complaints by faculty members that students were not able to reach Dr. McEvoy by phone or email?

BY DR. WILLIAMS:

A.  Not that I recall.  Not to my knowledge.

Q.  Okay.  Dr. Williams, was one of the reasons that you recommended to Provost Babington that Professor McEvoy not receive a further renewal of her Directorship of the Pre-Law Advising Program because of any complaints that you received from any faculty member that a student was not able to reach Dr. McEvoy by phone or email?

A.  No.

Q.  Dr. Williams, do you have knowledge of any complaints by students that they were not able to -- strike that -- Do you have any knowledge of any complaints by students that Dr. McEvoy did not make herself available to meet with them regarding Pre-Law advising?

A.  I referenced having heard, and it was a

Page 178

about Dr. McEvoy not being present.  I do, as I shared earlier, have a anecdotal stories from students who said they found it very difficult to get in touch with her to arrange time for advising.  I don't have documentation of that.

Q.  Dr. Williams, was one of the reasons that you decided to recommend to Provost Babington that she not further renew Dr. McEvoy's appointment as the Director of the Pre-Law Advising Program because of any complaints by students that Dr. McEvoy did not make herself available to discuss pre-law advising?

A.  No.

Q.  Dr. Williams, was one of the reasons that you recommended to Provost Babington that she not further renew Dr. McEvoy appointment as Director of Pre-Law Advising because of any complaints that Dr. McEvoy did not use the internet effectively?

A.  No.

Q.  Dr. Williams, was one of the reasons why you decided to recommend to Provost Babington that she not further renew Dr. McEvoy's appointment as the Director of the Pre-Law

Page 179

Program because the Pre-Law Advisory Program was not addressing new developments in the law?

A.  Yes.

Q.  Dr. Williams, did you have knowledge of any concerns of any members of Fairfield university's board that the Pre-Law Advisory Program was not addressing new developments in the law?

A.  I testified to that.  I shared what was shared with me from development from Mr. Pates and others.  That was my -- that's how that was shared with me.

Q.  Okay.  So when you testified earlier about information that Christopher Pates conveyed to you that included concerns related to that subject matter from a board member or board members?

A.  Are you talking about members of the university board or members of the Law Advisory Board?

Q.  For right now, the university's board?

A.  No.  I never testified to anything about the university's board.

Q.  Okay.  So let's go back a couple questions so

Page 180

I can get this cleared up.  Did you have any knowledge of any concerns by any members of the university's board --

A.  No.

Q.  -- that the Pre-Law Program was not addressing new developments in the law when Dr. McEvoy was the director?

A.  I had no knowledge of the anyone at the university board.  I was -- what was shared with me were concerns that were articulated by the Law School Advisory Board.  Now, there may have been things that were articulated by people who are on the university board, that was never shared directly with me, and that would not have been a factor in my decision to not support, you know, Sharlene.

Q.  Okay.  And you mentioned the Law School Advisory Board.  Who were members of the Law School Advisory Board?

A.  I don't know.  Again, they're alum of the institution and donors to the Pre-Law Program, that's a development function, it wasn't something -- since I was running that program, you know, the AVP is responsible for managing the academic director and those

Page 181

types of things.  The people who engage with the alum are not, you know, typically not that level of university officer.  It would be the program director and development.

Q.  Okay.  And, again, I just want to clear this up.  So I apologize if you feel that you've answered this already, but I have a -- I'm not clear on it.  So did Mr. Pates or anybody else at the university communicate to you that the university's Law School Advisory Board had concerns that the Pre-Law Program was not addressing new developments in the law?

A.  Yes.

Q.  And were those concerns part of the reasons why you recommended to Provost Babington that she not further renew Dr. McEvoy's appointment as the director of the Pre-Law Program program beyond the 2015, 2016 academic year?

A.  I gave you a very specific accounting of what factors went into that decision; so that answer is no.  I shared the three things that factored into my recommendation, and all those things may have been concerns that were

Corrections to Yohuru Williams Deposition Transcript
dated September 6, 2018:

| Page | Line | Reads | Should Read |
|------|------|-------|-------------|
| 14 | 5 | admirable work - yet | multiple concerns |
| 19 | 5 | her driven of the Pre-Law Program direction. That is what I was responding to. | ? I think this should read |
| 46 | 10 | take us a minute to get scheduled expression meaning that it took more time than usual. | ? Take us a minute is a colloquial |
| 81 | 23 | voracity | veracity |
| 91 | 25 | very difficulty | difficult |
| 100 | 12 | mission center | centered |
| 105 | 29 | senior college faculty and her office | in her office |
| 120 | 15 | at the provost of dean or | at the discretion |
| 138 | 8 | emailing balk | back |
| 144 | 25 | cognisant | cognizant |
| 156 | 20 | composition | position |
| 157 | 24 | watt | what |

7003409v1

Deposition of Yohuru Williams - 9/6/2018
Sharlene McEvoy v. Fairfield University

Page 189

I, YOHURU WILLIAMS, have read this deposition transcript pages 1-187 and acknowledge herein its accuracy except as noted on the errata sheet.

_____ 10/17/2018
Signature

GINA M. ZITZER
Notary Public-Minnesota
My Commission Expires Jan 31, 2022

Subscribed & sworn to me on this date,
October 17, 2018.
State of Minnesota
County of Washington
My Commission expires January 31, 2022

Page 190

STATE OF MINNESOTA
                    CERTIFICATE
COUNTY OF HENNEPIN
        I, Deanna Oaks, hereby certify that I reported the deposition of YOHURU WILLIAMS on the 6th of September, 2018 in St. Paul Minnesota, and that the witness was by me first duly sworn to tell the truth and nothing but the truth concerning the matter in controversy aforesaid;

        That I was then and there a notary public for the County of Hennepin, State of Minnesota; that by virtue thereof I was duly authorized to administer an oath;

        That the foregoing transcript is a true and correct transcript of my stenographic notes in said matter, transcribed under my direction and control;

        That the cost of the original has been charged to the party who noticed the deposition and that all parties who ordered copies have been charged at the same rate for such copies;

        That the reading and signing of the deposition was not waived;

        That I am not related to any of the parties hereto, nor interested in the outcome of the action and have no contract with any parties, attorneys or persons with an interest in the action that has a substantial tendency to affect my impartiality;

        WITNESS MY HAND AND SEAL this 14th day of September, 2018.



                    _____
                    Deanna Oaks, Court Reporter