**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SHARLENE MCEVOY | |
| *Plaintiff*, | No. 3:17-cv-1861 (MPS) |
| v. | |
| FAIRFIELD UNIVERSITY, | |
| *Defendant*. | |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dr. Sharlene McEvoy brought suit against Fairfield University, alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Fairfield filed a motion for summary judgment. For the reasons discussed below, the motion for summary judgment is GRANTED.

**I.    FACTS**

The following facts, which are taken from the parties' Local Rule 56(a) statements, supporting exhibits, and briefs, are undisputed unless otherwise indicated.

### *A.  Dr. McEvoy's Appointment as Director of the Pre-Law Advisory Program*

Dr. McEvoy began teaching at Fairfield University, an institution of higher education, in 1986. ECF No. 25 at ¶¶ 1, 4; ECF No. 30-1 at ¶¶ 1, 4. In May 2012, Senior Vice President for Academic Affairs Dr. Paul J. Fitzgerald sought applications from the faculty to lead a Pre-Law Advisory Program ("the Program"). ECF No. 25 at ¶ 5; ECF No. 30-1 at ¶ 5. Dr. McEvoy applied, ECF No. 25 at ¶ 6; ECF No. 30-1 at ¶ 6, and Dr. Fitzgerald appointed her to a three-year term as Director of the Program on July 3, 2012, ECF No. 25 at ¶ 7; ECF No. 30-1 at ¶ 7.

In his appointment letter, Dr. Fitzgerald said that he was impressed with Dr. McEvoy's proposals; he specifically highlighted her proposals to (1) form a Pre-Law Club; (2) gather and analyze data on GPAs, LSAT scores, and law school admission statistics; (3) increase the number of internships; and (4) reconnect with Fairfield alumni. ECF No. 27-6 at 2. He advised Dr. McEvoy that the Office of Alumni Relations, the Office of Institutional Research, and the Advancement Division,[1] as well as an individual named Cath Borgman, would be helpful resources as she implemented these proposals. *Id*.

### B. Dr. McEvoy's First Term as Director of the Program

The 2012-2013 academic year was Dr. McEvoy's first year as Director of the Program. ECF No. 25 at ¶ 7; ECF No. 30-1 at ¶ 7. At the end of the year, she submitted an annual report about the Program to Dr. David Sapp, who oversaw the Program in his role as Associate Vice President for Academic Affairs. ECF No. 27-7 at 2-6; ECF No. 27-1 at ¶ 11. After reviewing the report, Dr. Sapp requested additional information from Dr. McEvoy about student LSAT scores and the impact of the LSAT boot camp on those scores; the students participating in internships, the job shadow program, and law advising; and Dr. McEvoy's goals for the next two years. ECF No. 27-11 at 2-3. Dr. McEvoy provided him with this additional information on July 23, 2013 by return email, ECF No. 27-11 at 2-3, but did not include the bulk of this information in subsequent annual reports, ECF No. 25 at ¶ 13; ECF No. 30-1 at ¶ 13; ECF No. 27-8; ECF No. 27-9; ECF No. 27-10. Dr. McEvoy says that she did not include "specific information about specific students" in her reports because she was concerned about protecting student confidentiality and because the

---

[1] The parties appear to use the terms "Advancement Office," "Advancement Division," and "Development Office" interchangeably. As far as the Court can tell, these three titles refer to the same fundraising office at Fairfield.

template that she obtained for annual reports did not call for specific information about individual students. ECF No. 30-1 at ¶ 13. She does not explain from whom she obtained the template.

Dr. Fitzgerald left Fairfield in June 2014 and Dr. Lynn Babington became the Senior Vice President of Academic Affairs in July 2014. ECF No. 25 at ¶ 15; ECF No. 30-1 at ¶ 15. Around the same time, Dr. Sapp left Fairfield and was replaced by Dr. Yohuru Williams. ECF No. 25 at ¶ 16; ECF No. 30-1 at ¶ 16. Fairfield states that, in the course of this transition, Dr. Sapp voiced concerns about the Program and Dr. McEvoy's effectiveness to Dr. Williams. ECF No. 25 at ¶¶ 17-18.[2] Before Dr. Sapp left the university, he met with Dr. Williams and Dr. McEvoy to discuss the Program. ECF No. 25 at ¶ 19; ECF No. 30-1 at ¶ 19. Dr. McEvoy asserts that there was little substantive discussion about the Program during this meeting. ECF No. 30-1 at ¶ 19; ECF No. 27-3 at 36. But both parties agree that she was asked if she had any thoughts about who should take over as Director when her term ended. ECF No. 25 at ¶ 19; ECF No. 27-3 at 35-36. They also agree that she did not suggest anyone to be her successor or ask why she would not be continuing in the position. ECF No. 25 at ¶ 19; ECF No. 27-3 at 36-37. Dr. McEvoy testified that Dr. Sapp suggested two names as potential successors at the end of her term—Gwen Alphonso and Debra Strauss. ECF No. 27-3 at 37. Dr. McEvoy made no response when Dr. Sapp mentioned Alphonso and Strauss. *Id.* Dr. Alphonso was ultimately chosen as Dr. McEvoy's successor in 2016. ECF No. 30-16 at 2.

---

[2] Dr. McEvoy argues that testimony from Dr. Williams about what Dr. Sapp told him is inadmissible hearsay. ECF No. 30-1 at ¶¶ 17-18. Hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The Court does not rely on Dr. Sapp's statements for their truth, but rather for their effect on Dr. Williams, who was involved in the decision not to renew Dr. McEvoy's appointment. *U.S. v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay.").

Fairfield asserts that during the 2014-2015 academic year—the third year of Dr. McEvoy's term and the first year Dr. Williams supervised the Program—Dr. Williams met with Dr. McEvoy and conducted his own assessment of the Program. ECF No. 25 at ¶¶ 20, 22. Although Dr. McEvoy admits that Dr. Williams spoke with Dr. Babington and the Advancement Office, she argues that "[a]n assessment that was limited to speaking with only Dr. Babington and the development office would not have provided for much of an assessment." ECF No. 30-1 at ¶ 20; *see also id*. at ¶ 22.

Fairfield asserts that there were a number of issues with Dr. McEvoy's directorship of the Program. First, Fairfield asserts that Dr. McEvoy was not sufficiently accessible to students. Fairfield points to Dr. McEvoy's testimony that she held office hours only on Monday, Tuesday, and Wednesday, and that she did not have access to email at her home. ECF No. 25 at ¶ 24; ECF No. 27-3 at 5-7. Dr. McEvoy denies that she was inaccessible and asserts that she was available to meet with students by appointment if they were unable to meet during her office hours. ECF No. 30-1 at ¶ 24; ECF No. 30-7 at ¶ 88. She also notes that her contact information, including her phone number and email address, was included on written materials distributed in connection with the Program, and on the Program's website. ECF No. 30-7 at ¶ 88. She does not deny, however, that she only had access to email while on campus or that she was typically absent from the school on Thursdays and Fridays. ECF No. 27-3 at 7.[3] Dr. Williams testified that he heard "anecdotal stories from students who said they found it very difficult to get in touch with [Dr. McEvoy] to arrange time for advising." ECF No. 27-13 at 65. He also testified that when he shared his concerns about availability and accessibility with Dr. McEvoy, he "remember[ed] her kind of defending herself and . . . immediately becoming a little defensive about it." *Id.* at 20. Finally, he testified

---

[3] Fairfield also asserts that because Dr. McEvoy's office was in the School of Business, students in the College of Arts and Sciences found it difficult to meet with her during her office hours, ECF No. 25 at ¶ 24, but none of the record citations in this paragraph support this assertion.

that he himself had trouble getting in touch with Dr. McEvoy: "[W]e were trying to get in touch with Progressor McEvoy and were not able to get in touch with her. And that was a consistent theme that I had with her over the course of my engagement with her in those roles . . . I know for a fact we had trouble getting in touch with her." ECF No. 30-11 at 64. Dr. Babington testified that, based on the information she had from Dr. Williams, she came to the conclusion that Dr. McEvoy was inaccessible to students. ECF No. 27-12 at 20.[4]

Second, Fairfield asserts that Dr. McEvoy did not have a good relationship with the Advancement Office, which is responsible for raising funds for Fairfield and the Program. ECF No. 25 at ¶ 26. Mr. Christopher Pates, a development officer in the Advancement Office, was responsible for raising funds for various programs, including for the Pre-Law Program. ECF No. 27-13 at 31. He testified that Dr. McEvoy provided little assistance in developing a case statement that was to be used for fund raising:

> Q. So about four weeks after the meeting you remember emailing Professor McEvoy a draft of the case statement?
>
> A. Yes.
>
> . . .
>
> A. I may have called Sue Quinlivan during the drafting process. I didn't interact directly with Sharlene McEvoy. I did ask some questions to have passed on, and I think I sent some email with questions that didn't get a response, so I called, I copied Sue Quinlivan and asked her, and it had to do with – in a case for support you have how the donors will be recognized, how they'll be involved, and we didn't have that in our case, so I was asking those types of questions, what do you think if we did this, could you ask Professor McEvoy if we could do that, that type of thing, can you follow up on an email that I sent here, trying to figure out if we could build that section out in the case or not.
>
> . . .

---

[4] Although Dr. Williams testified that complaints by students regarding Dr. McEvoy's availability for pre-law advising was not one of the reasons he recommended non-renewal, ECF No. 27-13 at 65, Dr. Babington testified that she viewed the problems with Dr. McEvoy's availability as one basis for her decision not to renew the appointment, ECF No. 27-12 at 17–20.

> A. She sent the document back with very minor edits, and no real comments. That, too, I though was different. There's usually some feedback, when you do this with a person who owns the program, and there was no feedback. The only feedback – and if I remember right – and I wish I had a copy of the document, but there might have been a one word change in the five or six pages of narrative, but there were three changes in her bio. So she had spent time editing her bio, but she didn't spend time amplifying the vision, which I just, again, I thought was strange, and it was certainly unusual in my experiences with faculty.

ECF No. 27-14 at 10-11. He also testified that "every time [he suggested] something [to Dr. McEvoy] it was being sort of shut down [by Dr. McEvoy] before [they] even had a chance to brainstorm it," *id.* at 7, and that she complained about him even though he treated her no differently than he treated other faculty, *id*. at 12. Dr. McEvoy admits that she complained about Mr. Pates, but states that Mr. Pates was only concerned with raising money and did not criticize her performance as Director of the Program. ECF No. 30-1 at ¶¶ 25-26. Mr. Pates agrees that his suggestions to Dr. McEvoy "would have had to do with donors interacting with the program." ECF No. 27-14 at 14. He also testified about his criticisms of Dr. McEvoy as follows:

> Q. In any of your communications with Mr. Halas, did you convey any criticisms that you had about the prelaw program itself under Professor McEvoy's directorship?
>
> A. Probably shared the same that I did with [Dr. Williams], if we had someone that was more willing to communicate with donors. And donors give feedback, so you have to be able to take that feedback. Donors, they have ideas, and if you're not willing to listen to those ideas, donors get offended and they don't invest. You at least have to listen to the ideas. So yes, I definitely would have said something about that.
>
> Q. The same kind of sentiment that you testified about earlier that you expressed to Dr. Williams, that you wished you had a prelaw director that you could take on donor visits with you, right?
>
> A. Yes, I'm certain of that, yes.

*Id*. at 19-20. Dr. McEvoy denies Fairfield's assertion that she had issues with the Advancement Office; she asserts that she worked closely with members of the office, particularly with Gerry Derbyshire and Hope Ogletree. ECF No. 30-1 at ¶¶ 26, 77; ECF No. 30-7 at ¶ 108. Mr. Pates

testified that Ms. Ogletree "warned" him "that Professor McEvoy could be confrontational, and that's why [Ms. Ogletree] was in the meeting [with Dr. McEvoy]," even though he normally attended faculty meetings one-on-one. ECF No. 27-14 at 7. Dr. Williams testified that he was made aware of some "very specific concerns about the Pre-Law Program" by Mr. Pates, including that alumni would not support the Program because it was not addressing contemporary issues in the study of the law, and that Dr. McEvoy was combative in response to suggestions about raising revenue for the Program. ECF No. 27-13 at 31-35. Dr. McEvoy asserts that at no time was she informed that it was her job to raise money for the Program. ECF No. 30-1 at ¶ 76. Dr. Williams testified otherwise:

> What I did share with her was that it was important for her to engage with development, and part of . . . that engagement facilitated the work of development to raise funds. That's the same expectation you would communicate to any director in that role that you've got to work with your development officers because they're out raising the curriculum money necessary for programs to provide opportunities for students. And that, that would have been – that's what we would have talked about. Did she have a specific responsibility? As a program director for a program which was of high interest and where you have significant alum interest and some alum who were willing to give, it's the same expectation of anyone. Yeah, you have to engage and play nice with your development officers.

ECF No. 30-11 at 46.

Fairfield's third stated concern about Dr. McEvoy was her alleged failure to align the Program with Fairfield 2020, a strategic plan to take the university through the year 2020. ECF No. 25 at ¶ 36. Dr. Williams testified that Dr. McEvoy's reports did not include "any real strategic visioning or any attempt to engage with the priorities that had been shared," ECF No. 27-13 at 44, even though they had "been asking for . . . her to align the program with [the Fairfield 2020] strategic plan," *id*. at 45. He elaborated that:

> [Dr. McEvoy's reports] felt a little cut-and-pasted from year to year, formulaic, and there's nothing [in the 2014-2015 report] about strategic direction or university mission . . . in a year when we spent an entire year talking about strategic planning. So here was her opportunity to say [t]his is what the university's articulating in terms of its strategic plan,

here's how I see the Pre-Law Program positioned to contribute to positioning for the future. There was none of that. It was just some general observations about students in the program, and then you look at goals and potential growth, and it's the same thing. So that's what I mean by it was disappointing. Superficial.

*Id*. at 45. He said that "the annual report itself" was not the problem; rather, it was the "behavior and the problems that [the report] highlights." ECF No. 30-11 at 54. He went on to testify that:

The kind of backward-looking, traditional, not engaged with 2020, not thinking about strategic visioning, the report itself is a reflection of [that]. It is not the reason. It's a reflection of what we were already seeing that would have made it very problematic for anyone to continue in that role who held similar views.

*Id*. Dr. McEvoy asserts that Dr. Williams never communicated with her about Fairfield 2020. ECF No. 30-1 at ¶ 36; ECF No. 30-7 at ¶ 114. Dr. Williams testified otherwise. ECF No. 27-13 at 18-19, 24, 45. The letter appointing Dr. McEvoy to a one-year term as Director of the Program referenced Fairfield 2020. ECF No. 27-17 at 2 (explaining that, "given the changes associated with Fairfield 2020, the Provost's office is taking the year to review all contractual arrangements including those governing program directors with an eye toward increasing efficiency, effectiveness, and accountability across the campus").

As a fourth issue, Fairfield cites Dr. Williams's testimony that Dr. Sapp had "shared some concerns about the curricular – the direction of the program where the program did not seem to be responding to changing avenues for the preparation of young people into law school particularly around health care and technology," and that "[i]t seemed kind of frozen around corporate and criminal law." ECF No. 25 at ¶ 17; ECF No. 27-13 at 6.[5] He also testified that students told him "that, you know, it was a more traditional pathway." ECF No. 27-13 at 41. Dr. McEvoy asserts that "the charge that the Pre-Law Advisory Program under [her] directorship was focused on

---

[5] Dr. McEvoy objected to this testimony as inadmissible hearsay. As set forth in note 2, the Court does not rely on Dr. Sapp's statements for their truth, but rather for their effect on Dr. Williams, who was involved in the decision not to renew Dr. McEvoy's appointment.

corporate or criminal law is completely false." ECF No. 30-1 at ¶ 42; ECF No. 30-7 at ¶¶ 62-78. She states that she scheduled many events that provided students the opportunity to explore areas of law other than corporate or criminal law and to speak with practitioners in those other areas of law. ECF No. 30-1 at ¶¶ 61-63; ECF No. 30-7 at ¶¶ 67-78. Dr. Williams also expressed concern about another curricular issue—3/3 programs. These programs permit students to complete three years at an undergraduate institution and three years at a law school and have the first law school year count toward the final year of their undergraduate degrees. ECF No. 30-11 at 16. Dr. Williams testified that he spoke to Dr. McEvoy in the summer of 2014 about pursuing 3/3 programs, *id*. at 20; that "it certainly would have been something that I would have anticipated would have been on her radar," *id*. at 26; and that he believed "she should have been exploring the opportunities [to enter into 3/3 programs]," *id*. at 28. Dr. McEvoy asserts that Dr. Williams never notified her that she needed to take action to help secure 3/3 programs with law schools. ECF No. 30-1 at ¶ 78; ECF No. 30-7 at ¶ 110. And Dr. Babington testified that she did not believe it was Dr. McEvoy's responsibility to establish 3/3 programs with law schools. ECF No. 30-10 at 40-41.

Fifth, Fairfield asserts that Dr. McEvoy did not gather or analyze data on student grade point averages, LSAT scores, or law school admissions, and that there was no assessment of outcomes that could be used to give advice to students. ECF No. 25 at ¶ 23. In her application for the directorship, Dr. McEvoy explained that she would take the following action with respect to data collection:

> I would keep records of which students from which majors have an interest in law school and those who have been successful in getting admitted: GPAs, LSAT scores and the law school applied to. I would also keep track of the schools that Fairfield Students are not accepted to.

ECF No. 27-5 at 2. When Dr. Fitzgerald appointed her to the directorship, he highlighted the data collection component of the proposal:

You plan to gather and analyze data on GPA's [sic], LSAT scores and relative success in gaining admissions to various law schools in order to assess outcomes and give the best advice and guidance to students. The Office of Institutional Research will be able to assist you in setting this up.

ECF No. 27-6 at 2. Dr. McEvoy denies the assertion that she failed to collect such information; she admits, however, that she did not include the information in her annual reports or otherwise share it with Dr. Williams. ECF No. 30-1 at ¶ 23; ECF No. 27-3 at 16-17.

Sixth, Fairfield asserts that there were problems with the internship and mentorship components of the Program. With respect to internships, Fairfield asserts that Dr. McEvoy did not increase the number of internship opportunities for students. ECF No. 25 at ¶ 24. Although Dr. McEvoy denies this statement, ECF No. 30-1 at ¶ 24, she admitted during her testimony that she did not establish any internships, ECF No. 27-3 at 18. With respect to mentorship, Dr. McEvoy connected law students with students interested in law school, but there were no formal guidelines, monitoring, or reporting about the mentorship program. ECF No. 25 at ¶ 31; ECF No. 30-1 at ¶ 31. Dr. Babington testified that the Program was not "student-focused" or "student-centric" under Dr. McEvoy in part because "[the Program was] not improving [its] connection with [its] alumni and finding internships for [its] students." ECF No. 30-10 at 27.

Dr. McEvoy asserts that Dr. Williams did not notify her of any perceived deficiencies in her performance as Director of the Program. ECF No. 30-1 at ¶¶ 78-84. Specifically, she asserts that "he never expressed concerns regarding her availability or difficulty in communicating with her; that the Program was not student-centered or student-focused; that the Program was failing to address new developments in the law regarding healthcare or technology; that the Program was not aligned with the strategic vision of Fairfield2020; that Plaintiff needed to take action to help secure 3/3 programs with law schools; that the annual reports submitted by Plaintiff failed to meet expectations, or needed to be changed; that the Program was too focused on corporate and criminal

law; or that Plaintiff needed to work better with the Development Office." ECF No. 30-1 at ¶ 78; *see also id*. at ¶¶ 79, 81-84; ECF No. 30-7 at ¶¶ 110-111, 113, 115-117.

### C. The Decision to Appoint Dr. McEvoy to an Additional One-Year Term as Director

As Dr. McEvoy's first term drew to a close, Dr. Williams and Dr. Babington discussed potential successors to Dr. McEvoy, including Dr. Gwen Alphonso and Dr. Debra Strauss, the same two individuals who had been mentioned by Dr. Sapp in the 2014 meeting with Dr. McEvoy and Dr. Williams. ECF No. 27-12 at 9-10. Ultimately, Dr. Williams and Dr. Babington decided to offer the position to Dr. Alphonso. ECF No. 25 at ¶ 41; ECF No. 30-1 at ¶ 41. Dr. Williams testified that they were concerned with improving student outcomes, aligning the Program with the Fairfield 2020 strategic plan, and having a Director who worked effectively with the Advancement Office. ECF No. 27-13 at 48-49. He also explained that "[i]t was a three-year term," "[Dr. McEvoy's] time was just up, and this was the opportunity to think about a reimagination of this program and a shift in leadership." ECF No. 27-13 at 48. Dr. Babington testified that the Program "wasn't bad the way it was," but it "just wasn't good." ECF No. 27-12 at 14.

Dr. Alphonso declined the offer because she was applying for tenure and had a number of other commitments that would prevent her from committing herself wholeheartedly to the position. ECF No. 27-20 at 2; ECF No. 25 at ¶ 41; ECF No. 30-1 at ¶ 41. In an email rejecting the offer, Dr. Alphonso explained that "[she] could do this instead, much more successfully (and sanely!), starting in Fall 2016" because by then she "would (hopefully) have tenure, have [her] book and the Polity piece done, and [there would likely be] another Americanist in the Department." ECF No. 27-20 at 2. She went on to say that "[i]f it is at all possible to have an interim Director for this coming year and for [her] to be considered for a full term starting Fall 2016, [she] would be most thrilled and obliged to be so considered." *Id*.

After Dr. Alphonso turned down the position, Dr. Williams and Dr. Babington offered Dr. McEvoy a one-year appointment. ECF No. 27-17 at 2. The appointment letter noted that the one-year term was "a break with previous practice," but that it was in "no way a negative reflection on [her] service to the university." *Id*. Dr. Babington testified that she and Dr. Williams decided to offer Dr. McEvoy a one-year appointment because "Dr. McEvoy had proven that she could adequately run the program, [b]ut [they] definitely wanted a change and Dr. Alphonso had indicated that . . . if she was successful in being promoted and earning tenure, that she would be interested in then taking leadership of the program." ECF No. 30-10 at 17-18. Dr. McEvoy accepted the one-year appointment as Director of the Program. ECF No. 27-17 at 2.

### D. Dr. Alphonso's Appointment as Director of the Program

At the end of Dr. McEvoy's one-year term, Dr. Williams and Dr. Babington decided to offer Dr. Alphonso a three-year term as Director. ECF No. 30-16 at 2. Dr. Babington testified that "Dr. Gwen Alphonso, we felt, would be able to institute best practices and revise and revamp the pre-law program to make it more student-centered, student-focused, and improve outcomes for our students." ECF No. 27-12 at 16. She also testified that, under Dr. McEvoy, "[t]he program had been doing the same thing for years with the same outcomes," "[i]t wasn't student-focused, student-centric," "[w]e were not improving our connection with our alumni and finding internships for our students," and "[n]o changes had been made over the years." *Id*. at 18. In the spring of 2016, Dr. Williams testified, he spoke with Dr. Alphonso about the Program:

> I shared at that point what we were looking for in a Pre-Law Director. I talked a lot about Fairfield 2020 needing somebody who would be willing to engage deeply with the development office to think very strategically about student outcomes and about a range of opportunities within the law specifically highlighting technology and health care. [Dr. Alphonso] talked a lot about what she would need in terms of release time and stipend and funding for speakers. So it was that kind of – kind of a broad-ranging, high-level conversation about what she would need to take the duty on and what we were looking for, what the provost was looking for in terms of, of a leader.

ECF No. 27-13 at 55-56; ECF No. 25 at ¶ 50.[6]

### E. Statements About Dr. McEvoy's Age

Fairfield asserts that Dr. McEvoy has no evidence that her age was discussed by Dr. Babington or Dr. Williams or that either of them made any age-related comments to her or about her. ECF No. 25 at ¶ 60. Dr. McEvoy denies this statement in part, asserting that in his deposition testimony, Dr. Williams "made a number of statements evidencing age bias against [her], including false statements that the Program she directed was 'backward-looking,' 'traditional,' 'frozen,' 'stuck in the 20th century,' and preparing students for a '19th century law career.'" ECF No. 30-1 at ¶ 60.

## II. LEGAL STANDARDS

The court must grant a motion for summary judgment if the moving party shows "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d

---

[6] Dr. McEvoy "denies that there were discussions with Dr. Alphonso about 'what the University wanted to accomplish with the Program.'" ECF No. 30-1 at ¶ 50. However, to support this denial, Dr. McEvoy cites Dr. Williams's testimony about his communication with Dr. McEvoy in 2015; the discussion with Dr. Alphonso referenced here occurred in 2016. ECF No. 30-11 at 55-57 (discussing 2015); ECF No. 27-13 at 55-56 (discussing conversation with Dr. Alphonso in 2016).

42, 44 (2d Cir. 2015) (internal citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* In reviewing the record, the court "must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013).

### III.  DISCUSSION

The Age Discrimination in Employment Act (the "ADEA") makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). It is well established that the *McDonnell Douglas* burden-shifting framework applies to claims brought under the ADEA. *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). "Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If the plaintiff does so, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (internal quotation marks and citations omitted).

In *Gross*, the Supreme Court explained that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the

'but-for' cause of the challenged adverse employment action" and not just a contributing or "motivating factor." *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 180 (2009).[7]

### A. *Prima Facie Case*

In order to establish a prima facie case of age discrimination, Dr. McEvoy must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. Fairfield does not contest any elements of the prima facie case. ECF No. 26 at 11 ("As the degree of proof necessary to establish a prima fade case 'is minimal,' the University reserves its right to challenge the elements of the prima facie case at this time."). Indeed, the burden at this stage "is not a heavy one," *Gorzynski*, 596 F.3d at 107, and it is met here. First, Dr. McEvoy was 65 years old when Fairfield declined to renew her appointment. ECF No. 30-7 at ¶ 5; 29 U.S.C. § 631(a) (the class protected by the ADEA is comprised of "individuals who are at least 40 years of age"). Second, she was qualified for the position. ECF No. 30-10 at 18 (Dr. Babington testifying that Dr. McEvoy was qualified to serve as Director of the Program). Third, she experienced an adverse employment action when she was not appointed to another term as Director of the Program. Fourth, her replacement was 27 years her junior. ECF No. 30-12 at ¶ 6; *Hopkins v. New Eng. Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 257 (D. Conn. 2013) ("[A]ge difference has been found to be enough to establish a prima facie case").

---

[7] Before *Gross*, an employee could carry her burden at the third step "if the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find that her dismissal was motivated *at least in part* by age discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (internal quotation marks omitted) (emphasis in original).

### B. Legitimate Nondiscriminatory Reasons

At the second stage of the *McDonnell Douglas* framework, the burden shifts to the employer to "produce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (internal citations and emphases omitted). Just as Dr. McEvoy's burden was not a heavy one at the prima facie stage, Fairfield's burden at this stage is also "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998). "The employer need not *persuade* the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Id.* (emphasis in original). Here, Fairfield has advanced several legitimate reasons for declining to re-appoint Dr. McEvoy as Director of the Program.

First, Fairfield argues that Dr. McEvoy was not sufficiently accessible to students. ECF No. 26 at 12-13. To support this argument, Fairfield points to Dr. McEvoy's testimony that she was not on campus on Thursdays or Fridays, and that she did not have access to email at her home. ECF No. 27-3 at 6-7 (Dr. McEvoy's testimony that she was typically absent from the school on Thursdays and Fridays and did not have access to email at home). It also notes that "[t]here were accounts that students were unable to reach Dr. McEvoy or that she did not respond in a timely manner to them." ECF No. 26 at 12; *see also* ECF No. 27-13 at 65 (Dr. Williams testifying that he heard "anecdotal stories from students who said they found it very difficult to get in touch with [Dr. McEvoy] to arrange time for advising"); *id.* at 20 (Dr. Williams testifying that when he shared concerns about availability and accessibility with Dr. McEvoy, he "remember[ed] her kind of defending herself and . . . immediately becoming a little defensive about it"); ECF No. 27-12 at 20 (Dr. Babington testifying that, based on the information she had, she came to the conclusion that Dr. McEvoy was inaccessible to students.).

Second, Fairfield argues that in submitting her annual reports, she "did not provide a vision for the future of the Program." ECF No. 26 at 12; *see also id*. at 13 (arguing that "Dr. Williams did not think that the Program was as effective as it could be" in part because "there was no articulation of a vision for improving the Program"). Fairfield points to testimony from Dr. Williams that his "recommendation to the provost was that [they] needed to find a director that would allow [them] to strategically align with the Fairfield 2020, and that in [his] estimation, Dr. McEvoy was not gonna be able to help [them] do that." ECF No. 27-13 at 58; *see also id.* at 45 (Dr. Williams testifying that "[the reports] felt a little cut-and-pasted from year to year, formulaic, and there's nothing [in the 2014-2015 report] about strategic direction or university mission . . . in a year when we spent an entire year talking about strategic planning"); *id*. at 44 (Dr. Williams testifying that the reports did not include "any real strategic visioning or any attempt to engage with the priorities that had been shared").

Third, Fairfield argues that Dr. McEvoy "did not provide the type of data that Dr. Fitzgerald had indicated that he wanted." ECF No. 26 at 12; *see also id*. at 13 (arguing that "Dr. Williams did not think that the Program was as effective as it could be" in part because "there was no data included in the annual reports to determine what was being accomplished"). Fairfield points to the appointment letter in which Dr. Fitzgerald set out specific goals including gathering and analyzing data to assess student outcomes. ECF No. 26 at 11; *see also* ECF No. 27-6 at 2 (appointment letter highlighting that Dr. McEvoy "plan[ned] to gather and analyze data on GPA's [sic], LSAT scores and relative success in gaining admissions to various law schools in order to assess outcomes and give the best advice and guidance to students" and noting that the "Office of Institutional Research will be able to assist [her] in setting this up"). It also points to Dr. McEvoy's annual reports, which

included little of this information. ECF No. 26 at 12; ECF No. 27-7; ECF No. 27-8; ECF No. 27-9; ECF No. 27-10.

Fourth, Fairfield argues that "there were issues concerning [Dr. McEvoy's] relationship with the Advancement Office." ECF No. 26 at 13. Dr. Williams testified that he was made aware of some "very specific concerns about the Pre-Law Program" by Mr. Pates, including that alumni would not support the Program because it was not addressing contemporary issues in the study of the law, and that Dr. McEvoy was combative in response to suggestions about raising revenue for the Program. ECF No. 27-13 at 31-35. Fairfield also points to testimony by Mr. Pates that Dr. McEvoy provided little assistance in developing a case statement that was to be used for fund raising, ECF No. 26 at 13; ECF No. 27-14 at 10-11, and that "every time [he suggested] something it was being sort of shut down [by Dr. McEvoy] before [they] even had a chance to brainstorm it." ECF No. 26 at 13; ECF No. 27-14 at 7; *see also id.* at 12 (Mr. Pates testifying that although he treated Dr. McEvoy the same way he treated other members of the faculty, she complained that he had been pushing her and telling her how to run the Program).

Fifth, Fairfield argues that the Program was not "finding internships for students" and was not sufficiently "student-centered." ECF No. 26 at 14. Fairfield points to Dr. Babington's testimony that the Program was not "student-focused" or "student-centric" under Dr. McEvoy in part because "[the Program was] not improving [its] connection with [its] alumni and finding internships for [its] students." ECF No. 30-10 at 27; *see also* ECF No. 27-3 at 18 (Dr. McEvoy testifying that she did not establish any internships).

Fairfield argues that, despite concerns about Dr. McEvoy's directorship, Dr. Williams and Dr. Babington extended her appointment for one year when Dr. Alphonso turned down their offer in the spring of 2015. ECF No. 26 at 13-14. Fairfield goes on to argue that "Dr. Williams did not

see any significant changes in the Program during the 2015-2016 year" and that he, along with Dr. Babington, "believed that the Program basically had been doing the same thing for several years with the same outcomes and was not student focused or student centric." *Id.* at 14. Fairfield argues that they offered the position to Dr. Alphonso because they believed that she "could improve the Program," "would be more responsive to students and alumni," and "would improve the working relationship with the Advancement Office." *Id.*

If true, these rationales and supporting evidence "would connote lawful behavior." *Greenway*, 143 F.3d at 52. Fairfield has therefore met its burden at this stage.

### C. Pretext

Once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, the burden shifts back to the plaintiff, who must "persuade the factfinder that the employer's proffered explanation is merely a pretext for its intentional discrimination." *Greenway*, 143 F.3d at 52. "The extent of this burden varies on a case-specific basis," *Hodges v. Rensselaer Hartford Graduate Ctr., Inc.*, 2008 WL 793594, at *7 (D. Conn. Mar. 20, 2008), and depends on "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case," *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49 (2000). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia U.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and alterations omitted). As noted above, Dr. McEvoy must produce sufficient evidence to allow a

reasonable juror to conclude that age discrimination was the "but-for" cause of the adverse employment decision.

### 1) Age-Related Comments

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to [take adverse action against] the plaintiff." *Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F. Supp. 2d 288, 295 (S.D.N.Y. 2005). Here, Dr. McEvoy does not contend that she was subjected to any age-related comments or criticisms on the job. Nor does she contend that Dr. Williams and Dr. Babington discussed her age in declining to renew her appointment. Rather, she argues that during his deposition, "Dr. Williams used a number of adjectives to describe [her] or the Program which are suggestive of age bias." ECF No. 30 at 33. Specifically, she notes that he used the terms "traditional," "backward-looking," "antiquated," "stuck in the 20th century," and "19th century law career." *Id.*

In determining whether a comment evidences an intent to discriminate, "a court should consider the following factors: (1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process." *Seltzer*, 356 F. Supp. 2d at 295. Although Dr. Williams was a decisionmaker, the probative value of his comments is greatly diminished because all the comments were made during a deposition taken over two years after the employment decision had been finalized. *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008) ("On the other hand, the remark was made approximately one year after that decision, a length of time that . . .

diminishes its probative value."); *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 285 (D. Conn. 2008) ("[T]he closer a remark's relation to the allegedly discriminatory behavior is, the more probative that remark will be."). The comments were not made during the decisionmaking process; rather, they were part of Dr. Williams's *post hoc* assessment of the Program and Dr. McEvoy's directorship.

Most importantly, when each word or phrase is viewed in the broader context of Dr. Williams's testimony, it becomes clear that the comments are legally insufficient to constitute evidence of age discrimination. Dr. Williams used the terms "antiquated," "traditional," "20th century," and "19th century" in the following contexts:

> Q. Do you have any more specific information about what the alum's complaint was regarding the direction of the Pre-Law Program?
>
> A. At that time part of what Chris shared is that we were not – the program appeared to be frozen. Not, not his words, but, you know, kind of antiquated in a way that we were thinking about directions for law study, opportunities for student interns, pre-law advising around things like intellectual property, health care, emerging technology, those types of things that we seem to be kind of frozen in a – in a – in a model that was more 20th century, backward facing than 21st century.
>
> Q. And have – what was it about the Pre-Law Program that was frozen in those areas?
>
> A. I think two things. One was the pathway. So, again, we were very traditional, and by that I mean it was a focus on either you're going into criminal law or you're going into corporate law, and there was no clear way to engage. For example, the biology student who might see law as an opportunity to be involved in health law policy . . .

ECF No. 30-11 at 40-41.

> Q. How was the Pre-Law Advisory Program under Dr. McEvoy's directorship focused on criminal or corporate law to the exclusion of these other areas?
>
> A. I would say that that really came from the director in the direction of the director, that Dr. McEvoy herself was very traditional and, again, that may have been a result of where she was and where she sat in relation to the university being in the business school. We tend to academics – this is no surprise here – tend to focus our gaze in the area of where our training is, our specialization is. To give you an example, with regard to myself as a historian, we tend to steer students to a graduate school and say You should get a graduate

degree in history and not think about the emerging fields, emerging technology . . . . I think that was part of the critiques that was coming from the alums, part of what Chris was hearing in te[r]ms of donors who were saying that Fairfield doesn't seem to be kind of reimagining or recasting itself in a way to be responsive to the changing parameters of the legal field . . . .

ECF No. 30-11 at 41-42.

Q. . . . [W]hen you said that she wasn't convinced that the new directions is where the program should be headed, what new directions were you referring to?

A. I'm referring to specifically to her response to the idea that corporate and criminal were not the kind of primary pathways . . .

. . .

Q. And what do you know about the advising that Dr. McEvoy provided to students that reflected a primary focus on criminal and corporate law?

A. . . . I did have conversations with students to this regard. . . . And, you know, people are – even back in 2015 I remember this conversation about self-driving cars and folks saying, Look, you really need to start getting students to look at what are the legal parameters of these types of issues and not be talking about, you know, kind of the more traditional route. . . . there were students that I had conversations with who had also shared – not so much concerns as much as having been told by others that, you know, you're not really – you're, you're kind of prepared for a 19th century law career in the midst of a major change.

ECF No. 30-11 at 47–49. In each of these deposition excerpts, Dr. Williams is discussing the views of Mr. Pate, alumni, students, and himself that the Program was exposing students to traditional legal careers in corporate and criminal law instead of exposing them to legal careers "in intellectual property, health care, emerging technology." Viewed in context, the words and phrases identified by Dr. McEvoy are being used to describe the type of legal career that Dr. Williams believed was the focus of the Program, and not to refer to Dr. McEvoy's age. In context, then, the comments identified by Dr. McEvoy do not raise an inference of age bias. *C.f. Hodges*, 2008 WL 793594, at *10 ("[I]t is clear that he used the phrase 'old and tired' in this context to refer to older programs at Rensselaer, as opposed to the cutting-edge programs he sought to institute, and not to older-aged or otherwise senior faculty, and therefore does not raise an inference of age bias."). Similarly, the

comment that Dr. McEvoy's annual report reflected a view that was "backward-looking, traditional, not engaged with 2020, [and] not thinking about strategic visioning," ECF No. 30-11 at 54, is part of Dr. Williams's broader concern that Dr. McEvoy did not engage with the Fairfield 2020 strategic plan. This comment on its face is not about age, but rather about Dr. McEvoy's lack of engagement with the administration's stated priorities. Indeed, courts have held that comments much more directly about age, such as repeated references to an employee being part of the "old guard," are "relatively benign" and not actionable. *McGarty v. City of New York*, 2014 WL 4626019, at *13 (S.D.N.Y. Sept. 16, 2014).

In sum, Dr. McEvoy does not contend that she was subjected to any age-related comments or criticisms on the job; she does not contend that Dr. Williams and Dr. Babington discussed her age in declining to renew her appointment; and the only comments she identifies as "suggestive of age bias" were used to describe the Program's curricular focus or Dr. McEvoy's lack of engagement with the administration's priorities, and were uttered during a deposition taken years after the employment decision had been made. In this context, the comments are legally insufficient to constitute evidence of discriminatory motivation.

### 2) Fairfield's "False" and "Shifting" Explanations

An employee may show pretext "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) ("[A] jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff.").

Here, Dr. McEvoy argues that pretext may be inferred because Fairfield "has advanced a litany of demonstrably false statements and pretextual narratives that are riddled with weaknesses, implausibilities, inconsistencies, incoherences, or contradictions," ECF No. 30 at 30, and that the "various contradictions and inconsistencies in [Fairfield's] various explanations are also evidence of shifting explanations, from which pretext can be inferred," *id*. at 31. Specifically, she argues that:

> Defendant falsely claimed the existence of complaints that Plaintiff did not make herself accessible to students, that members of a Board or law school advisory committee complained that the Program was not addressing new developments in the law, that Plaintiff was not using the internet effectively, and that Plaintiff did not work cooperatively with the development office.

> Dr. Williams repeatedly provided false testimony that the Program under Plaintiff's direction focused on corporate and criminal law, despite abundant record evidence demonstrating the opposite. Dr. Williams's claims about an alleged focus on corporate and criminal law are not only proven false by Plaintiff's declaration and the available documents, such as the annual reports submitted by Plaintiff, but Chris Pates, the person whom Dr. Williams identified as the source for his claims, also failed to corroborate the allegation.

> Throughout its motion and memorandum, Defendant repeatedly asserts, in conclusory fashion and without specific evidentiary support, the mantra that the Program under Plaintiff's direction was not student-focused, student-centric, and did not utilize best practices. However, none of those claims has any merit . . . . Defendant's claim that it decided to replace Plaintiff as the Director because of the need for a strategic vision aligned with Fairfield 2020 is similarly without credibility.

ECF No. 30 at 30-31 (internal citations omitted).

As an initial matter, Dr. McEvoy spends considerable time arguing about the truth of the various complaints made about her directorship, but the Court is "decidedly not interested in the truth of the allegations against plaintiff." *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006). That is, "the factual validity of the underlying imputation against the employee is not at issue"; rather, the central inquiry is "what *motivated* the employer." *Id.* (internal quotation marks and citation omitted). Thus, the relevant question is not whether Dr. McEvoy's

stewardship of the Program was *actually* deficient. Even assuming, as the Court must at this stage, that Dr. McEvoy is correct about the underlying truth of the justifications—that she *was* accessible to students, that she *did* address new developments in the law, that she *did* use the internet effectively, and that she *did* work cooperatively with the Advancement Office—that does nothing, by itself, to show that reliance on these concerns by decisionmakers was pretext for discriminatory animus.[8]

For instance, Dr. McEvoy argues that she worked cooperatively with the Advancement Office. *See, e.g.*, ECF No. 30 at 7 (arguing that some members of the Advancement Office did not criticize Dr. McEvoy's performance as Director of the Program); *id.* at 13 (arguing that Dr. McEvoy "did work cooperatively with the Development office"); *id.* at 30 (arguing that Fairfield "falsely claimed . . . that [she] did not work cooperatively with the development office"). But even if she did work well with the Advancement Office, that does not mean, by itself, that Dr. Williams was not motivated by his perception that she had a poor relationship with the office. Dr. Williams testified that he was made aware of some "very specific concerns about the Pre-Law Program" by Mr. Pates, who worked in the Advancement Office, ECF No. 27-13 at 31-35, and that he spoke directly with Dr. McEvoy about the importance of "engag[ing] with development," ECF No. 30-11 at 46. He also testified that one reason he chose not to renew Dr. McEvoy's appointment was because of "a desire really to address some of the issues that had been raised by development and to think about how we could be more strategic in attracting funds for a program." ECF No. 27-13

---

[8] Evidence that an employer's proffered justifications were so divorced from the facts as to appear contrived would suggest pretext because such evidence would cast doubt on whether the employer "sincerely believe[d]" those justifications. *Toussaint v. NY Dialysis Services, Inc.*, 706 F. App'x 44, 46 (2d Cir. 2017). But Fairfield's offered justifications are not frivolous and are generally supported by evidence of observations by third parties, such as students, alumni, and Mr. Pates; there is no evidence that the decisionmakers did not sincerely believe them.

at 48. Mr. Pates confirmed that he shared concerns with Dr. Williams about Dr. McEvoy's ability to work with the office and with donors:

> Q. In any of your communications with Mr. Halas, did you convey any criticisms that you had about the prelaw program itself under Professor McEvoy's directorship?
>
> A. Probably shared the same that I did with [Dr. Williams], if we had someone that was more willing to communicate with donors. And donors give feedback, so you have to be able to take that feedback. Donors, they have ideas, and if you're not willing to listen to those ideas, donors get offended and they don't invest. You at least have to listen to the ideas. So yes, I definitely would have said something about that.
>
> Q. The same kind of sentiment that you testified about earlier that you expressed to Dr. Williams, that you wished you had a prelaw director that you could take on donor visits with you, right?
>
> A. Yes, I'm certain of that, yes.

ECF No. 27-14 at 19-20. Fairfield has therefore submitted evidence showing that Dr. Williams did not renew Dr. McEvoy's appointment at least in part because he was concerned about her ability to work with the Advancement Office, and that that concern was based on a report to him by the Advancement Office. Dr. McEvoy argues that this concern was unfounded because she did work well with the Advancement Office, but she presents no evidence that Dr. Williams was not *motivated* by such a concern or that his reliance on negative feedback from a development officer was pretextual. *Toussaint v. NY Dialysis Services, Inc.*, 706 F. App'x 44, 45 (2d Cir. 2017). (affirming summary judgment for employer because even if a reasonable jury could conclude that the employer erroneously credited a colleague's version of events rather than the plaintiff's, it did not follow that the employer's proffered reasons were pretextual).

In much the same way, Dr. McEvoy presents no evidence indicating that the decisionmakers' concerns about her accessibility were pretextual. Dr. Williams testified that he heard "anecdotal stories from students who said they found it very difficult to get in touch with [Dr. McEvoy] to arrange time for advising," ECF No. 27-13 at 65, and that Dr. Sapp told him that

Dr. McEvoy could be difficult to get in touch with, *id*. at 16. He also testified about his own difficulties getting in touch with Dr. McEvoy: "we were trying to get in touch with Professor McEvoy and were not able to get in touch with her. And that was a consistent theme that I had with her over the course of my engagement with her in those roles . . . I know for a fact we had trouble getting in touch with her." ECF No. 30-11 at 64. He conveyed those concerns to Dr. Babington. ECF No. 27-12 at 20. And Dr. Babington, in turn, testified that she decided not to renew Dr. McEvoy's appointment in part because the Program was not "student-centric" and Dr. McEvoy's "inaccessibility" was one reason the Program was not student-centric. ECF No. 27-12 at 18-19. Dr. McEvoy presents no evidence suggesting that Dr. Williams's reliance on student stories about inaccessibility (especially in conjunction with similar complaints from Dr. Sapp and his own difficulties getting in touch with Dr. McEvoy) was pretext for discriminatory animus, or that Dr. Babington's reliance on Dr. Williams's impressions of inaccessibility was pretext for discriminatory animus.

Dr. McEvoy next argues that Fairfield's proffered justifications are pretextual because Dr. Williams, Dr. Babington, and Fairfield (in filings submitted to the CHRO) raised different concerns about her directorship. ECF No. 30 at 31-32. In its CHRO filing, Fairfield pointed to concerns about Dr. McEvoy's accessibility, use of the internet, relationship with the Advancement Office, and reticence to address new areas of the law. ECF No. 27-24 at 5-6. Dr. Babington testified that she was concerned about accessibility, internship opportunities, student outcomes, and connections with alumni. ECF No. 27-12 at 16-18. Dr. Williams was largely concerned about Dr. McEvoy's accessibility, ECF No. 27-13 at 20, 64-65, strategic vision, ECF No. 30-10 at 44-45, 100, reticence to address new developments in the law, ECF No. 27-13 at 6, 41, 65-66, and relationship with the Advancement Office, ECF No. 30-11 at 46. Thus, the decisionmakers, Dr.

Babington and Dr. Williams, shared several concerns about the Program, and some of those concerns are also reflected in Fairfield's CHRO filing. And although not *all* the concerns overlap, "merely having multiple reasons for firing an employee does not constitute pretext where the differences among them are not materially inconsistent." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 30 (E.D.N.Y. 2015).

And contrary to Dr. McEvoy's argument, ECF No. 30 at 20, the fact that Dr. Williams and Fairfield (in the CHRO filing) expressed concern about strategic vision while Dr. Babington testified that she was not concerned about that issue, does not mean that the justification advanced by Dr. Williams and Fairfield is pretextual. Dr. McEvoy presents no evidence to support a finding that concern about strategic vision is materially inconsistent with the concerns articulated by Dr. Babington. Indeed, Dr. Babington's testimony that "[t]he program had been doing the same thing for years with the same outcomes" and that "[n]o changes had been made over the years," ECF No. 27-12 at 18, is generally in line with Dr. Williams's concern about a lack of strategic vision. An employee's argument "that [the employer's] non-discriminatory explanations are inconsistent" does not create a jury question unless "a reasonable fact-finder could find any material inconsistency in the proffered explanations." *Timothy v. Our Lady of Mercy Med. Ctr.*, 233 Fed. Appx. 17, 20 (2d Cir. 2007); *see also Hodges*, 2008 WL 793594, at *9 (noting that "shifting justifications" do not support an inference of pretext where they "are not overtly self-contradictory" or "sufficiently inconsistent"); *Mathews v. Huntington*, 499 F. Supp. 2d 258, 267 n.6 (E.D.N.Y. 2007) (explaining that "varying explanations . . . must be *materially* inconsistent with one another" to create a jury issue on the question of pretext"). Here, although there are a number of non-discriminatory explanations from different decisionmakers, some of which overlap

and some of which do not, a reasonable fact-finder could not find that the various explanations are materially inconsistent.

Finally, Dr. McEvoy argues that Dr. Williams falsely claimed that there were complaints that the Program did not address new developments in the law or was unduly focused on corporate and criminal law. ECF No. 30 at 14-18, 30. The crux of her argument is that "Dr. Williams attributed the basis for th[is] criticism to alumni or members of the law school advisory board who had shared concerns with Mr. Pates, but Mr. Pates denied that any alumni or Board members or law school advisory committee communicated any such concerns to him about the Program." ECF No. 30 at 15 (internal citations omitted). She cites the following testimony from Mr. Pates to support her argument:

> Q. During the time that Professor McEvoy was the director of the prelaw program, did anyone other than Dr. Williams make any statements to you that were critical of the prelaw program under Professor McEvoy's directorship?
>
> A. No.
>
> Q. Did any members of Fairfield University's board make any statements to you that were critical of the prelaw program under Professor McEvoy's leadership?
>
> A. No.

ECF No. 30-8 at 11. But despite these answers, Mr. Pates went on to testify that he heard concerns about the Program from alumni. He testified that Dan Fitzgerald, an alumnus, "thought that the topic [of a dinner event] could be different" and that "he had some suggestions for how that could be done a little differently." ECF No. 30-8 at 13. Mr. Pates also testified that he told Dr. Williams that he hoped to have "someone that was more willing to communicate with donors" and someone who was "able to take that feedback [from donors]." ECF No. 27-14 at 20. He elaborated that "[d]onors, they have ideas, and if you're not willing to listen to those ideas, donors get offended and they don't invest." *Id*. Although Mr. Pates did not testify that these donors specifically

complained about Dr. McEvoy's failure to pursue new developments in the law, his testimony about their concerns is consistent with testimony from Dr. Williams that donors were concerned about "the direction of the program" and that they saw Fairfield being "stuck and frozen." Moreover, Dr. Williams did not rely solely on reports from Mr. Pates to develop his view about the Program's direction; he also testified that Dr. Sapp "shared some concerns about the curricular – the direction of the program where the program did not seem to be responding to changing avenues for the preparation of young people into law school particularly around health care and technology," ECF No. 27-13 at 6, and that students told him "that, you know, it was a more traditional pathway," *id.* at 41. Dr. McEvoy points to no evidence that Dr. Williams's testimony about his conversations with Dr. Sapp and with students was false.

When the record is viewed in the light most favorable to Dr. McEvoy, there is some evidence that Dr. Williams's reliance on one proffered justification was pretextual—namely, that testimony from Dr. Williams about what Mr. Pates told him was not entirely corroborated by Mr. Pates. But an employee must produce more than just "some evidence;" she must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false." *Weinstock v. Columbia U.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks, citations, and alterations omitted). Here, in light of subsequent testimony from Mr. Pates, and testimony from Dr. Williams that he heard concerns about the same issue from Dr. Sapp and from students, Dr. McEvoy has not produced sufficient evidence to support a finding that this proffered justification was false. In addition, Dr. McEvoy has pointed to no evidence of pretext with respect to the other proffered justifications, and Mr. Pates did

corroborate Dr. Williams's testimony with respect to Dr. McEvoy's lack of engagement with development and unsuitability for visits with donors, as shown above.[9]

More importantly, Dr. McEvoy has not produced sufficient evidence to carry her "ultimate burden" "that the true reason was an illegally discriminatory one." *O'Sullivan v. New York Times*, 37 F. Supp. 2d 307, 315 (S.D.N.Y. 1999); *see also Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir.2001) (upholding grant of summary judgment for employer where, even assuming that the employer's explanations for its decision were partly pretextual, "the evidence presented by [Plaintiff] is not enough to permit a jury to find that the real reason he was fired was his age"); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999) (upholding summary judgment on ADEA claim because, although employer offered contradictory explanations as to why it rejected plaintiff, the plaintiff had "produced no evidence that the hospital's reasons, even if pretextual, served as pretext for age discrimination"); *Reeves*, 530 U.S. at 146–47 ("The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.") (internal quotation marks omitted). Because Dr. McEvoy had a one-year appointment, Dr. Williams and Dr. Babington did not need to have any particular reason to appoint another person as Director of the Program. They were entitled to appoint another person even if Dr. McEvoy was doing a satisfactory job. In fact,

---

[9] In the course of arguing that pretext may be inferred because Fairfield "has advanced a litany of demonstrably false statements," Dr. McEvoy contends that "[Fairfield] falsely claimed to the CHRO that [she] had been notified of her non-reappointment to argue that her claims were untimely." ECF No. 30 at 30. But as she acknowledges, Fairfield only raised the alleged meeting to support its argument about the timeliness of Dr. McEvoy's claim. *Id.* at 12. Whether or not the meeting occurred is unrelated to Fairfield's reasons for declining to re-appoint Dr. McEvoy and sheds no light on whether those reasons were pretextual. Thus, assuming that Fairfield's claim about the meeting is false shows only that Dr. McEvoy was not notified about the decision not to re-appoint her, and shows nothing about whether the reasons for that decision were pretextual.

Fairfield has submitted evidence, none of which Dr. McEvoy has disputed, that its practice was to rotate administrative assignments to University-wide director positions among the faculty. ECF No. 27-1 at 4; ECF No. 27-12 at 23 (Dr. Babington testified that "[t]he director positions are not meant to be permanent positions held by one person."). Of course, this does not mean that Fairfield could refuse to reappoint someone because of her age or another protected status. But it does mean that it could do so, and often did so, for any other reason, or for no reason, and even if the person was doing a good job, as Dr. McEvoy contends she was. Ultimately, Dr. McEvoy points to no evidence that her age, rather than the benign explanations Fairfield proffers, led to her non-renewal as director of the pre-law program. Even after reviewing the record in the light most favorable to the plaintiff, I conclude no reasonable juror could find that age was the but-for cause of Fairfield's decision not to renew the plaintiff's appointment.[10]

* * *

Dr. McEvoy has not submitted evidence sufficient to create a jury question as to whether age was a determinative factor in Fairfield's decision not to renew her appointment. Summary judgment is therefore warranted.

## IV.     CONCLUSION

For the reasons set forth above, Fairfield's motion for summary judgment, ECF No. 24, is GRANTED.

IT IS SO ORDERED.

Dated:          Hartford, Connecticut          _____/s/_____
                October 29, 2019                 Michael P. Shea, U.S.D.J.

---

[10] Because I reach this conclusion, I need not decide whether Fairfield is entitled to a strong inference of non-discrimination under the "same actor" rule, as it argues in its brief. ECF No. 26 at 15–17.